David C. Reymann (8495)
Kade N. Olsen (17775)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, UT 84111
(801) 257-7939
dreymann@parrbrown.com
kolsen@parrbrown.com

Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com
   *(motions for admission
    pro hac vice forthcoming)

Todd Disher*
Joshua P. Morrow*
Alexis Swartz*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
todd@lkcfirm.com
josh@lkcfirm.com
alexis@lkcfirm.com

*Attorneys for Plaintiff NetChoice, LLC*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| **NETCHOICE, LLC,** | |
| **Plaintiff,** | |
| **v.** | |
| **SEAN D. REYES, in his official capacity as Attorney General of Utah,** | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **KATHERINE HASS, in her official capacity as Director of the Division of Consumer Protection of the Utah Department of Commerce,** | **Case No. _____** |
| **Defendants.** | |

## INTRODUCTION

1.      As new mediums of expression emerge, they are not always met with universal enthusiasm. While (or indeed because) many adopt these new forms of expression, governments often try to restrict who can use them and what speech they facilitate out of perceived social harms. Governments often justify these efforts by contending that new media require new methods of regulation—particularly where minors are concerned. Accordingly, governments and the public have considered regulating dime novels, movies, radio serials, comic books, music videos, and video games, among many others. But courts have routinely declared those laws unconstitutional. *See, e.g.*, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 797-99 (2011). And with good reason: The First Amendment prohibits restricting access to protected expression, no matter how well-intentioned the government might be. These First Amendment rights are not limited to adults. As courts have consistently held, minors "are entitled to a significant measure of First Amendment protection." *Id.* at 794 (cleaned up; quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212-13 (1975)). And the First Amendment's strictures are even harder to satisfy where a law impedes both minors' access to speech and *adults'* rights. *Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 882 (1997); *NetChoice, LLC v. Bonta*, 2023 WL 6135551, at *13 (N.D. Cal. Sept. 18, 2023); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *21 (W.D. Ark. Aug. 31, 2023).

2.      Like restrictions invalidated before it, the Utah Social Media Regulation Act, Utah Code §§ 13-63-101 to 701 ("Act"),[1] is an unconstitutional attempt to regulate both minors' and adults' access to—and ability to engage in—protected expression.

---

[1] Unless otherwise noted, statutory citations in this Complaint refer to the Utah Code.

3.      The websites the Act covers allow both minors and adults to "engage in a wide array of . . . activity on topics 'as diverse as human thought'"—all "protected by the First Amendment" from government interference. *Griffin*, 2023 WL 5660155, at *5 (quoting *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017)). These websites' users can listen, learn, and speak about politics, religion, employment, self-improvement, and nearly any subject that strikes their fancy. The websites allow people to bridge language, culture, and geography, making the world a slightly smaller and significantly more connected place.

4.      The Act would fundamentally change that. It would place multiple restrictions on minors' and adults' ability to access these websites. In some cases, the Act blocks access altogether. The Act restricts who can express themselves, what can be said, and when and how speech on covered websites can occur, down to the very hours of the day minors can use covered websites. Worse, the Act treats all minors the same, ignoring the differences between the websites' youngest users and 17-year-olds. It would therefore leave Utah minors worse off relative to their peers across the country. And the Act ignores the many tools that parents can choose to shape their children's online experiences. The First Amendment, reinforced by decades of precedent, allows none of this.

5.      Compounding these problems, the Act's scope and effects turn on sweeping, undefined, and fatally vague terms. This leaves websites across the Internet uncertain about whether they are covered by the Act and, if so, what the Act's provisions require of them.

6.      Certain provisions of the Act also fall squarely within the protections Congress enacted for all Internet websites in 47 U.S.C. § 230. Through this statute, Congress broadly protected websites from liability based on Internet websites' "exercise of . . . editorial . . . functions." *Ben Ezra, Weinstein, & Co. v. Am. Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000) (citation omitted).

And Congress expressly provided that "[n]o cause of action may be brought," 47 U.S.C. § 230(e)(3), that would challenge those "editorial functions," *Ben Ezra*, 206 F.3d at 986. Otherwise, the risk of myriad lawsuits would "threaten the freedom of speech" online. *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003) (cleaned up).

7.      The Act, in whole and in part, is unlawful for multiple reasons.

8.      At the outset, the entire Act violates the First Amendment and the Due Process Clause because it depends on a vague and content-, speaker-, and viewpoint-based definition of a regulated "social media company." § 13-63-101(9). Through a series of vague definitions and exceptions with arbitrary thresholds, the Act singles out some Internet websites for regulatory burdens based on, among other things, the content they disseminate. The same speech may be heavily regulated—or not regulated at all—based on who is speaking, what is being said, and what website it is being said on. For instance, YouTube must comply with the Act's burdensome requirements. But Netflix is exempted, under at least three exceptions: (1) as a "streaming service"; (2) as a service "where the predominant or exclusive function is . . . entertainment"; and (3) as a service that does not allow users to "upload posts." § 13-63-101(10)(a)(ii), (b)(i)(C), (b)(i)(D). As another example, X (formerly known as Twitter), Bluesky, Gab, and Truth Social all allow users to discuss the issues of the day and share similar content. But while X must comply with the Act, Bluesky, Gab, and Truth Social are exempted under the law's arbitrary 5-million account threshold. § 13-63-101(9)(a). Nextdoor appears to be covered by the Act, but if it restricted its community's discussions to "public safety," it would not be. § 13-63-101(10)(b)(i)(I). Minors must secure parental consent (and adults and minors would need to verify their ages) to engage in "interactive gaming" on Facebook, but not on websites like Roblox "where the predominant or exclusive function

is . . . interactive gaming." § 13-63-101(10)(b)(i)(F). Anyone searching for a new job on a covered website must jump through similar age-verification hurdles (and minors must secure parental consent), but not on websites providing "career development opportunities." § 13-63-101(10)(b)(i)(J). These are just some of the nonsensical consequences of the Act's multiple content-, speaker-, and viewpoint-based distinctions. Those distinctions all give rise to strict scrutiny, which the Act cannot satisfy. That alone is a sufficient basis to enjoin Defendants from enforcing the Act.

9.     Moreover, individual provisions of the Act are independently unlawful.

10.     *First*, the Act's requirements that covered websites verify the ages of all Utah account holders (both minors and adults) and secure parental consent before allowing minors to create or continue accessing accounts, § 13-63-102, violate the First Amendment. *Griffin*, 2023 WL 5660155, at *21 (rejecting similar requirements). The requirements mandate that people of all ages hand over personal information or identification that they may be unwilling or unable to provide. As the Supreme Court has recognized, such requirements burden the exercise of speech and thus violate the First Amendment. *See, e.g.*, *Ashcroft*, 542 U.S. at 673; *Reno*, 521 U.S. at 882. Likewise, the Supreme Court has held that governments may not require minors to secure parental consent before accessing protected speech. *Brown*, 564 U.S. at 799.

11.     *Second*, the Act's ban on "display[ing] . . . any advertising in [minors'] account[s]," § 13-63-103(3), violates the First Amendment and is preempted under 47 U.S.C. § 230. This blanket ban affects websites' First Amendment right to disseminate advertisements, individuals' right to speak, and minors' right to view advertisements. The effect of this provision could be broad, as the Act leaves "advertising" and other terms undefined. It likely applies to revenue-supporting ads like ads for military recruitment, higher-education opportunities, and test preparation. But

4

uncertainty about the scope of prohibited "advertising" may also require websites to monitor for "advertising" in user-generated content, like teens offering babysitting services to neighbors.

12.      *Third*, the Act's ban on displaying personalized content to minors, § 13-63-103(5) ("use of targeted or suggested" content), is similarly unconstitutional and preempted under 47 U.S.C. § 230. Personalization is how many websites organize, display, and disseminate billions of pictures, videos, posts, and comments to their users. Personalization is also how many covered websites provide minors with age-appropriate and useful experiences (*e.g.*, by filtering out inappropriate or potentially harmful content). This extensive ban on personalized content harms minors' rights. It harms covered websites' rights too, because decisions about the "presentation of an edited compilation of speech generated by other persons . . . fall squarely within the core of First Amendment security." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995) (citing *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974)).

13.      *Fourth*, the Act's ban on "collect[ing] or us[ing] any personal information" from minors, § 13-63-103(4), violates the First Amendment because its purpose and effect is to restrict speech. Governmental restrictions of the "availability and use" of information raise grave First Amendment concerns. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570-71 (2011). That is especially true here, where covered websites use the information they collect to make their expressive services functional and secure—and to display expressive content to users. The Act's failure to define what "personal information" the ban regulates also renders this provision unconstitutionally vague.

14.      *Fifth*, the ban prohibiting minors from using covered websites "during the hours of 10:30 p.m. to 6:30 a.m.," § 13-63-105(1), violates the very premise of the First Amendment. Under this ban, a minor presumptively cannot engage in (or with) protected expression on covered

websites during hours the government has declared off limits. This curfew will make it difficult for minors to connect with people and express themselves across time zones, or to access content like math tutorials available on covered websites whenever the State deems access improper.

15.     *Sixth*, the Act's "design" requirements, § 13-63-401, violate the First Amendment, are unconstitutionally vague, and are preempted under 47 U.S.C. § 230. Specifically, the Act imposes vague and undefined obligations for websites to alter their "practice[s], design[s], or feature[s]" to avoid vague, broad, and undefined harms to minors. § 13-63-401(2). These restrictions could include virtually everything the websites do; they could even cover websites' foundational choices that facilitate connection and expression among users, who create, upload, post, and view content. These broad "design" requirements cannot be squared with websites' First Amendment right to exercise "editorial control and judgment" over the practices that they use to present content. *Tornillo*, 418 U.S. at 258; *see Bonta*, 2023 WL 6135551, at *7-9 (rejecting state law that regulated the "design of [an] online service, product, or feature" on content-based grounds). And this would also violate users' First Amendment rights by restricting the ways they can interact on the covered websites. Given the breadth and ambiguity of these requirements, a covered website might well believe that the only *safe* speech is *no* speech. This is especially true given the leveraged liability arising from violations of the design requirements. § 13-63-401(3).

