David C. Reymann (8495)
Kade N. Olsen (17775)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, UT 84111
(801) 257-7939
dreymann@parrbrown.com
kolsen@parrbrown.com

Steven P. Lehotsky*                  Todd Disher*
Scott A. Keller*                     Joshua P. Morrow*
Jeremy Evan Maltz*                   Alexis Swartz*
LEHOTSKY KELLER COHN LLP             LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW         408 W. 11th Street, 5th Floor
Washington, DC 20001                 Austin, TX 78701
(512) 693-8350                       (512) 693-8350
steve@lkcfirm.com                    todd@lkcfirm.com
scott@lkcfirm.com                    josh@lkcfirm.com
jeremy@lkcfirm.com                   alexis@lkcfirm.com
    *(motions for admission
     pro hac vice pending)

*Attorneys for Plaintiff NetChoice, LLC*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| **NETCHOICE, LLC,** | |
| **Plaintiff,** | |
| **v.** | **MOTION FOR** |
| | **PRELIMINARY INJUNCTION** |
| **SEAN D. REYES, in his official capacity as Attorney General of Utah,** | |
| | **Case No. 2:23-cv-00911-CMR** |
| **KATHERINE HASS, in her official capacity as Director of the Division of Consumer Protection of the Utah Department of Commerce,** | **Magistrate Judge Cecilia M. Romero** |
| **Defendants.** | |

# Table of Contents

Table of Authorities ................................................................................................... iv

Grounds for Relief ...................................................................................................... 1

Preliminary Statement ................................................................................................ 1

Statement of Facts ...................................................................................................... 7

    A. Factual background ........................................................................................ 7

        1.  Social media websites disseminate vast amounts of protected speech. ................. 7

        2.  Websites must choose how to display and organize content. ................................. 8

        3.  Websites rely on advertisements and on the data that users provide. ..................... 9

        4.  Parents have many tools to oversee how their children use the Internet. ............ 12

    B. Utah's Social Media Regulation Act ........................................................... 13

        1.  The Act's content-, viewpoint-, and speaker-based central coverage definitions of "social media company" and "social media platform" ................ 13

        2.  The Act's "general" requirements .......................................................... 15

        3.  The Act's "design" requirements ........................................................... 18

Argument ................................................................................................................. 21

I.   NetChoice is likely to succeed on the merits of its challenges to Utah's Social Media Regulation Act. .................................................................................... 23

    A. The entire Act violates the First Amendment and the Due Process Clause. .............. 23

        1.  The entire Act triggers strict scrutiny because its vague coverage definition of "social media company" is content-, viewpoint-, and speaker-based. .................................................................................. 23

        2.  The Act's central coverage definition, and thus the entire Act, fails strict scrutiny. .................................................................................. 29

    B. Multiple substantive provisions of the Act independently violate the First Amendment and the Due Process Clause. .................................................... 33

        1.  The Act's age-verification, identity-verification, and parental-consent requirements violate the First Amendment. .............................................. 33

        2.  The Act's ban on advertising violates the First Amendment. ............................... 35

        3.  The Act's ban on suggested or targeted content violates the First Amendment. .................................................................................. 37

        4.  The Act's ban on collecting and using data violates the First Amendment and the Due Process Clause. .................................................... 39

5.  The Act's ban on access during a 10:30 p.m. to 6:30 a.m. curfew violates the First Amendment............................................................................................. 41

6.  The Act's "design" requirements—which ban certain "practices, designs, or features"—violate the First Amendment and the Due Process Clause. ........... 43

C.  Multiple substantive provisions of the Act independently are preempted under 47 U.S.C. § 230.......................................................................................................... 46

II.  The remaining factors support a preliminary injunction.................................................. 48

Conclusion ................................................................................................................................ 50

## Table of Authorities

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
143 S. Ct. 2298 (2023) ...............................................................................7, 21, 22

*44 Liquormart, Inc. v. Rhode Island*,
517 U.S. 484 (1996) .................................................................................................36

*Adolph Coors Co. v. Brady*,
944 F.2d 1543 (10th Cir. 1991) .............................................................................35

*Airbnb, Inc. v. City of Boston*,
386 F. Supp. 3d 113 (D. Mass. 2019) ...................................................................47

*Alario v. Knudsen*,
2023 WL 8270811 (D. Mont. Nov. 30, 2023) .......................................................29

*Ams. for Prosperity Found. v. Bonta*,
141 S. Ct. 2373 (2021) .............................................................................29, 30, 32, 44

*Aposhian v. Barr*,
958 F.3d 969 (10th Cir. 2020) ...............................................................................50

*Aptive Env't, LLC v. Town of Castle Rock*,
959 F.3d 961 (10th Cir. 2020) ...............................................................36, 37, 42

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) .................................................................................2, 3, 22, 34

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) .......................................................................49, 50

*Baggett v. Bullitt*,
377 U.S. 360 (1964) .................................................................................................28

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ...............................................................................48

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
140 S. Ct. 2335 (2020) .............................................................................................25

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001)........................................................................................26

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003) ......................................................................46

*Ben Ezra, Weinstein, & Co., v. Am. Online Inc.*,
    206 F.3d 980 (10th Cir. 2000) ................................................................46, 47

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011)................................................................................ *passim*

*Calise v. Meta Platforms, Inc.*,
    2022 WL 1240860 (N.D. Cal. Apr. 27, 2022) ..............................................47

*Cate v. Oldham*,
    707 F.2d 1176 (10th Cir. 1983) ....................................................................50

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
    447 U.S. 557 (1980)......................................................................................35

*Chamber of Com. of the U.S. v. Edmondson*,
    594 F.3d 742 (10th Cir. 2010) ......................................................................50

*Citizens United v. FEC*,
    558 U.S. 310 (2010)......................................................................................27

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
    596 U.S. 61 (2022)..................................................................................24, 25

*City of Boerne v. Flores*,
    521 U.S. 507 (1997)......................................................................................29

*Doe v. Shurtleff*,
    628 F.3d 1217 (10th Cir. 2010) ....................................................................22

*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019) ................................................................47, 48

*Edenfield v. Fane*,
    507 U.S. 761 (1993)..........................................................................36, 37, 42

*Elrod v. Burns*,
    427 U.S. 347 (1976)......................................................................................48

*Erznoznik v. City of Jacksonville,*
    422 U.S. 205 (1975) ........................................................................................23

*Evans v. Sandy City,*
    944 F.3d 847 (10th Cir. 2019) .....................................................................42, 44

*FCC v. Fox TV Stations, Inc.,*
    567 U.S. 239 (2012) ....................................................................................27, 28

*Fields v. Twitter, Inc.,*
    217 F. Supp. 3d 1116 (N.D. Cal. 2016) .........................................................47

*Force v. Facebook, Inc.,*
    934 F.3d 53 (2d Cir. 2019) ............................................................................48

*FTC v. Accusearch Inc.,*
    570 F.3d 1187 (10th Cir. 2009) .....................................................................46

*Ginsberg v. New York,*
    390 U.S. 629 (1968) ........................................................................................35

*Goddard v. Google, Inc.,*
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) .........................................................47

*Herceg v. Hustler Mag., Inc.,*
    814 F.2d 1017 (5th Cir. 1987) ........................................................................46

*Hobby Lobby Stores, Inc. v. Sebelius,*
    723 F.3d 1114 (10th Cir. 2013) .......................................................................48

*Home Box Off., Inc. v. Wilkinson,*
    531 F. Supp. 987 (D. Utah 1982) ...................................................................30

*HomeAway.com, Inc. v. City of Santa Monica,*
    918 F.3d 676 (9th Cir. 2019) ..........................................................................47

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995) ................................................................................ *passim*

*Iancu v. Brunetti,*
    139 S. Ct. 2294 (2019) ....................................................................................25

*Joseph Burstyn, Inc. v. Wilson,*
    343 U.S. 495 (1952) ........................................................................................22

*La'Tiejira v. Facebook, Inc.*,
  272 F. Supp. 3d 981 (S.D. Tex. 2017) ................................................................47

*Lovell v. City of Griffin*,
  303 U.S. 444 (1938) ..............................................................................................22

*Mahanoy Area Sch. Dist. v. B. L.*,
  141 S. Ct. 2038 (2021) ............................................................................23, 35, 42

*Mainstream Mktg. Servs., Inc. v. FTC*,
  358 F.3d 1228 (10th Cir. 2004) ...........................................................................37

*McCollum v. CBS, Inc.*,
  202 Cal. App. 3d 989 (1988) ................................................................................46

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ........................................................................................26, 29

*Miami Herald Pub. Co. v. Tornillo*,
  418 U.S. 241 (1974) .......................................................................6, 33, 38, 44

*Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue*,
  460 U.S. 575 (1983) ........................................................................................26, 43

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  138 S. Ct. 2361 (2018) .....................................................................................26, 27

*NetChoice, LLC v. Bonta*,
  2023 WL 6135551 (N.D. Cal. Sept. 18, 2023) .............................................. *passim*

*NetChoice, LLC v. Griffin*,
  2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ............................................. *passim*

*Nken v. Holder*,
  556 U.S. 418 (2009) ..............................................................................................50

*Pac. Frontier v. Pleasant Grove City*,
  414 F.3d 1221 (10th Cir. 2005) .....................................................................36, 37

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ........................................................................................24, 25

*Reno v. ACLU*,
  521 U.S. 844 (1997) .................................................................................... *passim*

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020)......................................................................................48

*Rubin v. Coors Brewing Co.*,
    514 U.S. 476 (1995)......................................................................................36

*Rutan v. Republican Party of Illinois*,
    497 U.S. 62 (1990)................................................................................ *passim*

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)............................................................................. *passim*

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969)......................................................................................23

*Turner Broad. Sys., v. FCC*,
    512 U.S. 622 (1994)................................................................................26, 27

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023)......................................................................................44

*United States v. Playboy Ent. Group, Inc.*,
    529 U.S. 803 (2000)..........................................................................29, 30, 32

*United States v. Stevens*,
    559 U.S. 460 (2010)......................................................................................21

*United States v. Wenger*,
    427 F.3d 840 (10th Cir. 2005) ...............................................................35, 36

*United States v. Williams*,
    553 U.S. 285 (2008)..........................................................................27, 41, 45

*Utah Licensed Beverage Ass'n v. Leavitt*,
    256 F.3d 1061 (10th Cir. 2001) .............................................................37, 48

*Verlo v. Martinez*,
    820 F.3d 1113 (10th Cir. 2016) .............................................................21, 48

*Virginia v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988)......................................................................................21

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)......................................................................................42

*Zeran v. Am. Online*,
   129 F.3d 327 (4th Cir. 1997) ................................................................46

**Statutes**

47 U.S.C. § 230 ................................................................................ *passim*

Utah Code § 13-63-101 ..................................................................... *passim*

Utah Code § 13-63-102 ..................................................................... *passim*

Utah Code § 13-63-103 ..................................................................... *passim*

Utah Code § 13-63-104 ............................................................................28

Utah Code § 13-63-105 ..................................................................... *passim*

Utah Code § 13-63-202 ....................................................................18, 49

Utah Code § 13-63-301 ............................................................................18

Utah Code § 13-63-401 ..................................................................... *passim*

Utah Code § 13-63-501 ............................................................................21

**Other Authorities**

Utah Social Media Regulation Act Rule, 20 Utah State Bulletin 15 (Oct. 15,
   2023), https://perma.cc/HMZ6-85KN ..........................................16, 34

**Grounds for Relief**

The Utah Social Media Regulation Act, Utah Code §§ 13-63-101 to -701 ("Act"), is unconstitutional because it uses content-, viewpoint-, and speaker-based definitions to restrict minors' and adults' ability to access and engage in protected speech. The Act also uses these same definitions to restrict how certain websites organize, display, and disseminate protected speech. The entire Act violates the First Amendment and the Due Process Clause. Parts of the Act also violate the First Amendment and the Due Process Clause or are preempted under 47 U.S.C. § 230. Plaintiff NetChoice, LLC requests a preliminary injunction before the Act takes effect on March 1, 2024, enjoining Defendants Sean D. Reyes, in his official capacity as Attorney General of Utah, and Katherine Hass, in her official capacity as Director of the Division of Consumer Protection of the Utah Department of Commerce, from enforcing the Act against Plaintiff's members.

