David C. Reymann (8495)
Kade N. Olsen (17775)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, UT 84111
(801) 257-7939
dreymann@parrbrown.com
kolsen@parrbrown.com

| | |
|---|---|
| Steven P. Lehotsky* | Todd Disher* |
| Scott A. Keller* | Joshua P. Morrow* |
| Jeremy Evan Maltz* | Alexis Swartz* |
| LEHOTSKY KELLER COHN LLP | LEHOTSKY KELLER COHN LLP |
| 200 Massachusetts Avenue, NW | 408 W. 11th Street, 5th Floor |
| Washington, DC 20001 | Austin, TX 78701 |
| (512) 693-8350 | (512) 693-8350 |
| steve@lkcfirm.com | todd@lkcfirm.com |
| scott@lkcfirm.com | josh@lkcfirm.com |
| jeremy@lkcfirm.com | alexis@lkcfirm.com |

*(motions for admission
 pro hac vice forthcoming)*

*Attorneys for Plaintiff NetChoice, LLC*

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH**

| | |
|---|---|
| **NETCHOICE, LLC,**<br><br>**Plaintiff,**<br><br>v.<br><br>**SEAN D. REYES, in his official capacity as Attorney General of Utah,**<br><br>**KATHERINE HASS, in her official capacity as Director of the Division of Consumer Protection of the Utah Department of Commerce,**<br><br>**Defendants.** | **DECLARATION OF CARL SZABO IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Case No.** _____ |

I, Carl Szabo, declare as follows:

1. I am the Vice President and General Counsel of Plaintiff NetChoice, LLC ("NetChoice"). In addition to providing legal counsel to NetChoice, I coordinate NetChoice's advocacy before legislative bodies, courts, and government agencies to promote NetChoice's mission of advancing free enterprise and free expression on the Internet. My role at NetChoice has made me broadly familiar with member companies' business practices, the benefits they provide the public, and their efforts to keep minors safe online. My role has also made me familiar with other websites, applications, and digital services more broadly.[1]

2. I submit this declaration in support of Plaintiff's Motion for Preliminary Injunction. I am over the age of 18 and am competent to make the statements herein. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

**I.    About NetChoice**

3. NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization. As our website explains, NetChoice "works to make the Internet safe for free enterprise and free expression" and engages at the local, state, national, and international levels to ensure a bright digital future.[2] In particular, we are dedicated to preserving the Internet as a vibrant marketplace for communication, commerce, and the exchange of ideas.

---

[1] This Declaration will refer to all digital services affected by Utah's Social Media Act as "websites" unless necessary to distinguish among different kinds of digital services. Similarly, this Declaration will use "members" or "covered members" to refer to NetChoice members affected by the Act, unless otherwise noted.

[2] NetChoice, Home, https://perma.cc/9AVS-CL88.

4. For over two decades, NetChoice has worked to promote online speech and commerce and to increase consumer access and options through the Internet, while minimizing burdens on businesses to help make the Internet more accessible and useful for both businesses and consumers. Our members include a broad array of popular online services, including: Airbnb, Alibaba.com, Amazon.com, AOL, eBay, Etsy, Expedia, Fluid Truck, Google, HomeAway, Hotels.com, Lime, Lyft, Meta, Nextdoor, Oath, OfferUp, Orbitz, PayPal, Pinterest, Snap Inc., StubHub, Swimply, TikTok, TravelTech, Travelocity, Trivago, Turo, Verisign, VRBO, VSBLTY, Waymo, Wing, X (formerly known as Twitter), and Yahoo!.[3] Some of these members operate what are commonly referred to as "social media" websites. These websites are among the Internet's most popular destinations.

5. NetChoice has over two decades of experience advocating for online businesses and for the principles of free speech and free enterprise on the Internet. That experience, combined with the practical applications of the law and declarations submitted by our members, leads us to conclude that the Utah Social Media Regulation Act ("the Act"), should it take effect, would irreparably harm our members and those who interact with members' websites.

