David C. Reymann (8495)
Kade N. Olsen (17775)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, UT 84111
(801) 257-7939
dreymann@parrbrown.com
kolsen@parrbrown.com

Steven P. Lehotsky*                    Todd Disher*
Scott A. Keller*                       Joshua P. Morrow*
Jeremy Evan Maltz*                     Alexis Swartz*
LEHOTSKY KELLER COHN LLP               LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW           408 W. 11th Street, 5th Floor
Washington, DC 20001                   Austin, TX 78701
(512) 693-8350                         (512) 693-8350
steve@lkcfirm.com                      todd@lkcfirm.com
scott@lkcfirm.com                      josh@lkcfirm.com
jeremy@lkcfirm.com                     alexis@lkcfirm.com
    *(admitted pro hac vice)

*Attorneys for Plaintiff NetChoice, LLC*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| **NETCHOICE, LLC,** | |
| **Plaintiff,** | |
| **v.** | **PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| **SEAN D. REYES, in his official capacity as Attorney General of Utah,** | **Case No. 2:23-cv-00911-AMA-CMR** |
| **KATHERINE HASS, in her official capacity as Director of the Division of Consumer Protection of the Utah Department of Commerce,** | **Judge Ann Marie McIff Allen** **Magistrate Judge Cecilia M. Romero** |
| **Defendants.** | |

# INTRODUCTION

1.      For the second time, Utah has enacted an unconstitutional law regulating online speech in the name of protecting minors—at the expense of their (and others') First Amendment rights. After Plaintiff challenged and moved to enjoin Defendants' enforcement of the Utah Social Media Regulation Act (2023), *see* ECF 1, 25, Utah repealed and replaced that law. But the Legislature did not fix the problem. The newly enacted Utah Minor Protection in Social Media Act (2024), Utah Code §§ 13-71-101 to 401 ("Act"),[1] suffers from many of the same constitutional flaws as the prior law, including impermissibly burdening minors' and adults' access to protected speech. Plus, it introduces new flaws, such as regulating who minors can speak with absent parental consent. All of these requirements are backed by large, speech-chilling penalties. As a result, the replacement Act, like its predecessor, joins a long list of unconstitutional state attempts to regulate speech to prevent perceived social harms to minors. *See, e.g.*, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 797-99 (2011); *NetChoice, LLC v. Yost*, 2024 WL 555904, at *12-13 (S.D. Ohio Feb. 12, 2024); *NetChoice, LLC v. Bonta*, 2023 WL 6135551, at *13 (N.D. Cal. Sept. 18, 2023); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *21 (W.D. Ark. Aug. 31, 2023).

2.      At bottom, the State cannot justify the ways in which the Act restricts minors' and adults' ability to engage with the "wide array of protected" speech "on topics as diverse as human thought" that the websites regulated by the Act disseminate. *Griffin*, 2023 WL 5660155, at *5 (cleaned up). Adults and teens alike "flock to NetChoice's member websites and generate billions of 'posts' every day." *Yost*, 2024 WL 555904, at *1. Minors can interact with their elected officials on X, share their artwork on Instagram, post their athletic highlights on YouTube, meet their

---

[1] Unless otherwise noted, statutory citations in this Complaint refer to the Utah Code.

neighbors on Nextdoor—and anything and everything in between. Members agree that minors' wellbeing is important. That is why they devote so many resources and so much effort to safe-guarding their users. Where they part ways with the State is over whether the State can use uncon-stitutional means to impose its view of how best to protect minors. This unlawful restriction of speech should be enjoined for several reasons.

3.      At the outset, the entire Act is unconstitutional because its speech restrictions and burdens depend on a vague and content-, speaker-, and viewpoint-based coverage definition of a regulated "social media company." § 13-71-101(13). There is a mismatch between the Act's em-phasis on means of disseminating speech and its regulation of only certain websites.[2] For instance, pursuant to the Act's burdensome requirements, YouTube cannot disseminate streaming videos on minors' accounts using autoplay or seamless pagination. But Hulu and Disney+ can stream videos to minors without fear of liability. Similarly, an article (along with its comment section) presented using seamless pagination on *The New York Times'* website would not be covered, but a post on Facebook or X linking to that same article (along with comments to the post) would be regulated. These distinctions trigger strict scrutiny, and the Act cannot satisfy this standard.

4.      From that central definition, the Act will burden minors' and adults' access to, and ability to engage in, speech. It does so by requiring covered websites to implement "age assurance" for all users, adults and minors alike. § 13-71-201. As contemplated by the Act, this may require covered websites "to *verify* a new account holder's age using an approved system." Ex. 1 at p.1:10-11 (emphasis added). But calling it age assurance rather than age verification does not make that

---

[2] This Complaint will refer to websites, applications, and other services as "websites." And it will refer to all services regulated by the Act as "covered websites."

requirement any less unconstitutional. Whatever it is called, requiring people to provide—or websites to collect—personal information or documentation to access protected speech violates the First Amendment. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 882 (1997); *Bonta*, 2023 WL 6135551, at *13 (enjoining age-estimation requirement); *Griffin*, 2023 WL 5660155, at *21 (enjoining age-verification requirement).

5.      The Act contains further unconstitutional restrictions on minors' accounts that simultaneously abridge websites' speech and "editorial control and judgment" over their publication, dissemination, and presentation of expression. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *see Bonta*, 2023 WL 6135551, at *7-9. For example, the Act outright prohibits multiple means of disseminating speech on minors' accounts. Websites cannot use "autoplay" and seamless pagination to present speech. § 13-71-202(5)(a)-(b). And covered websites are prohibited from sending minors certain (vaguely defined) notifications "prompting repeated user engagement"—*i.e.*, from speaking. § 13-71-202(5)(c). The Act also requires parental consent for minors to share expression and their accounts beyond a network of users limited by the State. § 13-71-202(1)(a)-(b). But the Supreme Court has rejected the idea "that the state has the power to prevent children from . . . saying anything without their parents' prior consent" under the First Amendment. *Brown*, 564 U.S. at 795 & n.3; *see Yost*, 2024 WL 555904, at *12-13; *Griffin*, 2023 WL 5660155, at *21. None of these provisions satisfy constitutional scrutiny, especially given the wealth of tools that parents have to control and oversee their minor children's online activities. These provisions are also preempted by 47 U.S.C. § 230 ("§ 230"), as they impose liability on websites' use of "tools meant to facilitate the communication and content of others." *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019).

6.     Finally, the Act includes two vague commands about minors' data. At the outset, it limits covered websites' ability to "collect[ ] . . . data from a Utah minor account holder's account that is not required for core functioning of the social media service." § 13-71-202(1)(c). Yet the Act does not define what it means for data to be "required for *core functioning*." Then the Act provides that covered websites' terms of service related to a minor account holder shall "be presumed to include an assurance of confidentiality" for the minor account holder's personal information, subject only to parental consent. § 13-71-204(2)-(3). The Act does not define what "assurance of confidentiality" means or requires, except to include some exceptions that only exacerbate the uncertainty. In fact, these exceptions suggest that even "*internal* use[s]" of data could potentially violate this vague "assurance of confidentiality." § 13-71-204(4) (emphasis added). By imposing these obligations without defining these core terms, the Act leaves covered websites with no guidance about how to comply with these provisions.

7.     For these reasons and more, this Court should enjoin Defendants from enforcing the Act, §§ 13-71-101 to -401, against Plaintiff's members and declare the Act unlawful.

## PARTIES & STANDING

8.     Plaintiff NetChoice, LLC is a District of Columbia nonprofit trade association for Internet companies.[3] NetChoice's mission is to promote online commerce and speech and to increase consumer access and options via the Internet, while also minimizing the burdens that would prevent businesses from making the Internet more accessible and useful.

9.     NetChoice has standing to bring its challenges on at least three grounds.

---

[3] NetChoice's members are listed at NetChoice, About Us, https://perma.cc/GD5W-JYV6.

10.     NetChoice has associational standing because: (1) some of NetChoice's members have individual standing to sue in their own right, as those members are subject to the Act; (2) challenging the Act is germane to NetChoice's purpose; and (3) members' individual participation is unnecessary in this legal challenge. *See Citizens for Const. Integrity v. United States*, 57 F.4th 750, 759 (10th Cir. 2023); *Yost*, 2024 WL 555904, at *4-5; *Griffin*, 2023 WL 5660155, at *9.

11.     Based on the Act's definitions, § 13-71-101, the Act regulates some of the services offered by these NetChoice members: (1) Dreamwidth; (2) Google, which owns and operates YouTube; (3) Meta, which owns and operates Facebook and Instagram; (4) Nextdoor; (5) Pinterest; (6) Snap Inc., which owns and operates Snapchat; and (7) X. Although the Act does not regulate all of NetChoice's members, this Complaint refers to members with services the Act regulates as "members."

