David C. Reymann (8495)
Kade N. Olsen (17775)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, UT 84111
(801) 257-7939
dreymann@parrbrown.com
kolsen@parrbrown.com

Steven P. Lehotsky*                       Todd Disher*
Scott A. Keller*                          Joshua P. Morrow*
Jeremy Evan Maltz*                        Alexis Swartz*
LEHOTSKY KELLER COHN LLP                  LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW              408 W. 11th Street, 5th Floor
Washington, DC 20001                      Austin, TX 78701
(512) 693-8350                            (512) 693-8350
steve@lkcfirm.com                         todd@lkcfirm.com
scott@lkcfirm.com                         josh@lkcfirm.com
jeremy@lkcfirm.com                        alexis@lkcfirm.com
   *(admitted pro hac vice)

*Attorneys for Plaintiff NetChoice, LLC*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| **NETCHOICE, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**SEAN D. REYES, in his official capacity as Attorney General of Utah,**<br><br>**KATHERINE HASS, in her official capacity as Director of the Division of Consumer Protection of the Utah Department of Commerce,**<br><br>**Defendants.** | **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Case No. 2:23-cv-00911-AMA-CMR**<br><br>**Judge Ann Marie McIff Allen**<br><br>**Magistrate Judge Cecilia M. Romero** |

## Table of Contents

Table of Authorities ............................................................................................................. iii

Grounds for Relief ............................................................................................................... 1

Preliminary Statement .......................................................................................................... 1

Statement of Facts ................................................................................................................ 5

    A.  Factual background ................................................................................................. 5

    B.  Utah's 2024 Minor Protection in Social Media Act ................................................ 8

    C.  Procedural history ................................................................................................. 13

Argument ........................................................................................................................... 14

   I.  NetChoice is likely to succeed on the merits of its challenge to Utah's 2024 Minor Protection in Social Media Act. ................................................................................ 15

    A.  The entire Act violates the First Amendment and the Due Process Clause................ 16

    B.  Multiple substantive provisions of the Act independently violate the First Amendment and the Due Process Clause. ............................................................... 26

    C.  Multiple substantive provisions of the Act's restrictions on speech independently are preempted under 47 U.S.C. § 230. ............................................................... 35

    D.  The Act's undefined data collection and use regulations are unconstitutionally vague in violation of the First Amendment and Due Process Clause......................... 37

  II.  The remaining factors support a preliminary injunction................................................. 39

Conclusion ......................................................................................................................... 40

# Table of Authorities

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023)...................................................................................5

*ACLU v. Mukasey*,
  534 F.3d 181 (3d Cir. 2008).......................................................................33

*Ams. for Prosperity Found. v. Bonta*,
  141 S. Ct. 2373 (2021)..........................................................................19, 21

*Aposhian v. Barr*,
  958 F.3d 969 (10th Cir. 2020) ...................................................................40

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004)...........................................................................*passim*

*Ashcroft v. Free Speech Coalition*,
  535 U.S. 234 (2002)....................................................................................32

*Awad v. Ziriax*,
  670 F.3d 1111 (10th Cir. 2012) ............................................................39, 40

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001)....................................................................................17

*Batzel v. Smith*,
  333 F.3d 1018 (9th Cir. 2003) ....................................................................36

*Ben Ezra, Weinstein & Co. v. Am. Online Inc.*,
  206 F.3d 980 (10th Cir. 2000) ...............................................................35, 36

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011).............................................................................*passim*

*Butler v. Michigan*,
  352 U.S. 380 (1957)....................................................................................23

*Chamber of Com. v. Edmondson*,
  594 F.3d 742 (10th Cir. 2010) ...............................................................39, 40

*Citizens United v. FEC*,
    558 U.S. 310 (2010)............................................................................18

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
    596 U.S. 61 (2022)......................................................................16, 17

*City of Boerne v. Flores*,
    521 U.S. 507 (1997)..........................................................................19

*Consol. Edison Co. v. Public Service Comm'n*,
    447 U.S. 530 (1980)..........................................................................17

*Dangaard v. Instagram, LLC*,
    2022 WL 17342198 (N.D. Cal. Nov. 30, 2022) ....................................35

*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019) .........................................................4, 37

*Edenfield v. Fane*,
    507 U.S. 761 (1993)......................................................................28, 32

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975)..........................................................................15

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) ...........................................................36

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)..................................................................*passim*

*Fed. Agency of News LLC v. Facebook, Inc.*,
    432 F. Supp. 3d 1107 (N.D. Cal. 2020) ..............................................37

*Fields v. Twitter, Inc.*,
    217 F. Supp. 3d 1116 (N.D. Cal. 2016) ..............................................36

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019)............................................................35, 36

*FTC v. Accusearch Inc.*,
    570 F.3d 1187 (10th Cir. 2009) ....................................................35, 37

*Home Box Off., Inc. v. Wilkinson*,
    531 F. Supp. 987 (D. Utah 1982).......................................................20

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995)............................................................................................14, 31

*Iancu v. Brunetti*,
    139 S. Ct. 2294 (2019)............................................................................................17

*Interactive Digit. Software Ass'n v. St. Louis Cnty.*,
    329 F.3d 954 (8th Cir. 2003) ................................................................................27

*Jackson v. Airbnb, Inc.*,
    2022 WL 16753197 (C.D. Cal. Nov. 4, 2022)......................................................35

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952) ................................................................................................6

*Lewis v. Google LLC*,
    461 F. Supp. 3d 938 (N.D. Cal. 2020) ..................................................................35

*Lovell v. City of Griffin*,
    303 U.S. 444 (1938)................................................................................................14

*Mahanoy Area Sch. Dist. v. B.L.*,
    594 U.S. 180 (2021)................................................................................................15

*McCullen v. Coakley*,
    573 U.S. 464 (2014)................................................................................................18

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974)....................................................................................3, 6, 31, 32

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983)................................................................................................18

*Murphy v. NCAA*,
    584 U.S. 453 (2018)................................................................................................25

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018)................................................................................................18

*NetChoice, LLC v. Bonta*,
    2023 WL 6135551 (N.D. Cal. Sept. 18, 2023) ............................................ *passim*

*NetChoice, LLC v. Griffin*,
    2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ........................................... *passim*

*NetChoice, LLC v. Yost*,
    2024 WL 555904 (S.D. Ohio Feb. 12, 2024) ................................................................ *passim*

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) ........................................................................................................19

*PSINet, Inc. v. Chapman*,
    362 F.3d 227 (4th Cir. 2004) ........................................................................................33

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ........................................................................................16, 17, 30

*Reno v. ACLU*,
    521 U.S. 844 (1997) ................................................................................................ *passim*

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) ........................................................................................................39

*Rutan v. Republican Party of Ill.*,
    497 U.S. 62 (1990) ........................................................................................................23

*Sable Commc'ns of Cal., Inc. v. FCC*,
    492 U.S. 115 (1989) ......................................................................................................20

*In re Soc. Media Adolescent Addiction/Pers. Injury Prods. Liab. Litig.*,
    2023 WL 7524912 (N.D. Cal. Nov. 14, 2023) ..............................................................35, 37

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ........................................................................................14, 16, 30

*Stephenson v. Davenport Cmty. Sch. Dist.*,
    110 F.3d 1303 (8th Cir. 1997) ..................................................................................24, 37

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ........................................................................................17, 28, 32

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ........................................................................................20, 21, 22

*United States v. Stevens*,
    559 U.S. 460 (2010) ......................................................................................................15

*United States v. Williams*,
    553 U.S. 285 (2008) ......................................................................................................4, 24

*Verlo v. Martinez*,
    820 F.3d 1113 (10th Cir. 2016) ............................................................................14, 39

*Virginia v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988).........................................................................................3, 15, 24

**Statutes**

47 U.S.C. § 230 ................................................................................................. *passim*

Utah Code § 13-71-101 ..................................................................................... *passim*

Utah Code § 13-71-102...............................................................................12, 13, 20, 34

Utah Code § 13-71-201 ..................................................................................... *passim*

Utah Code § 13-71-202 ..................................................................................... *passim*

Utah Code § 13-71-204...................................................................................... *passim*

Utah Code § 13-71-301...............................................................................................13, 39

Utah Code § 13-71-302.............................................................................................13

**Other Authorities**

*Confidential*, Black's Law Dictionary (11th ed. 2019).............................................38

Katie Kindelan, *6 Teen Girls Were The Organizers Behind Nashville's Massive Black Lives Matter Protest*, ABC News (June 9, 2020),
    perma.cc/L5L3-ZKN6 ............................................................................................27

**Grounds for Relief**

The Utah Minor Protection in Social Media Act, Utah Code § 13-71-101 to -401 ("Act"),[1] is an unconstitutional restriction on minors' and adults' ability to access and engage in protected speech. Specifically, the Act impermissibly regulates the conditions under which minors and adults can access certain websites and how those websites facilitate, disseminate, and display protected speech.[2] The entire Act violates the First Amendment and the Due Process Clause because its definition of what entities are covered is unconstitutional. Parts of the Act independently violate the First Amendment and the Due Process Clause and are preempted under 47 U.S.C. § 230. Plaintiff NetChoice, LLC requests a preliminary injunction before the Act takes effect on October 1, 2024, enjoining Defendants Sean D. Reyes, in his official capacity as Attorney General of Utah, and Katherine Hass, in her official capacity as Director of the Division of Consumer Protection of the Utah Department of Commerce, from enforcing the Act against Plaintiff's members.