16.     *Finally*, the Act's requirements violate the First Amendment because, in combination, their practical effect is to limit minors' and adults' access to a broad array of protected expression. "What the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 77-78 (1990). Because the First Amendment does not allow Utah to restrict people from

accessing covered websites altogether, it also does not allow the State to accomplish that result indirectly through a series of laws requiring websites to fundamentally change the nature of their services—potentially for all users—to continue offering their services to minors. *See id.*

17.     For these reasons and more, this Court should enjoin Defendants from enforcing the Act against Plaintiff's members and declare the Act unlawful.

## PARTIES & STANDING

18.     Plaintiff NetChoice, LLC is a District of Columbia nonprofit trade association for Internet companies.[2] NetChoice's mission is to promote online commerce and speech and to increase consumer access and options via the Internet, while also minimizing the burdens that would prevent businesses from making the Internet more accessible and useful.

19.     NetChoice has standing to bring its challenges on at least three grounds.

20.     NetChoice has associational standing to challenge the Act, because: (1) some of NetChoice's members have individual standing to sue in their own right, as those members are subject to the Act; (2) challenging the Act is germane to NetChoice's purpose; and (3) members' individual participation is unnecessary in this purely legal, facial challenge. *See Citizens for Const. Integrity v. United States*, 57 F.4th 750, 759 (10th Cir. 2023); *Griffin*, 2023 WL 5660155, at *9.

21.     Based on the Act's definitions, § 13-63-101, the Act will affect, at a minimum, the following NetChoice members: (1) Amazon, which owns and operates Twitch; (2) Google, which owns and operates YouTube; (3) Meta, which owns and operates Facebook and Instagram; (4) Nextdoor; (5) Pinterest; (6) Snap Inc., which owns and operates Snapchat; and (7) X. Although

---

[2] NetChoice's members are listed at NetChoice, About Us, https://perma.cc/7286-Q7W2.

the Act does not regulate all of Plaintiff's members, this Complaint refers to members that the Act seems to regulate as "members" or "covered websites."

22.     NetChoice and its members have standing to assert the First Amendment rights of members' current and prospective users. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988); *Bonta*, 2023 WL 6135551, at *4; *Griffin*, 2023 WL 5660155, at *11-12.[3]

23.     NetChoice also has organizational standing on its own behalf to challenge the Act. NetChoice has incurred costs and will continue to divert finite resources to address the Act's implications and compliance costs for Internet companies.

24.     Defendant Sean D. Reyes is the Attorney General of Utah. He is a resident of Utah and is sued in his official capacity. The Act grants enforcement authority to the "attorney general on behalf of the division." § 13-63-202(6)(b); *see* § 13-63-202(2).

25.     Defendant Katherine Hass (together with Reyes, "Defendants") is Director of the Division of Consumer Protection of the Utah Department of Commerce ("Division"). She is a resident of Utah and is sued in her official capacity. The Act grants enforcement authority to the Division and to its Director. §§ 13-63-202, -401.

26.     Defendants have publicly pursued enforcement against some of NetChoice's members under other state laws, advancing similar theories to those codified under the Act.

---

[3] This Complaint uses the terms "minor," "adult," "account holder," and "user" to refer only to Utah minors, adults, account holders, and users. Likewise, this Complaint generally employs the term "user" to encompass both of what the Act refers to as "users" and "account holders." *See* § 13-63-101(1), (11). Plaintiff and its members reserve the right to argue that their compliance obligations for "users" (under the Act) are different than their compliance obligations for "account holders," and are different from the burdens discussed in this Complaint.

**JURISDICTION & VENUE**

27.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983, injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

28.     This Court has personal jurisdiction over Defendants, because they reside in and/or conduct a substantial proportion of their official business in Utah. Venue is proper in this District under 28 U.S.C. § 1391(b) because the only Defendants reside in, and the events giving rise to this civil action occurred in, Utah.

**BACKGROUND**

29.     **Plaintiff's members' covered websites disseminate, facilitate, and promote First Amendment protected speech.** NetChoice's members operate websites, applications, and other digital services that both "publish," *Reno*, 521 U.S. at 53, and "disseminate" protected speech on many subjects. *303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023). The websites do so by displaying text, audio, graphics, or video. *Id.* The speech on these websites includes expression at the heart of the First Amendment's protections like art, literature, politics, and religion.

30.     Some of NetChoice's members operate what are commonly referred to as "social-media" websites. *See, e.g.*, *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 479 (2023). These websites "allow users to gain access to information and communicate with one another about it on any subject that might come to mind." *Griffin*, 2023 WL 5660155, at *5 (cleaned up). "On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos." *Packingham*, 582 U.S. at 104. Instagram allows people to post and view photos and videos, comment on them, learn about the causes they care about, showcase their art, keep up with

the latest political commentary, and discover or start small businesses. Pinterest allows its users to explore recipes, style, home decor, and more. On Snapchat, users can communicate with friends and family in fun and casual ways. On TikTok, users going through a difficult experience can find advice, support, and empathy. Twitch permits its users to see interactive livestreams, allowing people to create entertainment together. On X, "users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-05. And YouTube endeavors to show people the world in all its facets, from travel documentaries to step-by-step cooking instructions.

31.     **Minors' use of covered websites.** People of all ages use the covered websites. Minors (like adults) use them for a variety of reasons entitled to First Amendment protections from government interference. Depending on the minor, the website, or the time of day, minors may use the website to keep up with the news, interact with family and friends, find support, conduct research for school projects, discover new interests, or explore existing ones. They can use the websites to showcase their creative work, engage in activism, or simply to form new communities with likeminded people. These interactions can help alleviate some minors' sense of isolation, help them connect with others who share their experiences, and enhance their educational experiences.

32.     **Display of user-generated content on covered websites.** Websites help facilitate those important conversations among their users through the websites' presentation of content.

33.     In general, covered websites organize combinations of both user-generated (third-party) content and speech they author. Each website makes unique decisions about how to organize, display, moderate, and disseminate content. The following are just some tools that many

covered websites offer to allow users to find, read, and engage with expressive material that interests them.

a.      *Feeds.* Many websites provide a "feed," "for you," "following," or "landing" page. This is a central hub that is generally personalized and allows a user to see the content, activity, and other expression created and shared by family, friends, selected contributors, connections, and other third-party content creators.

b.      *Comments.* Many covered websites allow users to make comments on others' (or their own) content, which may be similarly organized and displayed based on personalization.

c.      *Likes.* Many member websites also offer "likes" and similar tags, which allow users to show acknowledgment of, appreciation of, agreement with, or express other sentiments (such as anger or sadness) in response to third-party content such as posts,[4] photos, videos, or comments.

d.      *Search.* Most member websites offer a search function that allows users to discover new content, creators, or connections. Once the user runs the search, the website sifts through millions of pieces of content and other material to locate and display the most relevant results.

34.      More generally, covered websites have many means to facilitate users' abilities to express themselves—and those means have their own independent expressive qualities.

35.      **Options for parental control and oversight of minors' use of covered websites.** Parents can choose from many tools to control their minor children's use of the Internet.

36.      Parents can decide whether and when to purchase and let their children use computers, tablets, smartphones, and other Internet-connected devices.

---

[4] Not all member websites allow users to "post" third-party content, but rather allow users to upload, broadcast, or stream content. Because the Act uses the term "post[]," *see, e.g.*, § 13-63-101(10)(a)(ii), this Complaint uses "post" to mean all forms of user submission.

37.     Parents can also determine whether, when, and how their children use their devices to access the Internet. Cellular and broadband Internet providers offer families tools to block certain online services from certain devices. *See, e.g.*, Verizon, Verizon Smart Family, https://perma.cc/2UCK-ZSFG; AT&T, AT&T Secure Family, https://perma.cc/G5DC-H4JX; T-Mobile, Family Controls and Privacy, https://perma.cc/SX8T-9GMS; Comcast Xfinity, Set Up Parental Controls for the Internet, https://perma.cc/Z5QW-4F4K.

38.     Wireless routers (which provide wireless Internet) often have similar parental-control settings. *See, e.g.*, Molly Price & Ry Crist, *How to Set Up and Use Your Wi-Fi Router's Parental Controls*, CNET (Feb. 11, 2021), https://perma.cc/7ZZ9-25M4. These settings allow parents to block particular websites, filter content, and monitor Internet usage. *See* Netgear, Circle Smart Parental Controls, https://perma.cc/66W6-LNBS. They also allow parents to turn off Internet service at certain times, pause service to a device, or limit overall time spent on the Internet. *See id.*

39.     Device manufacturers provide even more parental controls. Popular Apple devices like iPhones and iPads allow parents to limit the time spent on the device, curtail the applications that can be used on the device, set content restrictions on those applications, filter online content, and control privacy settings. *See* Apple, Use Parental Controls on Your Child's iPhone, iPad, and iPod Touch, https://perma.cc/N6UJ-PLZH. Google and Microsoft offer similar controls on their devices. *See* Google Family Link, Help Keep Your Family Safer Online, https://perma.cc/DLR7-7ZRK; Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/T6F9-JWD9.

40.     Numerous third-party applications also allow parents to control and monitor their children's online activities. *See, e.g.*, Ben Moore & Kim Key, *The Best Parental Control Apps for Your Phone*, PCMag (Mar. 29, 2022), https://perma.cc/C4QX-A24X.

41.     All potentially covered NetChoice members prohibit minors under 13 from accessing their main services. Two offer separate experiences for users under 13. For example, TikTok offers a separate experience specifically designed for users under 13 that has heightened protections and that does not offer many design tools like the ability to post, to communicate with others, maintain a profile, or have followers. YouTube offers two services (YouTube Kids and a "supervised experience" on YouTube) for minors younger than 13 with parental consent. These services both offer parents the ability to oversee their children's use of the services in various ways.

42.     NetChoice members also provide parents with supervision tools. Facebook and Instagram offer "supervision tools" that empower parents and teens to work together to set time limits and schedule breaks; allow parents to see who their teen follows and who follows their teen; enable parents to view their teen's account settings for sensitive content, privacy, and messaging; and empower teens to notify their parents when they block or report someone. Similarly, Snapchat's "family center" allows parents to keep track of who their teen befriends and communicates with. TikTok has a "family pairing" feature that allows parents to, among other things, set a screen time limit, restrict exposure to certain content, decide whether their teen's account is private or public, turn off direct messaging, and decide who can comment on their teen's videos. And both YouTube for Kids and the supervised experience on YouTube allow parents to select content settings, set screen time limits, and engage in other oversight of their children's use of the services.