**Preliminary Statement**

New mediums of expression continually emerge, evolve, and reinvent the ways that we speak and engage. Yet governments too often try to regulate those new mediums, fearing that widespread adoption may be harmful. A common refrain among lawmakers is that the nature of a new technology requires limiting minors' access to the protected speech, ideas, and content available via these mediums because new channels of expression may endanger or harm our youth.

The Supreme Court has consistently rejected State control of the mediums minors use to access speech—such as "dime novels," "[r]adio dramas," "movies," "comic books," "television," "music lyrics," or "video games"—as contrary to the First Amendment. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 797-98 (2011). Moreover, the Supreme Court has made clear that minors "are entitled to a significant measure of First Amendment protection" and that the State lacks "a free-

floating power to restrict the ideas to which children may be exposed." *Id.* at 794 (cleaned up). Those protections apply with particular force when laws impeding minors' access to speech may also affect *adults'* access to speech. *See Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 882 (1997); *NetChoice, LLC v. Bonta*, 2023 WL 6135551, at *13 (N.D. Cal. Sept. 18, 2023); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *21 (W.D. Ark. Aug. 31, 2023).

The Utah Social Media Regulation Act should likewise be rejected as an unconstitutional attempt to regulate minors' ability to access, speak, hear, share, and otherwise engage in protected speech. Social media websites allow minors and adults alike to "engage in a wide array of protected First Amendment activity on topics as diverse as human thought." *Griffin*, 2023 WL 5660155, at *5 (cleaned up).[1] Yet the Act requires a content-, viewpoint-, and speaker-based subset of covered websites to, among other things: verify all users' ages, obtain parental consent before allowing minors to hold accounts, obtain information about minors' and parents' identities, and block minors' access to these websites during a 10:30 p.m. to 6:30 a.m. curfew. §§ 13-63-102, -105.[2] But the Act exempts dozens of categories of comparable websites that disseminate the same or similar speech. The Act's bans and restrictions also impede *adults'* ability to access and engage in protected speech on covered websites. Decades of First Amendment precedent prohibit all of this.

As an initial matter, the *entire* Act violates the First Amendment and the Due Process Clause by determining coverage based on vague and content-, viewpoint-, and speaker-based definitions of "social media company" and "social media platform." § 13-63-101(9)-(10). In fact, the coverage provisions expressly refer to "content" *ten times*. *See id.* The Act covers several

---

[1] This Motion uses "websites" or "covered websites" to refer to the websites, applications, and other digital services that the Act covers.

[2] Unless otherwise noted, statutory citations in this Motion refer to the Utah Code.

websites that have a large number of users, but it excludes other websites based solely on their content, such as "news, sports, entertainment, or other content that is preselected by the provider." § 13-63-101(10)(b)(i)(D); *see* §§ 13-63-101(10)(b)(i)(F) (similar); -101(10)(b)(i)(H) (similar).

These haphazard definitions create illogical results. YouTube must comply with the Act, but Netflix is exempted. *See* § 13-63-101(10)(a)(ii), (b)(i)(C), (b)(i)(D). As another example, X (formerly Twitter) must comply with the Act, but Bluesky, Gab, and Truth Social are exempted because the Act applies only to websites that have "at least 5,000,000 account holders worldwide." § 13-63-101(9)(a). Nextdoor appears to be covered, but if it limited discussion to "public safety," it would not be. § 13-63-101(10)(b)(i)(I). Minors must secure parental consent (and all users must verify their ages) to engage in "interactive gaming" on Facebook, but not on websites like Roblox "where the predominant or exclusive function is . . . interactive gaming." § 13-63-101(10)(b)(i)(F). All job seekers must jump through those same hoops on covered websites, but not on websites where "the predominant or exclusive function is . . . providing career development opportunities." § 13-63-101(10)(b)(i)(J). Because the Act disfavors only certain websites, it cannot survive any level of First Amendment scrutiny—much less strict scrutiny—and it is therefore unconstitutional.

Moreover, many of the Act's parts are also independently unconstitutional and unlawful.

*First*, the Act's requirements that websites verify the ages of all Utah account holders (both minors *and adults*) and secure parental consent before allowing minors to hold accounts, § 13-63-102, violate the First Amendment. The Act requires websites to collect and verify personal information for *all* Utah users. The Supreme Court has rejected similar laws requiring people to provide identification to access protected speech. *Ashcroft*, 542 U.S. at 673; *Reno*, 521 U.S. at 882. Courts have likewise rejected requirements for minors to secure parental consent before accessing

protected speech. *Brown*, 564 U.S. at 799; *Griffin*, 2023 WL 5660155, at *21 (rejecting age-verification and parental-consent law for social media websites). This Court should do the same.

*Second*, the Act's ban on "display[ing] . . . any advertising in [minors'] account[s]," § 13-63-103(3), is unconstitutional and preempted by 47 U.S.C. § 230 ("§ 230"). It prohibits covered websites from disseminating ads to minors and prohibits minors from seeing any ads on covered websites. Advertising ensures that free-to-use websites remain accessible to all users, not just those who can afford to pay to access expression. But the Act blocks minors from seeing even *user-generated* ads, like ads for tutors offering college-prep, or ads for local bands promoting concerts. The ad ban applies *even if* a minor secures parental consent. This sweeping ban violates the First Amendment. Additionally, 47 U.S.C. § 230 also preempts this regulation of websites publishing third-party ads and requirements for websites to monitor for ads in user-generated content.

*Third*, the Act's ban on displaying personalized content to a minor, § 13-63-103(5), is also unconstitutional and preempted by § 230. Many covered websites use personalization to provide content that is relevant and "beneficial to minors." *Bonta*, 2023 WL 6135551, at *16. Without this personalization, minors would see less high-quality and developmentally-appropriate content, and instead would see more content they may not have any interest in. This ban infringes websites' rights too: Decisions about the "presentation of an edited compilation of speech generated by other persons . . . fall squarely within the core of First Amendment security." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995).

*Fourth*, the Act's vague ban on "collect[ing] or us[ing] any personal information from" minors, § 13-63-103(4), violates the First Amendment and due process. Its purpose and effect is to prevent minors from seeing, and websites from disseminating, personalized content. Websites

4

use this collected information to help inform how they disseminate content to minors, and to ensure that websites are secure, functional, and social. Governmental restrictions of the "availability and use" of information raise grave First Amendment concerns. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570-71 (2011). Even "the compelling and laudable goal of protecting children does not permit the government to shield children from harmful content by enacting greatly overinclusive or underinclusive legislation" that prohibits websites from "[c]ollect[ing] . . . personal information" from a "child." *Bonta*, 2023 WL 6135551, at *16 (citing *Brown*, 564 U.S. at 802-04).

*Fifth*, banning minors' access to covered websites from "10:30 p.m. to 6:30 a.m.," § 13-63-105, also violates the First Amendment. This provision prohibits minors from accessing covered websites at hours the government declares impermissible (unless a parent opts them out). This curfew will make it difficult for minors to communicate across time zones, see ephemeral content, and access things like math tutorials available on covered websites when the State deems it improper to do so. This curfew violates the First Amendment and improperly "impose[s] *governmental* authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3.

*Sixth*, the Act's "design" requirements, § 13-63-401, violate the First Amendment and due process, and they are preempted by § 230. These provisions would require covered websites to alter their "practice[s], design[s], or feature[s]," § 13-63-401—terms the Act does not define—to protect minors from broad and vague "harms," § 13-63-101(2). Every choice a website makes about whether and how to publish, organize, and display expression could be characterized as a "practice, design, or feature." § 13-63-401. These vague, sweeping, and undefined obligations chill websites' First Amendment rights to exercise "editorial control and judgment" over how to organize, display, and disseminate protected speech. *Miami Herald Pub. Co. v. Tornillo*, 418 U.S.

241, 258 (1974); *see Bonta*, 2023 WL 6135551, at *7 (rejecting law that purported to regulate the "design of [an] online service, product, or feature"). The Act's attempt to tether the design requirements to a vague, unique definition of "addiction" aggravates this constitutional problem.

The chilling effect of these design requirements also violates users' First Amendment rights. The design requirements would significantly restrict the ways in which minors can share or access protected expression on covered websites, because websites rely on practices, designs, and features to disseminate content. This restriction will also impact adults' ability to access and engage in speech. If a "practice, design, or feature" violates the design requirements, then websites cannot "use" it at all—whether for minors *or adults*. § 13-63-401(2). And liability is massive: "$250,000 for each practice, design, or feature" that violates the "design" requirements, and "up to $2,500 for each" minor even "exposed" to any such "practice, design, or feature"—whether it affected them or not. § 13-63-401(3). To avoid this staggering liability, covered websites must upend and limit how they organize, display, and disseminate speech for both minors and adults.

*Finally*, the Act's various bans and requirements violate the First Amendment because their combined effect restricts minors' access to a broad array of protected speech. "What the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly." *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 77-78 (1990). Because the First Amendment does not allow Utah to restrict minors or adults from accessing covered websites altogether, it also does not allow the State to accomplish that result indirectly. *See id.* But the Act does just that via a series of outright bans and lowest-common-denominator restrictions requiring websites to transform the nature of their content publications—potentially for all users—to continue offering services that are accessible to minors. *See id.*

Before the Act takes effect on March 1, 2024, this Court should preliminarily enjoin Defendants from enforcing the entire Act or any part of it against Plaintiff's members.

**Statement of Facts**

**A.     Factual background**

**1.     Social media websites disseminate vast amounts of protected speech.**

Plaintiff NetChoice, LLC is a leading Internet trade association. Based on the Act's definitions, § 13-63-101, the Act will affect at least these NetChoice members: (1) Amazon, which owns and operates Twitch; (2) Google, which owns and operates YouTube; (3) Meta, which owns and operates Facebook and Instagram; (4) Nextdoor; (5) Pinterest; and (6) X (formerly known as Twitter). Although the Act does not regulate all NetChoice members, this Motion refers to members that the Act seems to regulate as "covered members."

Each of these covered members operates a website that "publish[es]," *Reno*, 521 U.S. at 852, "disseminate[s]," *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2316 (2023), "creat[es]," or "distribut[es]," *Brown*, 564 U.S. at 792 n.1, protected speech. Szabo Decl. ¶ 6. They do so by displaying text, audio, images, or video to their users. *Id.* ¶ 6.[3] Some covered members operate what are commonly referred to as "social media" websites. *Id.* ¶ 4. These websites allow users to share user-created content with family, friends, colleagues, and other users. *Id.* ¶ 6.

These websites organize, display, and disseminate billions of user-generated "posts" per day, *e.g.*, Davis Decl. ¶ 5, and they are among the Internet's most popular destinations,[4] Szabo

---

[3] Except where otherwise indicated, this Motion uses the term "user" to encompass both of what the Act refers to as "users" and "account holders." This Motion also uses "minor," "adult," "account holder," and "user" to refer only to Utah minors, adults, account holders, and users.

[4] In keeping with the Act's usage, *e.g.*, § 13-63-101(10)(a)(ii), this Motion uses the word "post" to refer to all forms of user-generated submissions (*e.g.*, chatting, streaming, broadcasting, etc.).

Decl. ¶ 4. Teens use social media websites for expression, education, and civic engagement. *Id.* ¶ 6. They read news, track world events, follow sports, pursue extracurricular activities, research universities, and explore careers. *E.g.*, Davis Decl. ¶¶ 13-22. These websites are an indispensable bridge for connecting teens with family and friends across any distance. Szabo Decl. ¶ 6.

### 2.     Websites must choose how to display and organize content.

Most members' websites disseminate user-generated content. Szabo Decl. ¶ 6. These websites must decide whether (and how) to display and organize that content. *E.g.*, Veitch Decl. ¶ 29. Display decisions involve choosing whether (and how) to disseminate text, photos, audio, and video content. *Id.* ¶ 29. Organizational decisions involve choosing how to arrange content on a particular website. *Id.* ¶ 30. While choices about display and organization vary widely among NetChoice's members, Szabo Decl. ¶ 14, there are some commonalities across websites.