## II. NetChoice Members' Websites Are Full of Valuable Expression and Communities That Provide People—Minors and Adults Alike—with Profound Benefits.

6. NetChoice members' websites are full of a wide range of incalculably valuable expression and communities. Whether it is to practice their religious beliefs, engage in political discourse, seek cross-cultural dialogue, supplement their education, or learn new skills, people across the world (both minors and adults) use these websites every day to explore protected speech.

---

[3] NetChoice, About Us, https://perma.cc/FT5Q-6VE7.

They do so in a wide variety of ways—socially (to connect with friends from school and church, form groups, find communities of those with likeminded interest), artistically (to showcase their creative talents, including their photography, writing, or other forms of creative expression), informatively (to keep up with the news, current events), politically (participate in public discussion, raise awareness about social causes), and educationally (to get help with math problems, learn about financial literacy, listen to college course lectures). Unsurprisingly, therefore, people—minors and adults alike—greatly benefit from access to these websites. Because NetChoice members' websites help minors learn about and engage with the world around them, the websites can play a profound role in children and teenagers' learning and development. In general, each covered website publishes, disseminates, creates, curates, and distributes protected and valuable speech. They do this by displaying text, audio, graphics, or video to their users.[4] Some of this content is generated by the websites themselves. Much of this content is also generated by users themselves, who use these websites to share content with a website-specific list of "friends" or with the world at large.

### III. NetChoice Members Go to Great Lengths to Protect Minors, and Parents Have Other Tools to Protect Their Children Online.

7.      NetChoice members take the safety of all their users and account holders seriously and place a special emphasis on minors' safety. To that end, NetChoice members have developed content-moderation policies and other safeguards intended to protect minors online.

---

[4] I understand that the Act distinguishes between "users" and "account holders." Utah Code § 13-63-101. NetChoice members normally refer to just their "users," and thus this declaration will refer to "users" unless necessary to distinguish the statutory terms.

4

a. **Limiting Access by Age.** NetChoice's affected members largely do not allow minors younger than 13 to create accounts on their websites. *E.g.*, Facebook, Terms of Service, https://perma.cc/K9A3-49S2 ("We try to make Facebook broadly available to everyone, but you cannot use Facebook if: You are under 13 years old."); Instagram, Terms of Use, https://perma.cc/D74U-22F4 ("You must be at least 13 years old."); Nextdoor, Help Center, https://perma.cc/7JP4-LCW8 ("Nextdoor is a family-friendly platform, open to neighbors ages 13 and over."); Pinterest, Terms of Service, https://perma.cc/RP7L-XA8S ("Any use or access to Pinterest by anyone under the age of 13 is not allowed."); Threads, Threads Terms of Use, https://perma.cc/S29W-NB8D (incorporating Instagram's terms of use); Twitch, Terms of Service, https://perma.cc/49V4-MC93 ("The Twitch Services are not available to persons under the age of 13."); X, X Terms of Service, https://perma.cc/HE3E-NE7J ("[Y]ou must be at least 13 years old to use X."). While YouTube and TikTok have developed separate services for minors younger than 13 that have parental consent, these members (1) put extensive limits on the content that these minors see; (2) ensure parents' abilities to oversee their children on the services; and (3) limit the interactions that these minors may have on the services. *See* TikTok, TikTok for Younger Users, https://perma.cc/5U9R-N28E; YouTube, My Family, https://perma.cc/RYY9-DSSV.