12.     NetChoice and its members also have standing to assert the First Amendment interests of members' current and prospective users. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988); *Yost*, 2024 WL 555904, at *5-6; *Bonta*, 2023 WL 6135551, at *4; *Griffin*, 2023 WL 5660155, at *11-12.[4]

13.     NetChoice also has organizational standing to challenge the Act. NetChoice has incurred costs and will continue to divert its finite resources from other endeavors to address the Act's implications and compliance costs for Internet companies.

---

[4] This Complaint uses the terms "minor," "adult," "account holder," and "user" to refer only to Utah minors, adults, account holders, and users when discussing the Act's requirements. Likewise, this Complaint generally employs the term "user" to encompass both what the Act refers to as "users" and "account holders." *See* § 13-71-101(1), (15). Thus, Plaintiff's members reserve the right to argue that their compliance obligations for "users" and "account holders" are different.

14.     Defendant Sean D. Reyes is the Attorney General of Utah. He is a resident of Utah and is sued in his official capacity. He has authority to "give legal advice to, and act as counsel for, the division in the exercise of the division's responsibilities." § 13-71-301(4)(b); *see* § 13-71-301(2). He has publicly sued some of NetChoice's members under other state laws.

15.     Defendant Katherine Hass (together with Reyes, "Defendants") is Director of the Division of Consumer Protection of the Utah Department of Commerce ("Division"). She is a resident of Utah and is sued in her official capacity. The Act grants enforcement authority to the Division and to its Director. § 13-71-301.

## JURISDICTION & VENUE

16.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983, injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

17.     This Court has personal jurisdiction over Defendants because they reside in and/or conduct a substantial proportion of their official business in Utah. Venue is proper in this District under 28 U.S.C. § 1391(b) because the only Defendants reside in, and the events giving rise to this civil action occurred in, Utah.

## BACKGROUND

18.     **NetChoice members' covered websites disseminate, facilitate, and promote speech protected by the First Amendment.** NetChoice's members operate websites that both "publish," *Reno*, 521 U.S. at 853, and "disseminate" protected speech on many subjects, *303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023). The websites do so by displaying text, audio, graphics, and/or video. The speech on these websites includes expression at the heart of the First

Amendment's protections like art, literature, politics, religion, and plain "entertain[ment]." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).

19.    NetChoice's members allow their users to "gain access to information and communicate with one another about it on any subject that might come to mind." *Griffin*, 2023 WL 5660155, at *5 (quoting *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017)). For example, Dreamwidth provides a home for creative users of all types and allows them to share their writing, artwork, and innermost thoughts. "On Facebook, . . . users can debate religion and politics with their friends and neighbors or share vacation photos." *Packingham*, 582 U.S. at 104. Instagram allows people to post and view photos and videos, comment on them, learn about and advocate for the causes they care about, showcase their art or athletic talent, hear from their local government officials, learn about volunteer activities, and fundraise for their church. On Nextdoor, users can connect with neighbors, share local news, and borrow tools. Pinterest allows its users to explore recipes, style, home decor, and more. Snapchat is designed to allow users to have digital conversations with friends and family in ways that replicate real-life interactions. On TikTok, users going through a difficult experience can find advice, support, and empathy. On X, "users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-05. And YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions.

20.    **Minors' use of covered websites.** Minors use covered websites for numerous reasons entitled to First Amendment protection from government interference. Minors use the websites to, among other things, conduct research for homework and school projects, interact with family and friends, find support, raise money for field trips, seek to be recruited for college

athletics, engage in activism, hear from local government officials, entertain and be entertained, discover new interests or explore existing ones, showcase their creative work, and form new communities.

21.    Minors use covered websites to speak beyond their social networks. Indeed, many covered websites allow users to reach, and interact with, a globe-spanning network of people.

22.    **Display of user-generated content on covered websites.** Websites make decisions about how to display, moderate, and disseminate content. Each website is different and disseminates different content according to their own policies and to serve their own users. Below are some means of disseminating speech that the Act singles out for regulation—none of which is unique to covered websites and all of which are widely used on the Internet.

a.    *Visibility of content.* Like other Internet websites left unregulated by the Act, most content on many covered websites is visible to other users of the website by default. Indeed, the point of many of these websites is to connect users sharing protected expression on a range of topics across geography, culture, and language. Therefore, many websites allow users to make their expression available to people across the globe, if they choose.

b.    *Seamless pagination.* Like other Internet websites left unregulated by the Act, many covered websites employ seamless pagination, where content—posts, videos, audio, streams, advertisements, and other expression—loads frictionlessly without requiring users to click onto more pages to see more content. Many other websites and online services use seamless pagination, yet are left unregulated, such as Apple News, Bing, *The New York Times*, and the U.S. News and World Report college rankings. *See* Apple, Inc., Apple News+, https://perma.cc/47HX-7AT9; Microsoft Bing, "New York," https://perma.cc/87QD-45MT; New York Times, U.S. News,

https://perma.cc/3JUC-V99D; U.S. News and World Report, Best National University Rankings, https://perma.cc/3DA7-HT5P.

   c.    *Autoplay*. Like many other Internet websites left unregulated by the Act, many covered websites offer users the option to allow content like videos or audio to "autoplay." Just as music streaming services like Spotify autoplay songs in a playlist or album and video streaming services like Hulu and Disney+ autoplay the next episode of a television show (sometimes subject to default limitations on minors' accounts), some covered websites similarly allow users to autoplay content. *See* Hulu, Autoplay on Hulu, https://perma.cc/6W9W-PMJ6; Disney+, Creating and Managing Disney+ Profiles, https://perma.cc/SKN9-LVR8; Spotify, Autoplay, https://perma.cc/N8AP-UH79. The same is true of news and entertainment websites commonly used by teenagers like Buzzfeed. *See* BuzzFeed, Videos, https://perma.cc/6JHM-H2M4.

   d.    *Notifications*. Like many other digital services left unregulated by the Act, many covered websites also provide users the option to receive notifications. Notifications allow covered websites to facilitate communication and interaction among users by informing users about new messages, comments, content from connections, and recommendations, among other things. Apple News, Disney+, Duolingo, and ESPN, in addition to nearly every other application, send users notifications. *See* Apple, Turn Notifications and Emails On or Off in Apple News, https://perma.cc/FH6N-TR7J; Disney+, Push Notifications on Disney+, https://perma.cc/6UF4-CBFC; Duolingo, How Do I Adjust the Time of My Daily Practice Reminder?, https://perma.cc/Q4AZ-FRXT; ESPN, How Do I Sign Up for Alerts?, https://perma.cc/R4ZC-EYX2. Covered websites allow users to control what notifications they see. *See, e.g.*, Pinterest, Edit Notification Settings, https://perma.cc/GY8F-DW84. In addition to customizing notifications

on the websites themselves, users can adjust notification settings on their devices. *See, e.g.*, Apple, Use Notifications on Your iPhone or iPad, https://perma.cc/WQ32-Z5EE; Samsung, Control App Notifications on Your Galaxy Phone or Tablet, https://perma.cc/TFF9-WZ45; Google, Control Notifications on Your Pixel Phone, https://perma.cc/77WN-K6E3.

23.     **Existing options for parental control and oversight.** Parents have many existing choices to regulate whether and how their minor children use the Internet.

24.     Parents decide whether and when to let their minor children use computers, tablets, smartphones, and other Internet-connected devices.

25.     Parents can also determine whether, when, and how their children use their devices to access the Internet. Cellular and broadband Internet providers offer families tools to block certain online services from certain devices. *See, e.g.*, Verizon, Verizon Smart Family, https://perma.cc/J8ML-GPWU; AT&T, AT&T Secure Family, https://perma.cc/B3G9-B94K; T-Mobile, Family Controls and Privacy, https://perma.cc/A8LY-ER5K; Comcast Xfinity, Set Up Parental Controls for the Internet, https://perma.cc/JL8C-T7AQ.

26.     Internet browsers also allow parents to control what online services their children may access. *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox, https://perma.cc/6H79-MH7H. For example, some browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most. *See* Google, Safety Center, https://perma.cc/97LX-RYJV; Microsoft, Learn More About Kids Mode in Microsoft Edge, https://perma.cc/R823-VGJQ. Parents can also use widely available third-party software and browser extensions to reinforce these tools. *See, e.g.*, Kim Key, *The Best Parental Control Software for 2023*, PCMag (Dec. 15, 2023), https://perma.cc/6J6B-2JLH.

27.     Wireless routers often have settings allowing parents to block particular websites, filter content, and monitor Internet usage. *See, e.g.*, Netgear, Circle Smart Parental Controls, https://perma.cc/SMJ7-KSEK; tp-link, How to Configure Parental Controls on the Wi-Fi Routers (Case 1), https://perma.cc/2BLV-5C9Q. They also allow parents to turn off Internet service at certain times, pause service to a device, or limit overall time spent on the Internet.