**Preliminary Statement**

For the second time, Utah has enacted a law violating bedrock constitutional principles of free speech in attempting to regulate minors' access to "social media." After Utah enacted 2023's Social Media Regulation Act, NetChoice sued and moved to preliminarily enjoin that law's enforcement. ECF 25. In response, Utah repealed its 2023 law and replaced it, in part, with the Act. This newly enacted Act suffers from many of the same flaws as Utah's prior unconstitutional attempt to regulate online speech, while at the same time creating new ones. Like other States' unconstitutional attempts to regulate online speech, the Act regulates (1) websites' "ability to publish

---

[1] Unless otherwise noted, statutory citations in this Motion refer to the Utah Code.

[2] This Motion uses "covered websites" to refer to the websites, applications, and other digital services that the Act covers.

and distribute speech *to minors* and speech *by minors*"; (2) "minors' ability to both *produce speech and receive speech*," *NetChoice, LLC v. Yost*, 2024 WL 555904, at *16 (S.D. Ohio Feb. 12, 2024); and (3) adults' access to speech. But minors "are entitled to a significant measure of First Amendment protection." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (citation omitted). And governments cannot burden adults' right to access protected speech in their efforts to regulate the speech appropriate for minors. *Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 882 (1997). Accordingly, this Court should reach the same result as courts across the country that have enjoined similar attempts to regulate online speech. *E.g.*, *Yost*, 2024 WL 555904, at *14; *NetChoice, LLC v. Bonta*, 2023 WL 6135551, at *13, *24 (N.D. Cal. Sept. 18, 2023); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *21 (W.D. Ark. Aug. 31, 2023).

Minors and adults engage in protected expression online—often facilitated by NetChoice members' websites, where they "generate billions of 'posts' every day." *Yost*, 2024 WL 555904, at *1. On these websites, users "gain access to information and communicate with one another about it on any subject that might come to mind," "engag[ing] in a wide array of protected First Amendment activity on topics as diverse as human thought." *Griffin*, 2023 WL 5660155, at *5 (cleaned up). Nevertheless, Utah wants to stifle this First Amendment activity based on concerns for minors' safety. NetChoice's members agree that minors' welfare is important and thus devote substantial resources to safeguarding minor users' wellbeing. But the State cannot use unconstitutional means to impose the State's view of how best to do that.

The Act here is such an unconstitutional attempt. Using a vague, content-, speaker-, and viewpoint-based definition of "social media company," the Act imposes restrictions on certain websites' ability to disseminate and facilitate the speech of their users. Yet there is a fundamental

mismatch between the State's putative goals in regulating certain *means of disseminating speech*, and the Act's haphazard regulation of certain *websites*. The Act does not regulate many websites across the Internet that use the same means of disseminating speech the Act restricts, while simultaneously burdening many websites that do not use those means at all. *See* Paolucci Decl. ¶ 13. That pervasive flaw fails strict scrutiny and flouts the First Amendment.

Many individual provisions of the Act are also unlawful. Strikingly, the Act would limit minors' ability to speak beyond a network defined by the State unless they have parental consent. §§ 13-71-202(1)(a)-(b), 13-71-204(1). Thus, minors would be unable to interact with elected officials on X, share their artistic expression on Instagram, post their athletic highlights on YouTube, or ask for help with their homework on Nextdoor. But the First Amendment prohibits such requirements for minors to secure parental consent before engaging in protected speech. *Brown*, 564 U.S. at 799; *see Yost*, 2024 WL 555904, at *14; *Griffin*, 2023 WL 5660155, at *21.

The Act also expressly forbids means of disseminating speech on minors' accounts: a vague set of website notifications "prompting repeated user engagement," autoplay, and seamless pagination. § 13-71-202(5). In addition to violating minors' right to receive speech, these restrictions violate websites' own First Amendment rights to speak and exercise "editorial control and judgment" over how to display and disseminate speech. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). In the case of the notification prohibition, Utah has outright prohibited covered websites from truthfully informing minors, the digital equivalent of the State banning a newspaper from proclaiming "Extra! Extra! Read All About It!" Worse, all of the Act's restrictions on minors' accounts unlawfully require covered websites to treat all minors alike, from 17-year-olds to the websites' youngest users. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 396 (1988).

In addition to their *constitutional* flaws, these minor-specific restrictions are preempted by 47 U.S.C. § 230 ("§ 230"), because they penalize websites for "facilitat[ing] the communication and content of others." *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019).

The Act's effects are not limited to minors, as the Act impedes all users' access to the websites by requiring covered websites to engage in age "assurance" for "current" and "prospective Utah account holder[s]." § 13-71-201(1). Although the Act calls the provision as "age assurance," it may do the same thing that other courts have concluded that the Constitution forbids: requiring many websites "to verify" users' "age[s]." *See* ECF 51-1 at 1:10-11; *see* Paolucci Decl. ¶ 8. However the State labels the requirement, the Act mandates that websites evaluate peoples' ages before granting users access to—or allowing users to engage in— protected speech. The First Amendment prohibits such requirements. *See Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 882; *Bonta*, 2023 WL 6135551, at *13 (age estimation); *Griffin*, 2023 WL 5660155, at *21 (age verification).

Finally, the Act contains vague restrictions on the collection and use of data from minors. It imposes an undefined "assurance of confidentiality" requirement for minors' data. § 13-71-204(2)-(4). The exceptions to this requirement create more confusion than they cure and suggest that even "internal use[s]" of data can violate the "assurance." § 13-71-204(4). And the Act proscribes data collection from minors unless it is "required for core functioning," without articulating what "core functioning" encompasses. § 13-71-202(1)(c). By not defining these core terms, the Act (1) fails to give covered websites "fair notice of conduct that is forbidden or required," *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); and (2) "authorizes or encourages seriously discriminatory enforcement," *United States v. Williams*, 553 U.S. 285, 304 (2008).

Because NetChoice has demonstrated that it is likely to succeed on the merits, that it faces

irreparable injury, and that the balance of the equities favors its position, this Court should preliminarily enjoin Defendants from enforcing the entire Act or any part of it against Plaintiff's members before the Act takes effect on October 1, 2024.

## Statement of Facts

### A.     Factual background

#### 1.     NetChoice-member websites disseminate vast amounts of diverse, protected speech.

NetChoice is a leading Internet trade association. Based on the Act's definitions, the Act regulates some of the services offered by the following NetChoice members: (1) Dreamwidth; (2) Google, which owns and operates YouTube; (3) Meta, which owns and operates Facebook and Instagram; (4) Nextdoor; (5) Pinterest; (6) Snap Inc., which owns and operates Snapchat; and (7) X. *See* Szabo Decl. ¶ 11. Although the Act does not regulate all NetChoice members, this Motion refers to members with services the Act regulates as "members." Each member operates a website that "publish[es]," *Reno*, 521 U.S. at 853, "disseminate[s]," *303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023), "creat[es]," or "distribut[es]," *Brown*, 564 U.S. at 792 n.1, protected speech. Szabo Decl. ¶¶ 6-7. They do so by displaying text, audio, images, or video to users—including user-generated "content." *Id.* ¶ 7.[3] Some members organize, display, and disseminate billions of pieces of user-generated content per day, and are among the Internet's most popular destinations. *Id.* ¶ 4. Others serve smaller communities. *Id.*

Teens (like adults) use these websites for protected expression, education, civic

---

[3] Except where noted otherwise, this Motion uses the term "user" to encompass both what the Act calls "users" and "account holders." When discussing the Act's requirements, this Motion also uses "minor," "adult," "account holder," and "user" to refer only to Utah minors, adults, account holders, and users covered by the Act.

engagement, *id.* ¶ 6, and plain "entertain[ment]," *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). They read and engage with news, politics, sports, extracurriculars, educational opportunities, and information about career prospects. *See, e.g.*, Szabo Decl. ¶ 6; Davis Decl. ¶¶ 13-21.

      **2.    Websites choose how to disseminate and display expression and facilitate the expression of their users.**

Members choose how to disseminate and display speech to users in ways that accord with their policies and account for user preferences. Thus, different members (and different websites across the Internet) disseminate different content in different ways to serve different users. Though these websites make many "editorial" choices about whether and how to display vast quantities of protected speech, *Tornillo*, 418 U.S. at 258, the Act directly regulates certain of those choices— none of which is unique to covered websites and all of which are widely used on the Internet.

*Public dissemination of users' speech.* Like countless other websites, many members publicly disseminate user-generated expression—broadly to the public or to registered users or to a mix of both. Szabo Decl. ¶ 16.c. Thus, by default on many members' websites, users' accounts and uploaded content are visible and accessible to the public. *Id.* Some members allow users to select who can see their content and account pages. *Id.*; Veitch Decl. ¶¶ 31-32, 50.

*Autoplay.* Some members provide "autoplay" features "that continuously play content without user interaction" that users can disable. § 13-71-202(5)(a); Szabo Decl. ¶ 17.a; Veitch Decl. ¶ 28. Users may prefer to have a series of music videos autoplay on covered websites, much like music automatically plays on music streaming services like Spotify. Veitch Decl. ¶ 38. Autoplay is common among many kinds of other digital services like ESPN.com, Hulu, Disney+, and Buzzfeed. Szabo Decl. ¶ 17.b.

*Seamless pagination.* Many NetChoice members also use seamless pagination, where more

content loads frictionlessly and does not require users to click onto more pages to see more content. *Id.* ¶ 18. This too is common across the Internet, including on services like Apple News and web-sites like the U.S. News and World Report, *The New York Times*, and Bing. *Id.*

*Notifications.* Many members allow users to receive notifications. These notifications inform users about recommended content, relevant announcements, activities of their connections, or suspicious account logins—among other things. *Id.* ¶ 19.a. Thus, notifications are important ways that websites communicate with users and enable users to communicate with other users. Members allow users to change what notifications they receive. *Id.* ¶ 19.b. And device manufacturers also allow users to control what notifications they see on their devices. *Id.* ¶ 19.c. Notifications are common among nearly all applications, including Apple News, Disney+, Duolingo, *The Wall Street Journal*, and messaging, shopping, and banking applications. *Id.* ¶ 19.d.