43.     To facilitate parental control for minors under 13, the federal Children's Online Privacy Protection Act imposes restrictions on access to online content from Internet websites "directed to children" younger than 13 and from any Internet website "that has actual knowledge that it is collecting personal information from a child" younger than 13. 15 U.S.C. § 6502(a)(1).

44.     **Advertising on covered websites.** Most of NetChoice's members offer websites that are free for users because the websites generate revenue from advertising. This model ensures that anyone with Internet access and access to a device can use these websites without a monetary cost. Advertising ensures that many online services—and the protected expression on them—are available to all, regardless of socioeconomic status.

45.     There are two basic ways of disseminating advertisements to a subset of users of a service: personalized ads and contextual ads. Though Plaintiff's members define these two types of advertising in slightly different ways, below are how some members would generally describe the differences between personalized and contextual ads.

46.     Personalized ads draw from and rely on user data, such as a user's interests, preferences, and demographics, to provide the individual user with more relevant advertising content. Many member websites do not present personalized advertisements to minors, and many also restrict the data used to present advertisements (*e.g.*, by age).

47.     Contextual ads also aim to show ads of interest to particular users, but instead rely on contextual information gained from sources such as a website's content, a user's views, or recent browsing history (including their search queries)—as compared to a user's personal interests.

48.     Personalized and contextual ads generally command a premium price relative to ads that draw on no data, allowing websites to generate higher revenue from fewer advertisements. Without personalized or contextual ads, many NetChoice members would have no choice but to either charge subscription fees to users, increase the volume of ads, or both. Subscription fees, in particular, restrict less-affluent users' ability to access information and exacerbate the digital divide.

49.     **Covered websites' collection and use of data.** The websites that NetChoice's members operate would be unusable if they could not collect, store, and use information and data that users provide. At the outset, covered websites collect certain demographic data to ensure that users are presented with age-appropriate content. Similarly, websites collect information about IP address, device type, operating system, screen resolution, browser type, language preferences, and time zone to determine how to present content (like choosing the correct format of a video based on device type and screen resolution). User data is also necessary for deterring and detecting malicious actors, protecting users from would-be identity thieves, and maintaining overall security. Many websites also log activity and changes on an account. These logs help websites detect behavior that could signal a compromised account, and they can also help users restore accounts. Logs are also a crucial tool for law enforcement in many contexts. For instance, activity logs can help determine a missing person's last known location, interactions, or travel plans. Beyond these baseline functions, websites collect and use information about a person's usage to help personalize experiences on the websites. This aims to ensure that people see the content they want to see while avoiding content they do not want to see.

50.     **Covered websites' dedication to beneficial user experiences and user security.** Safety and security are a paramount concern for NetChoice's members. They expend vast resources—time, money, and human resources—into improving their services and curating the content on their services to best ensure that it is appropriate for adults and minors alike. Members restrict the publication of content they consider harmful, like violent and sexual content, bullying, harassment, and content that encourages body shaming or eating disorders. Conversely, many covered websites promote age-appropriate content and positive content. For example, many promote

15

content that encourages a positive self-image or that encourages being a good person through modeling respect or healthy habits. Covered websites implement these policies using a mix of human review, human-programmed computer algorithms, and automated editing tools.

51.     Many NetChoice members also allow users to further curate the content they see. For instance, users can choose who they follow, block people, and control who sees and interacts with their content. Additionally, some members allow users to block categories of content. TikTok users, for example, can opt into "restricted mode," which automatically filters certain content and permits users to tailor the content they see with keyword filters (*e.g.*, not showing content featuring terms like "diet"). Facebook users can alter the content that Facebook recommends by hiding certain types of content or opting to see fewer posts from a specific person or group. Instagram users can select a "not interested" button to filter out content they do not wish to see. YouTube allows users to "dislike" content and to inform the service not to recommend certain content.

52.     Many covered websites also restrict messaging between minors and adults. TikTok bans users under age 16 from sending or receiving direct messages, and it allows parents and guardians of 16- to 18-year-old users to restrict who can send messages to their teen, or to turn off direct messaging completely through its family pairing feature. For 16- and 17-year-olds, TikTok also turns off direct messaging by default. Facebook, Instagram, Snapchat, and Pinterest take other steps to restrict messaging between unconnected adults and teens. By default, Snapchat allows messages only between friends. And Snapchat does not recommend minors as suggested friends unless the person is already in their phone contacts or shares mutual friends. Instagram encourages teens via prompts and safety notices to be cautious in conversations with adults, even those to whom they are connected. And YouTube does not offer private messaging between users at all.

53.     As explained above, these tools and others rely on user data.

## UTAH'S SOCIAL MEDIA REGULATION ACT

54.     Utah's Social Media Regulation Act is a combination of two bills. *See* 2023 Utah Laws Ch. 498 (Senate Bill 152); 2023 Utah Laws Ch. 477 (House Bill 311). Each bill independently created the "Utah Social Media Regulation Act" in Chapter 63, Title 13 of the Utah Code. *Id.* The Utah Legislature enacted both bills, and the Utah Governor signed both into law. *See id.* The Act's provisions regulating Plaintiff's covered members take effect on March 1, 2024.

55.     **Content-based central coverage definitions (Utah Code § 13-63-101).** The Act regulates businesses that meet the Act's definition of "social media company." But this category includes only a subset of businesses that offer what the Act calls a "social media platform." The Act's arbitrary size threshold and highly reticulated set of definitions and exclusions mean that the Act regulates only some Internet websites. At the same time, the Act excludes many similar online destinations for no apparent reason. For example, the Act excludes state-favored websites like sports, news, entertainment, gaming, and streaming services—among others. But much of the Act's scope is unclear because it contains numerous vague and undefined terms. This leaves many websites uncertain whether the Act applies to them and/or how to comply with its requirements.

56.     In combination, the Act's definitions, threshold requirements, and exclusions create an arbitrary patchwork of covered websites. Within this patchwork, the same kinds of content and similar kinds of dissemination of speech are treated differently under the Act based on where they appear. Websites on one side of the Act's arbitrary lines will have to comply with the Act's requirements, with a chilling effect on speech for covered websites and their users. But websites on the other side of those arbitrary lines face no regulation whatsoever. That is true regardless of how

many minors use those websites, for what purposes, during what hours, whether those websites disseminate similar content (including advertisements), whether those websites similarly recommend content, and whether the use of those websites might otherwise violate the Act.

57.     The Act defines a "social media company" as an entity that "(a) provides a social media platform that has at least 5,000,000 account holders worldwide; and (b) is an interactive computer service." § 13-63-101(9); *see* § 13-63-101(6) (defining "interactive computer service").

58.     A "social media platform" means "an online forum that a 'social media company' makes available for an account holder to: (i) create a profile; (ii) upload posts; (iii) view the posts of other account holders; and (iv) interact with other[s]." § 13-63-101(10)(a).

59.     The term "[s]ocial media platform" has a litany of content-, speaker-, and viewpoint-based exceptions, because it "does not include an online service, website, or application"—

"(i) where the predominant or exclusive function is:

(A) electronic mail;

(B) direct messaging consisting of text, photos, or videos that are sent between devices by electronic means, where messages are: (I) shared between the sender and the recipient; (II) only visible to the sender and the recipient; and (III) are not posted publicly;

(C) a streaming service that: (I) provides only licensed media in a continuous flow . . . ; and (II) does not obtain a license to the media from a user or account holder by agreement to its terms of service;

(D) news, sports, entertainment, or other content that is preselected by the provider and not user generated, and any chat, comment, or interactive functionality that is provided incidental to, directly related to, or dependent upon provision of the content;

(E) online shopping or e-commerce . . . ;

(F) interactive gaming, virtual gaming, or an online service, that allows the creation and uploading of content for the purpose of interactive gaming, edutainment, or associated entertainment, and the communication related to that content;

(G) photo editing that has an associated photo hosting service, if the interaction with other users or account holders is generally limited to liking or commenting;

(H) a professional creative network for showcasing and discovering artistic content, if the content is required to be non-pornographic;

(I) single-purpose community groups for public safety . . . ;

(J) providing career development opportunities, including professional networking, job skills, learning certifications, and job posting and application services; . . .

(Q) to permit comments on a digital news website, if the news content is posted only by the provider of the digital news website;

(R) providing or obtaining technical support for a platform, product, or service;

(S) academic or scholarly research; or

(T) genealogical research";

*or* "(ii) where:

(A) the majority of the content that is posted or created is posted or created by the provider of the online service, website, or application; and

(B) the ability to chat, comment, or interact with other users is directly related to the provider's content";

*or* "(iii) that is a classified ad service that only permits the sale of goods and prohibits the solicitation of personal services";

*or* "(iv) that is used by and under the direction of an educational entity."

§ 13-63-101(10)(b) (paragraph breaks adjusted).

60.    Nothing in the Act defines key coverage terms, such as "predominant or exclusive function," "predominant . . . purpose," or "incidental to." *Id.*

61.    **The Act's "general" requirements (Utah Code §§ 13-63-102 to -105).** The Act includes multiple provisions limiting minors' and adults' access to online speech using provisions that the Act labels as its "general" requirements. §§ 13-63-102 to -105.

62.    *Age verification and identify verification.* The Act provides that a "social media company shall verify the age of an existing or new Utah account holder." § 13-63-102(3)(a). "If a

Utah account holder fails to meet the verification requirements . . . , the social media company shall deny access to the account." § 13-63-102(3)(b). The Act therefore requires covered websites to verify every account holder's age—including adults—as a precondition to those account holders' access to members' websites. Yet many people may not wish to provide proof of age to gain access to the covered websites. Some people cannot do so.

63.     The Act delegates authority to the Division to establish the proper "processes or means" of age verification and the "acceptable forms or methods of identification." § 13-63-102(4). The Division has published a Proposed Rule that would implement the Act's age-verification requirements. *See* Utah Social Media Regulation Act Rule, 20 Utah State Bulletin 15 (Oct. 15, 2023) (to be codified at Utah Admin. Code R152-63), https://perma.cc/FH7X-HCZC ("Proposed Rule"). The Proposed Rule makes those constitutional burdens worse, not better.