Many websites display a "home," "feed," "for you," "following," or "landing" page. Szabo Decl. ¶ 14. This is a central hub that allows a user to see content in a single location. *E.g.*, Davis Decl. ¶ 10-11. Because it is impossible to display every piece of content first, websites must decide how to organize each account holder's home page. Davis Decl. ¶ 12; Veitch Decl. ¶ 45. For example, a website might choose a chronological method that suggests content in either descending or ascending order by recency. *See, e.g.*, Szabo Decl. ¶ 14. Others personalize and curate content that is most relevant to a user's interests. *E.g.*, Veitch Decl. ¶ 45. Still others allow users to switch between these options. *E.g.*, Davis Decl. ¶ 12. No matter what approach websites take, some content will be prioritized or suggested before other content. *E.g.*, Yadegar Decl. ¶ 11.

Many member websites also display "likes" that allow users to communicate (typically) public appreciation, agreement, or acknowledgment for content such as posts, photos, videos, or

even other comments. *E.g.*, Davis Decl. ¶ 9. Displaying "likes" also requires organization. *E.g.*, Veitch Decl. ¶ 31. Websites must decide how to display those "likes"—whether to the poster, the viewer, or both—as well as how to use "likes" in organizational decisions. *E.g.*, *id.* ¶ 28.

As a final example, most websites offer a "search" tool. *E.g.*, Yadegar Decl. ¶ 10. But websites cannot show every search result first. *Id.* ¶ 11. Instead, websites sift through millions of results to locate and display the most relevant search results in a particular order. *E.g.*, Veitch Decl. ¶ 30. Displaying those search results requires organization. *Id.* ¶ 30. For example, a music lover who searches "Utah Jazz" may not see the same results as a sports fan who runs the same search. Most websites use algorithms to help make these decisions. *E.g.*, *id.* ¶ 31. Thus, a search for a particular name will often suggest results that are in a user's area or that share connections with a user's other friends. *Id.* ¶ 45. So too if a user searches for groups, posts, or other content. *Id.* ¶ 45.

Although far from an exhaustive list, things like home pages, likes, and searches are part of the core services that many websites offer (even if under different names). Szabo Decl. ¶ 14. More generally, those core services use practices, designs, and features to display content. *E.g.*, *id.* ¶ 17. Posts contain content, but that content is present only because websites offer "posting" as part of their service. *See* Davis Decl. ¶ 9. The same goes for comments, likes, searches, and all the other myriad forms that content can take. *E.g.*, Veitch Decl. ¶ 31. In each instance, form and content go together. Szabo Decl. ¶ 17. Neither can exist in isolation from the other. *Id.* ¶ 17.

### 3. Websites rely on advertisements and on the data that users provide.

Most covered websites depend on advertisements for a substantial portion of their revenue. Szabo Decl. ¶ 13. This revenue allows websites to remain accessible to everyone. *E.g.*, Davis Decl. ¶ 57. Without ads, many websites could not continue to function in their current form. *E.g.*,

Yadegar Decl. ¶ 8.

Internet ads are often placed based on the interests that a user has expressed on a website. *E.g.*, Szabo Decl. ¶ 13. These "personalized" ads resonate by engaging with a user's specific preferences. *Id.* ¶ 13. For example, a user who joins a pet-focused group might see ads for pet food elsewhere on the website. Internet ads are also often placed based on website context. Veitch Decl. ¶ 35. These "context-based" ads draw insight from a website's content rather than a user's interests. *Id.* ¶ 35. For example, a user who visits the account for a National Park might see ads for lodging near the park on that website. Websites' control over ads gives users easy access to relevant content, allowing websites' free-to-use model to flourish. *Id.* ¶ 33; Davis Decl. ¶ 57.

Account holders use websites for advertising, too. Szabo Decl. ¶ 13. Individuals advertise their goods (*e.g.*, fundraisers, garage sales) and services (*e.g.*, tutoring, yardwork). *See id.* ¶ 13. Artists advertise gallery openings, musicians advertise albums, *see* Yadegar Decl. ¶ 8, and small businesses advertise discounts. Likewise, many major brands have advertising-focused accounts on covered websites. Veitch Decl. ¶ 37. Along with that, many "influencers" or "creators" have accounts on covered websites and advertise via sponsored content. *Id.* ¶ 36. For example, an outdoor-themed influencer might post a paid review of hiking boots on a covered website. Websites seldom earn revenue from any of these user-generated advertisements. Szabo Decl. ¶ 13.

Beyond advertising, user data helps websites present each user with personalized content, which is a central aspect of most social media websites. Szabo Decl. ¶ 14. This personalization draws insights from the data that users provide to the websites to suggest content that may interest the user. *E.g.*, Davis Decl. ¶ 12. That facilitates both users' viewing (because they will see more relevant content first, and less relevant content later or not at all) and users' creating (because their

expression will have a higher chance of reaching a relevant audience). Veitch Decl. ¶ 28.

The websites that NetChoice's members provide would cease functioning if they could not collect, store, and use the technological data that users provide. Szabo Decl. ¶ 15. This includes users' Internet Protocol ("IP") addresses, as well as data about the user's device, operating system, screen resolution, and browser type. Szabo Decl. ¶ 15. Without this data, websites could not function on the diverse devices that people use today (for example, not all screens can fit an equal amount of content). *Id.* ¶ 15. It is similar for engagement data such as load times, clicks, scrolls, and other interactions that allow websites to monitor functionality. *Id.* ¶ 15.

Security is a paramount concern for NetChoice's members. Szabo Decl. ¶ 15. User data is critical for detecting malicious actors, protecting users from would-be identity thieves, providing two-factor authentication, and maintaining overall security. *Id.* ¶ 15. For example, websites routinely track the time, place, and number of an account's login attempts. *See* Davis Decl. ¶ 50. This helps websites flag suspicious activity or sign-in attempts. *Id.* ¶ 50. Many websites also log account activity or changes. *See* Szabo Decl. ¶ 15. This helps websites detect behavior that could signal a compromised account, and logs can also help users restore accounts. Davis Decl. ¶ 50. Logs are also a crucial tool for law enforcement. Rumenap Decl. ¶ 5. For instance, activity logs can help determine a missing person's last known location, interactions, or travel plans. *Id.* ¶ 6.

Finally, various social aspects of covered websites depend on collecting and using user data. Szabo Decl. ¶ 15. If websites could not collect information about networks and connections, users would be unable to share content to only those groups. *E.g.*, Davis Decl. ¶¶ 48-49. Similar examples abound. Many websites allow users to provide data about their family, hometown, relationships, languages, education, employer, credentials, or work history. Szabo Decl. ¶ 15. This

data adds context to social interactions and allows other users to celebrate life events such as birthdays, anniversaries, graduations, and the like. Websites also store data about a user's connections and interactions. *Id.* ¶ 15. That is how websites remember who a user's "friends" are, or what posts a user has "liked." Without this data, websites would cease being "social." *Id.* ¶ 15.

### 4. Parents have many tools to oversee how their children use the Internet.

Parents of course have the legal "power to control what their children hear and say." *Brown*, 564 U.S. at 795 n.3. Because of the tools that the industry has developed, parents have many means of asserting practical control over their children's online experiences. Szabo Decl. ¶ 8.

Foremost, parents control what *devices* minors can access—and when. Not all devices are Internet-enabled. And today's Internet-enabled devices (including computers) come with a full suite of parental-control options. *Id.* ¶ 8. For example, Apple smartphones allow parents to lock or limit specific apps and features on a minor's device, restrict the device settings to limit content and downloads, limit access to only approved websites, and set overall or time-of-day usage limits. *Id.* ¶ 8. Google and others offer similar parental controls on their smartphones. *Id.* ¶ 8.

Parents also control the *networks* that minors use to connect to the Internet with their devices. The wireless routers that provide home Internet access have controls allowing parents to manage which Internet websites minors can use (and at what times). Szabo Decl. ¶ 8. Cellular and broadband Internet providers offer a similar set of parental controls. *Id.* ¶ 8.

Control over *software* is yet another avenue of parental authority. Szabo Decl. ¶ 8. The leading web browsers all offer parental controls. *Id.* ¶ 8. And third-party parental control software is available for many devices, including smartphones and computers. *Id.* ¶ 8. Furthermore, most covered websites require account holders to be at least 13 years old. *Id.* ¶ 8. And many NetChoice

members have also developed their own suite of parental controls. *E.g.*, Davis Decl. ¶ 45; Veitch Decl. ¶ 15; Yadegar Decl. ¶ 7. These controls supplement the substantial resources that members spend crafting and enforcing "content moderation" policies that aim to prevent harmful or objectionable speech from reaching minors. *E.g.*, Davis Decl. ¶ 35-43; Veitch Decl. ¶¶ 20-24.

**B.      Utah's Social Media Regulation Act**

The Governor signed Utah's Social Media Regulation Act into law on March 23, 2023. The Act takes effect on March 1, 2024. *See* ECF No. 1 (Complaint) ¶ 54.

**1.      The Act's content-, viewpoint-, and speaker-based central coverage definitions of "social media company" and "social media platform"**

The Act's central coverage definition targets "social media compan[ies]." § 13-63-101(9). The Act defines that category using a nested definition of "social media platform." § 13-63-101(10). An Internet service is a covered "social media company" if it "provides a social media platform that has at least 5,000,000 account holders worldwide" and "is an interactive computer service." § 13-63-101(9); *see* § 13-63-101(6) (defining "interactive computer service"). If a service has over 5,000,000 account holders, the Act can apply; but if a service has fewer than 5,000,000 account holders, the Act does not apply—even for the exact same speech.

A "social media platform," in turn, is "an online forum that" allows "an account holder to: (i) create a profile; (ii) upload posts; (iii) view the posts of other account holders; and (iv) interact with other account holders or users." § 13-63-101(10)(a). But the term "[s]ocial media platform" also comes with a litany of content-, viewpoint-, and speaker-based exceptions. For example, the definition expressly "does not include an online service, website, or application[ ]"—

"(i) where the predominant or exclusive function is:

     (A) electronic mail;

(B) direct messaging consisting of text, photos, or videos that are sent between devices by electronic means, where messages are: (I) shared between the sender and the recipient; (II) only visible to the sender and the recipient; and (III) are not posted publicly;

(C) a streaming service that: (I) provides only licensed media in a continuous flow . . . ; and (II) does not obtain a license to the media from a user or account holder by agreement to its terms of service;

(D) news, sports, entertainment, or other content that is preselected by the provider and not user generated, and any chat, comment, or interactive functionality that is provided incidental to, directly related to, or dependent upon provision of the content;

(E) online shopping or e-commerce, . . . ;

(F) interactive gaming, virtual gaming, or an online service, that allows the creation and uploading of content for the purpose of interactive gaming, edutainment, or associated entertainment, and the communication related to that content;

(G) photo editing that has an associated photo hosting service, if the interaction with other users or account holders is generally limited to liking or commenting;

(H) a professional creative network for showcasing and discovering artistic content, if the content is required to be non-pornographic;

(I) single-purpose community groups for public safety . . . ;

(J) providing career development opportunities, including professional networking, job skills, learning certifications, and job posting . . . ; . . .

(Q) to permit comments on a digital news website, if the news content is posted only by the provider of the digital news website; . . ."

*or* "(ii) where:

(A) the majority of the content that is posted or created is posted or created by the provider of the online service, website, or application; and

(B) the ability to chat, comment, or interact with other users is directly related to the provider's content;"

*or* "(iii) that is a classified ad service that only permits the sale of goods and prohibits the solicitation of personal services;"

*or* "(iv) that is used by and under the direction of an educational entity . . . ."

§ 13-63-101(10)(b) (paragraph breaks adjusted).

After applying those definitions and wading through the exclusions, the Act regulates

NetChoice's covered members, *see supra* p.7, and perhaps a handful of other websites.

The Act also expressly defines several additional terms:

- "Account holder" means "a person who has, or opens, an account or profile to use a social media company's platform."
- "Minor" means "an individual who is under the age of 18 and . . . has not been emancipated [or] . . . married."
- "User" means "a person who has access to view all, or some of, the posts on a social media platform, but is not an account holder."