b. **Minor-Specific Policies.** Some NetChoice members have adopted policies or practices specifically for minors' accounts on their websites. Instagram, for instance, imposes default restrictions that make it more difficult for people under 16 years old to come across potentially sensitive content. Instagram, Updates to the Sensitive Content Control,

https://perma.cc/WNB9-DY9T. Similarly, YouTube has a standalone "Child Safety Policy." YouTube, Child Safety Policy, https://perma.cc/H7UV-BVTQ.[5]

  c. **Content Moderation.** NetChoice members have chosen to balance disseminating large amounts of user-authored expression while also limiting publication of speech that NetChoice members consider harmful, objectionable, or simply not conducive to their communities. Though the policies vary, they recognize that free expression requires people to feel comfortable expressing themselves. All covered NetChoice members have content-moderation policies that address the publication of content those websites deem objectionable or harmful to their communities—including content that promotes or glorifies suicide, self-harm, or eating disorders, substance abuse, stalking, bullying, harassment, grooming, trafficking, child pornography, sexual exploitation, abuse, or content that is sexually explicit or pornographic. Based on our research, the "rate of violative content removed from platforms and the level at which it is removed prior to being seen by users makes clear companies are successfully prioritizing the safety of their users." NetChoice, By the Numbers: What Content Social Media Removes and Why (2021), https://perma.cc/T7F8-Z8K3.

  8. Parents and guardians, too, can control whether their minor children have access to Internet-connected devices in the first place. For parents who do allow their children to access the Internet, NetChoice members empower parents to oversee their children's use of members' websites. And members' app-specific tools exist alongside other tools provided by device

---

[5] This Declaration quotes and cites portions of NetChoice members' policies. Those policies are lengthy and nuanced, so this Declaration does not purport to summarize the policies in full.

manufacturers, Internet access providers, and software manufacturers that parents can use to further supervise their minor children.

  a.  **Network-Level Restrictions.** Many, if not most, cell service and broadband Internet providers have designed tools for parents to block certain apps, sites, and contacts from their children's phones and to restrict screen time on their children's devices. *See, e.g.*, Verizon, Verizon Smart Family, https://perma.cc/2UCK-ZSFG; AT&T, Secure Family, https://perma.cc/G5DC-H4JX; T-Mobile, Family Controls and Privacy, https://perma.cc/SX8T-9GMS; Comcast Xfinity, Set Up Parental Controls for the Internet, https://perma.cc/Z5QW-4F4K. Similarly, many wireless routers contain parental control settings that parents can use to block specific online services, limit the time that their children spend on the Internet, set individualized content filters, and monitor the online services their children visit. *See* Molly Price & Ry Crist, *How to Set Up and Use Your Wi-Fi Router's Parental Controls*, CNET (Feb. 11, 2021), https://perma.cc/5NNH-X7F2; Netgear, Circle Smart Parental Controls, https://perma.cc/5HKZ-U5SU.

  b.  **Device-Level Restrictions.** Many devices themselves contain ways parents can restrict their use. Many of the most popular phone manufacturers like Apple, Google, and Microsoft allow parents to limit screen time across their devices and provides parents with tools to control what applications their children can use, set age-related restrictions on those applications, filter content, and control privacy settings. *See, e.g.*, Google, Family Link, Help Keep Your Family Safer Online, https://perma.cc/DLR7-7ZRK; Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/T6F9-JWD9. For example, Apple allows parents to lock or limit specific apps and features on a minor's device, restrict the device settings to limit content

and downloads, limit access to only approved websites, and set overall or time-of-day usage limits. *See* Apple, *Use Parental Controls on Your Child's iPhone, iPad, and iPod Touch*, https://perma.cc/Z9ZY-2JRQ. There are also many third-party applications parents can install on their children's devices to monitor their activity, set limits on screen time, and filter content. *See* Ben Moore & Kim Key, *The Best Parental Control Apps for Your Phone*, PCMag (Mar. 29, 2022), https://perma.cc/6U7Y-KSPH.

  c. **Browser-Level Restrictions.** There are also parental controls on Internet browsers that allow parents to control what online services their children may access. *See, e.g.*, Mozilla, *Block and Unblock Websites with Parental Controls on Firefox*, https://perma.cc/6Y3H-3JEP. Some browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most. *See* Google, *Safety Center*, https://perma.cc/MQJ9-B3XV; Microsoft, *Learn More About Kids Mode in Microsoft Edge*, https://perma.cc/R823-VGJQ. Third-party software and browser extensions are also widely available to reinforce these tools. *See, e.g.*, Kim Key, *The Best Parental Control Software for 2023*, PCMag (Oct. 19, 2023), https://perma.cc/5HZQ-HR2X.