28.     Device manufacturers provide even more parental controls. Apple devices like iPhones and iPads allow parents to limit the time spent on the device, curtail the applications that can be used on the device, set content restrictions on those applications, filter online content, and control privacy settings. *See* Apple, Use Parental Controls on Your Child's iPhone, iPad, and iPod Touch, https://perma.cc/G8KT-DHKE. Google, Microsoft, and Samsung offer similar controls on their devices. *See* Google Family Link, Help Keep Your Family Safer Online, https://perma.cc/YCF3-KW6X; Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/72NU-LBDR; Samsung, Parental Controls Available on Your Galaxy Phone or Tablet, https://perma.cc/89QC-NUDC.

29.     Numerous third-party applications also allow parents to control and monitor their children's online activities. *See, e.g.*, Alyson Behr, *The Best Parental Control Apps In 2024, Tested By Our Editors*, CNN underscored (Mar. 11, 2024), https://perma.cc/RCW5-EUM6.

30.     NetChoice members provide parents with a number of options to help monitor their minor children's activities. Facebook and Instagram offer "supervision tools" that empower parents and teens to work together to set time limits and schedule breaks; allow parents to see who their teen follows and who follows their teen; allow parents to see which accounts their teen is currently blocking; enable parents to view their teen's account settings for sensitive content,

privacy, and messaging; and empower teens to notify their parents when they block or report some-one. Similarly, Snapchat's "Family Center" allows parents to see which friends the teen has been recently communicating with on Snapchat, view their list of friends, restrict sensitive content, and report abuse. TikTok has a "family pairing" feature that allows parents to, among other things, set a screen time limit, restrict exposure to certain content, decide whether their teen's account is private or public, turn off direct messaging, and decide who can comment on their teen's videos.

31.     All NetChoice members prohibit minors under 13 from accessing their main ser-vices, although some offer separate experiences for users under 13 geared for that age group. For example, TikTok offers a separate experience specifically designed for users under 13 that has heightened protections and that does not offer the ability to post, to communicate with others, maintain a profile, or have followers. And YouTube offers two services (YouTube Kids and a "Supervised Experience" on YouTube) for minors younger than 13 with parental consent. These services allow parents to select content settings, set screen time limits, and otherwise oversee their children's use of the services.

32.     To facilitate parental control for minors under 13, the federal Children's Online Privacy Protection Act imposes restrictions on access to online content from Internet websites "directed to children" younger than 13 and from any Internet website "that has actual knowledge that it is collecting personal information from a child" younger than 13. 15 U.S.C. § 6502(a)(1).

33.     **Covered websites' collection and use of data.** Members' ability to offer online services depends on the ability to collect, store, and use information and data that users provide. For example, user data is necessary for deterring and detecting malicious actors, protecting users from would-be identity thieves, and maintaining overall security. To deliver their services,

websites must collect information about a user's IP address, device type, operating system, screen resolution, browser type, language preferences, and time zone. Beyond these baseline functions, many members use information about a person's usage to help personalize experiences on the websites. This helps ensure that people see the content they want to see and not the content they do not. Thus, a user that likes a genre of music will see more of that music on the website.

34.    Accordingly, members go to great lengths to safeguard user data and to prevent unauthorized disclosure to third parties. Moreover, members all have privacy policies that explain how members will use data.

35.    To operate their services, some websites also share data with third parties for limited purposes, including for content moderation of harmful content. For example, some websites provide data to third-party contractors that help process the data for their websites subject to confidentiality requirements.

36.    **Covered websites' dedication to beneficial user experiences and user security.** NetChoice's members expend vast resources to improve their services and curate the content on their websites to best ensure that it is appropriate for users. They restrict the publication of content they consider harmful, like violent and sexual content, bullying, harassment, and content that encourages body shaming or eating disorders. Conversely, many covered websites promote age-appropriate and positive content, such as content that encourages a positive self-image.

37.    Many member websites restrict messaging between minors and adults, if they offer direct messaging at all. TikTok bans users under age 16 from sending or receiving direct messages, and it allows parents and guardians of 16- to 18-year-old users to restrict who can send messages to their teen, or to turn off direct messaging completely through its family pairing feature. For 16-

and 17-year-olds, TikTok also turns off direct messaging by default. Snapchat only allows minors to exchange messages with their friends on Snapchat or with people in their phone contact book. And Snapchat does not recommend minors as suggested friends unless the person is already in their phone contacts or shares mutual friends. Instagram restricts adults from messaging teens who do not follow them and encourages teens via prompts and safety notices to be cautious in conversations with adults, even those to whom they are connected. And YouTube and other members do not offer private messaging between users at all.

### THE UTAH MINOR PROTECTION IN SOCIAL MEDIA ACT OF 2024

38.    In March 2024, the Utah Legislature enacted, and the Utah Governor signed, Senate Bill 194, which created the "Utah Minor Protection in Social Media Act." The Act largely takes effect on October 1, 2024. The Act partially replaces Utah's Social Media Regulation Act of 2023, which was formally repealed by Utah House Bill 464 ("HB464").

39.    The State's repeal of the Social Media Regulation Act followed NetChoice's lawsuit challenging that Act. *See* ECF 1. Though Utah formally repealed 2023's Social Media Regulation Act, many of the State's unconstitutional restrictions on covered websites persist—some of which the State has attempted to shield from pre-enforcement review. Specifically, Utah reformulated many of the 2023 Act's restrictions as parts of HB464, which creates a private right of action "for an adverse mental health outcome" arising from "excessive use of [a] social media company's algorithmically curated social media service." § 78B-3-1103(1). But HB464 "presum[es]" many fundamental elements of liability. § 78B-3-1103(3). To overcome that presumption, covered websites must adopt a series of requirements like those imposed by the 2023 law, including a time-

limit, curfew, and parental-consent requirement. § 78B-3-1104(1). Those requirements remain un-constitutional, however they are imposed. *See, e.g.*, ECF 25 at 33-35, 41-43.

40.     **The Act's content-, speaker-, and viewpoint-based central coverage definition (Utah Code § 13-71-101).** Though the Act regulates means of displaying speech that are common across the Internet—like autoplay, seamless pagination, notifications, and data collection—it only regulates them on specific websites. Those websites alone will shoulder the Act's massive com-pliance burdens, including the costs of developing and maintaining the systems the Act mandates.

41.     Specifically, the Act regulates "social media compan[ies]," which are any "entity that owns or operates a social media service," which is in turn defined as any "public website or application that":

> (i) displays content that is primarily generated by account holders and not by the social media company.
> (ii) permits an individual to register as an account holder and create a profile that is made visible to the general public or a set of other users defined by the account holder;
> (iii) connects account holders to allow users to interact socially with each other within the website or application;
> (iv) makes available to each account holder a list or lists of other account holders with whom the account holder shares a connection within the system; and
> (v) allows account holders to post content viewable by other users.

§ 13-71-101(13)-(14)(a). The term "[s]ocial media service" excludes "(i) email; (ii) cloud storage; or (iii) document viewing, sharing, or collaboration services." § 13-71-101(14)(b).

42.     **The Act's age-"assurance" requirement (Utah Code § 13-71-201).** The Act pro-vides that covered websites "shall implement an age assurance system to determine whether a *current or prospective Utah account holder* on the . . . social media service is a minor." § 13-71-201(1) (emphasis added). The Act defines "age assurance system" as "measures reasonably calcu-lated to enable a" covered website "to identify whether a current or prospective Utah account

holder is a minor with an accuracy rate of at least 95%." § 13-71-101(2). "Minors" are all users younger than 18, except for those who are "emancipated [or] . . . married." § 13-71-101(8). "A Utah account holder that the social media company identifies as a minor through the use of an age assurance system is subject to" the Act's restrictions for minor account holders. § 13-71-201(2).

43.    The Act's introductory language says this provision "requires social media companies to verify a new account holder's age using an approved system." *See* Ex. 1 at p.1:10-11.

44.    Naming this requirement "age-assurance" as compared to "age-verification" is a distinction without a constitutional difference. Either way, this requirement imposes additional, unconstitutional barriers for both minors and adults to access protected speech and for websites to disseminate speech. In response to the Act's requirement for an "accuracy rate of at least 95%," § 13-71-101(2), many covered websites will request proof of age from users. And covered websites will need to distinguish between emancipated or married minors and other minors. Furthermore, "age assurance methods" like the Act's "create time delays and other barriers to entry that studies show cause users to navigate away from pages." *Bonta*, 2023 WL 6135551, at *8 (discussing amicus brief).

45.    In addition to the upfront requirement for age "assurance," the Act also includes an "appeal" requirement that directs covered websites to "implement a review process allowing account holders to appeal the account holder's age designation by submitting documentary evidence to establish the account holder's age range." § 13-71-201(3)(a).