### 3. Parents have many tools to oversee how their children use the Internet.

Parents have many means of asserting practical control over their children's online experiences. *Id.* ¶ 9. Fundamentally, parents control what *devices* minors can access—and when. Not all devices are Internet-enabled. And today's Internet-enabled devices come with many parental-control options, including the ability to lock or limit specific apps and features, restrict the device settings to limit content and downloads, limit access to only approved websites, and set overall or time-of-day usage limits. *Id.* ¶ 9.b.

Parents also control the *networks* that minors use to connect to the Internet. Wireless routers allow parents to manage which Internet websites minors can use (and at what times). *Id.* ¶ 9.a. Cellular and broadband Internet providers offer similar controls. *Id.*

Parents also have control over *software*. Leading web browsers offer parental controls. *Id.*

¶ 19.c. And third-party parental control software is available for many devices. *Id.* ¶ 19.b. On top of that, many members have also developed their own suite of parental controls and other protections for minors on their services. *E.g.*, *Id.* ¶ 8.b, 19.d; Davis Decl. ¶¶ 28-34; Veitch Decl. ¶¶ 11-18; Yadegar Decl. ¶ 7. These controls supplement the resources that members spend crafting and enforcing "content moderation" policies that aim to prevent harmful or objectionable speech from reaching users. *E.g.*, Szabo Decl. ¶ 8.c; Davis Decl. ¶¶ 35-46; Veitch Decl. ¶¶ 19-26.

**4.    Covered websites can function only by collecting and processing data from users, and they maintain that data according to strict policies of confidentiality.**

NetChoice members' ability to offer online services depends on their ability to collect, store, and use data that users provide; otherwise, the services would not be usable. Szabo Decl. ¶ 20.b; Davis Decl. ¶¶ 47-50. Such user data is critical to make the services secure. Szabo Decl. ¶ 20.b. Collecting user data is also necessary for the services to function, as the websites need to collect information about device type just to display content, for instance. *Id.* And some members employ user data to present each user with personalized content. Veitch Decl. ¶ 33.

Consequently, safeguarding user data is paramount to NetChoice members. Szabo Decl. ¶ 21. Specifically, covered websites' terms of service strictly govern what they may do with user data and provide for the confidentiality of that data. *Id.* Some members do rely on third-party contractors to help process this data; and when they do, they provide it for limited purposes and subject to strict confidentiality limitations and safeguards. *Id.* ¶ 22; Veitch Decl. ¶ 33.

**B.    Utah's 2024 Minor Protection in Social Media Act**

**1.    The Act's content-, speaker-, and viewpoint-based central coverage definition of "social media company" (§ 13-71-101(13)).**

The Act's central coverage definition targets "[s]ocial media compan[ies]" that operate

"social media service[s]." § 13-71-101(13). "Social media service[s]" are defined by their dissem-
ination of user-generated expression and their purpose—social interaction. § 13-71-101(14). Spe-
cifically, the statute identifies any "public website or application that":

> (i) displays content that is primarily generated by account holders and not by the social
> media company;
> (ii) permits an individual to register as an account holder and create a profile that is made
> visible to the general public or a set of other users defined by the account holder;
> (iii) connects account holders to allow users to interact socially with each other within the
> website or application;
> (iv) makes available to each account holder a list or lists of other account holders with
> whom the account holder shares a connection within the system; and
> (v) allows account holders to post content viewable by other users.

§ 13-71-101(14)(a). The Act expressly excludes from this definition "(i) email; (ii) cloud storage;
or (iii) document viewing, sharing, or collaboration services." § 13-71-101(14)(b).

> **2.    The Act's requirement for parental consent to override limitations on
> the visibility of minors' accounts and expression (§§ 13-71-202(1)(a)-
> (b), 13-71-204(1)).**

The Act imposes two limitations on minors' ability to interact with other users that can
only be overridden with parental consent. § 13-71-204(1). *First*, covered websites must "restrict
the visibility of a Utah minor account holder's account to only connected accounts." § 13-71-
202(1)(a). A minor's account would thus only be visible to users that are "directly connected
to: (a) the minor account holder's account; or (b) . . . an account directly connected to the minor
account holder's account." § 13-71-101(3).[4] Under this provision, minors would not be able to
create a page to display, for example, recruiting highlights or political activism visible beyond the

---

[4] In turn, "[d]irectly connected" means "an account on the social media service that is con-
nected to another account by: (a) sending a request to connect to another account holder and having
the request to connect accepted by the other account holder; or (b) receiving a request to connect
from another account holder and accepting the request to connect." § 13-71-101(5).

State-mandated limited network of users. *Second*, covered websites must "limit" a "minor account holder's ability to share content to only connected accounts." § 13-71-202(1)(b). Thus a minor cannot share a link to a fundraiser for her track and field team, comment on a post about current events, or share a musical performance beyond a limited network.

Not all members have "connected accounts" as defined by the Act. *See* Veitch Decl. ¶¶ 48-49; Szabo Decl. ¶ 16.e. On such websites (including YouTube and X), minors might not be able to share content or make their views accessible to *anyone* without parental consent.

### 3. The Act's prohibition on covered websites' speech and certain means of disseminating expression on minors' accounts (§ 13-71-202(5)).

The Act regulates how covered websites disseminate and display speech on minors' accounts. Specifically, "for Utah minor account holders," covered websites must "disable the following features," which are common across the Internet:

(a) autoplay functions that continuously play content without user interaction;
(b) scroll or pagination that loads additional content as long as the user continues scrolling; and
(c) push notifications prompting repeated user engagement.

§ 13-71-202(5). None of these provisions are defined, except "[p]ush notification."[5]

### 4. The Act's "age-assurance" requirement (§ 13-71-201).

The Act requires covered websites to "implement an age assurance system to determine whether a current or prospective Utah account holder . . . is a minor." § 13-71-201(1). "Age assurance system" is defined as "measures reasonably calculated to enable a social media company

---

[5] A "[p]ush notification" is an "automatic electronic message displayed on an account holder's device, when the user interface for the social media service is not actively open or visible on the device, that prompts the account holder to repeatedly check and engage with the social media service." § 13-71-101(11). The breadth of this definition may even capture emails. Paolucci Decl. ¶¶ 14-15.

to identify whether a current or prospective Utah account holder is a minor with an accuracy rate of at least 95%." § 13-71-101(2). "Minor[s]" are all users younger than 18, except for those who are "emancipated [or] . . . married." § 13-71-101(8).

Changing the label from age "verification" under Utah's now-repealed law to age "assurance" under the Act is a distinction without a constitutional difference. Under either label, the Act's requirement will result in additional barriers for users to access speech on covered websites. In fact, the Act's introductory language describes this provision as requiring covered websites "to *verify* a" user's "age using an approved system." *See* ECF 51-1 at 1:10-11 (emphasis added). Especially in light of the Act's unexplained requirement for an "accuracy rate of at least 95%," § 13-71-101(2), this provision will require many covered websites to essentially "card" everyone that wants to use the website to create, exchange, or view speech. *See, e.g.*, Paolucci Decl. ¶¶ 8-10.

In addition, covered websites will need to adopt new appeals processes requiring them to develop the means to analyze "documentary evidence" of people's ages. Specifically, covered websites must "implement a review process allowing account holders to appeal the account holder's age designation by submitting documentary evidence to establish the account holder's age range." § 13-71-201(3)(a). Adults misidentified as minors that are unwilling to go through this appeals process will have all of the same restrictions placed on their accounts as minors.

5.    **The Act's undefined restrictions on data collection and use (§§ 13-71-202(1)(c), 13-71-204(2)-(4)).**

The Act imposes two undefined requirements on covered websites' collection and use of data. *First*, the Act provides that covered websites must "restrict any data collection and sale of data from a Utah minor account holder's account that is not required for core functioning of the social media service." § 13-71-202(1)(c). But the Act does not define what "required for core

11

functioning of the social media service" means.

*Second*, the Act provides that covered websites' "terms of service related to a Utah minor account holder shall be presumed to include an assurance of confidentiality for the Utah minor account holder's personal information," which "may be overcome" with "verifiable parental consent." § 13-71-204(2)-(3). The Act does not explain what this "assurance" means. Yet the Act's exceptions to this "assurance" suggest that the websites may violate the "assurance" even through "*internal* use[s]" of user data, including personalization of content:

> The presumption of confidentiality . . . does not apply to a social media company's *internal use* or external sharing of a Utah minor account holder's personal information if the use or sharing is necessary to: (a) maintain or analyze functioning of the social media service; (b) enable network communications; (c) *personalize the user's experience based on the user's age and location*; (d) display a username chosen by the Utah minor account holder; (e) obtain age assurance information as required under Section 13-71-201; or (f) comply with the requirements of this chapter or other federal or state laws.

§ 13-71-204(4) (emphasis added). In other words, these exceptions suggest that *other* "internal uses" not included as exceptions would violate the "assurance."