64.     The Act's text does not mention identity verification. But to determine whether a specific person is the age he says he is, covered websites may also need to determine the identity of that individual. It may not be enough to simply verify the age of whatever person may be listed on a form of identification (if the person even has such a record) because that record may not accurately reflect who the individual actually is. Thus, the Act may also require covered websites to verify at least some account holders' identities—including adults—as a precondition to those account holders' access to members' websites. And the Act's steep penalties for noncompliance may inspire covered websites to verify the identities of all account holders just to be safe. Likewise, parents cannot provide consent without identifying themselves and their children.

65.     The Proposed Rule further suggests that the Act requires identity verification, as it requires covered websites to "proactively identify" all users. Proposed Rule at R152-63-4(2). Any

steps that a covered website takes to "proactively identify" minors will necessarily lead that company to "proactively identify" adult users, too. *Id.* That is because "proactive[]" identification under the Rule involves account holders who claim to be adults.

66.     Age verification requires people to provide identification or personal information to gain access to protected speech on covered websites. As a result, some will be deterred from using covered websites because they are unwilling or unable to provide that identification or personal information. Those who are not deterred must "forgo the anonymity otherwise available on the internet" as the state-imposed price of admission. *Griffin*, 2023 WL 5660155, at *17 (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *see ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008) ("relinquish the anonymity to access protected speech").

67.     *Parental consent.* Once a covered website verifies a new or existing account holder as a minor, the company must "confirm that a minor has [parental] consent" to hold an account. § 13-63-102(3)(a). If a company is unable to "confirm" that the minor has such consent, the company must "deny access to the account." § 13-63-102(3)(b); *see* § 13-63-102(1). "Minors" are all users younger than 18, except for those who are "emancipated [or] . . . married." § 13-63-101(7).

68.     The Act also directs the Division "to establish processes or means to confirm that a parent or guardian has provided consent for the minor to open or use an account." § 13-63-102(3)(d). The Division has described such a process in the Proposed Rule: "(a) using a method that complies with 16 CFR 312.5(b)(2) or (3), or has been approved by the Federal Trade Commission . . . ; and (b) obtaining a written attestation from the parent or guardian that they are the minor's legal guardian." *See* Proposed Rule at R152-63-6. The Federal Trade Commission has provided that websites can secure parental consent in a number of ways, including (1) signing a

consent form; (2) using a credit card or debit card; (3) having a parent call a number "staffed by trained personnel"; (4) having a parent "connect to trained personnel via video-conference"; and (5) checking a parent's government identification "against databases of such information" (where the website must delete the identification afterward). 16 C.F.R. § 312.5(b)(2)-(3).

69.     The Act does not account for the difficulty in verifying a parent-child relationship, which entails verifying the identities of the minor and parent—*and* the relationship between them. In enjoining a similar requirement, the Western District of Arkansas credited the *State's* expert testimony that "the biggest challenge you have with parental consent is actually establishing . . . the parental relationship." *Griffin*, 2023 WL 5660155, at *4. These difficulties are compounded when families have differences in name or address, or where parents disagree about consent.

70.     *Ban on advertising.* A "social media company, for a social media platform account held by a Utah minor account holder . . . shall prohibit the display of *any* advertising in the account." § 13-63-103(3) (emphasis added). On its face, this provision would reach paid advertisements about college-application deadlines, test-preparation courses, or anything else. Because the Act does not define "advertising," this provision could also be read as encompassing even user-generated promotional content. As just one example among countless, a teen's post about babysitting services could be deemed "advertising." Consequently, a website could not display such "ads" to a minor without violating the Act.

71.     *Ban on targeted and suggested content.* A covered website "shall prohibit the use of targeted or suggested groups, services, products, posts, accounts, or users in [a Utah minor's] account." § 13-63-103(5). The Act does not define "targeted" or "suggested." Thus, this provision

could prohibit both express recommendations of content, as well as the ways that many covered websites organize, prioritize, deprioritize, display, and disseminate content.

72. *Ban on collection and use of personal information.* A covered website "shall not collect or use any personal information from the posts, content, messages, text, or usage activities of [a minor's] account other than information that is necessary to comply with, and to verify compliance with, state or federal law." § 13-63-103(4). Yet all Internet websites must collect *some* information to make services functional, secure, and social, and to provide age-appropriate experiences. Worse—and as with many other key terms—the Act does not define "personal information," "content," "usage activities," or any of the other operative terms in § 13-63-103(4).

73. *Ban on access during state-imposed curfew.* A "social media company shall prohibit a Utah minor account holder from having access to the Utah minor account holder's account during the hours of 10:30 p.m. to 6:30 a.m." § 13-63-105. To comply with this requirement, "[t]ime of day . . . shall be calculated based on the Internet protocol address being used by the Utah minor account holder at the time of attempting access." *Id.* Websites also must provide "options" that allow a parent to "change or eliminate the time-of-day restriction" and to "set a limit on the number of hours per day that a Utah minor account holder may use the account." *Id.*

74. *Enforcement.* The Act allows for draconian penalties, designed to chill covered websites' dissemination of speech to minors—which will inevitably have spillover effects on the speech available to adults. The Division Director "may impose an administrative fine of up to $2,500 for each violation" of the Act's general requirements. § 13-63-202(3)(a). The Division, along with the Attorney General, may also seek "a civil penalty of up to $2,500 for each violation" of the Act's general requirements. § 13-63-202(3)(b).

75.     Although the Act allows websites to "cure[]" first-time violations of a particular provision, that is of limited utility because it can be construed as essentially a single-use defense. No such defense potentially exists if the website again "commits another violation of the same provision"—even if the later violation is different in kind. § 13-63-202(4)(c)(ii). Thus, for example, a website's first-time failure to verify a minor's age would not create liability, but any subsequent failures to verify *any* minor's age could create liability, even if it had an entirely different cause. That is because a single statutory "provision" requires websites to verify age. *See* § 13-63-102(3)(a). Thus, depending on how it is construed, this ability to "cure" may provide covered websites with little protection from liability.

76.     Covered websites also face private liability. The Act also grants a private right of action that allows individuals to enforce the Act's general requirements. § 13-63-301.

77.     **The Act's "design" requirements (Utah Code § 13-63-401)**. The Act also includes what it refers to as "design" requirements. § 13-63-401. These broad, vague, and chill-inducing requirements target the practices, designs, and features websites use to disseminate content.

78.     Specifically, the Act provides that a "social media company shall not use a practice, design, or feature on the company's social media platform that the social media company knows, or which by the exercise of reasonable care should know, causes a Utah minor account holder to have an addiction to the social media platform." § 13-63-401(2). The Act does not define "practice, design, or feature." But those terms reach nearly everything that covered websites do to disseminate speech and enable connection and expression among users. In fact, just the fundamental choice to create a website that allows people to post third-party content or to like or comment on someone else's content arguably implicates the Act's broad language.

79.    The Act defines "addiction" as "*use* of a social media platform" that "(a) *indicates* the user's substantial preoccupation or obsession with, or the user's substantial difficulty to cease or reduce use of, the social media platform" and "(b) causes physical, mental, emotional, developmental, *or* material harms to the user" § 13-63-101(2) (emphases added). But that definition creates yet more problems because it does not define any of its key terms.

80.    The Act provides a series of potentially illusory defenses to these broad and vague prohibitions. First, the Act's design requirements purportedly do not "impose liability" for: (1) "content that is generated by an account holder"; (2) content that is "created entirely by a third party" and which a company "passively display[s]"; (3) "information or content for which the social media company was not, in whole or in part, responsible for creating or developing"; or (4) "any conduct by a social media company involving a Utah minor account holder who would otherwise be protected by federal or Utah law." § 13-63-401(4). These purported defenses offer little certainty, given that "passively display[]" and other key terms are undefined. In any event, the purported distinction between "design" and "content" is also exceedingly difficult to apply. *Id.*

81.    Second, to avoid potentially ruinous penalties for violating the Act, a covered website must (1) conduct "at least quarterly audits" to "detect practices, designs, or features that have the *potential* to cause or *contribute* to the addiction of a minor user"; and (2) "correct . . . any practice, design, or feature discovered by the audit to present more than a *de minimus* risk of violating" the design requirements. § 13-63-401(3)(b) (emphases added).

82.    A company violates the Act if it fails to correctly predict and address any "practice, design, or feature" that has more than a "*de minimus*" risk of having the potential to cause or contribute to "addiction" for even a single minor. Violations trigger potential liability of: "(i) a

civil penalty of $250,000 for each practice, design, or feature shown to have [violated the Act's design requirements]; and (ii) a civil penalty of up to $2,500 for each Utah minor account holder who is shown to have been exposed to [any such] practice, design, or feature[.]" § 13-63-401(3). The Division has authority to "administer and enforce" these requirements. § 13-63-401(1).

83.     Thus, if a website violates the Act's design requirements for even *one* minor, then the website, conceivably, can be construed as liable for *every* minor who was exposed to the practice, design, or feature—regardless of a minor's age, parental consent, or individual circumstances.

84.     The Act also creates a private right of action for enforcing the design requirements. If someone under 16 years old invokes this right, the Act creates a "rebuttable presumption that the harm actually occurred and that the harm was caused" by using the website. § 13-63-501(4).

## CLAIMS

85.     Each of NetChoice's claims raises a traditional facial challenge, because "no set of circumstances exists under which the" the challenged provisions of the Act "would be valid." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) ("*AFP*") (cleaned up). Alternatively, each of NetChoice's First Amendment claims also raises a First Amendment overbreadth facial challenge, because "a substantial number of" the Act's challenged "applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (citation omitted).

86.     Each First Amendment challenge raises the rights of both NetChoice's members and those who use or could prospectively use NetChoice members' websites.

---

**All Requirements for a "Social Media Company"**
**(Utah Code §§ 13-63-101 to 13-63-701)**

---

### COUNT I
### 42 U.S.C. § 1983
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE
### STATES BY THE FOURTEENTH AMENDMENT
### (CENTRAL COVERAGE DEFINITION – UTAH CODE §§ 13-63-101 TO 13-63-701)

87.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

88.     As incorporated against the States, the First Amendment's Free Speech and Free Press Clauses provide that governments "shall make no Law . . . abridging the Freedom of Speech, or of the Press." U.S. Const. amend. I. Among other things, the First Amendment protects "publish[ing]," *Reno*, 521 U.S. at 852; "disseminat[ing]," *303 Creative*, 143 S. Ct. at 2316; and "creating, distributing, [and] consuming" protected speech from government interference. *Brown*, 564 U.S. at 792 n.1. And those rights apply to all manner of private entities. *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) (the "press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion").