§§ 13-63-101(1) to (14).

### 2.   The Act's "general" requirements

The Act's sweeping regulations for a covered "social media company" include what the Act refers to as "general" requirements as well as "design" requirements. §§ 13-63-101 to -701. The "general" requirements direct websites to verify the ages of all users, and to confirm that a minor has parental consent before becoming an account holder. § 13-63-102. They also contain multiple different and overlapping provisions requiring websites to limit the speech available to minors, *even if* the minor obtains parental consent. *E.g.*, §§ 13-63-103, -105.

*Age verification.* The Act requires websites to implement a burdensome and inherently imperfect process to verify the age of *anyone* in Utah—minor or adult—who wishes to hold an account. *See* Rumenap Decl. ¶ 7; Szabo Decl. ¶ 12. The Act provides that a "social media company shall verify the age of an existing or new Utah account holder." § 13-63-102(3)(a). If a person "fails to meet the verification requirements . . . , the social media company shall deny access to the account." § 13-63-102(3)(b). The Act directs Utah's Division of Consumer Protection to establish "processes or means" of age verification and "acceptable forms or methods of identification." § 13-

15

63-102(4). The Division has published a "Proposed Rule" under that authority.[5]

*Identity verification.* Although the Act does not expressly mention identity verification, it is hard for a user to verify their age without disclosing their identity. Rumenap Decl. ¶¶ 7-8. And the Act *does* expressly require the Division to verify the parent-child relationship for any minor who wishes to hold an account. § 13-63-102(4)(d). To do that, websites must identify the person claiming to be the parent *and* identify the minor who is seeking to hold an account. Szabo Decl. ¶ 12. Indeed, the Division's Proposed Rule requires websites to "obtain[] a written attestation from the parent or guardian that they are the minor's legal guardian." Proposed Rule R152-63-6(1)(b). This attestation will necessarily require identifying both "the parent" and "the minor." *Id.*

Wholly separate from this, "[a] social media company shall *proactively identify* any Utah minor account holder who the social media company's age verification process incorrectly determines is not a minor." *Id.* at R152-63-4(2) (emphasis added). To do that, websites must look for minors among *adult* account holders, as there is no need for proactive identification among the group that the website *already knows* are minors. Thus, any steps that a website takes to "proactively identify" minors among the adult user group will therefore lead that website to "proactively identify" adult users, too. *See* Rumenap Decl. ¶¶ 7-8; Szabo Decl. ¶ 12.

*Parental consent.* "[A] social media company may not permit a Utah resident who is a minor to be an account holder on the social media company's social media platform unless the Utah resident has the express consent of a parent or guardian." § 13-63-102(1). Once a covered website verifies that a new or existing account holder is a minor, the website must further "confirm

---

[5] *See* Utah Social Media Regulation Act Rule, 20 Utah State Bulletin 15 (proposed Oct. 15, 2023) (to be codified at Utah Admin. Code R152-63), https://perma.cc/HMZ6-85KN.

that [the] minor has [parental] consent." § 13-63-102(3)(a). If a covered website is unable to "confirm" such consent, the website must "deny access to the account." § 13-63-102(3)(b).

*Ban on advertising.* A "social media company, for a social media platform account held by a Utah minor account holder . . . shall prohibit the display of any advertising in the account." § 13-63-103(3). The Act does not define "advertising," and the Act does not distinguish between user-generated ads and the fee-based ads that many websites use to keep their websites free for users.

*Ban on collection and use of personal information.* A "social media company, for a social media platform account held by a Utah minor account holder . . . shall not collect or use any personal information from the posts, content, messages, text, or usage activities of the account other than information that is necessary to comply with, and to verify compliance with, state or federal law." § 13-63-103(4). The Act defines "posts" as "content that an account holder makes available on a social media platform for other[s] . . . to view." § 13-63-101(8). But it does not define "personal information," "content," "usage activities," or any other terms in this list.

*Ban on personalized content.* A "social media company, for a social media platform account held by a Utah minor account holder . . . shall prohibit the use of targeted or suggested groups, services, products, posts, accounts, or users in the [minor's] account." § 13-63-103(5). The Act does not define "targeted" or "suggested."

*Ban on access during State-imposed 10:30 p.m. to 6:30 a.m. curfew.* A "social media company shall prohibit a Utah minor account holder from having access to the Utah minor account holder's account during the hours of 10:30 p.m. to 6:30 a.m." § 13-63-105. Websites also must give "options" that allow a parent to "change or eliminate the time-of-day restriction" and to "set a limit on the number of hours per day that a Utah minor account holder may use the account." *Id.*

*Enforcement.* Defendants have authority to seek "a civil penalty of up to $2,500 for each violation" of the Act's general requirements. § 13-63-202(3)(b). The Act also creates a private right of action for violations of the Act's general requirements. § 13-63-301. Although the Act gives websites a chance to "cure[]" first-time violations of a particular provision, liability attaches if the website ever again "commits another violation of the *same provision*." § 13-63-202(4)(b) (emphasis added). For example, because a single provision requires websites to verify age, *see* § 13-63-102(3)(a), a website's first-time failure to verify *one* minor's age might not create liability. But subsequent failures to verify *any other* minor's age could create liability. § 13-63-202(4)(b).

### 3. The Act's "design" requirements

The Act also imposes "design" requirements that target the "practice[s]," "design[s]," and "feature[s]" that websites use to organize, display, and disseminate speech. § 13-63-401.

*Broad and vague definitions.* Under the Act, "a social media company shall not use a practice, design, or feature . . . that the social media company knows, or which by the exercise of reasonable care should know, causes a Utah minor account holder to have an addiction to the social media platform." § 13-63-401(2). Thus, if a particular "practice, design, or feature" would violate the Act *for minors*, websites also cannot "use" that feature at all—even for *adults*. *Id.*

The vague and undefined terms "practice, design, or feature" encompass nearly everything that a website does. *Id.* Disseminating user-generated content is a "practice." Branding is part of a website's "design." And accessibility from different devices is a core "feature" of the service that covered websites offer. Websites also rely on "practice[s], design[s], or feature[s]" to organize, display, and disseminate content. *Id.* Thus, any given "practice, design, or feature" cannot be disaggregated from the content that a website disseminates. For example, many websites allow

18

users to "like" other users' content. Davis Decl. ¶ 9. But that ability exists only because websites have decided to offer it as a practice, design, or feature. *Id.* ¶ 9. Eliminating all such practices, designs, and features would destroy the services that websites offer. *See* Szabo Decl. ¶ 17.

The remaining portion of this requirement is similarly vague. Under the Act, "addiction" means "*use* of a social media platform" that "(a) *indicates* the user's substantial preoccupation or obsession with, or the user's substantial difficulty to cease or reduce use of, the social media platform" and "(b) causes physical, mental, emotional, developmental, or material harms to the user." § 13-63-101(2) (emphasis added). The first clause relies on "substantial," "preoccupation," and "difficulty"—all undefined. *Id.* The second clause asks whether the minor experienced "harm"—including "emotional" harm—even though all expression carries some possibility of subjective emotional harm. *Id.* The Act also covers the catchall category of "material" harm. *Id.*

*Illusory defenses.* The Act offers two defenses to liability, but neither offers meaningful shelter from the Act's massive penalties. The first defense disclaims "liability" for: "(a) content that is generated by an account holder"; (b) "content that is created entirely by a third party" and which a company "passively display[s]"; "(c) . . . content for which the social media company was not, in whole or in part, responsible for creating or developing;" or "(d) any conduct by a social media company involving a Utah minor account holder who would otherwise be protected by federal or Utah law." § 13-63-401(4). But for *any* content that someone finds objectionable, there will always be an accompanying "practice, design, or feature" that the website used to display that content to a user. "Likes," for example, are third-party *content*. Davis Decl. ¶ 9; Szabo Decl. ¶ 17; Veitch Decl. ¶ 31. But "likes" are *displayed* via a "practice, design, or feature" implemented by websites. § 13-63-401(2). So, as a practical matter, this defense is no defense at all.

The Act's second defense is similarly illusory. A website "shall not be subject to a civil penalty for violating" the Act's design requirements if the website: (i) conducts "at least quarterly audits" to "detect practices, designs, or features that have the *potential* to cause or *contribute* to" a violation, and (ii) "correct[s] . . . any practice, design, or feature discovered by the audit to present more than a *de minimus* risk of violating" the design requirements. § 13-63-401(3)(b) (emphases added). The nested modifiers—"potential," "contribute," "de minimus," "indicate[]," and "reduce"—seem to define this defense out of practical existence. As such, neither of the Act's purported defenses reduces the Act's substantial chill on websites' First Amendment activity.

The Act's limited "knowledge" element provides no better protection. The Act prohibits websites from using a "practice, design, or feature" that a website "knows" or "by the exercise of reasonable caution should know" violates the Act's design requirements. § 13-63-401(2). But while this *prohibition* refers to a website's knowledge, the Act's *liability* provisions are not so limited. *See* § 13-63-401(3). Instead, "a social media company is subject to" multiple forms of "civil penalty" for any "practice, design or feature shown to have caused addiction." *Id.* These liability provisions do not expressly mention a website's knowledge—only its actions. *Id.*

*Leveraged enforcement.* The penalties for the design requirements are highly leveraged, making websites liable for *all* minors who were merely "exposed to" a "practice, design, or feature" that caused "addiction" in just a *single* minor. § 13-63-401(3). "[A] social media company is subject to: (i) a civil penalty of $250,000 for each practice, design, or feature shown to have caused addiction; and (ii) a civil penalty of up to $2,500 for each [minor] who is shown to have been exposed to [any such] practice, design, or feature." § 13-63-401(3). If a website violates the design requirements for even *one* "practice, design, or feature" for *one* minor, that website faces

liability for *every* minor who was "exposed" to that practice, design, or feature—even if it did not affect them. This is true regardless of a minor's age, parental consent, or individual circumstances.

Taken together, the design requirements will chill wide swaths of protected speech. *E.g.*, Davis Decl. ¶ 61; Veitch Decl. ¶ 48; Yadegar Decl. ¶ 12. The Act's private right of action—with its *presumption* of harm—intensifies this effect considerably. *See* § 13-63-501.

### Argument

NetChoice is entitled to a preliminary injunction because it can "demonstrate: (1) a likelihood of success on the merits; (2) a likelihood [of] irreparable harm if the injunction is not granted; (3) the balance of equities is in [NetChoice]'s favor; and (4) the preliminary injunction is in the public interest." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (citation omitted). For all claims, there is "no set of circumstances" under which the Act or the challenged provisions of the Act "would be valid" (a traditional facial challenge). *United States v. Stevens*, 559 U.S. 460, 472-73 (2010) (citation omitted). Alternatively, for each First Amendment claim, "a substantial number of [the Act's] applications are unconstitutional" (a First Amendment overbreadth facial challenge). *Id.* NetChoice can assert harms to the First Amendment rights of its members as well as harms to members' users. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988).

The First Amendment protects far more than just the *creation* of speech. *E.g.*, *Sorrell*, 564 U.S. at 570 ("[T]he creation *and dissemination* of information are speech within the meaning of the First Amendment."); *see also Reno*, 521 U.S. at 852; *303 Creative*, 143 S. Ct. at 2316; *Brown*, 564 U.S. at 792 n.1. It also protects entities that publish or disseminate speech *created by others*. And in particular here, it protects covered websites, which "publish," *Reno*, 521 U.S. at 852, and "disseminate" protected speech, *303 Creative*, 143 S. Ct. at 2316. The First Amendment does not

"require a speaker to generate, as an original matter, each item featured in the communication." *Hurley*, 515 U.S. at 570. As such, "the presentation of an edited compilation of speech generated by other persons . . . fall[s] squarely within the core of First Amendment security." *Id.*

These principles apply with equal force to social media websites. "[W]hatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears." *Brown*, 564 U.S. at 790 (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)). The "press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938). Covered websites' choices about how to disseminate speech are thus fully protected by both the First Amendment's Free Speech and Free Press Clauses.