  d. **App-Level Restrictions.** Layered on top of external restrictions, many NetChoice members have developed their own internal tools that allow parents to set further restrictions on their children's use of the websites. For instance, Meta has developed its own "Family Center," which provides for parental supervision on Instagram and allows parents to, among other things, (1) see their minor children's followers and who their minor children are following; (2) see how long the minor spends on Instagram; and (3) set time limits and scheduled breaks. Meta, *Family Center Tools*, https://perma.cc/ES72-T7WX. Likewise, TikTok's "Family Pairing features let parents link their TikTok account to their teen's to enable a variety of content, privacy, and well-

being settings. . . . Even without Family Pairing enabled, parents can help their teens enable our app's Screen Time offerings including Daily Screen Time and Restricted Mode, which are protected by a passcode set by the parent or guardian." Tik Tok, Guardian's Guide, https://perma.cc/JT6E-YLJU.

### IV. The Act's Effect on NetChoice Members and the Internet

9. The Act appears to affect several of NetChoice's member companies. Under the Act, a "[s]ocial media company" means "a person or entity that: (a) provides a social media platform that has at least 5,000,000 account holders worldwide; and (b) is an interactive computer service." Utah Code § 13-63-101(9). A "[s]ocial media platform" is defined as "an online forum that a social media company makes available for an account holder to: create a profile; upload posts; view the posts of other account holders; and interact with other account holders or users." *Id*. § 13-63-101(10)(a). The law excludes online services like email, streaming, "news, sports, entertainment, or other content that is preselected by the provider," or "single-purpose community groups for public safety" if "the majority of the content . . . is . . . created by the provider." *Id*. § 13-63-101(10)(b). An "[i]nteractive computer service" means "an information service, information system, or information access software provider that: provides or enables computer access by multiple users to a computer server; and provides access to the Internet," including "a web service; a web system; a website; a web application; or a web portal." *Id* § 13-63-101(6).

10. According to these definitions, the Act appears to affect at least the following NetChoice members: Amazon (which owns and operates Twitch), Meta (which owns and operates

Facebook, Instagram, and Threads), Google (which owns and operates YouTube), NextDoor, Pinterest, and X.

11. The Act's requirements are burdensome and would make it more difficult for NetChoice members to provide their websites to minors and will burden adults' access to highly valuable and protected speech. In particular, the following provisions of the Act would be significantly difficult, costly, and unmanageable for NetChoice members to implement, hindering their business interests, their First Amendment interests, and the First Amendment interests of their users and account holders. Furthermore, many of them may be counterproductive to the goals of preserving minors' well-being online.

12. **Parental Consent and Age Verification.** The Act's requirement that a social media company may not permit a minor Utah resident to be an account holder on a social media platform unless the minor has the express consent of a parent or guardian will prove costly and difficult for NetChoice members to implement. Utah Code § 13-63-102(1). It will also impede minors and adults' access to valuable and protected speech. The Act further requires that social media companies verify the ages of existing account holders or new Utah account holders, and that, if the account holder is a minor, confirm that the minor has parental consent. *Id.* at § 13-63-102(3). These requirements pose at least four major hurdles for social media companies—on top of the burdens they impose on social media users and account holders. First, many websites do not have compliance mechanisms in place for age-verification and parental-verification, and designing and maintaining a comprehensive and foolproof system to comply with the Act will be extremely costly, time-consuming, and resource-intensive. Second, websites will be required to obtain and store sensitive personal identifying information about minors and their parents or guardians. This