46.    The government cannot impose barriers to access to protected speech. Users of all ages will be deterred from using covered websites because they are unwilling or unable to provide that identification or personal information. Those who are not deterred must "forgo the anonymity

otherwise available on the internet" as the state-imposed price of admission. *Griffin*, 2023 WL 5660155, at *17 (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *see ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008).

47.    **The Act's prohibition on autoplay, seamless pagination, and certain notifications on minors' accounts (Utah Code § 13-71-202(5)).** The Act prohibits covered websites from disseminating content in particular ways on minors' accounts. Specifically, the Act provides that for "Utah minor account holders," a "social media company shall" "disable" three "features":

> (a) autoplay functions that continuously play content without user interaction;
> (b) scroll or pagination that loads additional content as long as the user continues scrolling; and
> (c) push notifications prompting repeated user engagement.

§ 13-71-202(5). A "push notification" is "an automatic electronic message displayed on an account holder's device, when the user interface for the social media service is not actively open or visible on the device, that prompts the account holder to repeatedly check and engage with the social media service." § 13-71-101(11).

48.    But the Act fails to define other important terms like "prompt[] repeated user engagement." § 13-71-202(5). That will chill covered websites from sending users notifications.

49.    Prohibiting these means of disseminating speech will deprive websites of their ability to choose how to engage in and display expression. For example, websites might use autoplay because some expression lends itself to being viewed in sequence, like episodes of a travelog. Seamless pagination is an effective way to display and view the enormous amount of content on many covered websites. And notifications are ways for websites to inform users about things like recommended content, relevant announcements, and suspicious logins to their accounts.

50.    Users too will be deprived of the ways in which these practices facilitate communication on the websites; they will not have the same ability to communicate and view information. For example, a minor may prefer to have videos autoplay while learning dance choreography. Similarly, seamless pagination is useful on mobile devices, where navigating between different pages can be more difficult. Moreover, users may rely on notifications to disseminate their content to others; and, on the receiving end, minors may prefer to receive notifications about new content from a scholarship program, athletic camp, or university admission department's page. The Act removes these options by imposing a government mandate on how users may receive, share, and view speech.

51.    **The Act's restrictions on websites' and minors' ability to share content absent parental consent (Utah Code §§ 13-71-202(1)(a)-(b), 13-71-204(1)).** The Act restricts minors' ability engage in protected speech by sharing their expressive content and account beyond a narrow, State-defined network without "first obtaining verifiable parental consent." §§ 13-71-202(1)(a)-(b), 13-71-204(1). And it would correspondingly limit others' ability to see that speech.

52.    First, covered websites must "limit the Utah minor account holder's ability to share content to only connected accounts." § 13-71-202(1)(b). In other words, minors cannot speak—share posts, videos, audio, comments, likes, and other expressive content—beyond a narrow network of people without first obtaining "verifiable parental consent." § 13-71-204(1).

53.    Second, covered websites must "restrict the visibility of a Utah minor account holder's account to only connected accounts." § 13-71-202(1)(a). Thus, minors would be similarly limited in their ability to share the pages that often contain much of their speech and expressive conduct.

54.    Though not every website uses this terminology, a "connected account" can roughly be understood as either a "friend" or a "friend of a friend." § 13-71-101(3), (5).

55.    These provisions require parental consent to engage in a broad range of protected speech. A minor could not leave a comment on an un-"connected" public official's post. Similarly, a high school student would be unable to share a picture of a lost dog beyond the network defined by the State. A high school athlete would not be able to share highlights for college recruiters. A high school student would be unable to leave a comment on an un-"connected" account's video about how to solve a math problem. Plus, minors' accounts would not be visible beyond the Utah-approved network of people. On top of all of that, minors would not be able to see the content and accounts of other minors outside of their networks.

56.    The Act raises compliance hurdles for covered websites to disseminate protected speech. For example, some websites may not have bilateral "connections" where one user "send[s] a request to connect to another account holder and ha[s] the request to connect accepted by the other account holder." § 13-71-101(5)(a). X only permits account holders to "follow" and be "followed" by other accounts. *See* X, Following FAQs, https://perma.cc/DJ4S-ZMLN. On those websites, minors may be entirely unable to share their content or accounts without parental consent.

57.    Nor does the Act account for the difficulty in verifying a parent-child relationship. In enjoining a similar requirement, the Western District of Arkansas credited the *State's* expert testimony that "the biggest challenge you have with parental consent is actually establishing . . . the parental relationship." *Griffin*, 2023 WL 5660155, at *4. These difficulties are compounded for non-traditional families (*e.g.*, foster families), when families have differences in name or address, where parents disagree about consent, or when parental rights have been terminated, among

other situations. As a result, covered websites may "err on the side of caution and require detailed proof of the parental relationship." *Id.* at *15. Thus, "parents and guardians who otherwise would have freely given consent to open an account will be dissuaded by the red tape and refuse consent—which will unnecessarily burden minors' access to constitutionally protected speech." *Id.* After all, parents will have to "forgo [] anonymity" to grant their minor children the ability to speak beyond their networks. *Id.* at *17.

58.    **The Act's undefined regulations of collection and use of data (Utah Code §§ 13-71-202(1)(c), 13-71-204(2)-(4)).** The Act imposes two potentially broad, but undefined, requirements on covered websites' collection and use of data.

59.    *First*, the Act provides that covered websites must "restrict any data collection and sale of data from a Utah minor account holder's account that is not required for core functioning of the social media service." § 13-71-202(1)(c). But the Act does not define what "required for core functioning of the social media service" means.

60.    *Second*, the Act also imputes a vague and undefined "assurance of confidentiality" regarding a minor account holder's personal information to covered entities' terms of service. § 13-71-204(2)-(4). But although it lists some exceptions to that requirement, the Act does not define what this "assurance of confidentiality" entails in the first place. Though members already go to great lengths to safeguard user data, this provision's undefined mandate leaves covered websites unsure about their compliance obligations.

61.    Specifically, a covered website's "terms of service related to a Utah minor account holder shall be presumed to include an assurance of confidentiality for the Utah minor account holder's personal information . . . [which] may be overcome if the social media company obtains

verifiable parental consent." § 13-71-204(2)-(3). The Act defines "personal information" broadly to include "information that is linked or can be reasonably linked to an identified individual or an identifiable individual." § 13-71-101(10)(a). Such information "includes": "(i) first and last name; (ii) date of birth; (iii) home or physical address, including street name and city; (iv) screen or user name that reveals an individual's email address, first name, or last name; (v) telephone number; (vi) Social Security number; (vii) photograph, video, or audio file containing a person's image or voice; (viii) geolocation information sufficient to identify street name and city; and (ix) any other identifier that a person may use to contact a specific individual." § 13-71-101(10)(b).

62.    The Act also lists exceptions to which the "presumption of confidentiality . . . does not apply." § 13-71-204(4). These include "internal use or external sharing of a Utah minor account holder's personal information if the use or sharing is necessary to: (a) maintain or analyze functioning of the social media service; (b) enable network communications; (c) personalize the user's experience based on the user's age and location; (d) display a username chosen by the Utah minor account holder; (e) obtain age assurance information as required under Section 13-71-201; or (f) comply with the requirements of this chapter or other federal or state laws." § 13-71-204(4). Those exceptions create more confusion than they cure, and do not solve for the statute's failure to define "assurance of confidentiality" in the first place.

63.    The Act's undefined "assurance of confidentiality" makes covered websites' compliance obligations unclear. For example, the exceptions suggest that even a covered website's "*internal* use" of data can violate an "assurance of confidentiality." § 13-71-204(4) (emphasis added). It likewise suggests that personalizing content based on data other than "the user's age and location" violates the undefined "assurance." Yet both of those would imply an entirely bespoke

meaning of "confidentiality" that deviates from common understandings of the term because they have nothing to do with unauthorized disclosure to third parties. *See, e.g.*, *Confidential*, Black's Law Dictionary (11th ed. 2019) ("meant to be kept secret").

64.     Moreover, it is also not clear whether this provision permits covered websites to use third-party contractors to help process data subject to strict confidentiality requirements.

65.     **The Act's enforcement (Utah Code §§ 13-71-301 to -302).** The Act imposes substantial penalties that will chill dissemination of speech.

66.     Defendants have two enforcement mechanisms. First, the Division Director "may impose an administrative fine of up to $2,500 for each violation" of the Act. § 13-71-301(3)(a)(i).