### 6. The Act's legislative findings, enforcement, and penalties (§§ 13-71-102, 13-71-301).

*Legislative findings.* The Act contains eight legislative findings, primarily asserting the State's "compelling interest in safeguarding the well-being and privacy of minors in the state." § 13-71-102(1).[6]

---

[6] The Act's other findings include: "(2) the proliferation of social media services has led to the widespread collection and utilization of personal information, exposing minors to potential privacy and identity related harms; (3) the addictive design features of certain social media services contribute to excessive use of a social media service by minors, impacting sleep patterns, academic performance, and overall health; (4) social media services are designed without sufficient tools to allow adequate parental oversight, exposing minors to risks that could be mitigated with proper parental involvement and control; (5) the state has enacted safeguards around products and

*Enforcement and penalties.* Both Defendants have enforcement responsibility. § 13-71-301(1)-(2). The Division has multiple enforcement tools at its discretion. *First*, it "may impose an administrative fine of up to $2,500 for each violation of" the Act. § 13-71-301(3)(a)(i). *Second*, it may pursue "court action," where it may seek (1) declaratory and injunctive relief; (2) "disgorgement of any money received in violation" of the Act; (3) civil penalties "of up to $2,500 for each violation of" the Act; (4) "actual damages to an injured purchaser or consumer"; and (5) attorney's fees, investigative fees, and court costs. § 13-71-301(3)(b)-(c).

*Safe harbor.* The Act also contains a "safe harbor" provision that requires covered websites to accept the significant infringements on their rights and the rights of their users. § 13-71-302. A covered website is purportedly (1) "not subject to an enforcement action for a violation of" the age-assurance provision "if the social media company implements and maintains an age assurance system that complies with rules made by the division"; and (2) "considered to have obtained verifiable parental consent if the social media company obtains parental consent through a mechanism that complies with the rules made by the division." § 13-71-302(2)-(3).

## C.    Procedural history

NetChoice originally sued Defendants on December 18, 2023, and moved to enjoin enforcement of provisions of the Utah Social Media Regulation Act on December 20, 2023. ECF 1,

---

activities that pose risks to minors, including regulations on motor vehicles, medications, and products and services targeted to children; (6) prolonged and unregulated social media use has been linked to adverse effects on the mental health of minors, including increased rates of anxiety, depression, and social isolation; (7) existing measures employed by social media companies to protect minors have proven insufficient; and (8) the state should ensure that minors' personal data is given special protection, as minors may have less awareness of the risks, consequences, and safeguards related to a social media company's processing of minors' personal data." § 13-71-102(2)-(8).

25. In response, the Utah Legislature repealed and replaced that law with Utah House Bill 464 and the Act at issue here. The parties agreed that NetChoice would file an amended complaint and a second preliminary injunction motion. ECF 44.

## Argument

*Standard of Review.* NetChoice is entitled to a preliminary injunction because it can "demonstrate: (1) a likelihood of success on the merits; (2) a likelihood [of] irreparable harm . . . ; (3) the balance of equities is in [NetChoice]'s favor; and (4) the preliminary injunction is in the public interest." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (citation omitted).

*First Amendment Principles.* Websites' choices about whether and how to disseminate speech are protected by the First Amendment. *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."); *see also Brown*, 564 U.S. at 792 n.1; *Reno*, 521 U.S. at 853. The First Amendment protects entities that publish or disseminate speech *created by others*. The First Amendment does not "require a speaker to generate, as an original matter, each item featured in the communication." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 570 (1995). The "presentation of an edited compilation of speech generated by other persons," like that on covered websites, "fall[s] squarely within the core of First Amendment security." *Id.*

These principles apply with equal force to covered websites. The "basic principles of freedom of speech and the press, like the First Amendment's command, do not vary when a new and different medium for communication appears." *Brown*, 564 U.S. at 790 (cleaned up). "The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938). Just like "protected books,

14

plays, . . . movies," and "video games," covered websites "communicate ideas"—which "suffices to confer First Amendment protection." *Brown*, 564 U.S. at 790.

NetChoice has standing to assert harms to the First Amendment interests of its members and its members' users—current and prospective. *See, e.g.*, *Am. Booksellers*, 484 U.S. at 392; *see Yost*, 2024 WL 555904, at *4-5; *Griffin*, 2023 WL 5660155, at *9. That includes the rights of minors. It is long settled that "the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975). To the contrary, minors have "robust First Amendment protections." *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 193 (2021).

For all claims, NetChoice raises a traditional facial challenge: there is "no set of circumstances" under which the challenged provisions "would be valid." *United States v. Stevens*, 559 U.S. 460, 472-73 (2010) (citation omitted). For each First Amendment claim, NetChoice also raises an overbreadth facial challenge: "a substantial number of [the Act's] applications are unconstitutional." *Id.* (citation omitted).

## I.     NetChoice is likely to succeed on the merits of its challenge to Utah's 2024 Minor Protection in Social Media Act.

The entire Act violates the First Amendment and the Due Process Clause of the Fourteenth Amendment because its central coverage definition of "social media company" is vague and renders the Act an unconstitutional content-, viewpoint-, and speaker-based restriction and burden on protected First Amendment activity. Specific provisions of the Act are independently unlawful under the First Amendment or the Due Process Clause, or are preempted by 47 U.S.C. § 230.

**A.**     **The entire Act violates the First Amendment and the Due Process Clause.**

**1.**     **The entire Act's burdens and restrictions on speech trigger strict scrutiny because the Act's central coverage definition of "social media company" is content-, speaker-, and viewpoint-based.**

The entire Act triggers strict scrutiny because its scope- and compliance-defining term—
"social media company," § 13-71-101(13)—restricts and burdens protected speech based on con-
tent, speaker, and viewpoint. All of the Act's operative provisions rely on that definition, and the
"[g]overnment's content-based burdens must satisfy the same rigorous scrutiny as its content-
based bans." *Sorrell*, 564 U.S. at 566 (citation omitted). That is especially true here, where the Act
will impede websites' *users* ability to access and engage in a wide array of protected speech.

The First Amendment's "most basic" principle is that "government has no power to restrict
expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at
790-91 (citation omitted). Thus, "[c]ontent-based laws . . . are presumptively unconstitutional and
may be justified only if the government proves that they" satisfy "strict scrutiny." *Reed v. Town of
Gilbert*, 576 U.S. 155, 163-64 (2015). Generally, a law "is facially content based . . . if it applies
to particular speech because of the topic discussed or the idea or message expressed." *City of Austin
v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (cleaned up). But even "facially
content neutral" laws "will be considered content-based" if they "cannot be 'justified without ref-
erence to the content of the regulated speech,' or" if they "were adopted . . . 'because of disagree-
ment with the message [the speech] conveys.'" *Reed*, 576 U.S. at 164 (citation omitted). Likewise,
"a regulation of speech cannot escape classification as facially content based simply by swapping
an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same
result." *Reagan*, 596 U.S. at 74.

Here, the Act is content-based because it applies to websites that "connect[] account holders to allow users to interact socially," § 13-71-101(14)(a)(iii), while treating expression with another "function or purpose" more favorably, *Reagan*, 596 U.S. at 74. The State's regulation of "social" interaction is akin to the restriction on political signs invalidated in *Reed*, adding restrictions on art, culture, and other content-based categories that are the hallmark of social interaction. 576 U.S. at 164. Just as the "First Amendment's hostility to content-based regulation extends . . . to prohibition of public discussion of an entire topic," it likewise extends to *restrictions* on *multiple* topics. *Consol. Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 537 (1980). Conversely, the Act will exclude many websites with the State's preferred speech that have a different "function or purpose," like shopping, news, business, and perhaps professional networking.

The Act is also speaker-based, triggering strict scrutiny. *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019). "[L]aws that single out the press, or certain elements thereof, for special treatment 'pose a particular danger of abuse by the State,' and so are *always subject* to at least some degree of heightened First Amendment scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 640-41 (1994) (emphasis added; citation omitted). The Act "present[s] serious First Amendment concerns" by distinguishing among speakers within the "single medium" of the Internet. *Id.* at 659.

In particular, the Act regulates websites that "display[] content that is primarily generated by account holders" but not websites that "primarily" display content "generated . . . by the" website itself. § 13-71-101(14)(a)(i); *see, e.g.*, *Bartnicki v. Vopper*, 532 U.S. 514, 525 n.8 (2001) (drawing "no distinction" as to the scope of First Amendment protection between ordinary individuals versus institutional media). In other words, the Act onerously regulates websites that facilitate the protected speech of their users. But it leaves other websites unregulated even though

they disseminate (non-user-generated) speech in the same ways many covered websites do. For instance, the Act does not regulate streaming services like Hulu and Disney+, which "collect[]" data from minors, "autoplay" content, or send "push notifications." § 13-71-202(1)(c), (5); *see* Szabo Decl. ¶¶ 17.b, 19.d, 23. Nor does it regulate other websites like ESPN.com, the New York Times, Upworthy, and Buzzfeed, which likewise collect data, autoplay content, use seamless pagination, or send notifications—or all four. *See, e.g.*, Szabo Decl. ¶¶ 17.b, 18, 19.d, 23. Thus, the Act "covers a curiously narrow subset of speakers," relative to the broader Internet. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777 (2018). The Act is also speaker-based because it imposes more onerous burdens on minors' speech relative to adults' speech.

First Amendment precedent is "deeply skeptical of laws that distinguish among different speakers, allowing speech by some but not others." *Id.* at 777-78 (cleaned up); *see Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591-92 (1983) (similar). "[R]estrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Furthermore, by favoring "content. . . generated by" the website itself, the Act gives special treatment to the viewpoints of the websites as compared to those of "account holders." § 13-71-101(14)(a)(i). Similarly, the Act favors the view that content "generated" by the website deserves special protection, while disfavoring the view that content "generated" by "account holders" is just as valuable. Laws that "favor[] one viewpoint . . . over the other . . . . must satisfy strict scrutiny." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014).