89.     The entire Act fails any form of First Amendment scrutiny because its central coverage definition of what websites are "social media compan[ies]" is riddled with arbitrary distinctions that are simultaneously overbroad and underinclusive. Further, the State cannot articulate a sufficient governmental interest supporting the Act, and the Act is not properly tailored.

90.     **The entire Act triggers strict scrutiny.** The Act triggers strict scrutiny in multiple ways because its central coverage definition—"social media company," § 13-63-101(9)—relies on content-, speaker-, and viewpoint-based definitions.

91.     The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*,

564 U.S. at 790-91 (citation omitted). "Content-based laws . . . are presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citation omitted). A law "is facially content based . . . if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (cleaned up). And "facially content neutral" laws "will be considered content-based" if they "cannot be 'justified without reference to the content of the regulated speech,' or" if they "were adopted . . . 'because of disagreement with the message [the speech] conveys.'" *Reed*, 576 U.S. at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

92.     The Act's central coverage definition is content-based because it draws lines based on the subject of the speech on a particular website. For instance, the Act:

a.     excludes websites that offer "news, sports, entertainment, or other content that is preselected by the provider," § 13-63-101(10)(b)(i)(D);

b.     excludes "interactive gaming, virtual gaming, or an online service[] that allows the creation and uploading of content for the purpose of interactive gaming," § 13-63-101(10)(b)(i)(F);

c.     restricts expression on websites that allow individuals "to interact with other account holders or users," § 13-63-101(10)(a)(iv), while exempting websites that have any number of other "predominant or exclusive function[s]," § 13-63-101(10)(b)(i); and

d.     excludes many more content-based categories, including "streaming service[s]," "online shopping," "photo editing," "creative network[s]," "digital news website[s]," "classified ad[s]," "single-purpose community groups for public safety," "professional networking," "genealogical research," *id.*

93.     Each of those exclusions is based on the subject matter presented on a particular website. "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020); *see id.* (content-based exceptions trigger strict scrutiny).

94.     The Act's central coverage definition also draws lines based on who is speaking or disseminating speech. But the First Amendment limits state power to enforce "restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). As the Supreme Court has recognized, "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Id.* Thus, the Court has properly been "deeply skeptical of laws that distinguish among different speakers." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (cleaned up). As a result, "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Reed*, 576 U.S. at 170 (citation omitted).

95.     The Act's central coverage definition is speaker-based because it does not apply to websites with fewer than "5,000,000 account holders worldwide." § 13-63-101(9). The Act regulates large websites (*e.g.*, X) while ignoring similar expression on similar, smaller websites (*e.g.*, Bluesky, which has about 1.8 million account holders, https://perma.cc/6RYQ-PMLQ, or Truth Social, reported to have about 607,000 monthly users, https://perma.cc/S5SL-B86E).

96.     The Act's central coverage definition is also speaker-based because it singles out for favorable treatment websites that "post[] or create[]" their own content while burdening similar websites that disseminate user-generated content, § 13-63-101(10)(b)(ii), even if those websites also post or create their own content. For example, among websites that disseminate large amounts of videos, the Act regulates YouTube, but not Netflix. And among websites that include links to the news stories of the day, the Act regulates X, but not aggregator blogs.

97.     Finally, the Act's content- and speaker-based exceptions also reflect some viewpoint-based preferences. Laws that "target[] . . . particular views taken by speakers on a subject"

are an "egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Consequently, the government must "abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*; *see Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019).

98.     Here, the Act treats content more favorably if it reflects the viewpoint expressed in speech created by the websites themselves, because the Act excludes websites where "the majority of the content that is posted or created is posted or created by the provider of the online service, website, or application." § 13-63-101(10)(b)(ii)(A).

99.     The Act also treats websites with the viewpoints that single-purpose communities are preferable to multi-purpose communities more favorably than other websites. For example, it excludes websites dedicated to "single-purpose community groups for public safety" § 13-63-101(10)(b)(i)(I).

100.     Because the Act's central coverage definition is content-, speaker-, and viewpoint-based, so too is each provision of the Act restricting speech that relies on this definition.

101.     Each provision of the Act therefore triggers and fails strict scrutiny.

102.     **The entire Act fails strict scrutiny.** Strict scrutiny requires a State to use "'the least restrictive means of achieving a compelling state interest.'" *AFP*, 141 S. Ct. at 2383 (quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014)).

103.     The State lacks a compelling government interest supporting the Act.

104.     While "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (cleaned up).

105.    The State has not "specifically identif[ied]" how the Act's content-, speaker-, and viewpoint-based scope responds to "an actual problem in need of solving." *Id.* at 799 (cleaned up). Moreover, it is not enough to simply identify a problem. To survive strict scrutiny, "the curtailment of free speech must be actually necessary to the solution." *Id.* (citation omitted).

106.    Even if the government could identify a sufficient governmental interest, the Act is not properly tailored—and certainly not narrowly tailored.

107.    The Act's central coverage definition gives the entire Act an arbitrary scope. For example, identical content is treated differently based on whether it appears on a "news" website versus a covered website. So too for content on a website with fewer than "5,000,000 account holders worldwide" versus a covered website that has more account holders. § 13-63-101(9).

108.    The Act is overinclusive because it chills adult speech and sweeps in broad swaths of protected speech. For example, "[i]t is likely that many adults who otherwise would be interested in becoming account holders on regulated social media platforms will be deterred—and their speech chilled—as a result of the age-verification requirements" that the Act imposes. *Griffin*, 2023 WL 5660155, at *17.

109.    The Act is also underinclusive, because it includes myriad exemptions, some of which result in allowing access to the exact same speech on a smaller or different website. This undermines any contention that the State is addressing a serious issue. *See Brown*, 564 U.S. at 802; *Griffin*, 2023 WL 5660155, at *19. For instance, there is no reason to treat identical content differently based on whether it appears on a website with 5 million accounts versus 4.9 million accounts. Yet the Act does just that.

110.    The Act is the polar opposite of a "narrow and well-defined" restriction on "public dissemination of [First Amendment] protected materials to [minors]" that might withstand constitutional scrutiny. *Erznoznik*, 422 U.S. at 213.

111.    The Act's central coverage definitions are integral to the entire Act. §§ 13-63-101 to -107. Without this central definition, no other provision in the Act could operate, and thus the entire Act requires invalidation.

112.    Unless declared invalid and enjoined, Utah Code §§ 13-63-101 to -107 will unlawfully deprive Plaintiff's affected members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

## COUNT II
### 42 U.S.C. § 1983
**VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS**
**(CENTRAL COVERAGE DEFINITION – UTAH CODE §§ 13-63-101 TO 13-63-701)**

113.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

114.    The Act's central coverage definition of "social media company" (§ 13-63-101) is unconstitutionally vague, and it violates principles of free speech and due process.

115.    "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). And a "law is unconstitutionally vague" if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). The constitutional standard for vagueness is heightened for speech restrictions under the First Amendment. *FCC v. Fox*, 567 U.S. at 253-54. Laws that fail to precisely regulate speech require publishers and speakers "to steer far wider of the unlawful zone" than they otherwise would

"if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

116.    The Act's central coverage definition fails to provide that necessary notice here. Specifically, the Act's "social media company" definition excludes certain websites based on their "predominant or exclusive function." § 13-63-101(10)(b)(i). Websites have no way of knowing what this means. Some websites allow people to use the services for multiple reasons. For example, some people may "predominant[ly]" use a covered website for exempted "gaming" purposes, while others may use the website for regulated "post[ing]" or "interact[ive]" purposes. *Id.* Purposes can shift over time, too. What is worse, the Act does not define predominant or exclusive—even though these "term[s are] critical to determining which entities fall within [the Act]'s scope." *Griffin*, 2023 WL 5660155, at *13. The Act also does not "provide[] any guidelines about how to determine a [website's function], leaving companies to choose between risking unpredictable and arbitrary enforcement (backed by civil penalties[and] attorneys' fees . . .) and trying to implement the Act's costly . . . requirements. Such ambiguity renders a law unconstitutional." *Id.*

117.    Similarly, the Act excludes certain websites that provide "chat, comment, or interactive functionality that is provided incidental to" "news, sports, [or] entertainment." § 13-63-101(10)(b)(i)(D). Just like "predominant" and "exclusive," "incidental to" is also vague. This leaves websites uncertain about what the Act means and how Defendants will enforce it.

118.    Because of this vagueness, the Act's central coverage definitions violate the First Amendment and the Due Process Clause of the Fourteenth Amendment.

119.    The Act's central coverage definitions are integral to the entire Act. §§ 13-63-101 to -107. Without this central definition, no other provision in the Act could operate, and thus the entire Act requires invalidation.

120.    Unless declared invalid and enjoined, Utah Code §§ 13-63-101 to -107 will unlawfully deprive Plaintiff's affected members and Internet users of their First Amendment and Due Process rights and will irreparably harm Plaintiff, its members, and Internet users.

### General Requirements
### (UTAH CODE §§ 13-63-102, -103(3), -103(4), -103(5), AND -105)

### COUNT III
### 42 U.S.C. § 1983
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT
### (AGE VERIFICATION AND PARENTAL CONSENT – UTAH CODE § 13-63-102)

121.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

122.    The Act's requirements for age verification and parental consent (§ 13-63-102) are unconstitutional and cannot satisfy any form of First Amendment scrutiny.

123.    Under the First Amendment, Defendants have the burden to "specifically identify" how the Act addresses "an actual problem in need of solving." *Brown*, 564 U.S. at 799. Strict scrutiny demands that "the curtailment of free speech must be actually necessary to the solution." *Id.* (citation omitted). Here, Defendants must demonstrate that there is a problem in need of *governmental* solution, as compared to private, family solutions. Parents have a wealth of choices to help oversee their minor children online, and those choices provide families more flexibility than the State's one-size-fits-all mandate. Defendants cannot demonstrate why the Legislature ignored those viable alternatives. There are no legislative findings sufficient to justify the law's infringement on First Amendment rights. *Edenfield v. Fane*, 507 U.S. 761, 770 (1993).

124.    **Parental-consent requirement.** The Act's parental-consent requirement is unconstitutional.