The Act therefore restricts a wide swath of protected speech. "Social media companies . . . allow users to gain access to information and communicate with one another about it on any subject that might come to mind." *Griffin*, 2023 WL 5660155, at *5 (alteration adopted) (internal quotation marks and citation omitted). As part of the larger Internet, these websites "provide[] relatively unlimited, low-cost capacity for communication of all kinds" on subjects "as diverse as human thought." *Reno*, 521 U.S. at 852, 870 (1997). Accordingly, "[t]he Supreme Court has . . . made clear that First Amendment protections for speech extend fully to communications made through the medium of the internet." *Doe v. Shurtleff*, 628 F.3d 1217, 1222 (10th Cir. 2010); *see 303 Creative*, 600 U.S. at 587; *Ashcroft*, 542 U.S. at 673; *Reno*, 521 U.S. at 870.

This speech is protected for minors, too—not just for websites or adults. Government does not have a "free-floating" interest in prohibiting minors from accessing speech on any of these

mediums. *Brown*, 564 U.S. at 794. It is long settled that "the values protected by the First Amendment are no less applicable when the government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975). Minors "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate" and "may not be confined to the expression of those sentiments that are officially approved." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). Instead, minors have "robust First Amendment protections." *Mahanoy Area Sch. Dist. v. B. L.*, 141 S. Ct. 2038, 2048 (2021).

**I.     NetChoice is likely to succeed on the merits of its challenges to Utah's Social Media Regulation Act.**

The entire Act violates the First Amendment and the Due Process Clause of the Fourteenth Amendment because its central coverage definition of "social media company" is vague and renders the Act an unconstitutional content-, viewpoint-, and speaker-based restriction on protected First Amendment activity. Specific provisions of the Act are also independently unlawful under the First Amendment or the Due Process Clause, or are preempted under 47 U.S.C. § 230.

**A.     The entire Act violates the First Amendment and the Due Process Clause.**

**1.     The entire Act triggers strict scrutiny because its vague coverage definition of "social media company" is content-, viewpoint-, and speaker-based.**

The entire Act triggers strict scrutiny because its scope-defining term—"social media company," § 13-63-101(9)—restricts protected speech based on arbitrary distinctions about what is said, who says it, and which viewpoints are said on a subset of websites. Minors are free to look for work on LinkedIn, but not on X or Facebook. *See* § 13-63-101(10)(b)(i)(J) (exemption for "professional networking"). The Act allows minors to review movies on Fandango, but not on YouTube. *See* § 13-63-101(10)(b)(i)(D) (exemption for "comment[s]" on online services that

predominantly provide "entertainment . . . content that is preselected by the provider and not user-generated"). Minors must clear the Act's hurdles to discuss homework on many content-moderated websites where tools for parental supervision are already available—such as many of NetChoice members' websites. Yet the Act poses no bar for minors who wish to discuss anything at all on smaller websites that may lack moderation and parental tools.

The entire Act triggers strict scrutiny by using content-, viewpoint-, and speaker-based coverage definitions, which are also impermissibly vague.

The Act is content-based because it excludes dozens of categories of Internet services from regulation based solely on the content they disseminate. For example, "streaming service[s]," "online shopping," "photo editing," "professional or creative network[s]," "comments on a digital news website," "classified ad service[s]," and many others are excluded. § 13-63-101(10)(b). The Act "singles out specific subject matter for differential treatment." *Reed v. Town of Gilbert*, 576 U.S. 155, 156, 169 (2015). After all, a law "is facially content based . . . if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (cleaned up). The Act does just that.

In fact, the Act's definitional exclusions expressly draw distinctions based on "content" *ten different times*. *See* § 13-63-101. For example, the Act excludes services that offer "*news, sports, entertainment*, or other *content* that is preselected by the provider." § 13-63-101(10)(b)(i)(D) (emphases added); *see* §§ 13-63-101(10)(b)(i)(F) (exempting certain "*content* for the purpose of interactive gaming" (emphasis added)); -101(10)(b)(i)(H) (exempting certain "artistic *content*" (emphasis added)); -101(10)(b)(i)(Q) (exempting another category of certain "news *content*" (emphasis added)). The Act is "facially content-based" due to these exclusions alone. *Reed*, 576

U.S. at 166; *see Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2345 (2020) (holding that "content-based exception[s]" render a law unconstitutional).

The Act also restricts websites that allow individuals "to interact with other account holders or users," § 13-63-101(10)(a)(iv), while exempting online services that have other "predominant or exclusive function[s]," § 13-63-101(10)(b). The Act's references to "function" are a proxy for other content-based restrictions. But "a regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin*, 596 U.S. at 74. The Act violates this precept because it exempts Internet websites that allow people to "interact" regarding some content (*e.g.*, sports, entertainment, or gaming) while restricting websites that allow people to "interact" regarding other content (*e.g.*, politics, religion, and local gatherings). § 13-63-101(10)(a)(iv).

The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91. Thus, "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they" satisfy "strict scrutiny." *Reed*, 576 U.S. at 163-164. The Act's content-based coverage definition thus triggers strict scrutiny for the entire Act.

The Act is also speaker- and viewpoint-based, again triggering strict scrutiny. *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019). By favoring "content that is preselected by the provider and not user generated," the Act gives special treatment to the viewpoints of "provider[s]" as compared to those of "user[s]." § 13-63-101(10)(b)(i)(D). Similarly, the Act favors the view that "preselected" content deserves special protection, while disfavoring the view that "user generated"

content is just as valuable. Laws that "favor[] one viewpoint . . . over the other . . . . must satisfy strict scrutiny." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). The Act's viewpoint distinction between "user[s]" and "providers" is especially antithetical to the First Amendment's guarantees. *See, e.g.*, *Bartnicki v. Vopper*, 532 U.S. 514, 525 n.8 (2001) (drawing "no distinction" as to the scope of First Amendment protection between ordinary individuals versus institutional media).

The Act also distinguishes among speakers within a "single medium"—the Internet. *Turner Broad. Sys., v. FCC*, 512 U.S. 622, 659 (1994). In particular, the Act contrasts online destinations that "preselect[]" content versus websites that are a home for "user generated" content. § 13-63-101(10)(b)(i)(D); *see* § 13-63-101(10)(b)(ii)(B) (distinguishing a "provider's content" from other types of content). Thus, a speaker who publishes on an online service dedicated to "sports" can enjoy "chat, comment, or interactive functionality" free of the Act's burdens. § 13-63-101(10)(b)(i)(D). But a speaker who wishes to publish on a covered website cannot do the same.

And the Act "covers a curiously narrow subset of speakers." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2377 (2018) ("*NIFLA*"); *see Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 591 (1983) (rejecting law that "target[ed] a small group of newspapers"). Along with the laundry list of content-based exclusions, the Act also does not apply to a "social media platform" that has fewer than "5,000,000 account holders worldwide." § 13-63-101(9). The effect of these definitions is that the Act covers only "a small number" of speakers—NetChoice's covered members, plus a few other covered websites. *Turner*, 512 U.S. at 659. For example, the Act restricts speech that occurs on covered websites that have a relatively large number of users (*e.g.*, X) but ignores the same speech occurring on otherwise similar websites—even those that have millions of users—if they do not have "at least 5,000,000 account

26

holders worldwide" (*e.g.*, Gab, Bluesky, and Truth Social). § 13-63-101(9).

The Supreme Court is "deeply skeptical of laws that distinguish among different speakers, allowing speech by some but not others." *NIFLA*, 138 S. Ct. at 2378 (2018) (cleaned up). "Speaker-based laws run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own views.'" *Id.* (quoting *Sorrell*, 564 U.S. at 580). Put differently, "restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Speaker-based laws "present serious First Amendment concerns" when they "discriminate . . . among different speakers within a single medium" or "f[a]ll upon only a small number" of speakers. *Turner*, 512 U.S. at 659. The Act does both.

Compounding these problems, the Act's numerous exclusions are all vague in violation of the First Amendment and the Due Process Clause. The Act's laundry list of exclusions depends on identifying a website's "predominant or exclusive function." § 13-63-101(10)(b)(i). Even though these terms are "critical to determining which entities fall within [the Act]'s scope," *Griffin*, 2023 WL 5660155, at *13, the Act leaves them undefined. The Act also gives no "guidelines about how to determine a [website's predominant or exclusive function], leaving companies to choose between risking unpredictable and arbitrary enforcement . . . and trying to implement the Act's costly . . . requirements." *Id.* As in *Griffin*—which considered these exact same terms—"[s]uch ambiguity renders a law unconstitutional." *Id.*

By relying on these vague terms, the Act fails to "give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). For the same reason, the Act "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). The constitutional standard

for vagueness is heightened for speech restrictions under the First Amendment. *Fox*, 567 U.S. at 253-54. The Act's central coverage definition is unconstitutionally vague because it pushes websites "to steer far wider of the unlawful zone" than they otherwise would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

The Act also severely restricts the protected speech that it reaches. It bars minors from using covered websites without first satisfying the State's demands related to age, identity, and parental consent. § 13-63-102(1). It also restricts minors' ability to use covered websites during the State-imposed curfew. § 13-63-105. And it prohibits even *adults* from using covered websites without jumping through hoops for age- and identity-verification. § 13-63-102(3). The Act also restricts the display of "advertising" that minors might wish to access—or that users might wish to share. § 13-63-103(3). And the Act restricts covered websites' own ability to create, publish, curate, edit, and disseminate speech. *E.g.*, §§ 13-63-103(3), -103(4), -103(5), -104, and -401.

For minors, the Act is more than a mere restriction—it is an outright ban. It requires covered websites to completely upend how they disseminate expression to minors, *even for minors who secure parental consent*. *See, e.g.*, § 13-63-103. The ban on advertising forbids websites from relying on the free-to-use model for minors, and it pushes websites to develop new and speculative tools for detecting and suppressing user-generated ads. § 13-63-103(3). The ban on collecting and using personal information blocks websites from offering minors an experience that is functional, secure, and social. § 13-63-103(4). The ban on targeted and suggested content requires covered websites to either ban minors or create a new, de-personalized service. § 13-63-103(5). And the design requirements have the effect of requiring covered websites to limit or block *all* minors (and potentially even *all* adults) from seeing any "practice, design, or feature," that might violate the

28

Act even for *one* minor. § 13-63-401. Each of these restrictions is independently unconstitutional (as discussed below in Part I-B), but together they also amount to an outright and unconstitutional ban on *any* minor accessing covered websites as they exist today. *See Alario v. Knudsen*, 2023 WL 8270811, at *12 (D. Mont. Nov. 30, 2023) ("SB 419 bans TikTok outright and, in doing so, it limits constitutionally protected First Amendment speech.").

> **2.   The Act's central coverage definition, and thus the entire Act, fails strict scrutiny.**

A law survives strict scrutiny only if "the government [has] adopt[ed] 'the least restrictive means of achieving a compelling state interest.'" *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) ("*AFP*") (quoting *McCullen*, 573 U.S. at 478). This is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). The Act fails both prongs of this test, and the failures are so severe that the entire Act cannot survive any other form of heightened First Amendment scrutiny, either.

The State undoubtedly has a "compelling interest in protecting children," but that "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. To the extent that Utah seeks to justify the Act on the theory that it has an interest in buttressing parental control, Supreme Court precedent forecloses that argument. *See id.* The Supreme Court has also registered "doubts" that the government has *any* interest in "punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech." *Id.* at 802. On the contrary, "esthetic and moral judgments about art and literature" and about speech in general "are for the individual [or a parent] to make, not for the Government to decree." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 818 (2000). As a Utah district court put it four decades ago when discussing a television show that was popular at the time, "if we're

29

concerned parents and we're not overjoyed by the violence and stupidity of *The Dukes of Hazzard*, we turn it off and direct our children to something else." *Home Box Off., Inc. v. Wilkinson*, 531 F. Supp. 987, 1001 (D. Utah 1982).