will significantly amplify the risks of data security breaches, necessitating even more investment in heightened cybersecurity measures. Third, there will be no foolproof mechanism for ensuring an account holder's age and a genuine parent-child relationship without identifying both the parent and the minor, and without otherwise infringing significantly on the privacy rights of both minors and parents or guardians. As just one example of the many difficulties in securing parental consent, the law does not account for situations in which there might be a dispute among parents and guardians as to consent. Finally, new processes at sign up inevitably affect account holder growth as cumbersome registration processes might dissuade people from signing up. Because the Act applies to current account holders, too, it will cause friction that may cause even current account holders to delete their accounts rather than comply with the cumbersome and invasive processes that the Act requires websites to impose. Any decline in account holder sign-ups or current accounts will have a ripple effect on companies' advertising revenues, brand partnerships, and overall vitality. And of course, decline in usage means that fewer people avail themselves of the valuable speech available on the websites.

13.     **Ban on Advertising.** The Act entirely prohibits websites from "display[ing] . . . any advertising" in a minor's account. *Id*. § 13-63-103(3). The breadth of this prohibition and the burden it will impose on social media companies cannot be overstated. As I understand the Act, it prohibits all "advertising"—a term the Act does not define. Thus, the Act would cover both personalized ads (which draw insights from a user's activity on a website) and contextual based ads (which draw insight from the website itself). These kinds of ads are an important and substantial revenue stream for websites. More, this advertising ban would presumably sweep in not just paid advertisements but any user-submitted posts that may contain "advertising"—even

11

though websites typically do not earn any revenue from this type of user-generated advertising. This type of advertising could include posts as innocuous as musicians inviting their friends to download a new single or buy tickets for a show, an author promoting an upcoming book, or an individual or small business promoting goods or services. It would also include posts from account holders promoting their own content (*e.g.*, influencers promoting a product) or posts on websites like YouTube where account holders have sponsors that support the channel or individual video. Likewise, a large number of major brands hold accounts and post content on many of these websites. And the Act would require websites to "prohibit" displays of "any advertising," requiring websites to monitor every post from every account holder that could be considered "advertising." No member's website currently automatically detects all advertising, and designing a system capable of proactively flagging all advertising would be cost-prohibitive—if it is possible at all. Moreover, the lost advertising revenue would make it much more difficult for member companies to offer their free-to-use services. A ban on all advertising is unnecessary to protect minors because websites already have policies regulating what advertisements will be available on minors' accounts.

14. **Ban on Targeted and Suggested Content.** The Act's "prohibit[ion]" on "the use of targeted or suggested groups, services, products, posts, accounts, or users in the [minor's] account," *id*. § 13-63-103(5), would prohibit websites from permitting any personalized content of any kind on a minor's account. The Act does not define "targeted" or "suggested," but this prohibition seemingly goes even further than the Advertising Ban, in that it prohibits the recommendation of *any kind of content* on a minor's account. Many NetChoice members' websites cannot function well—if at all—without making decisions about how to present content, groups,

ads, and posts on account holders' accounts. These decisions vary among NetChoice members. But personalized content is a hallmark of many members' services. Whether in search results or on individual "feeds" (also called "for you," "following," or "landing" page), websites often use suggestions to ensure that people are presented with the most useful and relevant content. Without the ability to curate and present content to people, it would be impossible for websites to prioritize minor safety and display only age-appropriate content to minors—perversely making it more likely that minors encounter inappropriate content on these sites. Furthermore, the Act's ban on targeted or suggested content would lead to an even more absurd result: prohibiting websites from displaying *any* content in any type of organized fashion, even chronologically. After all, chronological (or reverse chronological) display is a "suggestion" about the most useful order to view the content. By banning all personalization, the Act will also prohibit websites from offering their users choices among these various types of suggestion and organization (as some covered websites currently do).