67.     Second, the Division may also bring a "court action," and a "court may," among other things: (1) "order disgorgement of any money received in violation of" the Act; (2) "order payment of disgorged money to an injured purchaser or consumer"; (3) "impose a civil penalty of up to $2,500 for each violation"; (4) "award actual damages to an injured purchaser or consumer"; (5) award "reasonable attorney fees," "court costs," and "investigative fees"; and (6) "any other relief that the court deems reasonable and necessary." § 13-71-301(b)-(c). And "[a] person who violates an administrative or court order issued for a violation of" the Act "is subject to a civil penalty of no more than $5,000 for each violation." § 13-71-301(4)(a).

68.     The Act also contains a "safe-harbor" provision. § 13-71-302. A covered website is purportedly (1) "not subject to an enforcement action for a violation of" the age-assurance provision "if the social media company implements and maintains an age assurance system that complies with rules made by the division"; (2) "considered to have obtained verifiable parental consent if the social media company obtains parental consent through a mechanism that complies with the

rules made by the division." § 13-71-302(2)-(3). But the Act places no deadline for when the Division must issue such rules. There is no suggestion that the Act will not be fully enforced against covered websites once it is in effect even if the rules have not been issued.

## CLAIMS

69.    Each of NetChoice's claims raises a traditional facial challenge, because "no set of circumstances exists under which the" challenged provisions of the Act (§§ 13-71-101 to -401) "would be valid." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) ("*AFP*") (cleaned up). Alternatively, each of NetChoice's First Amendment claims also raises a First Amendment overbreadth facial challenge, because "a substantial number of" the Act's challenged "applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (citation omitted).

70.    Each First Amendment challenge raises the rights and interests of both NetChoice's members and those who use or could prospectively use NetChoice members' websites.

---

**All Requirements for a "Social Media Company"**
**(Utah Code §§ 13-71-101 to 13-71-401)**

---

**COUNT I**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT**
**(CENTRAL COVERAGE DEFINITION – UTAH CODE §§ 13-71-101 TO 13-71-401)**

71.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

72.    As incorporated against the States, the First Amendment's Free Speech and Free Press Clauses provide that governments "shall make no Law . . . abridging the Freedom of Speech, or of the Press." U.S. Const. amend. I. Among other things, the First Amendment protects "publish[ing]," *Reno*, 521 U.S. at 853; "disseminat[ing]," *303 Creative*, 143 S. Ct. at 2316; and

"creating, distributing, [and] consuming" protected speech from government interference. *Brown*, 564 U.S. at 792 n.1. And those rights apply to all manner of private entities—and their readers and viewers. *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) (the "press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion").

73.      The entire Act fails any form of First Amendment scrutiny because the applicability of its speech restrictions and burdens rely on a coverage definition of "social media compan[ies]" that is unconstitutionally content-, speaker-, and viewpoint-based. The "Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011) (citation omitted). The State cannot articulate a sufficient governmental interest supporting the Act, and—even if it could—the Act is not properly tailored to satisfy any form of First Amendment scrutiny. *See, e.g.*, *Griffin*¸ 2023 WL 5660155, at *16-21; *Bonta*, 2023 WL 6135551, at *13.

74.      **The entire Act triggers strict scrutiny.** The Act triggers strict scrutiny in multiple ways because its speech restrictions and burdens depend on a central coverage definition—"social media company," § 13-71-101(13)—that is content-, speaker-, and viewpoint-based.

75.      The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (citation omitted). A law "is facially content based . . . if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (citation omitted). Government cannot evade these bedrock prohibitions by using "subtler forms of discrimination that achieve identical results based on function or purpose." *Id.* at 1474 (citing *Reed v. Town of Gilbert*, 576 U.S. 155,

163 (2015)). "Content-based laws . . . are presumptively unconstitutional." *Reed*, 576 U.S. at 163 (citation omitted). And "facially content neutral" laws "will be considered content-based" if they "cannot be 'justified without reference to the content of the regulated speech,'" or if they "were adopted . . . 'because of disagreement with the message [the speech] conveys.'" *Id.* at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *United States v. Eichman*, 496 U.S. 310, 315 (1990) ("Although the [statute] contains no explicit content-based limitation on the scope of prohibited conduct, it is nevertheless clear that the Government's asserted interest is related to the suppression of free expression." (cleaned up)).

76.    The Act's central coverage definition is content-based because it targets websites based on whether they "allow users to interact *socially* with each other within the website," rather than websites that allow for user interaction for other purposes. § 13-71-101(14)(a)(iii) (emphasis added). This uses the "purpose" of speech—here, "social[]" "interact[ion]"—as a proxy for the content of disfavored speech. *Reed*, 576 U.S. at 163, 169; *see City of Austin*, 142 S. Ct. at 1472-73. Accordingly, means of disseminating speech that serve "social[]" "interact[ion]" are subject to onerous regulation, while other means of disseminating speech are not.

77.    The Act's central definition also discriminates based on who is disseminating speech, regulating some Internet websites but not others—even though they might disseminate speech in the same ways. "[L]aws that single out the press, or certain elements thereof, for special treatment pose a particular danger of abuse by the State, and so are always subject to at least some degree of heightened First Amendment scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 640-41 (1994) (cleaned up). The First Amendment limits state power to enforce "restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United v.*

*FEC*, 558 U.S. 310, 340 (2010). Such "restrictions . . . are all too often simply a means to control content." *Id.* Thus, the Supreme Court has been "deeply skeptical of laws that distinguish among different speakers." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777-78 (cleaned up). As a result, "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Reed*, 576 U.S. at 170 (citation omitted).

78.    The Act's central coverage definition is speaker-based because it burdens only websites that "display[] content that is primarily generated by account holders" while favoring websites that "primarily" generate their own content, § 13-71-101(14)(a)(i), even if the former websites also post or create their own content (as many covered websites do). In other words, the Act only burdens the editorial discretion and control of websites that decide to disseminate "primarily" user-generated speech. For example, among websites that disseminate large amounts of videos, the Act regulates YouTube, but not Hulu and Disney+.

79.    The Act is also speaker-based because it burdens minors more than adults.

80.    The Act also treats websites that "allow users to interact *socially* with each other" less favorably than websites that allow users to interact for other purposes—*e.g.*, business, educational, etc. § 13-71-101(14)(a)(iii) (emphasis added). Ostensibly, employment and business networking websites like LinkedIn may not be covered by the Act. Yet, those websites often contain the same content regarding various topics as covered websites such as Facebook and X.

81.    Finally, the Act's content- and speaker-based exceptions also reflect some viewpoint-based preferences. Laws that "target[] . . . particular views taken by speakers on a subject" are an "egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Consequently, the government must "abstain from regulating

speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* Here, the Act treats content more favorably if it reflects the viewpoint expressed in speech authored by the websites themselves, because the Act covers only websites that "display[] content that is primarily generated by account holders," thereby excluding websites where the content is primarily generated by the website itself. § 13-71-101(14)(a)(i).

82.     Because the Act's central coverage definition is content-, speaker-, and viewpoint-based, so too is each provision of the Act restricting speech that relies on this definition.

83.     Each provision of the Act therefore triggers and fails strict scrutiny.

84.     **The entire Act fails strict scrutiny.** Strict scrutiny requires a State to use "'the least restrictive means of achieving a compelling state interest.'" *AFP*, 141 S. Ct. at 2383 (quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014)).

85.     The State lacks a compelling government interest supporting the Act.

86.     Although the Act contains legislative findings, those findings do not articulate interests that the Act serves.

87.     The State lacks "a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794.

88.     Under the First Amendment, Defendants have the burden to "specifically identify" how the Act addresses an "actual problem in need of solving." *Id.* at 799 (citation omitted). Strict scrutiny demands that "the curtailment of free speech must be actually necessary to the solution." *Id.* Here, Defendants must demonstrate that there is a problem in need of *governmental* solution, as compared to private, family solutions. Parents have a wealth of choices to help oversee their minor children online, and those choices provide families more flexibility than the State's one-

size-fits-all mandate. The Supreme Court has repeatedly endorsed similar parental controls over governmental intervention. *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000). Defendants cannot demonstrate why the Legislature ignored those viable alternatives. There are no legislative findings sufficient to justify the law's infringement on First Amendment rights. *See Edenfield v. Fane*, 507 U.S. 761, 770 (1993). There are certainly nowhere near the kind of "unusually detailed statutory findings," *Turner*, 512 U.S. at 646, the Supreme Court has relied on in the past to uphold laws under *intermediate* scrutiny. Nor do those findings foreclose this Court's independent evaluation. *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 129 (1989). To be sure, the Act's legislative findings assert that "*social media services*" themselves "are designed without sufficient tools" and "existing measures *employed by social media companies* to protect minors have proven insufficient.*" § 13-71-102(4), (7) (emphases added). Those findings say nothing about the wealth of other options parents have to oversee and safeguard their minor children's online activity.

89.     The Act is not properly tailored—and not narrowly tailored—to any articulated interest. It "is either underinclusive or overinclusive, or both, for all the purported government interests at stake." *Yost*, 2024 WL 555904, at *13. Below is a non-exhaustive list of reasons.