      **2.**      **Through the Act's central coverage definition of "social media company," the entire Act fails strict scrutiny and any other form of heightened First Amendment scrutiny because there is a mismatch between the Act's purported aims and the scope of websites it regulates.**

The Act's central coverage definition—and thus all of its operative provisions—are not

properly tailored. At bottom, the State has identified *means of disseminating speech* that are commonplace among all websites, and yet has only singled out *particular websites* for regulation. That mismatch dooms the law under any form of heightened scrutiny.

A law survives strict scrutiny only if "the government [has] adopt[ed] 'the least restrictive means of achieving a compelling state interest.'" *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) ("*AFP*") (citation omitted). This is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). The Act fails both prongs of this test. Indeed, the Act cannot survive any other form of heightened First Amendment scrutiny. *See, e.g.*, *Griffin*, 2023 WL 5660155, at *16, *21 (enjoining law under intermediate scrutiny). Even intermediate scrutiny requires the State to show that the Act is "narrowly tailored to serve a significant governmental interest." *Packingham v. North Carolina*, 582 U.S. 98, 105-06 (2017) (citation omitted); *see AFP*, 141 S. Ct. at 2383. The Act here is not.

**The State lacks a sufficient governmental interest in the Act's restrictions and burdens on speech based on its "social media company" definition.** The State has a compelling interest in protecting children *generally*, but the Supreme Court has made clear that interest "does not include a free-floating power to *restrict the ideas* to which children may be exposed." *Brown*, 564 U.S. at 794 (emphasis added). If Utah seeks to justify the Act based on an interest in buttressing parental control over their minor children's access to protected speech, Supreme Court precedent forecloses that argument too. *See id.* at 802; *Yost*, 2024 WL 555904, at *13. Of course, not even all operative provisions of the Act turn on parental consent. The Act flatly bans certain notifications, autoplay, and seamless pagination on minors' accounts. § 13-71-202(5).

The Supreme Court has also registered "doubts" that the government has *any* interest in

"punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech." *Brown*, 564 U.S. at 802. On the contrary, "esthetic and moral judgments about art and literature . . . are for the individual"—or a parent—"to make, not for the Government to decree." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 818 (2000). As a court in this District said four decades ago, "if we're concerned parents and we're not overjoyed by the violence and stupidity of *The Dukes of Hazzard*, we turn it off and direct our children to something else." *Home Box Off., Inc. v. Wilkinson*, 531 F. Supp. 987, 1001 (D. Utah 1982). Similarly, requiring parental consent to access protected speech "would largely vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors].'" *Brown*, 564 U.S. at 802 (citation omitted).

At bottom, the State must "specifically identify an 'actual problem' in need of solving" *by the government* before restricting speech. *Id.* at 799 (citation omitted); *Yost*, 2024 WL 555904, at *12. True, the Act's legislative findings conclude that "*social media services* are designed without sufficient tools to allow adequate parental oversight" and "existing measures *employed by social media companies* to protect minors have proven insufficient." § 13-71-102(4), (7) (emphases added). But those findings ignore the full gamut of options parents have both on and off covered websites. Parents already have many tools—in addition to those offered by "social media companies"—to control whether and how their children use covered websites. *See supra* pp.7-8. It is precisely those kinds of tools that the Supreme Court has repeatedly endorsed as a less restrictive alternative to governmental intervention. *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *Playboy*, 529 U.S. at 826. Moreover, "whatever deference is due legislative findings" about the tools offered by covered websites, that does "not foreclose [this Court's] independent judgment." *Sable Commc'ns of*

*Cal., Inc. v. FCC*, 492 U.S. 115, 129 (1989).

Therefore, whatever "modest gap in concerned parents' control" the available tools leave open, if any, filling it "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803. That is because "the government does not have a compelling interest in each marginal percentage point by which its goals are advanced." *Id.* at 803 n.9. Instead, the State must "show that the Act's restrictions meet a substantial need of parents who wish to restrict their children's access to" the covered websites "but cannot do so." *Id.* at 803.

**The Act is not properly tailored to meet any sufficient governmental interest Defendants may assert.** In any event, the Act is not the "least restrictive means" to satisfy any sufficient governmental interest. *AFP*, 141 S. Ct. at 2383 (citation omitted). The State can only pursue a governmental interest "by means that are neither seriously underinclusive nor seriously overinclusive." *Brown*, 564 U.S. at 805. Here, the Act "is either underinclusive or overinclusive, or both, for all the purported government interests." *Yost*, 2024 WL 555904, at *13. The Act prohibits far too much and protects far too little. For that reason, the entire Act violates the First Amendment.

*Least restrictive means.* The Act is far from the "least restrictive" way to accomplish any goals the State asserts. *AFP*, 141 S. Ct. at 2383 (citation omitted). Utah could give "parents the information needed to engage in active supervision" over children's Internet access. *Playboy*, 529 U.S. at 826. That would require little more than the State itself publicizing the diverse supervisory technologies that are widely available. *See supra* pp.7-8. Or the State could "act to encourage the use of filters . . . by parents to protect minors." *Griffin*, 2023 WL 5660155, at *21 (cleaned up). "It is no response that [these tools] require[] a consumer to take action, or may be inconvenient, or may not go perfectly every time." *Playboy*, 529 U.S. at 824. Rather, "if a less restrictive means is

available for the Government to achieve its goals, the Government must use it." *Id.* at 815.

*Underinclusive.* The Act is "wildly underinclusive when judged against its asserted justification, which . . . is alone enough to defeat it." *Brown*, 564 U.S. at 802. The Act's operative provisions regulate *means of disseminating speech* that are common on the Internet, but the Act only regulates *some* of the websites that use them. *See* Davis. Decl. ¶ 52. This creates a disconnect between the ostensible ends of the statute (restricting minors' exposure to certain practices) and the limited means the State has used to pursue those ends. Countless websites used by minors—and left unregulated by the Act—disseminate speech in ways the Act restricts for covered websites:

> (1) essentially all websites with publicly accessible user-generated content—not to mention day-to-day life—allow users to communicate with people outside of their social networks, Szabo Decl. ¶ 16.b;

> (2) essentially all applications, including services like Apple News, Disney+, Duolingo, ESPN, and *The Wall Street Journal*, send notifications to users, *id.* ¶ 19.d;

> (3) services like Disney+, Hulu, Spotify, and Buzzfeed use autoplay to present content, *see id.* ¶ 17.b;

> (4) services like U.S. News and World Report College Rankings, *The New York Times*, Bing, and Apple News use seamless pagination to present content, *id.* ¶ 18; and

> (5) essentially all websites collect, process, and share some amount of user data, *see id.* ¶ 23.

The State has articulated no persuasive reason why, if these practices were harmful, they would not be just as harmful on the rest of the Internet.

*Overinclusive.* The Act is also overinclusive—in the speech and the websites it regulates.

The Act regulates a staggering amount of protected speech in multiple ways. As an initial matter, the Act is overinclusive as to *any* governmental interest that focuses only on minors. Both adults and minors will be subjected to the age-assurance process to access protected speech on covered websites. Thus adults will face those burdens on their access to protected speech, including from the "appeal" process. *See supra* p.11. There are also two ways that adults' accounts could

be subject to the same ongoing limitations as minors' accounts. Some adults could be misidentified as minors by the age-assurance process. *See supra* pp.10-11. And not all covered websites are able to "age-gate" their websites, such that they will be able to limit notifications, autoplay, seamless pagination, and the broad visibility of speech only to adults' accounts. Szabo Decl. ¶ 16.d. To comply with the law, such websites would need to prohibit adults from using, *e.g.*, autoplay. The Act may therefore "reduce the adult population . . . to reading only what is fit for children." *Butler v. Michigan*, 352 U.S. 380, 383 (1957). That is a tailoring problem, as well as an independent reason that the Act triggers and fails strict scrutiny.

Of course, the Act will also impede minors' ability to engage in and access protected speech. They will not be able to communicate and share their speech beyond the State-approved network of people without parental consent. Thus minors will not be able to reach people outside of those networks when fundraising for a field trip, gathering survey responses for a school project, or simply seeking to engage on matters of public concern. As a result, *other* users on covered websites will not be able to see content from minors who are not in their State-defined networks. For the expression the State does allow minors to see, minors will lack the option to view content through means of presentation like autoplay and seamless pagination. Nor will they be allowed to receive notifications that they may find useful. These prohibitions on the ways that covered websites disseminate speech to, and facilitate the speech of, their users would radically change the nature of their services. Because the First Amendment does not allow Utah to ban minors from websites altogether, *see Brown*, 564 U.S. at 794, the State cannot accomplish that result "indirectly" by requiring websites to fundamentally alter their services, *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 77-78 (1990).

Moreover, the Act fails to "take into account juveniles' differing ages and levels of maturity." *Am. Booksellers*, 484 U.S. at 396. Thus, the Act's one-size-fits-all approach treats all minors at every developmental stage identically—from websites' youngest users to 17-year-olds. *Id.*; *see Reno*, 521 U.S. at 865-66; Veitch Decl. ¶ 34. That alone renders the Act overbroad.

The Act also regulates a vastly overbroad number and range of websites. Though named the "Utah Minor Protection in *Social Media* Act," the Act is not limited to what would normally be deemed "social media." *See* Szabo Decl. ¶ 10. Instead, it captures all manner of Internet forums and places where minors can engage in protected First Amendment activity. *See id.* ¶ 12. In fact, covered websites may not even disseminate speech in all the ways regulated by the Act, yet still must shoulder the Act's other onerous burdens. Paolucci Decl. ¶ 13. Nor did the State attempt to limit the Act to websites that disseminate unprotected speech. Instead, wherever *minors* turn online to interact socially and engage in protected speech, they will face the same limitations on their ability to communicate. Likewise, wherever *adults* turn online to share and engage with other people's expression, they will face the requirement for "age assurance."