125.    The Supreme Court has rejected the idea "that the state has the power to prevent children from hearing or saying anything without their parents' prior consent," because "[s]uch laws do not enforce parental authority over children's speech and religion; they impose governmental authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 & n.3. That was true even in *Brown*, where California attempted to prohibit minors from purchasing violent video games. *See id.* at 818 (Alito, J., concurring in the judgment) ("the violence is astounding").

126.    Minors' protections should therefore apply with special force to the covered websites here, which disseminate and facilitate a broad range of protected speech. That is, in part, why courts have held that parental-consent requirements for minors to use "social media" websites violate the First Amendment. *Griffin*, 2023 WL 5660155, at *18.

127.    Moreover, the Act's one-size-fits-all approach requiring all minors at every development stage—from websites' youngest users to seventeen-year-olds—to secure parental consent is vastly overbroad. Even in the context of unprotected obscenity for minors, the Supreme Court has recognized that state laws that extend age-verification and parental-consent requirements to older minors raise even greater concerns. *Reno*, 521 U.S. at 866. The Act's exemption for married minors cannot further any state interest in the protection of minors. § 13-63-101(7)(b).

128.    **Age-verification requirement.** The Act's age-verification requirement is also unconstitutional.

129.    The Supreme Court has long held that a State cannot require individuals to provide personal information to access protected speech. *See, e.g.*, *Ashcroft*, 542 U.S. at 667 ("[A]dults

without children may gain access to speech they have a right to see without having to identify themselves or provide their credit card information"); *Reno*, 521 U.S. at 874 (similar). Lower courts, too, have consistently rejected age-verification requirements. *See, e.g.*, *Mukasey*, 534 F.3d at 196-97; *PSINet, Inc. v. Chapman*, 362 F.3d 227, 236-37 (4th Cir. 2004).

130.    Even if focusing only on the Act's impact on minors, the Act is unlawful. Age-verification requirements imposed on "social media" websites "obviously burden[] minors' First Amendment Rights." *Griffin*, 2023 WL 5660155, at *17. If the government cannot impose age-verification requirements to prevent minors from accessing unprotected speech (like obscenity for minors), the government certainly cannot require age-verification requirements that would impede minors' and adults' abilities to access a vast range of unquestionably protected speech.

131.    **Identity-verification requirements.** The Act's identity-verification requirements are also unconstitutional.

132.    Parents cannot comply with the Act's consent requirements unless they reveal to the government both their identities and their children's identities.

133.    Parents may be unwilling or unable to do this for any number of reasons.

134.    The Act directs the Division to "establish acceptable forms or methods of identification." § 13-63-102(4)(b). The Proposed Rule would require covered websites to "proactively identify" at least some users. Proposed Rule at R152-63-4(2) ("any Utah minor account holder who the social media company's age-verification process incorrectly determines is not a minor"); *see id.* at R152-63-1(2) (similar); R152-63-4(1)-(2) (similar). "Requiring adult users to produce state-approved documentation to prove their age and/or submit to biometric age-verification testing imposes significant burdens on adult access to constitutionally protected speech and

'discourages users from accessing the regulated sites.'" *Griffin*, 2023 WL 5660155, at *17 (alterations adopted) (quoting *Reno*, 521 U.S. at 856). So too for minors. *Id.*

135.    Unless declared invalid and enjoined, Utah Code § 13-63-102 will unlawfully deprive Plaintiff's affected members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

**COUNT IV**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT**
**(ADVERTISING BAN – UTAH CODE § 13-63-103(3))**

136.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

137.    The Act's categorical ban on all advertising (§ 13-63-103(3)) is unconstitutional and cannot survive any form of First Amendment scrutiny.

138.    The advertising ban triggers and fails strict scrutiny.

139.    The "selection of" an "advertisement for inclusion" in a "compilation of speech" "fall[s] squarely within the core of First Amendment security." *Hurley*, 515 U.S. at 570. More generally, the "choice of material to go into a" publication "constitute[s] the exercise of editorial control and judgment" protected by the First Amendment. *Tornillo*, 418 U.S. at 258.

140.    Additionally, there is no "philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 522 (1996) (Thomas, J., concurring in part and concurring in the judgment). Thus, a ban on all advertisements should face the same rigorous scrutiny as a ban on other speech.

141.    In all events, even under the commercial speech doctrine, the Act's "ban" on *all* advertising is substantially overbroad, as the Supreme Court has already rejected bans that reach

"all" ads. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 570 (1980). In fact, the FTC long ago abandoned attempts to ban all television advertising to children. 46 Fed. Reg. 48710, 48713 (Oct. 2, 1981).

142.    If websites cannot show ads to minors, websites will be forced to quit serving minors altogether or to find alternative revenue to support service for minors (such as subscription fees). That would put Utah minors at a disadvantage relative to their peers across the country. This triggers strict scrutiny because "[t]he Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Sorrell*, 564 U.S. at 566 (citation omitted).

143.    By potentially requiring websites to prevent minors from seeing user-generated content that contains advertisements, the Act also burdens the protected speech of users who wish to promote goods and services—and users who wish to see such content. *See id.* at 565. For instance, "advertisements" may encompass information about events in the community, sports league sign-ups, higher-education test preparation, and military recruitment. The Act would potentially prohibit minors from seeing all those user-generated advertisements on covered websites.

144.    Utah does not have a "free-floating" interest in preventing minors from seeing protected speech. *Brown*, 564 U.S. at 795. Advertisements that "accurately inform the public about lawful activity" are protected speech. *Cent. Hudson*, 447 U.S. at 563. Banning this protected speech requires *at least* "a substantial interest." *Id.* at 564. Yet the Act does not contain any legislative findings of fact (or even a statement of purpose) identifying such an interest.

145.    Even if Utah could identify a substantial interest in banning *all* minors from seeing *all* advertisements, Defendants would also need to show *at minimum* that the Act "directly advances the governmental interest asserted, and . . . is not more extensive than is necessary to serve

that interest." *Id.* at 566. That showing is not possible here. "The State cannot regulate speech that poses no danger to the asserted state interest, nor can it completely suppress information when narrower restrictions on expression would serve its interest as well." *Id.* at 565 (citation omitted).

146.    The State cannot demonstrate what purported problem this ban responds to, how the ban is necessary to solve the purported problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

147.    Fee-based ads are common across all kinds of media that minors view, such as television, billboards, and magazines. Thus, the Act's application to a handful of online services is not properly tailored. Further, many user-generated ads—including for things like local events, garage sales, jobs, and the like—also pose no danger. Utah's decision to "completely suppress" these kinds of advertisements (but only on a subset of online websites) is thus not "narrowly drawn" and cannot survive any form of scrutiny. *Id.*

148.    Unless declared invalid and enjoined, Utah Code § 13-63-103(3) will unlawfully deprive Plaintiff's affected members and Internet users of their First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

### COUNT V
### FEDERAL STATUTORY PREEMPTION UNDER 47 U.S.C. § 230,
### 42 U.S.C. § 1983, AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION
### (ADVERTISING BAN – UTAH CODE § 13-63-103(3))

149.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

150.    Plaintiff may assert federal preemption under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908).

151.    47 U.S.C. § 230 preempts the Act's advertising ban. § 13-63-103(3).

152.    Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Section 230 preempts "inconsistent" state laws. *Id.* § 230(e)(3). The Tenth Circuit has held that "§ 230 forbids the imposition of publisher liability on a service provider for the exercise of its editorial . . . functions." *Ben Ezra*, 206 F.3d at 986 (citation omitted).

153.    Covered member websites are "interactive computer services" and disseminate "information provided by another information content provider." 47 U.S.C. § 230(c)(1), (f)(2). Indeed, the "prototypical service qualifying for this statutory immunity is an online messaging board . . . on which Internet subscribers post comments and respond to comments posted by others." *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1195 (10th Cir. 2009).

154.    Advertisements on these websites can be created and posted on the websites by third parties, including both third-party advertisers and users of the websites who may use or include "advertising" in their user-generated content. In some cases, this may be as simple as a creator mentioning a new movie or book in a piece of user-generated content. In all such cases, such advertisements are "information provided by another information content provider." 47 U.S.C. § 230(c)(1).

155.    Section 230 protects websites' decisions to publish (or not to publish) third-party advertisements—whether those ads are paid content placements or user-generated content. It would be "inconsistent" with Section 230(c)(1), *id.* § 230(e)(3), to impose liability on websites for "display[ing]" third-party advertisements to minors, § 13-63-103; *see, e.g.*, *Calise v. Meta Platforms, Inc.*, 2022 WL 1240860, at *3 (N.D. Cal. Apr. 27, 2022). Moreover, Section 230 preempts

requirements to proactively "monitor third-party content." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019); *Airbnb, Inc. v. City of Boston*, 386 F. Supp. 3d 113, 123 n.11 (D. Mass. 2019) (similar). Such requirements would unlawfully "treat[]" websites "as the publisher or speaker of . . . information provided by another information content provider." 47 U.S.C. § 230(c)(1).

156.   Unless declared preempted and enjoined, Utah Code § 13-63-103(3) will unlawfully deprive Plaintiff's members and Internet users of their rights and will irreparably harm Plaintiff, its members, and Internet users.

## COUNT VI
### 42 U.S.C. § 1983
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT
### (PERSONALIZED CONTENT BAN – UTAH CODE § 13-63-103(5))

157.   Plaintiff incorporates all prior paragraphs as though fully set forth herein.

158.   The Act's ban on displaying personalized content to minors (§ 13-63-103(5)) is unconstitutional and cannot survive any form of First Amendment scrutiny.

159.   The Act's ban on displaying personalized and suggested content to minors triggers and fails strict scrutiny for several reasons, including that it burdens websites' right to "exercise . . . editorial control and judgment" over how content will be organized and suggested. *Tornillo*, 418 U.S. at 258. "[T]he presentation of an edited compilation of speech generated by other persons . . . of course[] fall[s] squarely within the core of First Amendment security." *Hurley*, 515 U.S. at 570. So too for a website's presentation and suggestion of "groups, services, products, posts, accounts, or users" to a minor user. § 13-63-103(5).

160.   The ban on displaying personalized content cannot survive strict scrutiny.

161.    Utah does not have any interest in regulating "the ideas to which children may be exposed." *Brown*, 564 U.S. at 794.

162.    The State cannot demonstrate what purported problem this ban responds to, how the ban is necessary to solve the purported problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address the purported problem.