Further, the State must "specifically identify an 'actual problem' in need of solving" before restricting speech. *Brown*, 564 U.S. at 799 (quoting *Playboy*, 529 U.S. at 822-23). Yet parents already have many tools to control how their children use covered websites and the Internet. *See supra* p.12. Whatever "modest gap in concerned parents' control" those tools leave open (if any), filling it "can hardly be a compelling state interest." *Brown,* 564 U.S. at 803. That is because "the government does not have a compelling interest in each marginal percentage point by which its goals are advanced." *Id.* at 803 n.9. Instead, the State must "show that the Act's restrictions meet a substantial need of parents who wish to restrict their children's access to [social media websites] *but cannot do so*." *Id.* at 803 (emphasis added). The State cannot do so here. No matter what interest Defendants cite, it will not qualify as "compelling." *Id.* at 799. "[A]mbiguous proof will not suffice." *Id.* at 800. Nor will mere "predictive judgment[s]" about harm. *Id.* at 799.

The entire Act is also not the "least restrictive means" to satisfy any possibly sufficient governmental interest. *AFP*, 141 S. Ct. at 2383. Even if the State could demonstrate a sufficient interest, it can pursue that interest only "by means that are neither seriously underinclusive nor seriously overinclusive." *Brown*, 564 U.S. at 805. The Act here is both. Such selective tailoring "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802.

First, the Act is vastly overinclusive. It prohibits minors from accessing *any* speech on covered websites absent parental consent—even if that speech is educational, religious, political,

or otherwise protected and valuable (or even innocuous). Minors use websites for all those purposes. *E.g.*, Davis Decl. ¶¶ 13-22. By requiring all users to submit to the age-verification process, the Act also restricts *adults*' access to protected speech. Accordingly, the Act is overinclusive as to *any* interest that focuses only on minors. This is an independent reason that the Act triggers and fails strict scrutiny. *Sorrell*, 564 U.S. at 566 ("[T]he Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." (citation omitted)).

Even minors who abide by the State's unconstitutional demand for parental consent would not gain access to covered websites as they exist today. Instead, covered websites would have to transform into the new, minor-specific versions the Act envisions. No advertising—even ads that a minor might wish to see (such as college-prep tutoring) or to post (such as offering to babysit). No sharing of personal information—even personal information that parents might wish a minor to share, such as who her parents are or what her educational interests are. No personalization— even that which a minor might welcome, such as suggestions for new books or social activities. And no "use" of any "practice, design, or feature" that could violate the Act's design requirements, even for practices, designs, and features that minors or their parents want the minor to access. § 13-63-401(2). And that is to say nothing of the practices, designs, and features that *adults* want to access. Because the First Amendment does not allow Utah to ban minors from websites altogether (much less adults), *see Brown*, 564 U.S. at 794, the State cannot accomplish that result "indirectly" by requiring websites to fundamentally alter their nature to serve minors. *Rutan*, 497 U.S. at 77-78. But this Act "burns the house to roast the pig." *Reno*, 521 U.S. at 882 (cleaned up).

Second, the Act is also underinclusive when judged against any purported justification. For example, the Act restricts users from accessing covered websites to engage in gaming-related

conversations but does not do so for *the exact same conversation* that takes place on a website where gaming is the "predominant or exclusive function." § 13-63-101(10)(b)(i)(F). Examples abound for all the Act's other exceptions. LinkedIn, Cameo, Discord, Imgur, Steam, Origin, Citizen, Behance, Gettr, Truth Social, and many other services are apparently excluded from the Act's reach (via the five-million account holder threshold)—even though minors can use them interchangeably with covered websites such as YouTube and Facebook. Furthermore, if covered websites are indeed "dangerous and mindaltering," it does "not make sense to leave [them] in the hands of children so long as one parent . . . says it's OK." *Griffin*, 2023 WL 5660155, at *18 (cleaned up) (quoting *Brown*, 564 U.S. at 802). "That is not how one addresses a serious social problem." *Brown*, 564 U.S. at 802. Similarly, it makes no sense for the Act to exempt some minors if they are married. § 13-63-101(7).

Regardless, the Act is far from the "least restrictive" way to accomplish any goals the State might have. *AFP*, 141 S. Ct. at 2383. To support parental control over ads or anything else, Utah could give "parents the information needed to engage in active supervision" over children's access to the Internet. *Playboy*, 529 U.S. at 826. That would require little more than the State itself publicizing the diverse array of supervisory technologies already widely available for networks, devices, and software. *See supra* p.12. Or the State could "act to encourage the use of filters . . . by parents to protect minors." *Griffin*, 2023 WL 5660155, at *21 (cleaned up). "It is no response that [these tools] require[] a consumer to take action, or may be inconvenient, or may not go perfectly every time." *Playboy*, 529 U.S. at 824. Rather, "[i]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id.* at 815.

Instead, the Act "is only in support of what the State thinks parents *ought* to want"

regarding social media, advertising, personal information, suggested content, and the like. *Brown*,
564 U.S. at 804. "This is not the narrow tailoring to 'assisting parents' that restriction of First
Amendment rights requires." *Id.* No matter how Defendants slice it, the Act prohibits far too much
and protects far too little. For that reason, the entire Act violates the First Amendment.

> **B.      Multiple substantive provisions of the Act independently violate the First
> Amendment and the Due Process Clause.**

The Act's substantive provisions impose multiple speech restrictions on what websites
"shall" or "shall not" do. *E.g.*, §§ 13-63-102, -103, -105, and -401. Each of these provisions is
unconstitutional because it imposes burdensome restrictions *only on* the content-, viewpoint-, and
speaker-based vague set of "social media compan[ies]." § 13-63-101(9). These provisions are part
of the larger Act, and they are unconstitutional for the same reasons. *See supra* Part I-A.

Many of the Act's substantive provisions also violate the First Amendment or the Due
Process Clause for additional, independent reasons. Even putting aside the Act's unlawful central
coverage definition, each of sections 13-63-102, -103(3), -103(4), -103(5), -105, and -401 triggers
and fails strict scrutiny. At minimum, these provisions target websites' "editorial control and
judgment" over how to organize, display, and disseminate content. *Hurley*, 515 U.S. at 575
(quoting *Tornillo*, 418 U.S. at 258). But these provisions cannot survive any form of heightened
First Amendment scrutiny, such as even "intermediate" or "commercial speech" scrutiny.

> **1.      The Act's age-verification, identity-verification, and parental-consent
> requirements violate the First Amendment.**

The Act violates the First Amendment by requiring websites to "verify the age of an
existing or new Utah account holder." § 13-63-102(3)(a). This requirement applies to all current
and would-be account holders—minors *and adults* alike. *See id.* Yet the Supreme Court has held

that the First Amendment prohibits the government from requiring adults to provide personal information—such as "credit card information"—to access speech. *Ashcroft*, 542 U.S. at 667. As in *Griffin*, "[i]t is likely that many adults who otherwise would be interested in becoming account holders on regulated social media platforms will be deterred—and their speech chilled—as a result of the age-verification requirements." 2023 WL 5660155, at *17. Likewise for minors. *See id.*

The Act's identity-verification requirements, *see supra* p.15, are also unconstitutional. "Requiring adult users to produce state-approved documentation to prove their age and/or submit to biometric age-verification testing imposes significant burdens on adult access to constitutionally protected speech and 'discourages users from accessing the regulated sites.'" *Griffin*, 2023 WL 5660155, at *17 (alterations adopted) (quoting *Reno*, 521 U.S. at 856). So too for minors. *See id.* Giving consent necessarily requires parents to identify themselves and their children to the State. Families may be unwilling to do this for any number of reasons, including privacy. Worse, the Division's Proposed Rule potentially requires websites to "proactively identify" *all* users—even those who have verified their ages. Proposed Rule at R152-63-4(2). All of this is unconstitutional.

The Act's parental-consent requirement also squarely violates established First Amendment precedent. The Supreme Court has rejected the idea "that the state has the power to prevent children from hearing or saying anything without their parents' prior consent," because "[s]uch laws do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3. The Supreme Court has specifically rejected parental-consent requirements for "political rall[ies]" or "religious" services. *Id.* Yet minors use covered websites for those very purposes. *E.g.*, Davis Decl. ¶¶ 13-22.

Each of these requirements triggers strict scrutiny. As in *Brown*, "the absence of any

historical warrant or compelling justification for such restrictions . . . renders them invalid." 564 U.S. at 795 n.3. Utah's Act "would fare better if there were a longstanding tradition in this country of specially restricting children's access to [protected speech], but there is none." *Id.* at 795. Nor may the State fall back on the "unprecedented and mistaken" strategy of "creat[ing] new categories of unprotected speech" specifically for minors. *Id.* at 792, 794. Utah's Act targets broad swaths of protected speech, and it reaches far beyond the few, "narrow," "well-defined" circumstances where the Supreme Court has recognized governments may have a bit more latitude to restrict minors from accessing speech. *Id.*; *see Ginsberg v. New York*, 390 U.S. 629, 636 (1968) (the "obscenity" category may be broader for children than for adults); *Mahanoy*, 141 S. Ct. at 2044 (government can regulate some "student" speech). Without anything even resembling "historical warrant," the Act's requirements for age-verification, identity-verification, and parental consent are all "invalid" under any standard of heightened First Amendment scrutiny. *Brown*, 564 U.S. at 795 n.3.

### 2. The Act's ban on advertising violates the First Amendment.

The Act also violates the First Amendment by requiring websites to "prohibit the display of any advertising in the account" of any minor. § 13-63-103(3). That broad prohibition sweeps in ads from colleges, the military, and political candidates. "Advertising is widely recognized as the most obvious example of commercial speech." *United States v. Wenger*, 427 F.3d 840, 846 (10th Cir. 2005) (citing *Adolph Coors Co. v. Brady*, 944 F.2d 1543, 1546 (10th Cir. 1991)).

Laws targeting commercial speech usually "must satisfy a form of intermediate scrutiny." *Id.* (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 564-65 (1980)). Under this doctrine, expression is "commercial speech" if it "is concededly an advertisement," "refers to a specific product" or service, or "is motivated by an economic interest

in selling [a] product" or service. *Id.* at 847. On the other hand, there is no "philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 522 (1996) (Thomas, J., concurring in part and concurring in the judgment). Thus, while the ban on all advertisements to minors should be considered under strict scrutiny, it cannot survive even "commercial speech" scrutiny.

The Tenth Circuit applies a "three-part test [to] First Amendment challenges to regulations restricting non-misleading commercial speech that relates to lawful activity." *Wenger*, 427 F.3d at 849. That test applies here, because by banning minors from seeing "any" advertisements, § 13-63-103(3), the Act necessarily bans minors from seeing "non-misleading" ads that "relate[] to lawful activity." *Id.* at 846. Importantly, this three-part test consists of elements, not factor balancing. *See, e.g.*, *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 999 (10th Cir. 2020). Here, the Act flunks all three elements, so it "does not withstand First Amendment scrutiny." *Id.*

First, the State "must assert a substantial interest to be achieved by" the advertising ban. *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1231 (10th Cir. 2005) (internal quotation marks and citation omitted). A "critical" aspect of this element requires that the State "must demonstrate that the harms it recites are real." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995) (internal quotation marks and citation omitted). Otherwise, "a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression." *Edenfield v. Fane*, 507 U.S. 761, 771 (1993). Here, the State has no interest in "suppress[ing] [speech] solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Brown*, 564 U.S. at 795. That includes advertising.

Second, the State must demonstrate that the advertising ban for minors "advances [the

State's] substantial interests in a direct and material way." *Aptive*, 959 F.3d at 986. If the advertising ban "provides only ineffective or remote support for the government's purpose, it will not be upheld." *Pac. Frontier*, 414 F.3d at 1231 (internal quotation marks and citation omitted). Instead, the State must show that "its laws restricting . . . advertising will reduce [the cited] harms to a material degree." *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1074 (10th Cir. 2001). Here, the ban on displaying advertising to minors provides at best only "remote support" for whatever interest the State may be seeking to protect. *Pac. Frontier*, 414 F.3d at 1231. Whatever harm the State may assert cannot trace to "advertising" in general, because ads are ubiquitous throughout the Nation's history and across all types of media. The advertising ban's unprecedented scope means that it serves the State's purported goals (if any) only remotely.