15. **Limits on Data Collection.** The Act's prohibition on companies' collection or use of "any personal information from the posts, content, messages, text, or usage activities of the [minor's] account other than information that is necessary to comply with, and to verify compliance with, state or federal law," *id*. § 13-63-103(4), is so broadly written that it may, functionally, make it impossible for minors to hold accounts on some websites.

a. Account holders provide personal information when they sign up on websites, and provide personal information to websites by joining groups, adding friends, or creating networks. For example, many websites allow users to provide data about their hometown, languages, education, personal details, family and relationships, job title, employer, professional credentials,

and work history, birthdays, anniversaries, graduations, connections, and interactions. Websites also must collect and use data in order to offer content that makes their services "social," such as the ability to add friends, join groups, and participate in events.

b. To remain functional and provide people with content they want to see, websites must "collect and use" some personal information. Social media websites collect personal information, in part, to make sure that people are seeing age-appropriate content that they want to see. That helps both users (who see more relevant content first) and creators (who have a higher chance of reaching a relevant audience). Thus, the inability to collect some data on minors would make it extremely difficult to curate and display age-appropriate content for those people, making it more likely that they would encounter more objectionable content on websites. The websites that NetChoice members provide would cease functioning if they could not collect, store, and use the technological information that users provide. This includes users' Internet Protocol ("IP") addresses, as well as data about the user's device, operating system, screen resolution, browser type and credentials for two-factor authentication (*e.g.* a cell phone number). Without this data, websites could not function on the diverse devices that people use today. It is similar for engagement data such as load times, clicks, scrolls, and other interactions that allow websites to monitor functionality.

c. Security is a paramount concern for NetChoice members. Yet collecting and using user data is also critical for detecting malicious actors, protecting users from would-be identity thieves, and maintaining overall security. As one example, websites routinely track the time, place, and number of an account's login attempts. This helps websites flag login attempts from suspicious times or locations. As another example, some websites also track how long users view a particular

14

post or piece of content. If a high percentage of users quickly move past that content, this can be an indication that the content violates the websites' policies and needs to be addressed.

16. **Curfew Requirements.** The Act requires social media companies to prohibit minors from using websites between the hours of 10:30 p.m. to 6:30 a.m. but allows a parent to "change" or "eliminate" this curfew. *Id*. § 13-63-105(1), (3). This "time-of-day" requirement is calculated based on a minor account holder's IP address. *Id*. This requirement would be functionally ineffective as it will push minors to use virtual private networks that mask their true, physical location (and therefore their time zone), and this in turn will allow them to access websites at any time. It would also make parents less able to meaningfully supervise their minors' activities online and set limits on those activities because it may allow minors to evade parental controls or otherwise hide online activity from their parents. The Act also does not allow for other means for implementing the curfew requirement, as it states that websites "shall" use IP addresses to calculate time of day. *Id*. § 13-63-105(2). Even if the curfew were administrable, it would block minors from seeing large swaths of protected and valuable speech. The content on websites is not static. Instead, much communication on these websites occurs in real time. Because of that, content may appear and disappear during the Act's curfew window, meaning that minors would never get to see it. The Act's curfew requirements would also block minors from using these websites for homework help or anything else at times that the Act deems too early or too late.

17. **Design Requirements.** The Act's design requirements prohibit social media companies from "us[ing] a practice, design, or feature on the company's social media platform that the social media company knows, or which by the exercise of reasonable care should know, causes a Utah minor account holder to have an addiction to the social media platform." *Id*. § 13-

15

63-401(2). The Act, however, states that social media companies will not be subject to § 13-63-401's civil penalties provision if the company performs quarterly anti-addiction audits to identify features that have the "potential" to "contribute to" addiction and "correct[s]" any feature that presents more than a de minimis risk of "addiction" as peculiarly defined by the Act. *Id*. § 13-63-401(3)(b)(i)-(ii). This provision will subject NetChoice members to significant uncertainty that may drive websites to stop allowing minors as account holders.

      a.      The Act's definition of "addiction" itself is extremely broad: "use of a social media platform" that both (a) "indicates the user's substantial preoccupation or obsession with, or the user's substantial difficulty to cease or reduce use of, the social media platform"; and (b) "causes physical, mental, emotional, developmental, or material harms to the user." *Id*. § 13-63-101(2)(a)-(b). It is not clear what would "*indicate*" a "substantial difficulty to . . . reduce use of[] the social media platform." *Id.* (emphasis added).