90.     The Act is overinclusive because the Act's broad scope sweeps in all manner and sizes of websites. The Act is not limited to "social media," in spite of all of the State's legislative findings being limited to "social media." Nor does the Act attempt to regulate only websites that disseminate unprotected speech. Instead, the Act regulates many websites across the Internet, including All Trails, MeWe, Pepper the App, ClubHouse, ArtStation, and Behance and countless forums.

91.    Not all websites are able to "age-gate" or otherwise distinguish between minor and adult users on the websites. For example, while some websites are capable of disabling autoplay only on minors' accounts, other websites will not be able to do so. For that latter category of websites, compliance with the Act will require the websites to disable, *e.g.*, autoplay for *all* users—minor and *adult*. The Act may therefore "reduce the adult population . . . to reading only what is fit for children." *Butler v. Michigan*, 352 U.S. 380, 383 (1957).

92.    The Act is also overinclusive because it regulates all manner of protected speech, including speech on political and religious topics that falls at the very heart of the First Amendment.

93.    The Act's one-size-fits-all approach treating all minors at every development stage—from websites' youngest users to seventeen-year-olds—alike is also vastly overbroad. *See Reno*, 521 U.S. at 866; *Am. Booksellers Ass'n*, 484 U.S. at 396 (laws must "take into account juveniles' differing ages and levels of maturity").

94.    At the same time, the Act is also underinclusive because its central coverage definition allows access to the exact same speech and practices on different websites. For example, a teenager can receive notifications about their favorite sports team from ESPN but not from X—even if the notification is word-for-word the same. Similarly, a teenager can seamlessly scroll through image searches on Bing or through college rankings on U.S. News and World Report but cannot use such seamless pagination for searching recipes on Pinterest. And minors can autoplay videos on Disney+ and Hulu, but not covered websites. This undermines any contention that the State's proposed restrictions on speech actually serve to address a serious issue. *See Brown*, 564 U.S. at 802; *Griffin*, 2023 WL 5660155, at *19.

95.     The Act's central coverage definition is integral to the entire Act. §§ 13-71-101 to -401. Without this central definition, no other provision in the Act could operate, and thus the entire Act requires invalidation.

96.     Unless declared invalid and enjoined, Utah Code §§ 13-71-101 to -401 will unlawfully deprive Plaintiff's affected members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

## COUNT II
## 42 U.S.C. § 1983
## VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS
## (CENTRAL COVERAGE DEFINITION – UTAH CODE §§ 13-71-101 TO 13-71-401)

97.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

98.     The Act's central coverage definition of "social media company" (§ 13-71-101(13)) is unconstitutionally vague, and thus violates principles of free speech and due process.

99.     "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). And a "law is unconstitutionally vague" if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citation omitted). The constitutional standard for vagueness is heightened for speech restrictions under the First Amendment. *FCC*, 567 U.S. at 253-54.

100.    The Act does not define what it means "to allow users to interact socially." § 13-71-101(14)(a)(iii). Most human interaction could be defined as "social," and thus most websites that enable interaction among users could plausibly be covered by the Act. For example, websites like LinkedIn are ostensibly intended for professional networking. It is not clear whether

professional networking is "social interaction" under the Act. Assuming that social networking is distinct from "social interaction," a great deal of the interactions on LinkedIn *are* "social." Many people have the same conversations on X, Facebook, Nextdoor, and LinkedIn—yet LinkedIn might be excluded from the Act's requirements. And many people cross-post to multiple websites, meaning they post the exact same content to multiple websites.

101. Similarly, the Act does not explain what it means for a website to "primarily" "display[]" user-generated content. § 13-71-101(14)(a)(i). Many covered websites both display their own content and advertisements while also displaying user content. It is not clear whether "primarily" means the majority of content has to be user-generated, or a super-majority, or something else. Moreover, the ratio of user- to website-generated content and advertisements could change over time. That means a website might fall in and out of the Act's regulatory ambit in ways that are difficult to predict.

102. Many websites will have no way of knowing what these "term[s]" mean, even though they are "critical to determining which entities fall within [the Act]'s scope." *Griffin*, 2023 WL 5660155, at *13. Therefore, the Act "leav[es] companies to choose between risking unpredictable and arbitrary enforcement . . . and trying to implement the Act's costly . . . requirements. Such ambiguity renders a law unconstitutional." *Id.*; *FCC*, 567 U.S. at 253.

103. Because of this vagueness, the Act's central coverage definition violates the First Amendment and the Due Process Clause of the Fourteenth Amendment.

104. The Act's central coverage definition is integral to the entire Act. §§ 13-71-101 to -401. Without this central definition, no other provision in the Act could operate. The central coverage definition is not severable and thus the entire Act is invalid.

105.    Unless declared invalid and enjoined, Utah Code §§ 13-71-101 to -401 will unlawfully deprive Plaintiff's affected members and Internet users of their First Amendment and Due Process rights and will irreparably harm Plaintiff, its members, and Internet users.

---

**Specific Prohibitions**
**(Utah Code §§ 13-71-201, -202(1)(a)-(b), -202(5), -204(1), and -204(2)-(4))**

---

**COUNT III**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT**
**(AGE "ASSURANCE" – UTAH CODE § 13-71-201)**

106.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

107.    The Act's requirement for age "assurance" (§ 13-71-201) is unconstitutional and cannot satisfy any level of First Amendment scrutiny.

108.    The Supreme Court has repeatedly reaffirmed that governments cannot require people to provide identification or personal information to access protected speech. *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 874 (similar). Lower courts, too, have consistently rejected age-verification requirements. *See, e.g.*, *Mukasey*, 534 F.3d at 196-97; *PSINet, Inc. v. Chapman*, 362 F.3d 227, 236-37 (4th Cir. 2004).

109.    In the context of this Act, whether referred to as "age assurance" or "age verification" the impact and constitutional violation are the same. To ensure compliance with an "accuracy rate of at least 95%," § 13-71-101(2), covered websites would have to bear (and even impose on their users) substantial burdens to obtain evidence of age from every account holder—including adults—as a precondition to disseminating speech. The account holder's age would determine what restrictions must be placed on the account. Likewise, websites will need to distinguish between married or emancipated and other minors.

110. Regardless of what the upfront "age-assurance" process itself will require, the Act necessarily contemplates that users will need to "submit[] documentary evidence to establish the account holder's age range" as part of the Act's appeal requirement. § 13-71-201(3)(a). If those adults are *unwilling* to "submit[] documentary evidence" to appeal their misidentification by the website, *id.*, their accounts will be subject to myriad restrictions under the Act.

111. As to the impact on minors, the Act's requirements "obviously burden[] minors' First Amendment Rights." *Griffin*, 2023 WL 5660155, at *17.

112. These provisions trigger strict scrutiny because they rely on the Act's central coverage definition.

113. These provisions independently trigger strict scrutiny.

114. The State cannot demonstrate what purported problem the age-assurance requirement responds to, how the requirement is necessary to solve the problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

115. The age-assurance requirement is also not properly tailored.

116. The Act's age-assurance requirement is integral to the entire Act. §§ 13-71-101 to -401. Without this provision, no other provision in the Act could operate. The age-assurance provision is not severable and thus the entire Act is invalid.

117. Unless declared invalid and enjoined, Utah Code § 13-71-201 will unlawfully deprive Plaintiff's affected members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

**COUNT IV**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT**
**(PROHIBITION ON MEANS OF DISSEMINATING SPEECH**
**– UTAH CODE § 13-71-202(5))**

118.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

119.    The Act's prohibitions on means of publishing, disseminating, and displaying speech on minors' accounts (§ 13-71-202(5)) are unconstitutional and cannot survive any form of First Amendment scrutiny.

120.    These requirements will control how covered websites display and disseminate speech to minors *and* facilitate the expression of people who use their websites.

121.    Although these prohibitions cannot survive any level of First Amendment scrutiny, they trigger strict scrutiny because they interfere with websites' First Amendment right to choose how to publish expression. *See Tornillo*, 418 U.S. at 258.

122.    These provisions also trigger strict scrutiny because they rely upon the Act's central coverage definition.

123.    Utah lacks a sufficient governmental interest in prohibiting means of publishing speech and these requirements are not properly tailored.

124.    The Act's legislative findings do not address, let alone warrant restricting, these means of disseminating speech.

125.    **Push Notifications.** The Act's prohibition on "push notifications prompting repeated user engagement" on minors' accounts is unconstitutional. § 13-71-202(5)(c).

126.    The First Amendment prohibits governments from imposing prohibitions on speech, such as a prohibition on notifications.

127.    This provision independently triggers strict scrutiny because it is content-based. Though this provision is vague, "prompting repeated user engagement" penalizes the "message expressed" that a user may want to view content on the website. *Reed*, 576 U.S. at 163.