### 3. The Act's central coverage definition of "social media company" is unconstitutionally vague, rendering the entire Act unenforceable.

The Act's central coverage definition is unconstitutionally vague. *See, e.g.*, *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1310 (8th Cir. 1997) ("[T]he failure to define the pivotal term of a regulation can render it fatally vague."); *Yost*, 2024 WL 555904, at *13 (concluding central coverage definition was unconstitutionally vague); *Griffin*, 2023 WL 5660155, at *13-14 (similar). By relying on vague terms, the Act fails to "give fair notice of conduct that is forbidden or required," *Fox*, 567 U.S. at 253, and it "is so standardless that it authorizes or encourages seriously discriminatory enforcement," *Williams*, 553 U.S. at 304. Moreover, the constitutional

standard for vagueness is heightened because the Act restricts speech. *Fox*, 567 U.S. at 253-54.

*First*, the Act does not define what it means "to allow users to interact socially." § 13-71-101(14)(a)(iii). Most interaction could be defined as "social," so most websites that "allow" user interaction could plausibly be covered. It is therefore unclear whether the mere *ability* to comment on another user's post is a social interaction that could subject a website to the Act's requirements. And if the Act does not regulate websites based on their functionality, that raises even more questions. If the Act distinguishes between "social" interaction and other kinds of interaction like "professional" interaction, then many websites will not have guidance about whether they "allow" sufficiently "social" interaction. For example, websites like LinkedIn are intended for *professional* networking but some interactions on the website might be deemed social. *See* Szabo Decl. ¶ 13.

*Second*, the Act does not explain what it means to "*primarily*" "display[]" content "generated by account holders." § 13-71-101(14)(a)(i) (emphasis added). Many covered websites display their own content (and advertisements) *and* content "generated by account holders." *See* Szabo Decl. ¶ 13. It is not clear whether "primarily" means the majority, supermajority, or some other measure has to be from account holders. Similarly, the Act does not clarify whether websites must calculate this based on the pieces of content, length of the content (*e.g.*, how many minutes of account-holder-submitted videos), or some other metric. Moreover, the ratio of account-holder content to other content changes over time on covered websites, and the Act provides no timeframe for determining when a website is "primarily" "display[ing]" such content. § 13-71-101(14)(a)(i).

\*     \*     \*

Because the "social media company" definition is central to every operative provision of the Act, the law cannot "remain[] 'fully operative' without the invalid provision[]." *Murphy v.*

*NCAA*, 584 U.S. 453, 481 (2018) (citation omitted). Thus, none of the Act's operative provisions are severable and each must be enjoined, notwithstanding the Act's severability provision.

**B.    Multiple substantive provisions of the Act independently violate the First Amendment and the Due Process Clause.**

The mismatch between the vague collection of websites regulated by the Act and the means of speech dissemination singled out by the State renders the statute's operative provisions unconstitutional for all the reasons explained above in Part I.A. Some of those operative provisions raise especially grave concerns under the First Amendment and Due Process Clause. Specifically, Sections 13-71-202(1)(a)-(b) and -204(1) (limitations on minors' speech), -202(5) (prohibitions on certain notifications, autoplay, and seamless pagination,), and -201 (age assurance) independently trigger and fail strict scrutiny for additional reasons. *See, e.g.*, *Yost*, 2024 WL 555904, at *12 ("[L]aws that require parental consent for children to access constitutionally protected, non-obscene content, are subject to strict scrutiny.").

In general, the "absence of any historical warrant or compelling justification for [these] restrictions . . . renders them invalid." *Brown*, 564 U.S. at 795 n.3. Utah's Act "would fare better if there were a longstanding tradition in this country of specially restricting children's access to [protected speech], but there is none." *Id.* at 795. Nor may the State fall back on the "unprecedented and mistaken" strategy of "creat[ing] new categories of unprotected speech" specifically for minors. *Id.* at 792, 794. Without anything even resembling "historical warrant," these provisions are all "invalid" under any standard of heightened First Amendment scrutiny. *Id.* at 795 n.3.

**1.    The Act's restrictions on websites' and minors' ability to share expression absent parental consent violate the First Amendment (§§ 13-71-202(1)(a)-(b), 13-71-204(1)).**

The Act's limitations on the ways that minors can engage in their own protected

expression—and that covered websites can disseminate such expression—absent parental consent violate the First Amendment. Minors and covered websites cannot disseminate speech from minors, or the "account[s]" of minors, beyond a circumscribed network of "connec[tions]" without parental consent. § 13-71-202(1)(a)-(b). In short, Utah would prohibit minors from addressing the worldwide audiences that use covered websites—unconstitutionally limiting aspiring musicians from cultivating an audience, high schoolers from engaging in political organizing, and countless other applications. *See, e.g.*, Katie Kindelan, *6 Teen Girls Were The Organizers Behind Nashville's Massive Black Lives Matter Protest*, ABC News (June 9, 2020), perma.cc/L5L3-ZKN6 ("A group of six teenage girls who met on Twitter were responsible for a massive protest in Nashville in support of the Black Lives Matter movement that drew thousands of people.").

Yet the Supreme Court has rejected the idea "that the state has the power to prevent children from . . . saying anything *without their parents' prior consent*," because "[s]uch laws . . . impose *governmental* authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3. In *Brown*, the Court rejected a law that prohibited the sale or rental of "violent video games" to minors and permitted minors to play such games only with parental consent. *Id.* at 802. The Court also rejected parental-consent requirements for "political rall[ies]" or "religious" services. *Id.* at 795 n.3. Courts nationwide have since rejected requirements for minors to secure parental consent before engaging in speech online. *Yost* rejected a parental-consent requirement to access a broad range of websites. *See* 2024 WL 555904, at *1, *11-12. And *Griffin* rejected a parental-consent requirement to access "social media platforms." 2023 WL 5660155, at *17.[7]

---

[7] *See Interactive Digit. Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954 (8th Cir. 2003) (invalidating ordinance prohibiting distribution of violent video games to minors without parental consent).

Those principles apply equally here, as there is no difference between requiring parental consent to consume speech and requiring parental consent to engage in speech and to choose the audience for that speech. Under Utah's approach, a minor would not be able to leave a comment on an un-"connected" public official's social media post about a recent policy proposal. Nor would a minor be allowed to create a page for her art that could be visible beyond the constrained network defined by the State. A high school athlete could not share highlights visible to college recruiters unless those recruiters were within State-limited networks. Minors looking for ways to save money for college or to buy a car—by advertising their babysitting services or by trying to "monetize" their expressive content—would not be able to reach a general audience. Of course, people would also not be able to *view* minors' speech unless they are in the minors' networks.

These provisions fail heightened First Amendment scrutiny for all the reasons discussed above in Part I.A.2 and for additional reasons. As an initial matter, the State lacks a sufficient governmental interest in preventing minors from speaking without parental consent. Nothing in the Act's legislative findings supports such a grave intrusion on minors' rights. *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993). There are certainly nowhere near the kind of "unusually detailed statutory findings," *Turner*, 512 U.S. at 646, the Supreme Court has relied on in the past to uphold laws under *intermediate* scrutiny. These provisions do not remedy the State's purported interest in the lack of tools for parental oversight. As explained above at pp.7-8, parents have a wide range of options to monitor and control minors' use of the Internet. Thus, the Act only addresses parents choosing not to use existing tools in ways the State would prefer. That is "not the narrow tailoring to 'assisting parents' that restriction of First Amendment rights requires." *Brown*, 564 U.S. at 804.

Like other laws requiring parental consent to engage in speech, these provisions are

underinclusive. If interacting outside of the networks limited by the State were indeed "danger-ous," it does "not make sense to" allow minors to do so as "long as one parent . . . says it's OK." *Griffin*, 2023 WL 5660155, at *18 (cleaned up); *see Yost*, 2024 WL 555904, at *13. "That is not how one addresses a serious social problem." *Brown*, 564 U.S. at 802. In addition, the Act restricts how minors can speak but not what they can see or read. So a 14-year-old can *see* news footage about overseas wars without parental consent, but a 17-year-old college student needs parental consent to engage in political speech about those wars to a broader audience.

These requirements are also overbroad. Covered websites may not have bilateral "con-nect[ions]." § 13-71-101(5)(a). On websites like X and YouTube, therefore, minors may be unable to share their content or account page at all without parental consent. *See* Szabo Decl. ¶ 16.e; Veitch Decl. ¶ 48.

The Act also does not account for the difficulty in verifying a parent-child relationship for purposes of processing parental consent. In enjoining a parental-consent requirement, *Griffin* cred-ited the *State's* expert testimony that "the biggest challenge you have with parental consent is actually establishing . . . the parental relationship." 2023 WL 5660155, at *4. These difficulties are compounded when, *e.g.*, families are nontraditional (like foster families), families have differences in name or address, parents disagree about consent, minors are unsafe at home, or parental rights have been terminated. *See* Szabo Decl. ¶ 16.f; Paolucci Decl. ¶¶ 17-19; Rumenap Decl. ¶ 6. So covered websites may "err on the side of caution and require detailed proof of the parental rela-tionship." *Griffin*, 2023 WL 5660155, at *15. Thus, "parents and guardians who otherwise would have freely given consent to open an account will be dissuaded by the red tape" and intrusiveness "and refuse consent—which will unnecessarily burden minors' access to constitutionally protected

speech." *Id.*; *see* Davis Decl. ¶ 55.