163.    In all events, the Act's ban on personalized and suggested content is not properly tailored. For example, it allows other, smaller websites with similar content to personalize content even though Plaintiff's members cannot do the same on their websites. And the Act applies to a broad swath of protected expression available on covered websites.

164.    Additionally, the ban is overinclusive because it fails to account for the differences among minors of different ages, as the Supreme Court has held laws regulating speech must do. *Am. Booksellers*, 484 U.S. at 396. The Act applies equally to an "infant, a five-year old, or a person just shy of age seventeen." *Bonta*, 2023 WL 6135551, at *15 (quoting *Mukasey*, 534 F.3d at 191). The Act's exemptions for emancipated and married minors (§ 13-63-101(7)(a)) do not cure the Act's failure to account for developmental differences among minors—and indeed create independent tailoring problems. It makes no sense for the Act to deprive an unmarried 17-year-old of personalized content, but not a married or emancipated 17-year-old.

165.    Unless declared invalid and enjoined, Utah Code § 13-63-103(5) will unlawfully deprive Plaintiff's affected members and Internet users of their First Amendment rights and irreparably harm Plaintiff, its members, and Internet users.

## COUNT VII
## FEDERAL STATUTORY PREEMPTION UNDER 47 U.S.C. § 230,
## 42 U.S.C. § 1983, AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION
## (PERSONALIZED CONTENT BAN – UTAH CODE § 13-63-103(5))

166.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

167.    47 U.S.C. § 230 preempts the Act's ban on displaying personalized and suggested content to minors. § 13-63-103(5).

168.    Covered websites display personalized and suggested third-party content that is "information provided by another information content provider." 47 U.S.C. § 230(c)(1).

169.    Section 230 protects websites' decisions about whether and how to publish user-generated content—including personalizing and suggesting content to users. Choosing how to present user-generated content is a core "editorial . . . function[]." *Ben Ezra*, 206 F.3d at 986. Courts have held that "recommendations," for example, are protected by Section 230. *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019). It thus would be "inconsistent" with Section 230, 47 U.S.C. § 230(e)(3), to impose liability on websites for those decisions.

170.    Unless declared preempted and enjoined, Utah Code § 13-63-103(5) will unlawfully deprive Plaintiff's affected members and Internet users of their rights and will irreparably harm Plaintiff, its members, and Internet users.

## COUNT VIII
## 42 U.S.C. § 1983
## VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE
## STATES THROUGH THE FOURTEENTH AMENDMENT
## (BAN ON COLLECTION AND USE OF INFORMATION – UTAH CODE § 13-63-103(4))

171.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

172.    The Act's ban on collecting and using information from minors' accounts (§ 13-63-103(4)) is unconstitutional and cannot survive any form of First Amendment scrutiny.

43

173.    The ban forbids a large range of activity that websites commonly engage in to facilitate their dissemination of speech and the facilitation of user expression. *See, e.g.*, *Bonta*, 2023 WL 6135551, at *16. At the outset, websites must collect information about users' ages to provide age-appropriate experiences for those users. Furthermore, many websites engage with users to learn about their preferences, use collected information to support personalized advertising, and recommend relevant user-generated content including music, film, educational content, and articles, among others. The First Amendment protects all of that. *See, e.g.*, *Sorrell*, 564 U.S. at 558.

174.    By limiting the information that websites can collect, the ban also limits websites' ability to exercise meaningful editorial discretion by disseminating content that users find most relevant and prevents users from receiving this curated content. *See Tornillo*, 418 U.S. at 258.

175.    The ban also triggers strict scrutiny because it would require covered websites to make their services functionally inaccessible to minors. *See Brown*, 564 U.S. at 799.

176.    Utah does not have any sufficient governmental interest in preventing websites from collecting and using information necessary to improve websites' functionality, reliability, safety features, and overall usefulness for users.

177.    The State cannot demonstrate what purported problem this ban responds to, how the ban is necessary to solve the purported problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

178.    This ban is also not properly tailored.

179.    The ban is overinclusive by covering the very information that makes websites useful, accessible, and secure. Prohibiting using "personal information" (which the Act does not

define) could include information necessary to make the websites *functional* (like device type) and information that makes the websites *useful*.

180.    Additionally, the ban is overinclusive because it fails to account for the differences among minors of different ages.

181.    The ban is also underinclusive because many websites not covered by the Act that contain similar—if not the same—content will be able to collect and use this same information.

182.    Even "the compelling and laudable goal of protecting children does not permit the government to shield children from harmful content by enacting greatly overinclusive or underin-clusive legislation" that prohibits websites from collecting "personal information" from a "child." *Bonta*, 2023 WL 6135551, at *16 (granting preliminary injunction against state law that prohibited websites from collecting data from minors).

183.    Unless declared invalid and enjoined, Utah Code § 13-63-103(4) will unlawfully deprive Plaintiff's affected members and Internet users of their First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

## COUNT IX
### 42 U.S.C. § 1983
### VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS
### (BAN ON COLLECTION AND USE OF INFORMATION – UTAH CODE § 13-63-103(4))

184.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

185.    The Act's ban on collecting and using information from minors' accounts (§ 13-63-103(4)) is unconstitutionally vague.

186.    Specifically, this provision does not define the key term "personal information," which leaves covered websites no way to determine whether their conduct is lawful. This, in turn, gives Defendants wide and unpredictable power to conduct discriminatory enforcement. As just

one example, the Act bans websites from collecting or using any "personal information" from an account holder's "posts." § 13-63-103(4). Whatever "personal information" may mean, *posts themselves* can contain that information. It is the same for "content, messages, [and] text." *Id.* Websites cannot *display* that content at all if they cannot "collect" and "use" it.

187.    Unless declared invalid and enjoined, Utah Code § 13-63-103(4) will unlawfully deprive Plaintiff's affected members and Internet users of their First Amendment and Due Process rights and will irreparably harm Plaintiff, its members, and Internet users.

### COUNT X
### 42 U.S.C. § 1983
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES THROUGH THE FOURTEENTH AMENDMENT
### (CURFEW REQUIREMENT – UTAH CODE § 13-63-105)

188.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

189.    The Act's ban on minors accessing websites during a state-imposed 10:30 p.m. to 6:30 a.m. curfew (§ 13-63-105) is unconstitutional and cannot survive any form of First Amendment scrutiny.

190.    Users have a First Amendment right to see and hear protected speech unencumbered by the government. Banning minors from accessing protected speech triggers strict scrutiny. *Brown*, 564 U.S. at 799-800. The state-imposed curfew bans minors from accessing protected speech during particular times only on particular services, which burdens minors' rights. Whether analyzed as a ban or a burden, the state-imposed curfew triggers strict scrutiny. *See id.*

191.    The curfew requirement mandates that some of the world's most popular websites must presumptively go dark to minors for eight hours per day. Consequently, the default rule imposed by the State is that minors cannot access or engage in speech with their peers—in Utah or

around the globe—on covered websites for a full third of every day. The effect of this blackout cannot be overstated. As just a few examples, minors will be unable to see social media posts from candidates for elected office, developing news covered by citizen journalists on the other side of the world, or watch homework help videos at times deemed impermissible by the State.

192.     The ban also violates websites' rights to disseminate speech.

193.     Consequently, the Act fails any form of First Amendment scrutiny.

194.     The Supreme Court has already rejected governmental authority to "prevent children from hearing or saying [things] without their parents' prior consent." *Id.* at 795 n.3. Similarly, here, this law is an improper attempt by the government to prevent minors from accessing speech on covered websites during certain times.

195.     The State cannot demonstrate what purported problem the curfew responds to, how the curfew is necessary to solve the purported problem, or why the existing private tools available to parents are insufficient to address any purported problem.

196.     The curfew requirement also is not properly—let alone narrowly—tailored.

197.     The curfew "burden[s] substantially more speech than is necessary to further" any of the State's even plausibly "legitimate interests." *McCullen*, 573 U.S. at 486.

198.     The curfew requirement is overinclusive because it prevents minors from accessing large swaths of protected speech. Members' websites are not static, and not all content is available at all times. For example, a minor who wishes to use a website's "chat" tool to interact live with a digital pen pal or family member across the globe may be able to do that only very early in the morning. Or a minor may wish to learn how to solve a math problem later at night. And because

some "live streams" of content are only available live and not stored to be viewed later, the curfew means Utah minors may be unable to see certain content from creators in other time zones at all.

199.    Additionally, the curfew requirement is overinclusive because it fails to account for the differences among minors of different ages.

200.    The curfew requirement is underinclusive because it allows a parental veto. If the State had a cognizable interest in enforcing a curfew for minors, then it would hardly be allowable for the State to *also* allow parents to disable the curfew. *See Brown*, 564 U.S. at 802; *Griffin*, 2023 WL 5660155, at *18.

201.    This curfew requirement is also underinclusive because of the limited range of websites and media the law reaches. While the State deems it improper for minors to access certain websites at certain times, it has no problem with those minors watching Netflix, playing World of Warcraft, or posting and viewing content and ads on Truth Social. In other words, the curfew is no curfew at all: It is a presumptive ban on certain expressive activities on certain websites.

202.    Unless declared invalid and enjoined, Utah Code § 13-63-105 will unlawfully deprive Plaintiff's affected members and Internet users of their First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

---

**"Design" Requirements
(Utah Code § 13-63-401)**

---

**COUNT XI
42 U.S.C. § 1983
VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE
STATES BY THE FOURTEENTH AMENDMENT
("DESIGN" REQUIREMENTS – UTAH CODE § 13-63-401)**

203.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

204.    The Act's so-called "design" requirements (§ 13-63-401) are unconstitutional and cannot survive any form of First Amendment scrutiny.

205.    The Act's design requirements seek to fundamentally gut how websites display and disseminate speech *and* facilitate the expression of the people who use their websites. Thus, these provisions affect the rights of both websites and their users. Though couched in terms of regulating "design," the Act's so-called "design" requirements seek to change the ways that websites organize, display, and disseminate content and how people can interact with that content. This provision potentially implicates every single editorial choice a website makes. It also may include websites' choices to facilitate users' interaction by allowing users to upload content.

206.    While the Act's design requirements cannot survive any level of First Amendment scrutiny, they trigger strict scrutiny because they interfere with websites' First Amendment right to organize, display, and disseminate content. *See Tornillo*, 418 U.S. at 258.