Third, the advertising ban for minors "is unconstitutional if the governmental interest could be served as well by a more limited restriction on commercial speech." *Id.* at 1231-32 (internal quotation marks and citation omitted). Under this element, the question is "whether the extent of the restriction on protected speech is in reasonable proportion to the interests served." *Edenfield*, 507 U.S. at 767. Defendants cannot meet their burden to show that banning *all* ads for *all* minors across *all* covered websites is "proportion[al]" to any substantial State interest. *See id.* Instead, for whatever interest Defendants could invoke, there will be "numerous and obvious less-burdensome alternatives that would restrict less speech while accomplishing the government's objectives equally as well." *Mainstream Mktg. Servs., Inc. v. FTC*, 358 F.3d 1228, 1245 (10th Cir. 2004).

### 3.    The Act's ban on suggested or targeted content violates the First Amendment.

The Act's ban on "the use of targeted or suggested groups, services, products, posts, accounts, or users in the account" of any minor also violates the First Amendment. § 13-63-103(5).

This ban independently triggers strict scrutiny because it infringes the "'the choice of material and the decisions made as to . . . content.'" *Hurley*, 515 U.S. at 575 (1995) (alterations adopted) (quoting *Tornillo*, 418 U.S. at 258). More specifically, the ban overrides the choices that websites make about if and how to organize and display content. *See supra* p.8; *e.g.*, Veitch Decl. ¶¶ 29-30. These choices "'constitute the exercise of editorial control and judgment' upon which the State cannot intrude." *Hurley*, 515 U.S. at 575 (quoting *Tornillo*, 418 U.S. at 258). Covered websites' decisions about "*presentation* of an edited compilation of speech generated by other persons . . . fall squarely within the core of First Amendment security." *Id.* at 570 (emphasis added).

Websites' ability to personalize how they display content for individual users is a hallmark of their services. *See supra* pp.8-9. Suggesting a book or film based on a user's browsing or reading history adds value by responding to the user's interests (and by connecting authors and filmmakers with an audience). Even setting aside personalization, choices about organization of content are inescapable. Regardless of how many millions or billions of pieces of content are posted daily on covered websites, websites simply cannot show all content first or at the same time. *E.g.*, Yadegar Decl. ¶ 11. Instead, they must organize it. This is equally true for the "posts" that account holders see on a home page as it is for "groups, . . . accounts, or users" that account holders see after conducting a search. § 13-63-103(5). By forbidding websites' organizational methods that "suggest[s]" one post (or user, group, comment, etc.) before another, the Act forbids organization outright as a practical matter. This ban is yet another way by which the Act "indirectly" tries to restrict speech that the State could not possibly regulate directly. *Rutan*, 497 U.S. at 77-78.

The ban on personalization therefore triggers strict scrutiny, and regardless, cannot survive any form of First Amendment scrutiny. Utah has no legitimate interest in barring minors from

accessing personalized content, or in prohibiting websites from displaying that content. Conjectural concerns are not enough. Instead, the State must "specifically identify an actual problem in need of solving" before restricting speech. *Brown*, 564 U.S. at 799. It has not done that. Even if it had, the State's means are wildly overbroad under any level of scrutiny. The ban prohibits *all* "suggested" or personalized content—including even the suggestions for content that minors want to see. § 13-63-103(5). On the flip side, many websites use suggestions as a tool to suppress content that users may find offensive or may want to *avoid*. *E.g.*, Veitch Decl. ¶¶ 28, 45. By banning websites from making any suggestions responding to user preferences, the Act may have the counter-productive effect of exposing users to *more* content they do not want to see, not less. That is not a proportional response to any conceivably adequate governmental interest.

      **4.**    **The Act's ban on collecting and using data violates the First Amendment and the Due Process Clause.**

The Act also violates the First Amendment and due process by prohibiting websites from "collect[ing] or us[ing] any personal information from the posts, content, messages, text, or usage activities of the account other than information that is necessary to comply with . . . state or federal law." § 13-63-103(4). This vague ban triggers and fails strict scrutiny for at least three reasons.

First, this provision attempts to "indirectly" ban minors from accessing covered websites, *Rutan*, 497 U.S. at 77-78, by attacking the information that websites collect and use to make choices about how to disseminate speech in a functional, secure, and social manner. Functionality requires websites to collect and use information about, among other things, a user's location, device type, and software. Szabo Decl. ¶ 15. Likewise, many websites collect and use activity logs to keep accounts secure and to counter malicious actors. *E.g.*, Rumenap Decl. ¶¶ 5-6. Similarly, dislikes and other aggregate "usage activities," § 13-63-103(4), are a key indicator of content that

may need to be reviewed for violating a website's content-moderation policies. *See, e.g.*, Veitch Decl. ¶¶ 28, 45. And the services that websites offer would cease to be social if websites could not collect and use information about an account holder's friends, connections, groups, posts, and the like. Szabo Decl. ¶ 15 All this information and activity is personal. Yet without it, websites could not continue to offer their services to minors. Szabo Decl. ¶ 15; *see, e.g.*, Veitch Decl. ¶ 28.

Second, the ban on collecting and using the data that minors provide also practically functions as an indirect advertising ban—which is itself unconstitutional. *See supra* Part I-B-2. Websites rely on the information that users provide to help deliver personalized and context-based advertising. *See* Szabo Decl. ¶ 13. Like businesses and salespeople, advertisers "can be more effective when they know the background and purchasing preferences of their clientele." *Sorrell*, 564 U.S. at 558. Just as the State cannot ban advertising, it also cannot "indirectly" ban the tools and methods that make advertising possible. *Rutan*, 497 U.S. at 77-78.

Third, the ban on collecting and using data also functions as an indirect ban on personalized content—another ban which is itself unconstitutional. *See supra* Part I-B-3. Websites work hard to display content that users are interested in. *E.g.*, Yadegar Decl. ¶ 11. As importantly, they work to avoid displaying content that users do not wish to see. *E.g.*, Davis Decl. ¶ 43. This is possible only if websites understand users' preferences. *E.g.*, Szabo Decl. ¶ 15. That understanding requires collecting and using the data that users provide. *E.g.*, Veitch Decl. ¶ 28. Just as the State cannot directly ban websites from responding to user preferences, it cannot "indirectly" pursue that goal by banning the practices that make responses possible. *Rutan*, 497 U.S. at 77-78.

Laws that prohibit the "availability and use" of information must satisfy heightened First Amendment scrutiny. *Sorrell*, 564 U.S. at 571; *see Brown*, 564 U.S. at 792 n.1 ("Whether

government regulation applies to creating, distributing, or consuming speech makes no difference [under the First Amendment].") Yet this ban on collecting and using data cannot survive any form of heightened scrutiny. *See Bonta*, 2023 WL 6135551, at *16 (using "commercial speech scrutiny" to reject a law that imposed "[r]estriction[s] on [c]ollecting . . . and [r]etaining [c]hildren's [d]ata"). Even if the State has an interest in limiting the data that minors share, a total ban on collecting and using personal information is "[not] proportional to the resulting burdens." *Sorrell*, 564 U.S. at 572. That is especially true given the data that websites must collect and use to offer their services to minors at all, such as diagnostic information, *see* Veitch Decl. ¶ 28, or credentials for two-factor authentication, *see* Davis Decl. ¶ 50. In fact, the Act itself purports to require websites to collect and use data about a minor's age, identity, and parental relationships. *See* § 13-63-102.

Moreover, by failing to define the key term "personal information," the ban on collecting and using data is unconstitutionally vague, leaving covered websites no way to determine whether their conduct is lawful. *See Williams*, 553 U.S. at 304. This, in turn, gives Defendants wide and unpredictable power to conduct discriminatory enforcement. *Id.* As just one example, the Act bans websites from collecting or using any "personal information" from an account holder's "posts." § 13-63-103(4). Whatever "personal information" may mean, *posts themselves* can contain that information. It is the same for "content, messages, [and] text." *Id.* Websites cannot *display* that content at all if they cannot "collect" and "use" it. *See, e.g.*, Davis Decl. ¶ 49.

### 5.   The Act's ban on access during a 10:30 p.m. to 6:30 a.m. curfew violates the First Amendment.

The Act also violates the First Amendment by requiring websites to, by default, "prohibit [minors] from having access to the[ir] account during the hours of 10:30 p.m. to 6:30 a.m." § 13-63-105(1). Not all websites have static content that is available for days or weeks on end. *E.g.*,

Yadegar Decl. ¶ 4. Much protected content may therefore appear, disappear, change, or shift during the Act's curfew hours. Szabo Decl. ¶ 16. For that content, the Act's curfew is practically an outright ban that triggers and fails strict scrutiny because it violates minors' "constitutional right to speak or be spoken to without their parents' consent." *Brown*, 564 U.S. at 795 n.3.

Yet "even were the Curfew at issue here truly content-neutral, it still would not escape First Amendment scrutiny." *Aptive*, 959 F.3d at 982. In other words, even if a lesser standard than strict scrutiny applies, the curfew is still unconstitutional. That is because "even content-neutral ordinances . . . that impose time, place, and manner restrictions remain subject to First Amendment scrutiny; the scrutiny is simply less rigorous than that traditionally attendant to regulations that are based on the content of the speech." *Id.* (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 790-91 (1989)). So the curfew provision "still must be narrowly tailored to serve a significant governmental interest." *Evans v. Sandy City*, 944 F.3d 847, 856 (10th Cir. 2019) (cleaned up).

The curfew cannot survive that test either. The Supreme Court has expressed "doubt[]" that States have any interest in "punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech." *Brown*, 564 U.S. at 802. This holds true for the time and place of speech as well as the content of speech. *See, e.g.*, *Mahanoy*, 141 S. Ct. at 2045, 2048 (students have "robust First Amendment protections" for speech, even though schools have "special characteristics that give [them] additional license to regulate student speech").

Nor is the Act's curfew narrowly tailored. Even under intermediate scrutiny for time-place-and-manner restrictions, the State still "must demonstrate that the harms it recites are real." *Aptive*, 959 F.3d at 988 (quoting *Edenfield*, 507 U.S. at 770-71). But "[t]his burden is not satisfied by mere speculation or conjecture." *Id.* (internal quotation marks and citation omitted). The curfew is

overinclusive because parents already have tools to create time-sensitive access blocks for specific devices and websites. *See* Szabo Decl. ¶ 12. And because the Act permits parents to override the State's curfew, this requirement is also underinclusive. If access during the State-imposed curfew really poses such a threat to minors' wellbeing, "it d[oes] not make sense to leave [the websites open to] children so long as one parent . . . says it's OK." *Griffin*, 2023 WL 5660155, at *18 (alterations adopted) (internal quotation marks omitted) (citing *Brown*, 564 U.S. at 802).

> **6.    The Act's "design" requirements—which ban certain "practices, designs, or features"—violate the First Amendment and the Due Process Clause.**

Finally, the Act's "design" requirements contravene both the First Amendment and the Due Process Clause by banning covered websites from using certain, undefined "practices, designs, or features." § 13-63-401(2). Strict scrutiny should apply to the "design" requirements because they directly infringe websites' decisions about whether and how they disseminate speech. *See, e.g.*, *Hurley*, 515 U.S. at 575. Regardless, the Act's ban fails all forms of heightened First Amendment scrutiny. *See, e.g.*, *Bonta*, 2023 WL 6135551, at *7, *11-12 (using commercial speech scrutiny to reject a law that required even "*assess*[*ing*] whether the 'design of [an] online service, product, or feature could harm children'" (emphasis added)).

The State cannot infringe the First Amendment protected acts of organizing, displaying, and disseminating protected speech by attacking the "practice[s], design[s], or feature[s]" of how a website accomplishes those activities. § 13-63-401(2). Disseminated content itself goes hand-in-hand with the "practice, design, or feature" employed by the medium displaying the content. Neither can exist without the other. Courts have long understood this, rejecting laws that restrict other steps in the process of publishing or disseminating speech. *See, e.g.*, *Minneapolis Star &*

*Trib.*, 460 U.S. at 581 (rejecting law that "singl[ed] out the press" for a "tax on paper and ink").