      b.      Compounding the uncertainty in the definition of "addiction," there is also no way for NetChoice members to assess what is "more than a de minimus risk" of an "indicat[ion]" of a "substantial difficulty to . . . reduce use of[] the social media platform." *Id*. § 13-63-401(3)(b)(i)-(ii). By combining these broad and vague terms, the statute creates substantial uncertainty.

      c.      The Act's "safe harbor" provision—purporting to distinguish between liability for features as compared to content—is written in such a way that it is unlikely to have much practical effect. *Id*. § 13-63-401(4). Whatever *theoretical* distinctions exist between "content" and "practice[s], design[s], [and] feature[s]," *in practice* it is not possible to disentangle content from the features that *deliver* content to people. *Id.* § 13-63-401(2). This holds true for all media. At bottom, people's ability to post content is a "practice, design, or feature," and without that feature

there would be no user-generated content on websites defined in large part by user-generated content. As another example, most social media websites have a "like" button or similar means that allows people to acknowledge or communicate approval of a post, and other people can typically see who has approved or liked a post. This is both a *feature* and *content*—it both allows people to communicate their approval of a piece of content and, accordingly, that approval becomes content itself, revealing a person's personal tastes and preferences.

        d.        The enforcement provisions for the design requirements are highly leveraged, because if even a single Utah minor is found to have been "addicted" to *any* "practice, design, or feature," then websites are liable for *every* minor who ever saw that "practice, design, or feature,"—regardless of whether those other minors suffered harm from that "practice, design, or feature," *id.* § 13-63-401(3)(a)(ii). The threat of liability under this provision is hard to overstate. Demographic information indicates that there are at least 200,000 minors in Utah aged 13, 14, 15, 16, or 17. Kem C. Gardner Policy Institute, University of Utah, *State of Utah Population by Age, Sex, Race and Ethnicity, 2010–2018* (Nov. 2019), https://perma.cc/NHN7-UW8T. Many member websites count more than half of American teenagers as regular users. Yet if even 20% of Utah minors use a certain website, then that website faces $100 million in liability for each of the hundreds or even thousands of "practice[s], design[s], or feature[s]," that every website *must* use just to display content in the first place (40,000 users × $2,500 liability for every user "exposed" to a given "practice, design, or feature," § 13-63-401(3)(a)(ii)). Even using these conservative estimates, the order of magnitude for these penalties easily reaches $100 million per violation of the design requirements. Because of the Act's leveraged penalty provisions for the design requirements, websites face that $100 million in liability if even a *single minor* meets the Act's

17

definition of "addiction"—no matter that minor's age, individual circumstances, or parental consent. This gargantuan liability creates an equally massive chilling effect that incentivizes websites to prohibit all minors altogether, regardless of whether they have parental consent.

18. Separately and in combination, these various "bans" and other restrictions that the Act imposes would require many websites to fundamentally transform the nature of their services to continue serving minors. Because the Act targets many of the services that make these websites "social" to begin with, the new websites that the Act envisions would need to overcome significant challenges in order to be commercially viable.

19. NetChoice members would be irreparably harmed if they were required to comply with the Act's burdensome requirements. For one thing, the Act's extremely broad and vague proscriptions make perfect compliance unobtainable for some websites. Any website that even attempted to comply would incur substantial, unrecoverable costs in reconfiguring their websites to comply with the law and would face significant uncertainty about their compliance with the law given the Act's ambiguities. NetChoice members' account holders (current and prospective) will also suffer harms as well, as the Act will place burdens on their access to protected and valuable speech—and the Act may require websites to stop providing their current range of services to their current range of users and account holders.

\*   \*   \*

20. If the Act takes effect on March 1, 2024, NetChoice's mission to protect free speech and free enterprise online would be directly and substantially hurt—as would its affected member companies.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing to be true and correct to the best of my knowledge. Executed on this December 15, 2023 in Washington DC.

_____

Carl Szabo