128.    Covered websites use notifications to inform users about content from other users. So notifications contain everything from protected "[f]acts" to opinion. *Sorrell*, 564 U.S. at 570.

129.    The State cannot demonstrate what purported problem the prohibition responds to, how the prohibition is necessary to solve the problem, or why the existing and plentiful choices of private tools available to parents (such as the ability to voluntarily enable or disable push notifications on devices and websites) are insufficient to address any purported problem.

130.    This provision is independently not properly tailored for multiple reasons.

131.    The prohibition on certain push notifications on minors' accounts is underinclusive because it prohibits only covered websites from engaging in certain speech. Websites such as Apple News, Disney+, Duolingo, and *The Wall Street Journal* use notifications. Indeed, nearly *all* applications use notifications. Such notifications are not unique to covered websites, and yet the Act only restricts covered websites' speech—and minors' ability to access that speech.

132.    The prohibition on certain push notifications on minors' accounts is also not the least restrictive means available. Covered websites and devices already allow users to control their notifications without government mandate.

133.    **Autoplay.** The Act's prohibition on "autoplay functions that continuously play content without user interaction" on minors' accounts is unconstitutional. § 13-71-202(5)(a).

134.    The First Amendment protects "choice[s]," *Tornillo*, 418 U.S. at 258, about whether to autoplay audiovisual content.

135.    The government has no authority to prohibit television stations from "autoplaying" episodes of a television show or radio stations and music streaming services from "autoplaying" music. The same is true on covered websites.

136.    The State cannot demonstrate what purported problem the prohibition on autoplay responds to, how the prohibition is necessary to solve the problem, or why the existing and plentiful choices of private tools available to parents and users (such as the ability to voluntarily enable or disable autoplay on many websites) are insufficient to address any purported problem.

137.    This provision is independently not properly tailored for multiple reasons.

138.    The prohibition on autoplay is underinclusive because it affects only disfavored websites, while leaving minors able to experience autoplay on State-favored services. For example, covered websites must prohibit autoplay of the next video of classical music, but Spotify faces no such restriction; Hulu and Disney+ are free to use autoplay for the next episode of a television show; and Buzzfeed can use autoplay to show the next video of an entertainment story.

139.    The prohibition on autoplay on minors' accounts is also not the least restrictive means available. Many covered websites allow users to disable autoplay, or themselves disable autoplay by default on minors' accounts.

140.    **Seamless Pagination.** The Act's prohibition on "scroll[ing] or pagination that loads additional content as long as the user continues scrolling" on minors' accounts is also unconstitutional. § 13-71-202(5)(b).

141.    The First Amendment protects decisions about whether to display content in discrete pages versus seamless pages, because protected "editorial control" includes "decisions made as to limitations on the size and content of" private publications. *Tornillo*, 418 U.S. at 258.

142.    The State cannot demonstrate what purported problem the prohibition responds to, how the prohibition is necessary to solve the purported problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

143.    This provision is independently not properly tailored for multiple reasons.

144.    The prohibition on seamless pagination on minors' accounts is underinclusive because it prohibits only covered websites from displaying speech in a certain way to minors. Seamless pagination, however, is commonplace. It is used to easily load new content in web browsers, news websites, streaming applications, and many other websites. Thus, a minor is prohibited from accessing speech displayed through seamless pagination on Facebook, but not on CNN, ESPN, or U.S. News and World Report's college rankings.

145.    Unless declared unlawful and enjoined, Utah Code § 13-71-202(5) will unlawfully deprive Plaintiff's affected members and Internet users of their First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

**COUNT V**
**42 U.S.C. § 1983**
**VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS**
**(PROHIBITION ON MEANS OF DISSEMINATING SPEECH**
**– UTAH CODE § 13-71-202(5))**

146.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

147.    The Act's requirement that social media companies disable certain features for minor account holders (§ 13-71-202(5)) is also unconstitutionally vague.

148.    A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304.

149.    **Seamless Pagination.** The prohibition on seamless pagination is unconstitutionally vague. § 13-71-202(5)(b). Although the Act seems to require websites to separate content into pages, the Act does not explain how much content is allowed on each virtual "page." As a result, websites cannot know how much "content" can be loaded on a single screen or page, how far down a website page may go with content, and other important liability-defining requirements. To avoid liability and crushing civil penalties, websites might place only a few pieces of content on each page, which may reduce dissemination of available content and restrict content available for users to read or view.

150.    **Push Notifications**. The undefined term "prompting repeated user engagement" is unconstitutionally vague. § 13-71-202(5)(c). Defendants could conceivably construe notifications about new messages, new connections, new content, comments on content, recommended content, and other notifications as "prompting repeated user engagement." Out of an abundance of caution, websites may disable all notifications to minors, chilling speech.

151.    Unless declared unlawfully vague and enjoined, Utah Code § 13-71-202(5) will unlawfully deprive Plaintiff's affected members and Internet users of their First Amendment and Due Process rights and irreparably harm Plaintiff, its members, and Internet users.

**COUNT VI**
**FEDERAL STATUTORY PREEMPTION UNDER 47 U.S.C. § 230,**
**42 U.S.C. § 1983, AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION**
**(PROHIBITION ON MEANS OF DISSEMINATING SPEECH**
**– UTAH CODE § 13-71-202(5))**

152.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

153.    Plaintiff may assert federal preemption under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908).

154.    47 U.S.C. § 230 preempts the Act's prohibition on autoplay, seamless pagination, and notifications on minors' accounts. § 13-71-202(5).

155.    Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Because Section 230 "forbids the imposition of publisher liability on a service provider for the exercise of its editorial . . . functions." *Ben Ezra, Weinstein, & Co. v. Am. Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000) (citation omitted), it preempts "inconsistent" state laws, 47 U.S.C § 230(e)(3).

156.    Member websites are "interactive computer services." *Id.* § 230(c)(1), (f)(2). Indeed, the "prototypical service qualifying for this statutory immunity is an online messaging board . . . on which Internet subscribers post comments and respond to comments posted by others." *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1195 (10th Cir. 2009).

157.    Section 230 protects websites' decisions about offering or using "tools meant to facilitate the communication and content of others"—including "notifications," seamless pagination, and autoplay. *Dyroff*, 934 F.3d at 1098; *see Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019) ("arranging and distributing third-party information"); *Ben Ezra*, 206 F.3d at 986 ("editorial . . . functions"). Section 230 also protects websites' decisions to "filter, screen, allow, or disallow[,] . . . pick, choose, analyze, or digest[,] . . . transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content." 47 U.S.C. § 230(f)(4). Imposing liability on websites for such decisions or for making those "tools" available to users to disseminate, receive, or display content would improperly treat websites as "publisher[s] of others' content." *Dyroff*, 934 F.3d at 1098.

158.    It would be "inconsistent" with Section 230(c)(1) and treat covered websites as "publisher[s] of others' content," *Dyroff*, 934 F.3d at 1098, to impose liability on websites based on those websites' decisions about how to display user-generated content or facilitate user communication. 47 U.S.C. § 230(e)(3).

159.    Unless declared preempted and enjoined, Utah Code § 13-71-202(5) will unlawfully deprive Plaintiff's affected members and Internet users of their rights and will irreparably harm Plaintiff, its members, and Internet users.

### COUNT VII
### 42 U.S.C. § 1983
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT
### (RESTRICTIONS ON MINORS' ABILITY TO SHARE CONTENT
### – UTAH CODE §§ 13-71-202(1)(A)-(B), 13-71-204(1))

160.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

161.    The Act's restrictions on minors' ability to share content and accounts without parental consent (§§ 13-71-202(1)(a)-(b), 13-71-204(1)) are unconstitutional and cannot satisfy any form of First Amendment scrutiny.

162.    The Act's parental-consent requirement places an unconstitutional burden on protected speech. The Supreme Court has rejected the idea "that the state has the power to prevent children from . . . saying anything without their parents' prior consent," because "[s]uch laws do not enforce parental authority over children's speech and religion; they impose governmental authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 & n.3. That is why courts have held that parental-consent requirements for minors to use "social media" and other websites violate the First Amendment. *Yost*, 2024 WL 104336, at *8-9 (parental-consent requirements trigger strict scrutiny); *Griffin*, 2023 WL 5660155, at *18; *see Interactive Digit. Software Ass'n v. St. Louis*

*Cnty.*, 329 F.3d 954, 956 (8th Cir. 2003) (rejecting parental-consent law for violent video games); *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 578-79 (7th Cir. 2001) (similar).

163.    That protection applies not just to categorical bans on using a website without parental consent, but also extends to the Act's restrictions on minors' ability to speak and share their accounts beyond a narrow, State-defined network. § 13-71-202(1)(a)-(b). For example, a 17-year-old musician would be unable—absent parental consent—to share his music from his account; nor would fans be able to locate his account. Such a burden on protected speech is flatly prohibited by the First Amendment. *Brown*, 564 U.S. at 795 & n.3.