Finally, these provisions are not properly tailored because they may have some arbitrary results. In some cases, the Act's restrictions will allow similarly situated minors to disseminate identical expression to very different audiences based only on minute differences in those users' "connections of connections." That is not a result that furthers any legitimate governmental interest. Moreover, it is a handicap that no other State in the country imposes on its minors.

### 2. The Act's prohibitions on notifying users about speech, and publishing speech in certain ways to minors, violate the First Amendment and the Due Process Clause (§ 13-71-202(5)).

The Act violates the First Amendment by prohibiting specific means of disseminating speech on minors' accounts. These restrictions infringe both covered websites' right to choose whether and how to disseminate speech—and minors' right to engage in and consume speech.

Specifically, the Act prohibits websites from issuing notifications "prompting repeated user engagement"—*i.e.*, from speaking. Assuming that covered websites can divine precisely what this provision will require, such a flat prohibition on speech violates the First Amendment. Covered websites use notifications to inform users about other users' content and to communicate with users. *See* Veitch Decl. ¶ 30. Thus, notifications contain everything from protected "[f]acts" to opinion about whether users will find content useful, all of which are protected speech. *Sorrell*, 564 U.S. at 570. Indeed, this prohibition penalizes the "message expressed" that a user may want to read or view a message or content on the website. *Reed*, 576 U.S. at 163. That is a further reason this provision triggers strict scrutiny as a content-based regulation of speech.

And covered websites will *not* be able to determine what speech is prohibited. *See, e.g.*, Veitch Decl. ¶ 44. For example, it is not clear whether websites unlawfully "prompt" users by

sending multiple notifications about the same thing (*e.g.*, a message from a friend), or multiple notifications about related things, or multiple messages about unrelated things, or something else. Similarly, it is not clear what qualifies as "repeated user engagement," and what timeframe that "engagement" must occur in: minutes, hours, days or something else. Nor does the Act define "engagement," which could mean anything from time spent on the website, to submitting content, to "liking" content, or something else. This uncertainty will chill covered websites from using notifications, and it will invite arbitrary and discriminatory enforcement. *Fox*, 567 U.S. at 253-55.

The Act also prohibits covered websites from disseminating speech using autoplay and seamless pagination on minors' accounts. *See supra* p.10. But decisions about "presentation of an edited compilation of speech generated by other persons . . . fall squarely within the core of First Amendment security." *Hurley*, 515 U.S. at 570. Thus "the decisions made" about whether and how to display "content" "constitute the exercise of editorial control and judgment upon which the State can not intrude." *Id.* at 575 (cleaned up). That includes decisions about whether to display content in seamless pages, because protected "editorial control" includes "decisions made as to limitations on the size and content of" private publications. *Tornillo*, 418 U.S. at 258. Just like *The New York Times* online may choose to format or organize content in a way that makes it easier for readers to navigate and review, covered websites have the right to display content using seamless pagination. *See Yost*, 2024 WL 555904, at *6 (comparing "social media operators" to "publishers of opinion work—a newspaper limited to 'Letters to the Editor,' or a publisher of a series of essays by different authors"). Compounding the First Amendment violation is the vagueness: The Act does not explain how much content is allowed on each virtual "page." As a result, websites cannot know how much "content" can be loaded on a single screen or page, how far down a website page

may go with content, and other important liability-defining requirements.

Protected editorial discretion also includes "choice[s]," *Tornillo*, 418 U.S. at 258, about whether to autoplay audiovisual content. Governments lack authority to prohibit Disney+ from autoplaying television show episodes or Spotify from autoplaying music. The same is true here.

From the user perspective, these provisions all violate the principle that "the First Amendment bars the government from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245 (2002).

These provisions fail heightened First Amendment scrutiny for all the reasons discussed above in Part I.A.2. They also fail heightened scrutiny because the State lacks a sufficient governmental interest in regulating the precise means of how covered websites disseminate protected speech. None of the legislative findings addresses—let alone warrants restricting—notifications, autoplay, or seamless pagination. *See Turner*, 512 U.S. at 646; *Edenfield*, 507 U.S. at 770-71.

### 3. The Act's "age-assurance" requirement violates the First Amendment (§ 13-71-201).

The Act violates the First Amendment by requiring covered websites to engage in "age assurance" to disseminate protected and valuable speech. This will require covered websites to collect personal information or documentation—including information about whether minors are married or emancipated, § 13-71-101(8)—to continue offering their services. As a result, all "current [and] prospective" account holders, minors *and adults* alike, § 13-71-201(1), will face "significant burdens on . . . access to constitutionally protected speech," which will "discourage[]" users from accessing the regulated sites," *Griffin*, 2023 WL 5660155, at *17 (cleaned up).

The First Amendment prohibits the government from imposing such burdens. *Ashcroft*,

542 U.S. at 667.[8] For example, the Supreme Court held it violated the First Amendment to require adults to provide "a credit card, debit account, adult access code, . . . adult personal identification number" or "a digital certificate that verifies age" to access protected speech for adults. *Id.* at 662, 667 (citation omitted). That was true even when the speech was unprotected for minors—which is not true here. *See id.* at 661-62. Recently, a pair of cases concluded that age-verification requirements violate *minors'* rights too. The Western District of Arkansas concluded that an "age-verification requirement[ ]" to access protected speech on "social media platforms" violated intermediate scrutiny. *Griffin*, 2023 WL 5660155, at *17-19. And the Northern District of California concluded that age-estimation requirements impose the same burdens as age-verification, and thus failed intermediate commercial speech scrutiny. *Bonta*, 2023 WL 6135551, at *8. Common to all of these requirements, "[i]t is likely that many [users] who otherwise would be interested in becoming account holders on regulated [websites] will be deterred—and their speech chilled—as a result of" the age-assurance requirements. *Griffin*, 2023 WL 5660155, at *17. Similarly, websites will be unable to disseminate speech to any users without adopting intrusive and costly age-assurance systems.

It does not matter constitutionally that the Act labels this a requirement for age "assurance," as compared to age "verification." The Act defines "[a]ge assurance" as "measures reasonably calculated to enable a social media company to identify whether a current or prospective Utah account holder is a minor with an accuracy rate of at least 95%." § 13-71-101(2). For many websites like Dreamwidth, the "only method that can determine a user's age to a sufficient degree of

---

[8] *See ACLU v. Mukasey*, 534 F.3d 181, 196-97 (3d Cir. 2008) (rejecting age-verification requirement); *PSINet, Inc. v. Chapman*, 362 F.3d 227, 236-37 (4th Cir. 2004) (same).

confidence is to require every user . . . to upload government-issued identification, deanonymizing themselves and jeopardizing their privacy." Paolucci Decl. ¶ 8; *see* Davis Decl. ¶¶ 53-54 (detailing difficulties some users may face in providing the necessary information or documentation to comply with certain age-assurance procedures). More generally, "age assurance methods" like those imposed by the Act "create time delays and other barriers to entry that studies show cause users to navigate away from pages." *Bonta*, 2023 WL 6135551, at *8 (discussing amicus brief).

Furthermore, even if covered websites could comply with the Act without requiring users to provide personal information as a *threshold* requirement to access speech, the Act still necessarily contemplates that many users will need to "submit[] documentary evidence to establish the account holder's age range" as part of the Act's *appeal* process. § 13-71-201(3)(a). That is precisely what unconstitutional "age verification" requires. *E.g.*, *Griffin*, 2023 WL 5660155, at *17. And it is what Utah's previous age-verification law would have required too. *See* ECF 1 at 20. Thus, unless those adults who are misidentified as minors are willing to "submit[] documentary evidence" to appeal their misidentification by the website, § 13-71-201(3)(a), their accounts will be subject to myriad restrictions under the Act.

These provisions fail heightened First Amendment scrutiny for all the reasons discussed above in Part I.A.2. They also fail scrutiny because they would require many covered websites to collect and process *more* data from users, which is contrary to the State's purported goals in addressing websites' data collection and use. *Cf.* § 13-71-102(2) ("widespread collection and utilization of personal information"); *see* Rumenap Decl. ¶ 5 (noting the potential harms of requiring age verification from covered websites).

**C.    Multiple substantive provisions of the Act's restrictions on speech independently are preempted under 47 U.S.C. § 230.**

The Act's restrictions on the visibility of minors' expression and prohibitions on certain notifications, autoplay, and seamless pagination are preempted by § 230 because they impose liability unless covered websites limit either the user-generated speech that they publish or how they publish it. Tenth Circuit precedent holds that decisions about whether and how to disseminate user-generated content lie at the heart of websites' protected "editorial . . . functions" under § 230. *Ben Ezra, Weinstein & Co. v. Am. Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000) (citation omitted). And case after case has found that claims that target "tools" that facilitate user speech are preempted by § 230. *See, e.g.*, *In re Soc. Media Adolescent Addiction/Pers. Injury Prods. Liab. Litig.*, 2023 WL 7524912, at *10-13 (N.D. Cal. Nov. 14, 2023). This Court should too.

Members qualify for § 230's protections because they are "provider[s] . . . of an interactive computer service." 47 U.S.C. § 230(c)(1).[9] Indeed, the "prototypical service" protected by § 230 is a website—like those offered by members—that allows users to "post comments and respond to comments posted by others." *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1195 (10th Cir. 2009).