207.    Utah lacks a sufficient governmental interest in the design requirements.

208.    The State cannot demonstrate what purported problem the design requirements respond to, how the design requirements are necessary to solve the purported problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

209.    The Act's design requirements are not properly tailored.

210.    The design requirements are underinclusive because they prohibit regulated websites from using (undefined) practices, designs, and features. At the same time, the Act allows every similar, yet excluded Internet websites, to use those very same practices, designs, and features. Most glaringly, the State has expressly exempted any "online service, website, or

application . . . where the predominant or exclusive function is . . . interactive gaming . . . and the communication related to that content." § 13-63-101(10)(b)(i)(F).

211. The design requirements are overinclusive because they purport to require a covered website to eliminate practices, designs, and features for all users if "a Utah minor" has even an "indicat[ion]" of "preoccupation" with the website because of an alleged violation. § 13-63-401(2), (3)(a)(ii); *see* § 13-63-101(2). The Act may therefore "reduce the adult population . . . to reading only what is fit for children." *Butler v. Michigan*, 352 U.S. 380, 383 (1957).

212. The design requirements are also overinclusive because they potentially impose liability on websites for *any* minor who was exposed to a practice, design, or feature that is later deemed to violate the Act. Similarly, liability could be imposed for any "physical, mental, emotional, [or] developmental" harm, even if such harm was allegedly the result of publishing protected speech. § 13-63-101(2)(a).

213. Additionally, the design requirements are overinclusive because they fail to account for the differences among minors of different ages.

214. The Act's massive penalties, sweeping provisions, and lack of meaningful defenses may have the effect of preventing minors from accessing some of the covered websites at all.

215. The design requirements are an unconstitutional attempt to do "indirectly" what the State cannot do "directly," namely ban minors from covered websites. *Rutan*, 497 U.S. at 77-78.

216. Unless declared unlawful and enjoined, Utah Code § 13-63-401 will unlawfully deprive Plaintiff's affected members and Internet users of their First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

**COUNT XII**
**42 U.S.C. § 1983**
**VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS**
**("DESIGN" REQUIREMENTS – UTAH CODE § 13-63-401)**

217.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

218.    The Act's design requirements (§ 13-63-401) are also unconstitutionally vague.

219.    The undefined terms "practice, design, or feature" are unconstitutionally vague. The line between "design" and "content" is not self-evident, and the two cannot be easily disaggregated (if at all). Given the close and inseparable connection between design and content, regulated websites have no way to know what the Act requires.

220.    The Act's definition of "addiction" is also unconstitutionally vague. § 13-63-101(2). It therefore violates the First Amendment and the Due Process Clause.

221.    The first part of the definition asks whether a minor uses the website in a way that "indicates" that the minor has a "substantial preoccupation" with or cannot "reduce use" of a website without "substantial difficulty." *Id.* The Act does not define "indicates," "substantial preoccupation," or "substantial difficulty." Here too, websites cannot know what these terms mean.

222.    The second part of the definition asks whether the minor experienced "harm." But "harm" expressly includes "emotional," "developmental," and even just "material" harm. *Id.* These terms are also undefined and prone to subjective interpretation. Websites have no way to know what these terms mean, or how Defendants will interpret them.

223.    This vagueness creates an especially problematic chill due to the lowest-common-denominator approach of the penalty provision: If even *one* minor in the State "indicates" some kind of "preoccupation," websites are potentially liable for *all* minors who were exposed to the same design, practice, or feature—even if none of those other minors suffered any harm. Further,

the statute provides that the covered website "shall not use [that] practice, design or feature on the company's social media platform"—evidently with respect to *any* user. § 13-63-401(2).

224.    Unless declared unlawfully vague and enjoined, § 13-63-401 will unlawfully deprive Plaintiff's affected members and Internet users of their First Amendment and Due Process rights and irreparably harm Plaintiff, its members, and Internet users.

**COUNT XIII**
**FEDERAL STATUTORY PREEMPTION UNDER 47 U.S.C. § 230,**
**42 U.S.C. § 1983, AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION**
**("DESIGN" REQUIREMENTS – UTAH CODE § 13-63-401)**

225.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

226.    47 U.S.C. § 230 preempts the Act's design requirements. § 13-63-401.

227.    Section 230 protects websites' decisions about what practices, designs, and features to make available to users to facilitate their expression or that websites use in disseminating user-generated content. *See, e.g.*, *Dyroff*, 934 F.3d at 1096 ("tools used to facilitate communications"); *Ben Ezra*, 206 F.3d at 986 ("editorial . . . functions"). The Tenth Circuit has observed that "post[ing] comments and respond[ing] to comments posted by others" are "prototypical" functions at Section 230's heart. *Accusearch*, 570 F.3d at 1195.

228.    It would be "inconsistent" with Section 230(c)(1) to impose liability on websites based on those websites' decisions about what practices, designs, or features to use for displaying user-generated content or facilitating user communication. 47 U.S.C. § 230(e)(3).

229.    Unless declared preempted and enjoined, Utah Code §§ 13-63-401 will unlawfully deprive Plaintiff's affected members and Internet users of their First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

---
**Combined Effect of "General" and "Design" Requirements**

---

**COUNT XIV**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT ("GENERAL" AND "DESIGN" REQUIREMENTS – UTAH CODE §§ 13-63-102; -103(3), (4), (5); -105; AND -401)**

230.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

231.    Together, the Act's general requirements and design requirements are unconstitutional because they work in tandem to prohibit minors from using covered websites.

232.    An outright ban on minors using covered websites in their current form would be plainly unconstitutional, as Utah does not have "a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. Utah also cannot "indirectly" ban minors from using websites in their current form, either. *Rutan*, 497 U.S. at 77-78.

233.    The Act requires websites to upend the ways that they disseminate and present speech—even to minors who secure parental consent. The ban on advertising forbids websites from using the free-to-use model to support services for minors, and it requires websites to develop new tools for detecting and suppressing advertisements, whether paid or user-generated. The ban on collecting personal information forbids websites from offering minors an experience that is functional, appropriate, and useful. The ban on targeted and suggested content potentially requires regulated websites to create an entirely new service that is free of any kind of editorial recommendations if they wish to continue serving minors. And the practice, design, and feature restrictions have the effect of requiring websites to restrict or block all minors (or potentially all users) from seeing any practice, design, or feature, that might violate the Act even as to a single minor.

234.    Utah lacks a sufficient governmental interest in indirectly banning minors from covered websites, and the Act is not properly—let alone narrowly—tailored in any event.

235.    For instance, the Act is overinclusive because it fails to take into account the differences among minors of different ages.

236.    The State cannot demonstrate what purported problem the Act responds to, how the Act is necessary to solve the purported problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

237.    Unless declared invalid and enjoined, Utah Code §§ 13-63-102; -103(3), (4), & (5); -105; and -401 will unlawfully deprive Plaintiff's affected members and Internet users of their First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

---
**Generally Applicable Counts**
---

**COUNT XV**
**EQUITABLE RELIEF**

238.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

239.    The Act as a whole and individual challenged provisions of the Act violate federal law and deprive Plaintiff, its members, and its members' users of enforceable federal rights. Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

240.    This Court can and should exercise its equitable power to enter an injunction prohibiting Defendants from enforcing the Act and all the challenged provisions of the Act against Plaintiff and its members.

**COUNT XVI**
**42 U.S.C. § 1983 AND 28 U.S.C. § 2201**
**DECLARATORY RELIEF**

241.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

242.    The Utah Social Media Regulation Act, Utah Code §§ 13-63-101 to -701, violates the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution and thereby deprives Plaintiff, its covered members, and Internet users of enforceable rights. The Act is unlawful and unenforceable because the entire Act relies on an unconstitutional definition of "social media company." § 13-63-101(9).

243.    Utah Code §§ 13-63-102; -103(3), (4), (5); -105; and -401 are unlawful and unenforceable, together and separately, because they violate the First Amendment to the Constitution and thereby deprive Plaintiff, its covered members, and Internet users of enforceable rights.

244.    Utah Code §§ 13-63-103(4) and -401 are unlawful and unenforceable because they are unconstitutionally vague in violation the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution and thereby deprive Plaintiff, its covered members, and Internet users of enforceable rights.

245.    Utah Code §§ 13-63-103(3), (5), and -401 are unlawful and unenforceable because they are preempted by federal law.

246.    The unlawful portions of the Act are not severable from the rest of the Act. The entire Act is therefore unlawful and unenforceable.

247.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

248.    This Court can and should exercise its equitable power to enter a declaration that the entire Act is unconstitutional and otherwise unlawful.

249.    This Court can and should exercise its equitable power to enter a declaration that each of the Act's challenged provisions is unconstitutional and otherwise unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A.  Declare that the Utah Social Media Regulation Act, Utah Code §§ 13-63-101 to -701, is unlawful;

B.  Declare that Utah Social Media Regulation Act, §§ 13-63-101 to -701, violates the First Amendment to the Constitution;

C.  Declare that the Utah Social Media Regulation Act, Utah Code §§ 13-63-101 to -701, is void for vagueness under the First Amendment and the Due Process Clause of the Fourteenth Amendment to the Constitution;

D.  Declare that Utah Code §§ 13-63-102; -103(3), (4), & (5); -105; and -401 violate the First Amendment to the Constitution;

E.  Declare that Utah Code §§ 13-63-103(4) and -401 are void for vagueness in violation the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution.

F.  Declare that Utah Code §§ 13-63-103(3), (5); and -401 are preempted by federal law;

G.  Enjoin Defendants and their agents, employees, and all persons acting under their direction or control from taking any action to enforce the Act or the challenged portions of the Act against Plaintiff or its members;

H.  Enter judgment in favor of Plaintiff;

I.  Award Plaintiff its attorneys' fees and costs incurred in bringing this action, including attorneys' fees costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

J.  Award Plaintiff all other such relief as the Court deems proper and just.

RESPECTFULLY SUBMITTED this 18th day of December 2023.

PARR BROWN GEE & LOVELESS, P.C.

/s/ David C. Reymann
David C. Reymann
Kade N. Olsen

LEHOTSKY KELLER COHN LLP
Steven P. Lehotsky
Scott A. Keller
Todd Disher
Jeremy Evan Maltz
Joshua P. Morrow
Alexis Swartz

*Attorneys for Plaintiff NetChoice, LLC*