Websites must use some combination of practices, designs, and features to disseminate content. *See, e.g.*, *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 499 (2023). Websites also must decide how to organize and display that content. *See supra* p.8. Yet the Act would subject covered websites to liability for those very decisions. The Act therefore targets "'the *decisions made*" about whether and how to display "content." *Hurley*, 515 U.S. at 575 (emphasis added; cleaned up). These decisions "'constitute the exercise of editorial control and judgment' upon which the State cannot intrude." *Id.* (quoting *Tornillo*, 418 U.S. at 258). That targeting triggers strict scrutiny.

The design requirements cannot survive any form of heightened scrutiny, much less strict scrutiny. *See, e.g.*, *Bonta*, 2023 WL 6135551, at *11-12. As discussed at length above, *see, e.g.*, *supra* pp.38-39, the State has no "free-floating" power to restrict speech for minors. *Brown*, 564 U.S. at 794. Nor are the Act's design requirements "the least restrictive means of achieving" any sufficient governmental interest. *AFP*, 141 S. Ct. at 2383 (cleaned up). The design requirements are vastly overinclusive. They will restrict adult speech, because they appear to forbid *any* "use" of a "practice, design, or feature" that could violate the design requirements. § 13-63-401(2). And if a covered website does violate the design requirements—for even one minor—it faces potential liability for *every* minor "who is shown to have been exposed to the practice, design, or feature found to have caused" the violation. § 13-63-401(3)(a)(ii). This liability applies no matter what effect the offending "practice, design, or feature" had on those other minors—or even if it had no effect at all. § 13-63-401(2). Making covered websites liable for disseminating vast amounts of content that produces no harm is neither the "least restrictive means" of addressing any interest, *AFP*, 141 S. Ct. at 2383, nor a "narrowly tailored" approach, *Evans*, 944 F.3d at 856.

The design requirements are also unconstitutionally vague. Because the Act never defines "practice, design, or feature," covered websites have no way to know what aspects of their services fall within the Act's restrictions. § 13-63-401(2). Websites also cannot know how the State will interpret the Act's prohibition against the "use" of such a "practice, design, or feature," or whether that prohibition applies to what adults see. *See id.* Websites thus cannot know "what is prohibited," and they face "seriously discriminatory enforcement" from Defendants. *Williams*, 553 U.S. at 304.

A website's violation of the design requirements turns on a vague, unique definition of "addiction," which asks whether a minor account holder's mere "use" of a covered website "indicates [a] substantial preoccupation or obsession with, or [a] substantial difficulty to cease or reduce use of" the website. § 13-63-101(2)(a). This definition is both sweeping and vague. But even ignoring those failures, courts have rejected attempts to impose liability for speech that the government deems overly engaging. *See, e.g.*, *Sorrell*, 564 U.S. at 577-78 (the First Amendment protects "catchy jingles"). "That the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Id.* at 578; *see Brown*, 564 U.S. at 798 (rejecting the argument that "interactive" and immersive video games fall outside the First Amendment).

In any event, by focusing on the mere "indicat[ion]" of difficulty to "reduce use" of a website, the Act imposes shockingly broad liability—up to $100 million in civil penalties for each offending "practice, design, or feature." Szabo Decl. ¶ 17. Violations also turn on whether an account holder experiences "developmental" or "emotional" or "material" "harm" from a website. § 13-63-101(2)(b). These undefined terms are also very broad. The possibility of subjective emotional reaction is inherent in any form of communication—whether email, books, music, film, or television. That is why courts have rejected liability for disseminating speech based on reactions

not already subsumed within well-defined First Amendment exceptions (such as defamation and fighting words). *See, e.g.*, *Herceg v. Hustler Mag., Inc.*, 814 F.2d 1017 (5th Cir. 1987) (rejecting liability where minor accidentally hanged himself after reading an article that described a similar act); *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989 (1988) (rejecting claims against publisher of heavy metal music where songs allegedly drove listener to take his own life).

### C. Multiple substantive provisions of the Act independently are preempted under 47 U.S.C. § 230.

Section 230 preempts several provisions: the ban on advertising (§ 13-63-101(3)), the ban on personalized content (§ 13-63-101(5)), and the design requirements (§ 13-63-401).

Covered websites qualify for § 230's protections because they are "provider[s] . . . of an interactive computer service." 47 U.S.C. § 230(c)(1). Indeed, the "prototypical service qualifying" for § 230's protections is a website that allows users to "post comments and respond to comments posted by others." *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1195 (10th Cir. 2009).

Under § 230, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by" someone else. 47 U.S.C. § 230(c)(1). Section 230 thus protects both providers *and* users, and "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with" the law. *Id.* § 230(e)(3). This preemptive scope is broad. As the Tenth Circuit has held, "§ 230 forbid[s] the imposition of publisher liability on a service provider for the exercise of its editorial . . . functions." *Ben Ezra, Weinstein, & Co., v. Am. Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000) (citing *Zeran v. Am. Online*, 129 F.3d 327, 331 (4th Cir. 1997)). Enforcing § 230's protections against lawsuits is important, because potential liability for disseminating user-generated speech "could threaten the freedom of speech." *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003) (cleaned up).

Three provisions of the Act are "inconsistent" with § 230 and therefore preempted.

*First*, the advertising ban (§ 13-63-103) is preempted. It seeks to subject covered websites to "cause[s] of action" and "liability," 47 U.S.C. § 230(e)(3), for publishing and "display[ing]" third-party-generated advertisements to minors. But courts have concluded that ads are protected under § 230 as part of websites' "editorial . . . functions." *Ben Ezra*, 206 F.3d at 986; *e.g.*, *Calise v. Meta Platforms, Inc.*, 2022 WL 1240860, at *4 (N.D. Cal. Apr. 27, 2022) (dismissing suit under § 230 where "claims [we]re premised on Meta's publication of the third-party advertisements"); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193 (N.D. Cal. 2009) (similar). Moreover, to the extent that the Act requires covered websites to *monitor* user-generated content for advertisements (*e.g.*, an author posting about an upcoming book on her private account), § 230 preempts that purported duty to "monitor third-party content." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019); *Airbnb, Inc. v. City of Boston*, 386 F. Supp. 3d 113, 123 n.11 (D. Mass. 2019) (similar); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 993-94 (S.D. Tex. 2017) ("'[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.'" (citation omitted)).

*Second*, the personalized-content ban (§ 13-63-101(5)) is preempted because decisions about whether and how to disseminate speech are at the heart of websites' protected "editorial . . . functions." *Ben Ezra*, 206 F.3d at 986. Thus, courts have held that "recommendations" are protected by § 230. *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019). More generally, as explained above at p.37, personalizing content for individual users is just one of the ways that websites "cho[ose] . . . what content can appear on the website and in what form"—which § 230 protects. *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1124 (N.D. Cal. 2016).

*Third*, the design requirements (§ 13-63-401) are preempted for similar reasons—and more. As explained above at p.43, these requirements seek to change how covered websites disseminate speech to their users and how their users can express themselves on the websites. Courts have held that "arranging and distributing third-party information," *Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019), and "reviewing," "editing," and "withdraw[ing]" content, are all protected decisions under § 230, *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009). The design requirements contain an additional defect: Imposing liability on websites for providing the functions that allow people to submit user-generated speech invites potentially innumerable lawsuits and would eviscerate Section 230's protections for "information provided by" third parties. 47 U.S.C. § 230(c)(1). That is why courts have held that providing "tools meant to facilitate the communication and content of others" is protected by § 230. *Dyroff*, 934 F.3d at 1098.

## II.  The remaining factors support a preliminary injunction.

When evaluating a preliminary injunction "[i]n the First Amendment context, 'the likelihood of success on the merits will often be the determinative factor' because of the seminal importance of the interests at stake." *Verlo*, 820 F.3d at 1126 (quoting *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013)). The other factors also overwhelmingly favor a preliminary injunction, which would maintain the status quo for websites and their users.

NetChoice, its members, and their adult and minor users all face irreparable injury absent a preliminary injunction. "'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Leavitt*, 256 F.3d at 1076 (same for "commercial speech rights"). Thus, "when an alleged constitutional right is

involved, most courts hold that no further showing of irreparable injury is necessary." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) (cleaned up).

Regardless, NetChoice can show all sorts of additional irreparable injuries. The Act's drastic and leveraged penalties make the harm especially severe for NetChoice's members. The Act's "general" requirements give rise to $2,500 in potential liability each time a website performs everyday functions such as registering accounts, displaying fee-based and user-generated ads, collecting the data that users provide, and responding to search queries. § 13-63-202(3)(a)(i). And the Act's "design" requirements give rise to *hundreds of millions of dollars* in potential liability for any website that violates those requirements for even a *single user*, *no matter that user's individual circumstances*. § 13-63-401(3)(a)(i); Szabo Decl. ¶ 17. ("Even using these conservative estimates, the order of magnitude for these penalties easily reaches $100 million per violation of the design requirements."). The Act also imposes an additional $250,000 penalty for any "practice, design, or feature" that violates the design requirements. § 13-63-401(3)(a)(ii). Any covered website that missteps also faces the threat of significant fees and costs. §§ 13-63-202(5), -401(5).

The Act's extensive obligations make perfect compliance impossible for many covered websites. Szabo Decl. ¶ 19; *see, e.g.*, Veitch Decl. ¶ 46; *Griffin*, 2023 WL 5660155, at *14 ("[I]f a child is the product of divorced parents who disagree about parental permission, proof of express consent will be that much trickier to establish—especially without guidance from the State."). But even if covered entities could perfectly anticipate how the State will interpret the Act, and even if spotless compliance were possible, that would not save covered websites from irreparable injury. As NetChoice members have explained in their accompanying declarations, complying with the Act would be extremely time-consuming, burdensome, and expensive. Davis Decl. ¶¶ 51-61;

Szabo Decl. ¶¶ 18-19; Veitch Decl. ¶ 40-48; Yadegar Decl. ¶ 12. "Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury." *Chamber of Com. of the U.S. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010). For all these reasons, irreparable harm is a certainty absent a preliminary injunction.

"Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest." *Nken v. Holder*, 556 U.S. 418, 435 (2009). But "[t]hese factors merge when the Government is the opposing party." *Id.*; *see Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (same).

Maintaining the status quo will ensure that thousands of minors and adults continue to have access to covered websites—and that those websites will themselves be able to continue disseminating content. The Act's unmistakable constitutional defects should be fully adjudicated before websites are forced to fundamentally change the nature of the services they offer. Nor would a speech-preserving preliminary injunction harm the State in any way. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad*, 670 F.3d at 1132 (internal quotation marks and citation omitted); *see Cate v. Oldham*, 707 F.2d 1176, 1190 (10th Cir. 1983) (noting "[t]he strong public interest in protecting First Amendment values"). As with the likelihood of success on the merits, all these factors heavily favor a preliminary injunction.

## Conclusion

Plaintiff respectfully requests that, before the Act takes effect on March 1, 2024, this Court enter a preliminary injunction prohibiting the Defendant Utah Attorney General and the Defendant Director of the Division of Consumer Protection of the Utah Department of Commerce, as well as their officers, agents, and employees, from enforcing the Act against NetChoice's members.

RESPECTFULLY SUBMITTED this 20th day of December 2023.

PARR BROWN GEE & LOVELESS, P.C.

/s/ *David C. Reymann*
David C. Reymann
Kade N. Olsen

LEHOTSKY KELLER COHN LLP
Steven P. Lehotsky
Scott A. Keller
Todd Disher
Jeremy Evan Maltz
Joshua P. Morrow
Alexis Swartz

*Attorneys for Plaintiff NetChoice, LLC*

**Certificate of Service**

I, David C. Reymann, certify that on December 20, 2023, the foregoing was filed electronically via the Court's CM/ECF system, and that on December 21, 2023, service was delivered via process server to:

Sean D. Reyes
Office of the Attorney General
Utah State Capitol Complex
350 North State Street Suite 230
Salt Lake City, Utah 84114

Katherine Hass
Heber M. Wells Building
Division of Consumer Protection
2nd Floor
160 East 300 South
Salt Lake City, Utah 84114

/s/ *David C. Reymann*
David C. Reymann