164.    These concerns are particularly acute for websites without traditional "connections" among users, where minors would not be able to share *any* content without parental consent.

165.    These provisions trigger strict scrutiny because they rely on the Act's central coverage definition.

166.    These provisions independently trigger strict scrutiny, including because they impose a prior restraint and they require parental consent. *Yost*, 2024 WL 104336, at *8-9.

167.    The State cannot demonstrate what purported problem these restrictions respond to, how these restrictions are necessary to solve the purported problem, or why the existing and plentiful choices of private tools available to parents and users (such as the ability to voluntarily make content private on covered websites) are insufficient to address any purported problem.

168.    The Act's legislative findings do not address what interest the State has in restricting how broadly minors might share their protected expression.

169.    In addition, these restrictions are overinclusive because they fail to account for the differences among minors of different ages.

170.    Moreover, these restrictions are wholly arbitrary, restricting the reach of identical speech by similarly situated minors solely based on minute differences in their connections.

171.    These limitations on Utah minors' ability to interact with people outside of state-defined networks will leave them worse off than their peers nation-wide who are not so limited.

172.    Compounding these problems, parents cannot comply with the Act's consent requirements unless they reveal to the government both their and their children's identities. Parents may be unwilling or unable to do this for any number of reasons.

173.    Unless declared invalid and enjoined, Utah Code §§ 13-71-202(1)(A)-(B), 13-71-204(1) will unlawfully deprive Plaintiff's affected members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

**COUNT VIII**
**FEDERAL STATUTORY PREEMPTION UNDER 47 U.S.C. § 230,**
**42 U.S.C. § 1983, AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION**
**(RESTRICTIONS ON MINORS' ABILITY TO SHARE CONTENT**
**– UTAH CODE §§ 13-71-202(1)(A)-(B), 13-71-204(1))**

174.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

175.    47 U.S.C. § 230 preempts the Act's restrictions on minors' ability to share content beyond State-defined networks without parental consent. §§ 13-71-202(1)(a)-(b), 13-71-204(1).

176.    Section 230 protects practices, designs, and "tools used to facilitate communications" among users. *Dyroff*, 934 F.3d at 1096; *see Force*, 934 F.3d at 66 ("arranging and distributing third-party information"); *Ben Ezra*, 206 F.3d at 986. And "post[ing] comments and respond[ing] to comments posted by others" are "prototypical" practices that Section 230 protects. *Accusearch*, 570 F.3d at 1195. Similarly, Section 230 also protects websites' decisions to "filter,

screen, allow, or disallow[,] . . . pick, choose, analyze, or digest[,] . . . transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content." 47 U.S.C. § 230(f)(4).

177.    It would be "inconsistent" with Section 230(c)(1) and treat covered websites as "publisher[s] of others' content," *Dyroff*, 934 F.3d at 1098, to impose liability on websites based on those websites allowing users to share, view, and interact with other user-generated content—including by limiting minors' ability to post and comment. 47 U.S.C. § 230(e)(3).

178.    Unless declared preempted and enjoined, Utah Code §§ 13-71-202(1)(a)-(b), 13-71-204(1) will unlawfully deprive Plaintiff's affected members and Internet users of their rights and will irreparably harm Plaintiff, its members, and Internet users.

**COUNT IX**
**42 U.S.C. § 1983**
**VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS**
**(UNDEFINED DATA COLLECTION AND USE PROVISIONS**
**– UTAH CODE §§ 13-71-202(1)(C), 13-71-204(2)-(4))**

179.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

180.    The Act's undefined regulations of data collection and use are unconstitutionally vague as they fail to define key terms. §§ 13-71-202(1)(c), 13-71-204(2)-(4).

181.    The Act's requirement that covered websites "restrict any data collection . . . from a Utah minor account holder's account that is not required for core functioning of the social media service" is unconstitutionally vague. § 13-71-202(1)(c).

182.    The Act does not define the key phrase "required for core functioning of the social media service." *Id.* Yet this phrase is central to covered websites' obligations.

183.     The Act's requirement that covered websites' terms of service "be presumed to include an assurance of confidentiality" for the minor account holder's personal information is also unconstitutionally vague. § 13-71-204(2).

184.     The Act does not define the key phrase "assurance of confidentiality." § 13-71-204(2). And the Act defines "personal information" incredibly broadly. In combination, therefore, this undefined "assurance" could apply broadly to prevent core functions on many covered websites.

185.     Worse, the Act suggests that "confidentiality" cannot be given its commonly understood meaning without explaining what other meaning might apply. The Act casts doubt on covered websites' *internal use* of data and means of disseminating speech that have nothing to do with unauthorized disclosure to third parties.

186.     Furthermore, covered websites provide personal information to third-party contractors for a variety of purposes, including data processing, subject to strict confidentiality requirements. Yet covered websites are unable to determine whether they are in compliance with the "assurance of confidentiality" requirement, even with these confidentiality safeguards.

187.     Unless declared invalid and enjoined, Utah Code §§ 13-71-202(1)(c), 13-71-204(2)-(4) will unlawfully deprive Plaintiff's affected members of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

## Generally Applicable Counts

## COUNT X
## EQUITABLE RELIEF

188.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

189.    The Act as a whole and the individual challenged provisions of the Act violate federal law and deprive Plaintiff, its members, and its members' users of enforceable federal rights. Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

190.    This Court can and should exercise its equitable power to enter an injunction prohibiting Defendants from enforcing the Act and all the challenged provisions of the Act against Plaintiff and its members.

## COUNT XI
## 42 U.S.C. § 1983 AND 28 U.S.C. § 2201
## DECLARATORY RELIEF

191.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

192.    The Utah Minor Protection in Social Media Act, Utah Code §§ 13-71-101 to -401, violates the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution and thereby deprives Plaintiff, its members, and Internet users of enforceable rights. The Act is unlawful and unenforceable because the entire Act relies on an unconstitutional definition of "social media company." § 13-71-101(13).

193.    Utah Code §§ 13-71-201; -202(1)(a)-(b), (5); and -204(1) are unlawful and unenforceable, together and separately, because they violate the First Amendment to the Constitution and thereby deprive Plaintiff, its members, and Internet users of enforceable rights.

194.    Utah Code §§ 13-71-202(1)(c), (5)(b)-(c); and -204(1)-(4) are unlawful and unenforceable because they are unconstitutionally vague in violation the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution and thereby deprive Plaintiff, its members, and Internet users of enforceable rights.

195.    Utah Code §§ 13-71-202(1)(a)-(b), 13-71-202(5), and 13-71-204(1) are unlawful and unenforceable because they are preempted by federal law.

196.    The unlawful portions of the Act are not severable from the rest of the Act. The entire Act is therefore unlawful and unenforceable.

197.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

198.    This Court can and should exercise its equitable power to enter a declaration that the entire Act is unconstitutional and otherwise unlawful.

199.    This Court can and should exercise its equitable power to enter a declaration that each of the Act's challenged provisions is unconstitutional and otherwise unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A.  Declare that the Utah Social Media Regulation Act, Utah Code §§ 13-71-101 to -401, is unlawful;

B.  Declare that Utah Social Media Regulation Act, §§ 13-71-101 to -401, violates the First Amendment to the Constitution;

C.  Declare that the Utah Social Media Regulation Act, Utah Code §§ 13-71-101 to -401, is void for vagueness under the First Amendment and the Due Process Clause of the Fourteenth Amendment to the Constitution;

D.  Declare that Utah Code §§ 13-71-201; -202(1)(a)-(b), (5); and -204(1) violate the First Amendment to the Constitution;

E.  Declare that Utah Code §§ 13-71-202(1)(c), (5)(b)-(c); and -204(1)-(4) are void for vagueness in violation the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution.

F.  Declare that Utah Code §§ 13-71-202(1)(a)-(b), 13-71-202(5), and 13-71-204(1) are preempted by federal law;

G.  Enjoin Defendants and their agents, employees, and all persons acting under their direction or control from taking any action to enforce the Act or the challenged portions of the Act against Plaintiff or its members;

H.  Enter judgment in favor of Plaintiff;

I.  Award Plaintiff its attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

J.  Award Plaintiff all other such relief as the Court deems proper and just.

RESPECTFULLY SUBMITTED this 3rd day of May 2024.

PARR BROWN GEE & LOVELESS, P.C.

*/s/ David C. Reymann*
David C. Reymann
Kade N. Olsen

LEHOTSKY KELLER COHN LLP
Steven P. Lehotsky
Scott A. Keller
Todd Disher
Jeremy Evan Maltz
Joshua P. Morrow
Alexis Swartz

*Attorneys for Plaintiff NetChoice, LLC*