Under § 230, "[n]o provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by" someone else. 47 U.S.C. § 230(c)(1). Congress preempted "inconsistent" state law. *Id.* § 230(e)(3). The "Circuits are in general agreement that . . . Section 230(c)(1) should be construed broadly in favor of immunity." *Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019). So § 230 "protect[s] websites" from liability *and* "having to

---

[9] *See, e.g.*, *Jackson v. Airbnb, Inc.*, 2022 WL 16753197, at *1 (C.D. Cal. Nov. 4, 2022) (Snapchat); *Lewis v. Google LLC*, 461 F. Supp. 3d 938, 954 (N.D. Cal. 2020) (YouTube); *Dangaard v. Instagram, LLC*, 2022 WL 17342198, at *4 (N.D. Cal. Nov. 30, 2022) (Facebook and Instagram).

fight costly and protracted legal battles." *Fair Hous. Council of San Fernando Valley v. Room-mates.Com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (en banc). Otherwise, permitting lawsuits for disseminating user-generated speech "could threaten the freedom of speech." *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003) (cleaned up).

The Act's restrictions on user-generated speech are "inconsistent" with § 230 for two reasons. *First*, decisions about whether and how to disseminate user-generated speech are at the heart of websites' protected "editorial . . . functions." *Ben Ezra*, 206 F.3d at 986. Under § 230, websites may "cho[ose] . . . what content can appear on the website and in what form." *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1124 (N.D. Cal. 2016) (citation omitted); *see also Force*, 934 F.3d at 66 ("arranging and distributing third-party information"). Section 230 protects websites' decisions to "filter, screen, allow, or disallow[,] . . . pick, choose, analyze, or digest[,] . . . transmit, . . . display, . . . subset, organize, [or] reorganize . . . content." 47 U.S.C. § 230(f)(4).

The Act unlawfully regulates the permissible user-generated content on websites and how that content can be displayed. The prohibitions on notifications on minors' accounts, autoplay, and seamless pagination regulate "what form" user-generated content can take, *Fields*, 217 F. Supp. 3d at 1124 (citation omitted), and how that content is "arrang[ed]" and "distribut[ed]," *Force*, 934 F.3d at 66. The Act strips websites of the ability to choose how to display user-generated content and penalizes websites for making choices that deviate from the State's preferences.

Likewise, the restriction on the visibility of minors' content regulates "what content can appear," *Fields*, 217 F. Supp. 3d at 1124 (citation omitted), on accounts that are not "connected" to minors' accounts, § 13-71-202(1)(a)-(b). The Act purports to impose liability for disseminating third-party content from minors to particular users that do not belong to State-defined networks.

*Second*, providing "tools meant to facilitate the communication and content of others" is also protected by § 230. *Dyroff*, 934 F.3d at 1098. Thus, websites "act[] as a publisher of others' content" when they use such tools to disseminate content. *Id.* Autoplay and seamless pagination are such "tools." *Id.* "[N]otifications," too, inform users about the "content of others" and "facilitate . . . communication" among users. *Id.*; *see Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1118 (N.D. Cal. 2020). Yet the Act prohibits those tools altogether. Section 230 preempts such laws. *See, e.g.*, *In re Soc. Media*, 2023 WL 7524912, at *3, *13 (concluding § 230 preempts claims based on "endless feeds," autoplay, and notifications of third-party content).

Of course, minors' ability to make their content visible to the public is also a means to "facilitate the communication and content" of those users. *Dyroff*, 934 F.3d at 1098. Yet the Act imposes liability on covered websites for enabling minor users to communicate outside of State-limited networks without parental consent. That too is preempted, as "post[ing] comments and respond[ing] to comments posted by others" are "prototypical" functions at the heart of § 230's protections. *Accusearch*, 570 F.3d at 1195.

### D.     The Act's undefined data collection and use regulations are unconstitutionally vague in violation of the First Amendment and Due Process Clause.

The Act's undefined restrictions on covered websites' collection and use of minors' data are unconstitutionally vague. Neither provision defines its core, liability-defining term.

*First*, the Act's requirement that covered websites' terms of service "be presumed to include an assurance of confidentiality" for the minor account holder's personal information is unconstitutionally vague. § 13-71-204(2)-(4). The Act does not define the phrase "assurance of confidentiality." § 13-71-204(2). Yet this phrase provides the full scope of covered websites' duties and obligations. *See, e.g.*, *Stephenson*, 110 F.3d at 1310. Although the Act lists exceptions to which

this undefined "assurance" does not apply, they only contribute to the problem.

Without the Act explaining what this "assurance" requires, covered websites cannot "know what is required of them." *Fox*, 567 U.S. at 253. This problem is heightened because statutory context suggests that websites cannot rely on the plain meaning of "confidentiality": unauthorized disclosure to third parties. *See, e.g.*, *Confidential*, Black's Law Dictionary (11th ed. 2019) ("meant to be kept secret"). For example, the exceptions to this "assurance" suggest that even a covered website's permissible "internal use" of data set forth in their privacy policies could violate the "assurance of confidentiality." § 13-71-204(4). But if covered websites could not use data internally, then their services would not be functional, secure, or useful for users. *See supra* p.8.

The exceptions also suggest that personalizing content based on data other than "the user's age and location" violates the undefined "assurance." § 13-71-204(4)(c). Without personalization, minors would see less high-quality and developmentally appropriate content, and instead would see content that is less "beneficial to [them]" and that they may have no interest in. *Bonta*, 2023 WL 6135551, at *16; *see* Veitch Decl. ¶ 54. Neither internal use of data nor content personalization has anything to do with the State's purported interest in the assurance of confidentiality requirement—namely, unauthorized disclosure of information to third parties (or any disclosure whatsoever). Yet Defendants could interpret the Act to regulate even those activities.

If the government can choose one of multiple, unspecified "internal" uses of data to impose liability, then the Act does not provide the government with the "precision and guidance . . . necessary" to ensure that it does "not act in an arbitrary or discriminatory way." *Fox*, 567 U.S. at 253.

*Second*, for similar reasons, the Act's requirement that covered websites "restrict any data collection . . . from a Utah minor account holder's account that is not required for core functioning

of the social media service" is also unconstitutionally vague. § 13-71-202(1)(c). The Act does not define what "required for core functioning of the social media service" means, nor how it interacts with the "assurance of confidentiality" above. Given the various ways in which covered websites use data, *see supra* p.8, this undefined requirement fails to provide covered websites with guidance and grants the government far too much enforcement discretion.

## II.    The remaining factors support a preliminary injunction.

When evaluating a preliminary injunction "[i]n the First Amendment context, the likelihood of success on the merits will often be the determinative factor." *Verlo*, 820 F.3d at 1126 (cleaned up). The other factors here also overwhelmingly favor a preliminary injunction, which would maintain the status quo for websites and their users.

NetChoice, its members, and covered websites' users face irreparable injury absent a preliminary injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). "[M]ost courts hold that no further showing of irreparable injury is necessary." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) (cleaned up). The constitutional harms are especially severe in light of the Act's penalties for covered websites' dissemination of protected speech. Under the Act, covered websites face $2,500 in civil penalties for every "violation" of the Act. § 13-71-301(3)(a)(i), (b)(v). Unless this Court enjoins enforcement of the Act, members will be forced to choose between complying—thereby sacrificing First Amendment freedoms—or risk incurring substantial penalties. *See Chamber of Com. v. Edmondson*, 594 F.3d 742, 756 (10th Cir. 2010) ("[b]oth compliance and non-compliance" with state law would "injure" the plaintiff's "members"); *see* Paolucci Decl. ¶ 21. Even if members did comply,

they still risk liability because the Act's vague and onerous obligations make perfect compliance impossible. Szabo Decl. ¶ 24; *Griffin*, 2023 WL 5660155, at *13-14.

Without an injunction, members will immediately begin incurring unrecoverable compliance costs. As members explain, attempting to comply with the Act would be time-consuming, burdensome, and expensive. Davis Decl. ¶ 58; Veitch Decl. ¶¶ 35, 41, 49, 53, 55; Yadegar Decl. ¶ 9. Some members may lack the resources to fully comply at all. Paolucci Decl. ¶¶ 8, 16-21. Before the Act's effective date, members must begin implementing the Act's requirements. And those costs will be unrecoverable as Defendants are immune from suit for monetary damages. Thus, those costs "constitute[] irreparable injury." *Chamber of Com.*, 594 F.3d at 770-71.

The remaining two factors "merge" when "the government is the opposing party." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (citation omitted). Maintaining the status quo will ensure that many minors and adults continue to have access to the full range of protected expression on covered websites. *See* Davis Decl. ¶¶ 23-27; Veitch Decl. ¶¶ 42, 45, 50, 54. The Act's defects should be adjudicated before websites are forced to change their services. Nor would a speech-preserving preliminary injunction harm the State: "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad*, 670 F.3d at 1132 (citation omitted).

## Conclusion

Plaintiff respectfully requests that, before the Act takes effect on October 1, 2024, this Court preliminarily enjoin Defendant Utah Attorney General and the Defendant Director of the Division of Consumer Protection of the Utah Department of Commerce, as well as their officers, agents, and employees, from enforcing the Act against NetChoice's members.

RESPECTFULLY SUBMITTED this 3rd day of May 2024.

PARR BROWN GEE & LOVELESS, P.C.

*/s/ David C. Reymann*
David C. Reymann
Kade N. Olsen

LEHOTSKY KELLER COHN LLP
Steven P. Lehotsky
Scott A. Keller
Todd Disher
Jeremy Evan Maltz
Joshua P. Morrow
Alexis Swartz
*Attorneys for Plaintiff NetChoice, LLC*

**Certificate of Service**

I, Kade N. Olsen, certify that on May 3, 2024, the foregoing was filed electronically via the Court's CM/ECF system.

*/s/ Kade N. Olsen*
Kade N. Olsen