DAVID N. WOLF (6688)
DOUGLAS CRAPO (13704)
LANCE F. SORENSON (10684)
Assistant Utah Attorneys General
Utah Attorney General
160 East 300 South, 6th Floor
PO Box 140856
Salt Lake City, UT 84114-0856
Telephone: (801) 366-0100
lancesorenson@agutah.gov

*Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NETCHOICE, LLC,<br><br>                              Plaintiff,<br><br>v.<br><br>SEAN D. REYES, in his official capacity as Attorney General of Utah, and<br><br>KATHERINE HASS, in her official capacity as Director of the Division of Consumer Protection of the Utah Department of Commerce,<br><br>                              Defendants. | **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No.: 2:23-cv-00911<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

# Table of Contents

INTRODUCTION.................................................................................................1

BACKGROUND.................................................................................................3

    THE PROBLEM .................................................................................................4

    THE ACT.........................................................................................................5

    STANDARD OF REVIEW...................................................................................9

DEFENDANTS' STATEMENT OF FACTS............................................................11

ARGUMENT...................................................................................................21

    I.   Plaintiff cannot meet its burden to demonstrate a substantial likelihood of
        success on the merits...................................................................................21

        A. The Act does not violate the First Amendment. ..................................21

        B. The Act is not vague for any of the reasons that NetChoice argues..................42

        C. 47 U.S.C. § 230 does not preempt the Act, expressly or otherwise. ..................57

    II.  The public interest strongly favors allowing the law to go into effect ...................58

    III. The balance of the harms weighs in favor of allowing the law to go into effect.....59

CONCLUSION ...............................................................................................60

# Table of Authorities

**Page(s)**

**Cases**

*ACORN v. City of Tulsa, Oklahoma,*
  835 F.2d 735 (10th Cir. 1987)................................................................................44

*American Booksellers Ass'n v. Rendell,*
  481 A.2d 919 (Penn. 1984)................................................................................48

*American Communications Assn. v. Dourds,*
  339 U.S. 382 (1950)................................................................................43

*American Target Advertising v. Giani,*
  199 F.3d 1241 (10th Cir. 2000)................................................................21, 27

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004)................................................................11, 35, 38, 39

*Barr v. American Association of Political Consultants, Inc.,*
  140 S. Ct. 2335 (2020)................................................................46, 47

*Brewer v. City of Albuquerque,*
  18 F.4th 1205 (10th Cir. 2021)................................................................10

*Brown v. Entertainment Merchants Ass'n,*
  564 U.S. 786 (2011)................................................................40, 41

*Burson v. Freeman,*
  504 U.S. 191 (1992)................................................................28

*Church of Lukumi Babalu Aye, Inc. v. Hialeah,*
  508 U.S. 520 (1993)................................................................28

*City of Austin v. Reagan,*
  596 U.S. 61 (2022)................................................................1, 22, 23, 24

*City of Chicago v. Morales,*
  527 U.S. 41 (1999)................................................................43

*City of Renton v. Playtime Theatres, Inc.,*
  475 U.S. 41 (1986)................................................................22

*Clark v. Community for Creative Non-Violence,*
  468 U.S. 288 (1984)................................................................33

*Consol. Edison Co. v. Public Service Comm'n,*
  447 U.S. 530 (1980)................................................................24

*Discount Tobacco City & Lottery, Inc., v. U.S.,*
  674 F.3d 509 (6th Cir. 2012)................................................................7

*Dyroff v. Ultimate Software Grp., Inc.,*
  934 F.3d 1093 (9th Cir. 2019)................................................................51, 57

*Eccles v. Peoples Bank of Lakewood Village, Cal.,*
  333 U.S. 426 (1948)................................................................9

*Eddings v. Oklahoma,*
  455 U.S. 104 (1982)................................................................1

*Erznoznik v. City of Jacksonville,*
  422 U.S. 205 (1975)................................................................1, 27, 36

*Evans v. Sandy City,*
  944 F.3d 847 (10th Cir. 2019) ................................................................................. 11
*Fields v. Twitter, Inc.,*
  217 F. Supp. 3d 1116 (N.D. Cal. 2016) ................................................................. 57
*Force v. Facebook, Inc.,*
  934 F.3d 53 (2d Cir. 2019) ...................................................................................... 57
*Frazier ex rel. Frazier v. Winn,*
  535 F.3d 1279 (11th Cir. 2008) ............................................................................... 41
*Free Speech Coalition v. Paxton,*
  S. Ct., 2024 WL 1864355 (April 30, 2024) ............................................................ 37
*Free Speech Coalition v. Paxton,*
  95 F.4th 263 .......................................................................................... 29, 36, 37, 39
*Games, Inc. v. Apple, Inc.,*
  67 F.4th 946 (9th Cir. 2023) .................................................................................... 51
*Ginsberg v. New York,*
  390 U.S. 629 (1968) ................................................................................................. 29
*Gonzales v. Carhart,*
  550 U.S. 124 (2007) ................................................................................................. 44
*Gonzales v. Google LLC,*
  2 F.4th 871 (9th Cir. 2021) ...................................................................................... 15
*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) ......................................................................................... passim
*Heffron v. International Soc. For Krishna Consciousness, Inc.,*
  452 U.S. 640 (1981) ............................................................................................ 24, 34
*Heideman v. South Salt Lake City,*
  348 F.3d 1182 (10th Cir. 2003) ............................................................................ 9, 59
*Hill v. Colorado,*
  530 U.S. 703 (2000) ................................................................................................. 43
*Humanitarian Law Project,*
  561 U.S. ........................................................................................................ 43, 44, 45
*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston,*
  515 U.S. 557 (1995) ............................................................................................ 31, 32
*Iancu v. Brunetti,*
  588 U.S. 388 (2019) ................................................................................................. 25
*In re Motor Fuel Temperature Sales Practice Litigation,*
  641 F. 3d 470 (10th Cir. 2011) ................................................................................ 29
*In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation,*
  -- F. Supp. --, 2023 WL 7524912 (N.D. Cal., Nov. 14, 2023) .............................. 57
*In re Twitter, Inc. Securities Litigation,*
  2020 WL 13863616, n.1 (N.D. Cal. January 28, 2020) .......................................... 15
*Jane Doe No. 1 v. Backpage.com, LLC,*
  817 F.3d 12 (1st Cir. 2016) ..................................................................................... 57
*John Doe No. 1 v. Reed,*
  561 U.S. 186 (2010) ................................................................................................. 39
*Jones v. District of Colombia,*
  323 F.2d 306 (D.C. Cir. 1963) ................................................................................ 44
*Keister v. Bell,*
  29 F.4th 1239 (11th Cir. 2022) ................................................................................ 50

*Klein v. Facebook, Inc.,*
   580 F.Supp.3d 743 (N.D. Cal. 2022) ........................................................................... 15

*Kovacs v. Cooper,*
   336 U.S. 77 (1949) ...................................................................................................... 33

*Lorillard Tobaco Co. v. Reilly,*
   533 U.S. 525 (2001) .................................................................................................... 38

*Maryland v. King,*
   567 U.S. 1301 (2012) ............................................................................................. 3, 9, 58

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997) ...................................................................................................... 9

*McCullen v. Coakley,*
   573 U.S. 464 (2014) .................................................................................................... 34

*Miami Heral Pub. Co. v. Tornillo,*
   418 U.S. 241 (1974) ................................................................................................ 31, 32

*Miller v. Alabama,*
   567 U.S. 460 (2012) ...................................................................................................... 1

*National Inst. of Family and Life Advocates v. Becerra,*
   585 U.S. 755 (2018) .................................................................................................... 25

*NetChoice LLC v. Bonta,*
   F. Supp., 2023 WL 6135551 (N.D. Cal., Sept. 18, 2023) ...................................... 34, 35

*NetChoice LLC v. Yost,*
   F. Supp., 2024 WL 555904 (S.D. Ohio, Feb. 12. 2024) ............................................. 34

*NetChoice, LLC v. Griffin,*
   F. Supp., 2023 WL 5660155 (W.D. Ark., August 31, 2024) ....................................... 34

*New Motor Vehicle Bd. of Cal. V. Orrin W. Fox Co.,*
   434 U.S. 1345 (1977) .................................................................................................... 3

*New York State Rifle & Pistol Ass'n v. Bruen,*
   597 U.S. 1 (2022) ....................................................................................................... 37

*People v. Lopez,*
   No. H041713, 2016 WL 297942 (Cal. Ct. App., Jan. 25, 2016) .................................. 50

*Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary,*
   268 U.S. 510 (1925) .................................................................................................... 41

*Pizza di Joey, LLC v. Mayor of Baltimore,*
   235 A.3d 873 (Md. Ct. App. 2020) ............................................................................. 47

*Posters 'N' Things, Ltd. v. United States,*
   511 U.S. 513 (1994) .................................................................................................... 47

*Powers v. Harris,*
   379 F.3d 1208 (10th Cir. 2004) .................................................................................. 37

*Prince v. Commonwealth of Massachusetts,*
   321 U.S. 158 (1944) .................................................................................................... 27

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) ................................................................................................ 22, 25

*Reno v. ACLU,*
   521 U.S. 844 (1997) ...................................................................................................... 5

*Rockdale County v. U.S. Enters., Inc.,*
   865 S.E.2d 135 (Ga. 2021) .......................................................................................... 47

*RoDa Drilling Co. v. Siegal,*
   552 F.3d 1203 (10th Cir. 2009) .................................................................................... 9

*Roper v. Simmons,*
   543 U.S. 551 (2005) ..................................................................................... 1, 16, 17
*Sable Communications of California, Inc. v. F.C.C.,*
   492 U.S. 115 (1989) ........................................................................................ 34, 36
*Schroeder v. Pinterest Inc.,*
   133 A.D. 3d 12 (N.Y. App. Div. 2015) ................................................................... 53
*Sorrell v. IMS Health Inc.,*
   564 U.S. 552 (2011) ........................................................................................ 22, 31
*Taverns for Tots, Inc. v. City of Toledo,*
   341 F.Supp.2d 844 (N.D. Ohio 2004) ...................................................................... 50
*TikTok, Inc. v. Trump,*
   490 F.Supp.3d 73 (D.C. 2020) ............................................................................... 16
*Turner Broadcasting System, Inc. v. F.C.C.,*
   512 U.S. 622 (1994) ........................................................................................ 22, 26
*U.S. v. Playboy Entertainment Group, Inc.,*
   529 U.S. 803 (2000) .............................................................................................. 22
*U.S. v. Rene E,*
   583 F. 3d 8 (1st Cir. 2009) ..................................................................................... 37
*United Staes v. American Library Assn. Inc.,*
   539 U.S. 194 (2003) .............................................................................................. 39
*United States v. Brandenburg,*
   157 F. App'x 875 (6th Cir. 2005) ........................................................................... 50
*United States v. Comer,*
   5 F.4th 535 (4th Cir. 2021) ............................................................................... 50, 51
*United States v. Gibson,*
   998 F.3d 415 (9th Cir. 2021) ................................................................................. 47
*United States v. O'Brien,*
   391 U.S. 367 (1968) .............................................................................................. 33
*United States v. Perea,*
   818 F.Supp.2d 1293 (D. N.M. 2010) ...................................................................... 56
*United States v. Petrillo,*
   332 U.S. 1 (1947) ................................................................................................. 43
*United States v. Powell,*
   423 U.S. 87 (1975) ............................................................................................... 57
*United States v. Salerno,*
   481 U.S. 739 (1987) .............................................................................................. 44
*United States v. Spy Factory, Inc.,*
   951 F. Supp. 450 (S.D.N.Y. 1997) ......................................................................... 47
*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
   455 U.S. ....................................................................................................... passim
*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ...................................................................................21, 33, 34
*Williams-Yulee v. Florida Bar,*
   575 U.S. 422 (2015) ........................................................................................ 27, 28
*Williams-Yulee,*
   575 U.S. ............................................................................................................. 28
*Winter v. Natural Resources Defense Council, Inc.,*
   555 U.S. 7 (2008) ............................................................................................... 3, 9

*Yershov v. Gannett Satellite Info. Network, Inc.,*
   820 F.3d 482 (1st Cir. 2016)........................................................................................52

**Statutes**

21 U.S.C. § 387a-1................................................................................................................7
47 U.S.C. § 230..........................................................................................................57, 58
Cal. Bus. & Prof. Code § 22675 (d) & (e).....................................................................21
HB 3, FLA. STAT..................................................................................................................6
UTAH CODE § 13-71-101......................................................................................................7
Utah Code § 13-71-102.....................................................................................................18
Utah Code § 13-71-401.....................................................................................................46
Utah Code § 13-71-101(11)........................................................................................33, 51
Utah Code § 13-71-201(1).................................................................................................39
UTAH CODE § 13-71-302(1)(a)..........................................................................................42
UTAH CODE § 13-71-302(3)..............................................................................................42
Utah Code § 13-2-5(1).......................................................................................................44
UTAH CODE § 13-71-101(14)(a)........................................................................................46
UTAH CODE § 13-71-101(14)(a)(i)....................................................................................46
UTAH CODE § 13-71-101(14)(a)(iv)............................................................................49, 50
UTAH CODE § 13-71-101(3)...............................................................................................49
Utah Code § 13-71-202(5)(c)...........................................................................................51
UTAH CODE § 13-71-202(5)(b)....................................................................................53, 54
UTAH CODE § 13-71-204(4)........................................................................................55, 56
Utah Code § 13-71-204(4)(c)...........................................................................................56
UTAH CODE § 13-71-202(1)(c).........................................................................................56
UTAH CODE § 13-71-204(3), (4).......................................................................................55
UTAH CODE § 23A-4-701(3)(b)(v)....................................................................................42
UTAH CODE § 32-4-403........................................................................................................7
UTAH CODE § 52-3-211(2)(a)............................................................................................42
UTAH CODE § 76-10-114......................................................................................................7
UTAH CODE § 76-10-5..........................................................................................................7
UTAH CODE § 76-10-1206....................................................................................................7
UTAH CODE § 76-10-2201............................................................................................8, 40
UTAH CODE § 76-10-509....................................................................................................40
UTAH CODE § 76-10-509.4.................................................................................................42
UTAH CODE § 78B-3-406(6).........................................................................................8, 40
UTAH CODE §§ 13-71-101(10)..........................................................................................55
Utah Code §§ 13-71-101(13) & (14).................................................................................21

**Regulations**

UTAH ADMIN. CODE R392-700-5 (2023) .....................................................................8, 40

**Other Authorities**

*Freedom of Speech and Information Privacy: The Troubling Implications of a Right to Stop People From Speaking*
   About You,
   52 Stan. L. Rev. 1049 (1999-2000) ...........................................................................................55
U.S. Patent No. US11237 ........................................................................................................54

**INTRODUCTION**

The Constitution recognizes that children are different than adults. "[A]s any parent knows and the scientific and sociological studies . . . tend to confirm, a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults[.]" *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (internal quotation and citation omitted); *see also Eddings v. Oklahoma*, 455 U.S. 104, 115-16 (1982) ("Even the normal 16-year-old customarily lacks the maturity of an adult"). "Our history is replete with laws and judicial recognition that children cannot be viewed simply as miniature adults . . . . [I]t is the odd legal rule that does *not* have some form of exception for children." *Miller v. Alabama*, 567 U.S. 460, 481 (2012) (cleaned up) (emphasis in original).

For these reasons, "It is well-settled that a State . . . can adopt more stringent controls on communicative materials available to youths than on those available to adults." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212 (1975). "The First Amendment rights of minors are not co-extensive with those of adults. A state may permissibly determine that, at least in some precisely delineated areas, a child – like someone in a captive audience – is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." *Id.* at 214 n.11 (internal citations omitted).

Unlike the law at issue in *Erznoznik*, however, and unlike the laws at issue in virtually all of the cases cited by Plaintiff NetChoice LLC ("NetChoice"), Utah's Minor Protection in Social Media Act (the "Act") (Exhibit A) does not seek to shield children from any particular content – or any content at all. It is "agnostic as to content." *See City of Austin v. Reagan*, 596 U.S. 61, 69 (2022). It does not ban minors from social media or even require parental consent to create social media accounts and establish connections with other accounts. Rather, the Act seeks to do two things: (1) mitigate the immense harms that youth suffer from social media addiction by prohibiting, for minor accounts only, certain addictive additives that, regardless of content, entrap minors in a social media world; and (2) protect, for minor accounts only (like

federal law already attempts to do for children under 13), sensitive personal information from wide dissemination by requiring parents to consent to any change to default data privacy settings for children.

The Act is content neutral and is a reasonable time, place, and manner restriction. While the "government has no power to restrict . . . activity because of its message . . . [,] reasonable time, place, and manner regulations may be necessary to further significant governmental interests, and are permitted." *Grayned v. City of Rockford*, 408 U.S. 104, 115 (1972). The Act is appropriately tailored to advance significant government interests under the First Amendment test for reasonable time, place, and manner restrictions. Any incidental burdens on minors or adults' speech are justied by the government's significant, even compelling, interest.

There may be little harm from moderate social media use by minors. But, as set forth below, social media use beyond about two hours per day leads to extreme, and sometimes irreparable adverse mental health outcomes in youth, no matter the content. *Erznoznik's* analogy of minors to a captive audience is apt. Minors have an underdeveloped capacity for self-regulation. When they find themselves inside a social media world they have a hard time escaping; they are like gamblers in a dark casino. The Acts helps them find the exit – an escape from the virtual world so that they might participate in other important and essential things, like schoolwork, sleep, exercise, and real-life social relationships. The Act places reasonable guardrails on a product that research shows, and experience confirms, is dangerous when overused by minors regardless of content. The Act is limited and reasonable. It is based in science and common sense. It is content-neutral. It is understandable by a person of reasonable, ordinary intelligence. And it is not preempted by federal law.

For these reasons, NetChoice does not and cannot meet its heavy burden to demonstrate that it is substantially likely to succeed on the merits; NetChoice's right to relief on the merits is far from clear and unequivocal as required by the preliminary injunction standard, and its request for a preliminary injunction fails on that prong.

2

And, although the Court need go no further than the substantial likelihood of success prong to deny the injunction, it remains NetChoice's burden to prove the other three prongs as well, which it cannot do. Without satisfying all four prongs, the injunction should not issue. *See, e.g.,* *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Here, there is a public interest at stake which would be harmed by issuance of the injunction. Further, the balance of harms weighs overwhelmingly in the State's favor. Where a State is prevented from enforcing a statute enacted by its people, it suffers a form of irreparable injury. *See Maryland v. King,* 567 U.S. 1301, 1303 (2012) (citing *New Motor Vehicle Bd. of Cal. V. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977)).

Because 1) the Act is a reasonable and constitutional regulation that is appropriately tailored to the State's important and compelling interests, 2) there is a strong public interest to have the Act enforced during the pendency of this lawsuit, and 3) NetChoice has failed to meet its burden of establishing a clear and unequivocal right to drastic injunctive relief, Defendants Sean Reyes and Katherine Hass (collectively, the "State") respectfully request the Court deny NetChoice's Motion for a Preliminary Injunction ("Pl.'s Mot.").

## **BACKGROUND**

Sean Parker, the first president of Facebook, described the thought process that went into building social media sites. He said:

> [I]t was all about: How do we consume as much of your time and conscious attention as possible? . . . [W]e need to sort of give you a little dopamine hit every once in a while . . . it's a social-validation feedback loop . . . exactly the sort of thing that a hacker like myself would come up with, because you're exploiting a vulnerability in human psychology.

He concluded: "God only knows what it's doing to our children's brains."[1]

---

[1] Sean Parker, Axios interview, cited in Jonathan Haidt and Greg Lukianoff, *The Coddling of the American Mind*, Penguin Press (New York, 2018), p. 147.

### *The Problem*

Based on extensive, multiple, longitudinal studies, we now know what excessive social media use does to children's brains. It re-wires them and makes youth susceptible to depression, anxiety, body image problems, self-harm, and suicide. It causes loss of sleep, worse academic performance, and deterioration of real-life relationships. Excessive social media use is the cause of an alarming spike in adverse mental health outcomes among teenagers. *See* Declaration of Dr. Jean Twenge ("Twenge Dec."), Exhibit B, ¶¶ 21-47.

The causal relationship between excessive social media use and adverse mental health outcomes for youth has been established. The real-life experience of parents and teenagers is now supported by extensive and sound academic research: adverse mental outcomes among youth are not just correlated with excessive social media use; they are caused by it. Twenge Dec., Exhibit B, ¶¶ 33-47.

Despite this, and in order to hook new generations of users so that they may mine their personal information for profit, social media companies have laced their products with highly addictive elements that act like nicotine in tobacco. Or, to switch analogies, they act like the design features of casinos, meant to keep gamblers at the slots and tables as long as possible, perhaps forever. These addictive elements have nothing to do with the underlying content that is shared, and everything to do with trapping youth in an endless loop, where their eyeballs are constantly on a screen, unable to focus on anything else.

The addictive elements of social media websites are working as intended, just like the additives to cigarettes and the bells and whistles in casinos. In the last decade, there has been a dramatic rise in the amount of time adolescents spend on screens, particularly social media. By 2022, teenagers were spending 8-9 hours per day on screens. Of that, the average teenager spends 5 hours per day on social media. For children between the ages of 13-18, 95% use social media, and more than 33% of them say they use it *constantly*. Many American teenagers say they use social media for more than 40 hours per week. Teenage addiction to social media is having disastrous consequences for youth, their families, and societies writ large. Excessive social media use has caused a mental health crisis in teenagers. Twenge Dec., Exhibit B, ¶¶ 16-47.

Parents are crying out for help. Gone are the quaint days when parents could simply shut down the living room desktop as suggested by some caselaw from a bygone era before the invention of the smartphone, before accessible high-speed streaming, and before the proliferation of social media.[2] This is not your grandmother's internet. Now, children carry supercomputers, with all their immersive, interactive, and enticing streaming content, in their pockets and backpacks. They carry them on school buses. They look at them during class, in between classes, and at lunch. Parents need more tools in the toolkit. The parental and device controls that NetChoice lauds are not effective at preventing harm. The ineffectiveness of these tools, at a societal level, is supported by research. Even the most conscientious of parents are in a losing battle against social media companies for the attention and well-being of their own children. *See* Declaration of Tony Allen ("Allen Dec."), Exhibit C, ¶¶ 38-42.

The U.S. Surgeon General wrote in an advisory last year that there are "ample indicators that social media can . . . have a profound risk of harm to the mental health and well-being of children and adolescents." U.S. Surgeon General's Advisory, Social Media and Youth Mental Health, Exhibit D, p. 4. The Surgeon General said, "We must . . . urgently take action to create safe and healthy digital environments that minimize harm and safeguard children's and adolescents' mental health and well-being during critical stages of development." *Id.*

### The Act

Many states and countries have recognized the growing and deadly problem, and have responded to parents' pleas. Last year, the United Kingdom passed an Online Safety Law requiring social media companies to verify that users are old enough to be on their platforms;[3] Ireland likewise passed an online

---

[2] *See, e.g., Reno v. ACLU*, 521 U.S. 844, 854, 869 (1997) ("the Internet is not as invasive as radio or television . . . communications over the Internet do not invade an individual's home or appear on one's computer screen unbidden" and "in many cases the user will receive detailed information about a site's content before he or she need take the step to access the document").

[3] *See* https://www.gov.uk/government/publications/online-safety-act-explainer.

Safety and Media Regulation Act in 2022;[4] Italy, France and Australia have similar laws.[5] France, for example, requires parental consent for youth under 15 to access social media.[6] In the United States, multiple states have passed laws that place just some of the burden of protecting kids onto the source of the problem – social media companies.[7]

In addition to new legislative enactments, and in addition to civil suits brought by private party plaintiffs,[8] many States have brought legal action against social media companies under existing law, for the harms that social media companies are causing to youth. A coalition of 33 states spanning the political spectrum, through their respective Attorneys General, have brought claims against NetChoice member Meta alleging unfair and deceptive practices stemming from the addictive nature of Meta's products, and non-compliance with the Children's Online Privacy Protection Act (COPPA).[9] Nine additional states have brought claims against social media companies in their respective states, meaning that over 40 states are currently taking proactive measures to address the serious problems.[10] The Federal Trade Commission has also brought several actions against NetChoice member Facebook (Meta), determining that "Facebook has repeatedly violated its privacy promises."[11]

---

[4] *See, e.g.*, https://www.thejournal.ie/taking-down-harmful-content-6184208-Oct2023.

[5] *See* https://www.bbc.com/news/world-europe-68004438 and https://www.esafety.gov.au/ newsroom/whats-on/online-safety-act. While some of these international laws are aimed at content, Utah's Act is not.

[6] *See* https://www.lemonde.fr/en/france/article/2023/06/29/france-requires-parental-consent-for-under-15s-on-social-media_6039514_7.html.

[7] *See, e.g.*, Florida's H.B. 3, FLA. STAT. § 501.1736, banning minors under 14 from having social media accounts.

[8] *See, e.g.*, Ruling on Defendants' Demurrer to Master Complaint, *Social Media Cases*, Case No. JCC 5255 (Sup. Court of Cal., Oct. 13, 2023) (finding that minors' negligence claims against multiple social media companies were not barred by the First Amendment or Section 230). A copy of the Court's ruling in Social Media Cases is attached hereto as Exhibit E.

[9] *See Coalition of 33 States v. Meta, et al,* Case No. 4:23-cv-05448 (N.D. Cal., filed 10/24/2024). A copy of the Complaint in that case is attached hereto as Exhibit F.

[10] Utah's Division of Consumer Protection, for example, has brought suit against TikTok under its Consumer Sales Practices Act in state court. *See Division of Consumer Protection of the State of Utah v. TikTok, Inc.* Case No. 230907634 (3rd Judicial District).

[11] *See, e.g.*, https://www.ftc.gov/news-events/news/press-releases/2023/05/ftc-proposes-blanket-prohibition-preventing-facebook-monetizing-youth-data.

Utah, in line with these other countries and states, recently passed the Act.[12] The Act places modest, yet precise, obligations on social media companies to: (1) determine whether their account holders are under or over the age of 18, (2) remove certain addictive, nicotine-like elements for minor accounts; and (3) set data-sharing settings to maximum privacy levels for minors, which settings may be altered with the consent of parents.[13]

That's it. The Act does not ban minors from creating social media accounts, which they may do without parental consent. The Act does not ban minors from establishing direct connections with other users which they may do without parental consent. The Act does not preclude minors from sharing with or receiving from connected accounts any content they wish, which they may do without parental consent. Minors may expand the scope of their audience, to see and be seen by strangers, with parental consent. The Act makes no judgment whatsoever about the content which is shared on social media, expressing no agreement or disagreement with any of it.

The Act is thus an exercise of governmental regulatory authority that is used in a variety of other contexts where the State is concerned about minor welfare. Some products and activities present risks unique to minors due to their immaturity, lack of self-control, and lack of experience. The State may require age assurance for in-person or online tobacco purchases,[14] alcohol purchases,[15] gun purchases (which implicates constitutional rights),[16] and purchases at brick-and-mortar adult bookstores as well as online.[17] States that have casinos restrict minors from entry into gaming areas.[18] The State may also require age assurance and/or parental consent in other contexts where the immature decision-making abilities of

[12] *See* UTAH CODE § 13-71-101 *et seq.*
[13] *Id.* at §§ 201, 202(5), & 202(1), respectively.
[14] *See, e.g.*, UTAH CODE § 76-10-114. The federal government also restricts the marketing and sale of tobacco to youth. *See* U.S. Tobacco Control Act, 21 U.S.C. § 387a-1. The Sixth Circuit largely upheld the Tobacco Control Act in *Discount Tobacco City & Lottery, Inc., v. U.S.*, 674 F.3d 509 (6th Cir. 2012).
[15] *See, e.g.*, UTAH CODE § 32-4-403.
[16] *See, e.g.*, UTAH CODE § 76-10-5.
[17] *See, e.g.*, UTAH CODE § 76-10-1206.
[18] *See, e.g.*, NEV. RES. STAT. § 463.350.

7

minors may have long-term consequences, such as in tanning salons,[19] tattoo parlors (arguably implicating

First Amendment rights),[20] and medical procedure decisions.[21]

The fact is that minors are different. Social media companies, however, wish to treat users as young

as 13 (and younger)[22] as if they were miniature adults, capable of weighing the risks and benefits of sharing

data online and self-regulating their use of a highly addictive product.

Social media companies are financially incentivized to get and keep children addicted to their

products. NetChoice's members are, above all else, data mining companies. They monetize the information

provided by users, and not just that given when registering an account. Social media companies keep track

of all sorts of information about their users, including what they are interested in, where they are and where

they are going, who they associate with, and much more. They glean this information from the user's

activity on a social media platform, and then sell it to advertisers. In order to sell it at the highest premium,

the social media companies need eyeballs on screens as much as possible.[23] And, like cigarette companies

figured out, it's best to get users while they are young, before they go to a competitor. But putting personal

information out into the world entails risk – risk that parents often understand far better than their children.

The Act also seeks to protect minors from the extremely harmful consequences of social media

addiction by requiring social media companies to remove the addictive elements from their platforms.

These addictive elements contribute to the "dopamine hits" that Sean Parker succinctly described which

serve to keep minors glued to screens. Social media addiction is a real problem: although it benefits

NetChoice's members by keeping young eyeballs on their products and money flowing to their pockets, it

is devastatingly harmful to the mental health of children.

---

[19] *See, e.g.*, UTAH ADMIN. CODE R392-700-5 (2023).
[20] *See, e.g.*, UTAH CODE § 76-10-2201.
[21] *See, e.g.*, UTAH CODE § 78B-3-406(6).
[22] Credible claims have been brought by the Federal Trade Commission as well as at least 33 State Attorneys General that Plaintiff member Meta is in violation of COPPA because it deliberately hung onto the personal information of children younger than 13 years of age. *See* Exhibit F.
[23] *See* Defs.' Statement of Facts, p. 15 n. 35, *infra*.

*Standard of Review*

As the Court considers NetChoice's Motion, it must apply two judicial standards of review: (1) the preliminary injunction standard of review; and (2) the appropriate constitutional standard of review for NetChoice's First Amendment, Due Process, and Preemption claims.

**A.   The Preliminary Injunction Standard of Review**

NetChoice asks this Court to take the "extraordinary" and "drastic" action of preliminarily enjoining the State from enforcing a duly enacted law that addresses a real and growing problem in a content-neutral way. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). To obtain a preliminary injunction, NetChoice has the heavy burden to establish that its right to relief is "clear and unequivocal." *See Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).

To obtain a preliminary injunction, the movant must establish all four preliminary injunction factors. *Winter,* 555 U.S. at 20; *see also RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1209 n.3 (10th Cir. 2009). "[E]specially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative." *Eccles v. Peoples Bank of Lakewood Village, Cal.*, 333 U.S. 426, 431 (1948). This is because "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *King*, 567 U.S. at 1303 (internal citation omitted).

About that clear and unequivocal standard: as this Court considers NetChoice's request, it must do what courts often do – apply constitutional principles to a new, emerging technology. The Court should look to analogous situations for guidance; the State has already pointed to a few, and will highlight several more in this brief. But the Court should also be mindful that social media coupled with portable supercomputers is something new; teenagers face a world unlike anything before. The analogies can take us only so far.

For example, NetChoice compares their push notifications to a young newsboy (picture, say, 1934) standing on a street corner shouting "Extra, Extra, read all about it!" as he sells newspapers with finite content. Pl.'s Mot. at 3. A better analogy would be a newsboy standing next to a teenage girl's bed as she is trying to fall asleep, whispering in her ear every ten seconds, "extra, extra, immerse yourself in infinite, interactive, addictive content – never put your phone down!" Not only would NetChoice need to demonstrate at trial that the Act's reasonable efforts to regulate *that* situation violates the Constitution (which it cannot do), but at this preliminary stage, NetChoice has the burden to show that the Act *unequivocally* violates the Constitution. If this were a close call (it is not), then the benefit of the doubt goes to leaving the law in place and allowing duly elected officials to act in the interest of the children they seek to protect.

### B. Constitutional Standard of Review

Although the harmful effects of social media addiction are comparable to (and perhaps much worse than) the harmful effects of other products like tobacco, the State acknowledges that social media platforms contain speech, such that there are First Amendment and Due Process concerns. With the exception of the Act's age assurance provision (for which rational basis review should apply as discussed herein), the Act, as a content-neutral and reasonable time, place, and manner restriction, is subject to intermediate scrutiny (and satisfies that standard).

The narrow tailoring required by intermediate scrutiny differs from that of strict scrutiny in that it does *not* require the State's chosen means to be the least restrictive alternative. *See Brewer v. City of Albuquerque*, 18 F.4th 1205, 1224-25 (10th Cir. 2021) ("[W]hile 'fit matters,' when it comes to content-neutral regulations of speech, such regulations need not be the least restrictive or least intrusive means of serving the government's interests. Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be *achieved less effectively* absent the regulation without burdening substantially more speech than is necessary to further the government's legitimate interests")

(cleaned up) (emphasis added). *See also Evans v. Sandy City*, 944 F.3d 847, 856-57 (10ᵗʰ Cir. 2019) ("So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative"). However, here, the State's means to address its compelling interest are drawn so narrowly, so precisely, that they also satisfy strict scrutiny, if that were the standard. And so the State advances that argument as well.

## DEFENDANTS' STATEMENT OF FACTS

### *Social Media Companies' constant access to children*

Internet connectivity arrived in two waves in the United States. First, the 1990s saw an increase in the paired technologies of personal computers and internet access via modem, both of which could be found in most homes by 2001. The second wave was the rapid increase in the paired technologies of social media and smartphones, beginning around 2007 when the first smartphone was released, and reaching a majority of homes by 2012 or 2013.[24]

Forty-three percent of 8- to 12-year-olds and ninety-five percent of 13- to 17-year-olds in the United States have a smartphone. Smartphones are portable supercomputers that allow 24-hour access to immersive, interactive content accessed through high-speed streaming. Teenagers also access the internet through other high-speed streaming devices, such as school-issued devices. By 2022, teenagers spent 8-9 hours *per day* on screens and 46% of teens reported being online *almost all of the time*. The average teenager spends five hours *per day* on social media, far more than they are spending on other activities, such as homework, sports, reading, other hobbies, or being outside. Studies demonstrate that the number of

---

[24] Twenge Dec., Exhibit B, ¶¶ 9-11. As discussed herein, many of the precedents Plaintiff relies on were set two decades ago, during this first wave. Those precedents anticipated further technological changes that would alter legal analysis. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656, 671 (2004) ("[T]he factual record does not reflect current technological reality – a serious flaw in any case involving the Internet. The technology of the Internet evolves at a rapid pace. Since [the district court entered its findings], certain facts about the Internet are known to have changed[.]").

teenagers on social media and the amount of time that teenagers spend on social media increased dramatically between 2010 and 2015. In 2009, about 50% of American high school seniors were using social media every day. In 2011, about 75% of American high school seniors were using social media every day. By 2015, 15% of American high school girls were using social media for more than 40 hours per week. For children between the ages of 13-18, 95% use social media, and more than 33% of them say they are using almost constantly.[25]

### Social media's extremely harmful effects on children

There has been a drastic increase in teen mental illness since 2010. Rates of major depressive disorders has more than doubled for both boys and girls since 2010. Major depression for boys has increased 161% and major depression for girls has increased 145% since 2010. By 2021, about 1/3 of American girls report experiencing major depression. There has been a sharp and sudden increase since about 2010 in hospital admissions for teenagers who had intentionally harmed themselves. The rate of nonfatal self-harm for 10–14-year-old boys has increased 96% since 2010. The rate of nonfatal self-harm for 10-14-year-old girls has increased an astounding 281% since 2010. Suicide rates among girls born after 1995 are higher today than any previous time period for which we have data for the UK, Canada, United Staes, Australia, and New Zealand. Suicide rates among 10- to 14- year-old girls in the U.S. have doubled since 2010. The adolescent mental health crisis is not limited to the United States; it is global.[26]

The collapse in mental health among teens occurred precisely at the time most Americans owned a smartphone and more than 70% of high school students used social media every day. Correlational studies have consistently shown a link between heavy social media use and mood disorders. Social media use among adolescents is correlated to cyberbullying-related depression, body image and eating disorders, poor sleep, online harassment, low self-esteem, and higher depressive symptoms.[27]

---

[25] *Id.* at ¶¶ 12-20.
[26] *Id.* at ¶¶ 21- 29.
[27] *Id.* at ¶¶ 30-31.

Now, research demonstrates causation, not just correlation. Studies show that the more time teens spend on social media per day beyond 1 or 2 hours, the more depressed they are. A United Kingdom study found that in 2015, girls who used social media 5 or more hours a day were three times as likely to meet clinical criteria for depression than non-users. Among boys, they were twice as likely. A Gallup study from 2023 found that 37% of adolescents who spend more than 3 hours per day on social media report poor mental health, compared with 23% who spend less than 3 hours pers day. These studies are consistent with a 2022 meta-analysis finding a strong connection between social media use and depression/anxiety. The meta-analytic study found that there is a 13% increase in depression for each additional hour spent on social media per day. A longitudinal cohort study of U.S. adolescents aged 12-15 found that adolescents who spent more than 3 hours per day on social media faced double the risk of experiencing poor mental health outcomes including symptoms of depression and anxiety. In a unique natural experiment that leveraged the staggered introduction of a social media platform across U.S. colleges, the roll-out of the platform was associated with an increase in depression (9%) and anxiety (12%) among college-aged youth. The introduction of just one social media platform may have contributed to more than 300,000 new cases of depression.[28]

Excessive and problematic social media use, such as compulsive or uncontrollable use, has been linked to sleep problems, attention problems, and feelings of exclusion among adolescents. Sleep is essential for the healthy development of adolescents. A systematic review of 55 studies on the effects of excessive social media use found a consistent relationship between social media use and poor sleep quality, reduced sleep duration, sleep difficulties, and depression among youth. Social media, more than TV or gaming, is linked to shorter sleep, more mid-sleep awakenings, and longer time to fall asleep. Poor sleep has been linked to altered neurological development in adolescent brains, depressive symptoms, and suicidal thoughts and behaviors. On a typical weekday, nearly 1-in-3 adolescents report using screen media until

---

[28] *Id.* at ¶¶ 32-36.

midnight or later. While screen media use encompasses various digital activities, social media applications are the most commonly used applications by adolescents.[29]

A longitudinal prospective study of adolescents without ADHD symptoms at the beginning of the study found that, over a 2-year follow-up, high-frequency use of digital media, with social media as one of the most common activities, was associated with a modest yet statistically significant increased odds of developing ADHD symptoms. Additionally, social media-induced fear of missing out, or "the pervasive apprehension that others might be having rewarding experiences from which one is absent," has been associated with depression, anxiety, and neuroticism.[30]

Studies have shown that people with frequent and problematic social media use can experience changes in brain structure similar to changes seen in individuals with substance use or gambling addictions.[31] Even the *social media companies themselves*, as exposed by Facebook whistleblower Frances Haugen, have internal research establishing the causal link between their product and poor mental health outcomes for youth.[32]

There are now many experimental studies showing that cutting back or giving up social media causes better mental health. Limits on the use of social media have resulted in mental health benefits for young adults and adults. A small, randomized controlled trial in college-aged youth found that limiting social media use to 30 minutes daily over three weeks led to significant improvements in depression severity. Other studies show improvement in mental health outcomes when social media is restricted. For example, researcher Hunt Alcott in an experiment paid people money to try to get off social media, and reported that a reduction in social media use increased general happiness. A random assignment experiment found that reducing social media use to one hour a day improved youths' confidence in their

---

[29] *Id.* at ¶¶ 37-41.
[30] *Id.* at ¶¶ 42-43.
[31] *Id.* at ¶ 46.
[32] *Id.* at ¶ 47.

appearance. Another experiment randomly assigned college students to engage in common activities.

Walking and studying increased positive mood, while using social media decreased positive mood.[33]

### Social media companies seek to trap adolescents

Use of social media platforms is generally free. Social media companies make money primarily by

selling advertising space.[34] Marketers covet such space because social media companies possess vast

amounts of data about their users. This enables them to target advertisements to specific audiences.[35]

Given this business model, profits from these platforms are highly dependent on the number of users, the

amount of time each user spends on the platform, and the amount of information a user provides, directly

or indirectly, to the platform about themselves.[36] Social media companies are financially incentivized to

keep eyeballs on screens.[37] Social media companies are also financially incentivized to learn as much as they

can about their users so they can sell that information to advertisers.[38] Social media companies compete

with each other for users.[39] Social media companies, like cigarette companies, are financially incentivized to

---

[33] *Id.* at ¶¶ 48-53.

[34] *See, e.g., Klein v. Facebook, Inc.*, 580 F.Supp.3d 743, 774 (N.D. Cal. 2022) ("whereas social media services make money by showing users advertisements, online entertainment services like Hulu typically collect from users a per-use monetary fee").

[35] *See, e.g., In re Twitter, Inc. Securities Litigation*, 2020 WL 13863616, at *1, n.1 (N.D. Cal. January 28, 2020) ("Twitter uses three principal metrics to measure its financial health and growth prospects: (1) monthly active users . . (2) those users daily activity (user engagement) and (3) . . . the ability of the Company to turn user activity into advertising revenue") (cleaned up); *see also Gonzales v. Google LLC*, 2 F.4th 871, 933 (9th Cir. 2021) (J. Gould, concurring in part and dissenting in part) ("As I see it, the conduct of Google, Twitter, and Facebook as related to the risks of terrorists attacks . . . is either recklessly indifferent or willfully blind, as they enjoy increased advertising revenue associated with eyeballs on videos") (vacated and remanded on grounds that plaintiffs did not sufficiently allege that operators of social media platforms "consciously and culpably" participated in terrorist attack).

[36] *Id.*

[37] *Id.*

[38] *See Monetizing Attention: How Facebook Revolutionized Social Media Advertising*, Columbia Business Law Review, 2018 Colum. Bus. Law R. 994 ("Facebook also provided advertisers with a startling amount of customizability in selecting their target demographic – today, advertisers can select up to ninety-eight personal data points such as location, age, generation, gender [etc.]").

[39] *Id.*

target adolescents as their new users because once an individual registers for a social media platform and becomes addicted to it, they are less likely to switch platforms.[40]

Adolescents do not weigh the risks and rewards of providing personal information to social media companies in the same way that adults do.[41] Like casinos that are specifically designed to keep gamblers at the slots and tables, social media sites have added design elements that foster addiction, regardless of the content that is viewed.[42] Among these design elements are infinite scroll (by which a user will never see a page break in their social media feed), autoplay features (through which the next video automatically begins playing without any user activity), and push notifications (which "ping" users regarding any number of activities happening on their social media feeds).[43] Push notifications, autoplay, and infinite scroll are designed to encourage over-indulgence and contribute to user addiction to social media, regardless of the content.[44]

According to one recent model, nearly a third (31%) of social media use may be attributable to self-control challenges magnified by habit formation.[45] In a nationally representative survey of girls aged 11–15, one-third or more say they feel "addicted" to a social media platform.[46] Nearly 3-in-4 teenagers believe that technology companies manipulate users to spend more time on their devices.[47] The average number of notifications on young people's phones from top social and communication apps amount to 192 alerts per

---

[40] *See TikTok, Inc. v. Trump*, 490 F.Supp.3d 73, 84 (D.C. 2020) ("The nature of social media is . . such that users are unlikely to return to platforms they have abandoned").
[41] *Roper*, 543 U.S. at 569.
[42] *See, e.g.,* Griffiths, M.D. (2018). Adolescent social networking: How do social media operations facilitate habitual use? *Education and Health*, 36(3), 66-69; *see also* "Major psychology group says infinite scrolling, other social media features are 'particularly risky' to youth mental health," NBC News, https://www.nbcnews.com/news/us-news/psychology-group-says-infinite-scrolling-social-media-features-are-par-rcna147876.
[43] *See* U.S. Surgeon General Advisory, "Social Media and Youth Mental Health," Exhibit D, p. 9.
[44] *Id.*
[45] *Id.*
[46] Id.
[47] *Id.* at p. 10.

day.[48] The average teen gets about 11 notifications per waking hour, or one every five minutes.[49] For older teen girls, the average interruption is once every minute.[50] Over half of teens use their phones overnight, primarily for social media (including YouTube).[51] Researchers have detected changes in brainwaves generated by smartphone push notifications.[52]

### The ineffectiveness of device filtering / parental supervision

Filtering applied in the home, on the router or on laptops, tablets, and smartphones, is generally managed by parents. Directions on how to circumvent parental controls are easily available on the internet and children are successful at circumventing parental control features. A survey from 2021 found that just 50% of US parents use any kind of controls. Those who do are often in a full-time "technological arms race over parental controls" with their children, and the children are winning. One study has found that 86% of parents support laws restricting children's access to social media.[53] A Pew Research Center found that just 16% of parents use blocking or filtering controls to restrict their teens use of his or her cell phone.[54]

### In addition to causing addiction, social media companies endanger children through data mining

Social media companies target adolescents for data mining in order to maximize profits. Whereas adults, on average, weigh the risks and rewards of providing personal information to social media companies, adolescents, who do not have fully developed brains, often do not understand or appreciate the risks involved in providing personal information to social media companies and other users. Personal data,

---

[48] Jonathan Haidt, The Anxious Generation: How the Great Rewiring of Childhood is Causing an Epidemic of Mental Illness, p. 126 (2024).

[49] *Id.*

[50] *Id.*

[51] *See* Constant Companion: A week in the life of a young person's smartphone use, (2023) *Common Sense Media.*

[52] *See* Kim *et al* (2016) An analysis of the effects of smartphone push notifications on task performance, Computational Intelligence and Neuroscience, 1-6.

[53] *See* Allen Dec., Exhibit C, ¶¶ 38-42.

[54] *See* https://www.pewresearch.org/internet/2016/01/07/parents-teens-and-digital-monitoring/pi_2016-01-07_parents-teens-digital-monitoring_0-01/ (accessed June 7, 2023).

once given to a social media company or another user, becomes everlasting as it is shared among advertisers. Social media companies can spread children's worst moments around the world instantly, never to be deleted.[55]

### The Act

To serve the State's significant and compelling interests as set forth in its detailed legislative findings, *see* Utah Code § 13-71-102, the Legislature enacted restrictions on social media accounts held by minors in the Act. First, to determine whether a social media account belongs to a minor ("Minor Account") or not, the Act requires the social media companies to "implement an age assurance system to determine whether a current or prospective Utah account holder . . . is a minor." Utah Code § 201(1). A social media company that implements and maintains an age assurance system that complies with rules made by the Division of Consumer Protection (the "Division") is not subject to an enforcement action for violation of the age assurance requirement. *Id.* at § 302(2).

For Minor Accounts, social media companies are required to: (a) set default privacy settings to prioritize maximum privacy; (b) implement and maintain reasonable security measures to protect the confidentiality, security, and integrity of personal information collected from minor accounts; (c) provide a notice that describes any information the social media company collects from the Minor Account and explains how that information is used or disclosed; and (d) delete personal information of the Minor Account upon request and remove any information made publicly available on the Minor Account upon request. *Id.* at § 202.

The Act requires social media companies to maintain the default maximum privacy settings unless it has obtained parental consent to change them and to disable the following features that prolong user engagement: autoplay functions, infinite scrolling, and push notifications. *Id.* at § 204. Further, the Act

---

[55] *See* "Your Data is Forever," Kaveh Waddell, The Atlantic, June 2, 2016.
https://www.theatlantic.com/technology/archive/2016/06/your-data-is-forever/485219/.

creates a presumption that a social media company will keep a Minor Account's personal information confidential, which presumption may be overcome if the social media company obtains parental consent to change privacy settings. *Id.* at § 204(2) & (3).

The Act gives enforcement power to the Division and directs the Division to promulgate rules establishing processes for age verification and parental consent, in addition to its general rulemaking authority. *Id.* at § 302(1); *see also* Declaration of Katherine Hass ("Hass Dec."), Exhibit G, ¶¶ 3-4. By statute, rules regarding the Act may not be promulgated until October 1, 2024, when the Act goes into effect. Hass Dec., Exhibit G, ¶ 5. The Division is in the process of drafting rules related to the Act ("Proposed Rule"). *Id.* at ¶ 6. The Proposed Rule will outline methodologies for age assurance, approved by the Division, that a social media company may use to avail itself of the safe harbor provided for in the Act. *Id.* at ¶ 7. The Proposed Rule will implement process and means by which a social media company may obtain verifiable parental consent that will be similar to those utilized by the Federal Trade Commission under the Children's Online Privacy Protection Act ("COPPA"). *Id.* at ¶ 10. The Proposed Rule will allow a social media company to use third party vendors to meet the Act's age assurance and the verifiable parental consent requirements, provided that the third-party vendor adheres to the requirements of the Act and the Proposed Rule. *Id.* at ¶ 11.

### Age assurance Technology

"Age Assurance" in the context of the Act is the process by which the provider of internet content ("Content Provider") verifies, estimates or infers that the consumer is age 18 or older. *See* Allen Dec., Exhibit C, ¶ 10. Age Assurance may take the form of: (a) "age estimation" – an age assurance method based on using inherent features or behaviors to estimate the age or age range of an individual; (b) "age inference," – an age assurance method based on confirmed information which indirectly implies that an individual is over or under a certain age or within an age range; or (c) "age verification," – an age assurance

method based on calculating the difference computation between the current date and the confirmed date of birth of an individual. *Id.* at ¶ 11.

Age Verification and Age Inference may be achieved by reference to drivers' licenses, passports, electoral rolls, credit reports, cell phone network records, banking, and credit card records. Users may also choose to create a digital identity, and selectively release just their age attributes. Age Estimation, on the other hand, can be achieved by analyzing facial images, voiceprints or game play. The most advanced of these, facial estimation, is accurate to within +/-1 to 1.5 years mean absolute error. The value of Age Estimation for both Content Providers and consumers is that it does not require consumers to submit any personal information other than a photograph or voiceprint, which is then instantly discarded. Facial age estimation is distinct from facial recognition. Facial age estimation detects and assesses information to give an age estimation; it does not seek to identify who the person in the image or recording is. *Id.* at ¶¶ 12-17.

Although social media companies may perform Age Assurance themselves, they may also contract with third-party companies ("Third-Party Services") to perform the service for a fee. When using a Third-Party Service, a Content Provider directs the consumer to provide information directly to the Third-Party Servicer who performs the age assurance and then informs the Content Provider only of the result of the check – "pass" or "fail." It does not pass on any other information. The Third-Party Servicer does not retain a consumer's personal information other than the date of birth, which can be used to respond to subsequent inquiries about that user's age. The assurance process need only be performed once per user and the verification results for any individual user may be shared with other websites, thereby minimizing the need for multiple age verification checks of the same individual. Age assurance may be performed online from home or anywhere the user has access to the internet and can usually be completed in less than

a minute. *Id.* at ¶¶ 18-22. Modern online age verification systems are inexpensive, costing platforms

between 0 and 12 cents per one-time verification that can be used across platforms.[56]

## ARGUMENT

**I.    Plaintiff cannot meet its burden to demonstrate a substantial likelihood of success on the merits.**

**A.    The Act does not violate the First Amendment.**

**1.    *The Act is a content-neutral, reasonable time, place, and manner restriction.***

**a.    *The Act's definition of social media company is content-, speaker-, and viewpoint-neutral.***

The Act defines Social Media Company as an entity that owns or operates a social media service,

which in turn is defined by reference to five characteristics, all of which must be present to meet the

definition: (i) displays content primarily generated by account holders; (ii) permits an individual to register as

an account holder and create a profile visible to others; (iii) connects account holders to allow users to

interact socially; (iv) makes available to each account holder a list or lists of other account holders; and (v)

allows account holders to post content viewable by others. Utah Code §§ 13-71-101(13) & (14).[57]

NetChoice alleges that the entire Act violates the First Amendment because the definition of the

entities subject to its enforcement, social media companies, is (on NetChoice's theory) simultaneously

content-based, speaker-based, and viewpoint-based. Pl.'s Mot. at 16-18. NetChoice would thus have this

Court apply strict scrutiny to the definition of social media companies and strike the entire Act. *Id.* at 18-21.

NetChoice's assertions are unfounded; NetChoice does not, and cannot, point to any message with

which the State has expressed disagreement through enactment of the Act, as is required by the hallmark

test for neutrality. *American Target Advertising v. Giani*, 199 F.3d 1241, 1247 (10th Cir. 2000), (quoting *Ward v.

Rock Against Racism*, 491 U.S. 781, 791 (1989) ("The principal inquiry in determining content neutrality . . . is

---

[56] *Id.* at ¶¶ 23-25.
[57] Incidentally, Utah's definition of social media company is virtually identical to that of California's.
*See* Cal. Bus. & Prof. Code § 22675 (d) & (e).

whether the government has adopted a regulation of speech because of disagreement with the message it conveys")). The Act does not target subject matter at all. Like the sign ordinance upheld in *Reagan*, 596 U.S. at 69, "[it] is agnostic as to content."

    i.  <u>The Act's definition of Social Media Company is content-neutral.</u>

Courts have treated "content" as synonymous with topics or subject matter, such as "educational communications," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011), "ideological" or "political," messages, *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015), or "sexually oriented" depictions, *U.S. v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 806 (2000). Content-neutral regulations are those that are justified without reference to the content of the regulated speech. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986).

The Act's coverage definition describes structure, not subject matter – registering accounts, connecting accounts, displaying user-generated content, whatever that content may be. Thus, the Act may be enforced without reference to any particular content – that is, topic or subject matter. *See Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 652 (1994) ("the must-carry provisions are not designed to favor or disadvantage speech of any particular *content*. Rather, they are [based on] what Congress determined to be unfair competition by . . . *systems*") (emphasis added). The decision in *Turner* (directing the district court to apply intermediate scrutiny because content-based considerations were not involved) rested in large part on the "existing structure" of the Nation's broadcast television medium. *See id.* ("Appellants' ability to hypothesize a content-based purpose for these provisions rests on little more than speculation and does not cast down upon the content-neutral character of the [the law])." Here, minor account holders and the other users they connect with may discuss any topic they wish. As the court said in the *Social Media Cases*, "the allegations can be read to state that [the minors'] harms were caused by their addiction to [social media] *platforms themselves*, not simply to any particular content visible on those platforms." *See* Social Media Case, Exhibit E, p. 69 (emphasis added).

NetChoice attempts to hang its content-based hat on the portion of the Act's definition of social media as a service that allows account holders to allow users to "interact socially." On NetChoice's theory, the Act targets online "social interaction," but not other forms of online interaction, such as "shopping, news, [or] business," that also meet the other four criteria of the definition. Pl.'s Mot. at 17. Such alleged preference, NetChoice says, is a content-based regulation.

NetChoice misreads the Act as wells as misunderstands the common, everyday usage of the word "social." To determine whether a company is subject to its operative provisions, the Act points to a company's configuration, including user-to-user interaction, not its content. To be sure, one of the structural elements that would render a company subject to the Act is whether it allows users to interact socially with each other. But "social" interaction merely describes human beings interacting with each other as part of a "society." *See* Merriam-Webster.com, *social* meaning 3, "of or relating to human *society*, the interaction of the individual and the group, or the welfare of human beings as members of *society*," available at https://www.merriam-webster.com/dictionary/social (emphasis added). The basis for social interaction could be a number of different functions or purposes – selling a bicycle or discussing the weather; the Act does not distinguish among those myriad purposes. What the Act does, however, is look at whether the company allows users to interact *with each other* – that is, socially. It is that user-to-user online interaction, regardless of content, function, or purpose, that researchers have found to cause adverse mental health outcomes in youth if taken to excess. And it is that social interaction element that subjects minors' personal information to global exposure. The question, then, is whether a website is structurally designed, regardless of content or purpose or function, to allow users to interact with each other (in addition to meeting the other requirements of § 13-71-101(14)).

NetChoice points to *Reed* for the proposition that even facially content-neutral laws will receive strict scrutiny if they "cannot be justified without reference to the regulated speech." Pl.'s Mot. at 16. But the Supreme Court, in *Reagan*, forcefully rejected the idea that "a regulation cannot be content neutral if it

requires reading" the regulated medium. *Reagan*, 596 U.S. at 69. The Court found that to be "too extreme an interpretation" of *Reed*. *Id*. at 69-70. *Reagan* is a case in which the Supreme Court applied intermediate scrutiny and upheld the City of Austin's regulation of billboards. *Reagan* is more applicable to this case than *Reed*. Here's why.

The *Reed* Court emphasized that even if a regulation is viewpoint-neutral, it might nevertheless still be content-based, and then struck down a regulation that distinguished among different topics or subject matter – ideological vs. political vs. directional topics. The regulation at issue in *Reagan*, however, did "not single out any topic or subject matter for differential treatment." *Id*. at 71. The Court explained that "the First Amendment allows for regulations of solicitation – that is, speech requesting or seeking to obtain something" and "[t]o identify whether speech entails solicitation, one must read or hear it first." *Id*. at 72. "Even so," the Court concluded, "restrictions on solicitation are not content-based and do not inherently present the potential for becoming a means of suppressing a particular point of view so long as they do not discriminate based on topic, subject matter, or viewpoint." *Id*. (citing *Heffron v. International Soc. For Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981). The Court rejected the argument that having to merely read or hear the content would render the regulation "content-based on its face and thus subject to strict scrutiny." *Id*. at 74. That "argument stretches *Reed*'s 'function or purpose' language too far." *Id*. NetChoice advances that rejected argument here.[58]

*Reagan* concerned solicitations. NetChoice has acknowledged that its push notifications are the digital equivalents of "extra, extra" solicitations. *See* Pl.'s Mot. at 3. Nevertheless, whether the addictive features of social media services are considered solicitations, loudspeakers, or something else, they are content-neutral, and that is the relevance of *Reagan*.

---

[58] *See* Pl.'s Mot. at 16-17. NetChoice's citation to *Consol. Edison Co. v. Public Service Comm'n*, 447 U.S. 530 (1980) is likewise inapposite. The statute there prohibited utilities from inserting pamphlets with their bills that discussed "political matters, including the desirability of the future development nuclear power." Thus, the challenged law targeted a particular message. Here, the Act does no such thing.

ii. The Act's definition of Social Media Company is speaker-neutral.

NetChoice next argues that the law is speaker-based and therefore subject to strict scrutiny. Pl.'s Mot. at 17-18. Plaintiff is wrong on both counts, and the cases NetChoice cites generally support the State's position, not NetChoice's.[59] At the outset, it is important to note that strict scrutiny is only applied to speaker-based laws when they operate as "a means to control content" or "when the legislature's speaker preference reflects a content preference." *Reed*, 576 U.S. at 157, 170. The risk is that the State will burden speakers with which it disagrees, while leaving "unburdened those speakers whose messages are in accord with its own view." *National Inst. of Family and Life Advocates v. Becerra*, 585 U.S. 755, 778 (2018). None of those concerns are present here.

NetChoice's allegation that the Act is speaker-based is two-fold. First, NetChoice complains that the Act applies to online platforms for which content is primarily produced by users, and not platforms for which content is generated by the platform itself, even where those platforms have begun to mimic the push notifications, infinite scroll, and autoplay that social media companies pioneered. Pl.'s Mot. at 17-18. But this has nothing to do with the State disagreeing with any particular message or discriminating on the basis of the identity of the speaker, and everything to do with the fact, well-established now, that teenagers are addicted to platforms where interactive, immersive, social interaction is the whole point. That's what social media platforms have that Netflix doesn't. Current research demonstrates that social media platforms present problems others don't. Maybe that will change. But the Act's definition has nothing to do with the identity of the speaker; a social media company can engage in speech that is not regulated by the Act. And a platform like Netflix could (and would) become subject to the Act if and when it creates a platform that incorporates the elements of a covered social media platform. The Act's definition of social media shows

---

[59] The first case Plaintiff cites to in support of this proposition is *Iancu v. Brunetti*, 588 U.S. 388 (2019), but it is unclear why. *Iancu* is a trademark case about viewpoint discrimination, not speaker discrimination, and the Court did not clearly indicate which form of heightened scrutiny it applied. Indeed, the Court seemed ultimately to land on the overbreadth doctrine, rather than tiers of scrutiny. *Id.* at 399 ("But in any event, the 'immoral or scandalous' bar is substantially overbroad").

that the State is appropriately tailoring its regulation to its interest, going no further than is (currently) necessary.

NetChoice points to *Turner* for the proposition that laws that single out the press for special treatment are always subject to at least some degree of heightened First Amendment scrutiny. Pl.'s Mot. at 17. But *Turner* does not support NetChoice's position that strict scrutiny applies. The Court in *Turner* reviewed a law that required cable television carriers to provide local broadcast stations. The Court found the provisions of the law to be content-neutral with incidental burdens on speech. The Court thus instructed the district court to apply intermediate, not strict, scrutiny. *Turner*, 512 U.S. at 661-62; *see also id.* at 657 ("To the extent that appellants' argument rests on the view that all regulations distinguishing between speakers warrant strict scrutiny, it is mistaken"), *id.* at 658 ("Our holding in *Buckley* does not support appellants' broad assertion that all speaker-partial laws are presumed invalid"), and *id.* at 660 ("It would be error to conclude . . . that the First Amendment mandates strict scrutiny for any speech regulation that applies to one medium (or a subset thereof) but not others").

*Turner* is a good case for this Court to review and apply. The *Turner* Court found the law at issue to be content- and speaker-neutral because it distinguished between speakers in the television programming market based only upon the manner in which programmers transmit their messages to viewers, not the messages they carry. *See id.* at 627 ("Broadcast and cable television are distinguished by the different technologies through which they reach viewers"). The differential treatment was justified by the special characteristics of the cable medium. Here, too, the restrictions on the social media companies are justified by the special structural characteristics of social media – interactive, immersive content that lends itself to a whole host of adverse outcomes, such as negative self-comparisons, that don't occur from watching Netflix.

NetChoice's second speaker-based assertion is made in a one-sentence, unsupported argument. NetChoice complains that the Act places "more onerous burdens on minors' speech relative to adults'

speech" and thereby is speaker-based. Pl.'s Mot. at p. 18. But the "state's authority over children's activities is broader than over like actions of adults." *Prince v. Commonwealth of Massachusetts*, 321 U.S. 158, 168 (1944). Many constitutional laws place greater restrictions on minors than on adults, such as laws restricting or regulating children's access to pornography, guns, tobacco, alcohol, gambling, tanning beds, tattoo parlors, and medical procedures. Children are different. "The First Amendment rights of minors are not co-extensive with those of adults. A state may permissibly determine that, at least in some precisely delineated areas, a child – like someone in a captive audience – is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." *Erznoznik*, 422 U.S. at 214 n.11 (internal citations omitted).

    iii.   The Act's definition of Social Media Company is viewpoint neutral.

     NetChoice likewise does not develop its argument that the Act is viewpoint-based, other than to say the Act favors *content* generated by the websites themselves, thus supposedly giving preferential treatment to the *views* expressed by those platforms. Pl.'s Mot. at 18. This is just a re-packaging of NetChoice's content-based argument, and should be treated as such and similarly rejected. NetChoice has not answered the "principle inquiry" by identifying any viewpoints with which the State has expressed disagreement, as is essential when claiming a law discriminates against particular views. *See American Target Advertising*, 199 F.3d at 1247.

       **b.  The Act is not underinclusive.**

     "It is always somewhat counterintuitive to argue that a law violates the First Amendment by abridging *too little* speech." *Williams-Yulee v. Florida Bar*, 575 U.S. 422, 448 (2015) (emphasis in original). This is because the "First Amendment imposes no freestanding underinclusiveness limitation. . . A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." *Id.* at 449. The Supreme Court has "accordingly upheld laws – even under strict scrutiny – that

conceivably could have restricted even greater amounts of speech in service of their state interest." *Id.* (citing *Burson v. Freeman*, 504 U.S. 191, 207 (1992)).

Nevertheless, underinclusivity may be a "red flag" if it suggests that the government is targeting a particular speaker or viewpoint, *see Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) or if the exemption of other conduct means the government is not actually advancing its interests or doing so in the least restrictive way. *Williams-Yulee*, 575 U.S. at 448-49. Neither concern is present in this case.

NetChoice complains that the Act regulates means of disseminating speech (push notifications, autoplay, infinite scroll) that are common to the internet, but only regulates social media companies and not, say, Disney+ and other streaming services. Pl.'s Mot. at 22.[60] But it is addiction to the social media sites, with content generated by users *and* which facilitate social interaction in a way that the streaming services don't, that researchers have found cause mental health problems. It is the combination of the addictive design features with social media's user-generated and user-to-user interface that entraps youth in a world they cannot escape from, which is not (presently) true of other entertainment services. *See* Twenge Dec., Exhibit B, ¶ 39 ("Social media, more than TV or gaming, is linked to shorter sleep, more mid-sleep awakenings, and longer time to fall asleep").[61] The State's targeting of social media is evidence that it is appropriately tailoring its law, not being underinclusive.

### c. The Act is not overinclusive.

NetChoice complains that the Act is overinclusive because "[b]oth adults and minors will be subjected to the age-assurance process[.]"[62] Of course they will. The very nature of age assurance is to

---

[60] Pl.'s Mot. at 22. On the one hand, NetChoice says the Act is not sufficiently narrow, and on the other, it argues the Act is underinclusive. The reality is that the Act is drawn with precision to address a concerning problem unique to social media platforms.

[61] *See also* Haidt, *The Anxious Generation*, p. 308 n. 24 ("social media's unique elements such as social validation, frequent reinforcement for behaviors, public displays of followers and likes, and profiles of relatable peers slightly older than the user make it an even more potent force [than streaming platforms like Netflix and Hulu]").

[62] Pl.'s Mot. at 22.

determine whether someone is old enough to participate in a particular activity – whether that be buying alcohol, tobacco, pornography, or guns. It would not make sense, as Plaintiff seems to suggest, for the State to require age assurance for minors but not adults. That would defeat the whole purpose. In *Ginsberg v. New York*, 390 U.S. 629 (1968), the Supreme Court upheld a law prohibiting the sale to minors of materials harmful to minors. *Ginsberg* concerned a law about speech that had lesser value with respect to minors. But the point is that the speech at issue was *protected* for adults and the only way to comply with the law was for vendors to assure the ages of their customers/users. *Ginsberg* dictated the Fifth Circuit's recent decision in *Paxton*, 95 F.4th 263, staying a preliminary injunction of an age verification law.

NetChoice also complains that certain social media sites are not currently able to turn off the restricted features for minors without also doing it for adults. Pl.'s Mot at 23. It is not clear if any of NetChoice's members are in this situation. Regardless, this is as if a car manufacturer, in the face of seatbelt requirements, complained that it doesn't currently manufacture cars with seatbelts and therefore cannot be required to do it. Or if a cigarette manufacturer, in the face of the mandated surgeon general's warning, argued that the cost of compliance was too high. That there may be a cost of compliance associated with a law is no argument, in and of itself, against a law's constitutionality. *See In re Motor Fuel Temperature Sales Practice Litigation*, 641 F. 3d 470, 490 (10th Cir. 2011). The technology exists to assure users are under or over age 18. It is up to the social media companies to implement that technology to comply with the Act. If they choose instead to turn off the addictive elements for all users, then that is a private choice on how to comply with the law, not a government mandate.

Finally, Plaintiff complains that the Act is overinclusive because minors will not be able to interact with online strangers without parental consent. Pl.'s Mot at 23. NetChoice thus argues that children have a constitutional right to interact with strangers online, and that online strangers, whoever they may be, have a

constitutional right to interact with children on social media absent parental oversight.[63] NetChoice provides no support for this rather astounding overinclusive argument. Because there is none. From time immemorial, parents have restricted their children's interaction with strangers and, importantly, governments have restricted strangers' access to children's spaces, such as schools, without running afoul of the Constitution.

> **b.** **The prohibitions on addictive elements are content neutral and are reasonable time, place, and manner restrictions.**

NetChoice argues the Act's restrictions regarding push notifications, infinite scroll, and autoplay violate the First Amendment. Pl.'s Mot. at 30-32. On NetChoice's theory, these provisions intrude upon the social media companies' right to choose whether and how to disseminate speech as well as minors' right to engage in and consume speech. NetChoice is wrong on both counts. First, there is no unfettered right for a speaker or publisher to disseminate speech in any way they choose. Just as a speaker may be prohibited from driving down residential streets at 3:00 am blasting their message through loudspeakers (no matter what that message is), the State may prohibit social media companies from blasting messages (no matter what they are) to teenagers at any and all times of the day or night, as well as keeping them locked onto their already addictive product through nicotine-like additives. Second, these restrictions do not affect either the "size [or] content of private publications" as NetChoice argues. *Id.* at 31. The restrictions do not address content at all. And with respect to size, NetChoice's members are still free to place as much content as they wish; the prohibition on seamless pagination and autoplay for teenagers only serves to separate content, not limit its size, giving teenagers a break from constant bombardment. In *Grayned*, the Court said, "If overamplified loudspeakers assault the citizenry, government may turn them down." 408 U.S. at 116. Push notifications, infinite scroll, and autoplay are today's version of overamplified loudspeakers assaulting children.

---

[63] There is evidence that the virtual world, especially social media, is far riskier to children than the real world. *See* Haidt, *The Anxious Generation*, pp. 67-68, 166-67.

NetChoice cites to *Sorrell* for the proposition that a push notification "contain[s] everything from protected facts to opinion about whether users will find content useful, all of which are protected speech." Pl.'s Mot. at 30. It is unclear what Plaintiff means by saying that push notifications "contain" facts and opinions. A push notification is a loudspeaker – it does not add content at all. Under the Act, push notifications may still be used to shout at adults. But, like in *Grayned*, the government may turn them down in the interest of protecting children. Regardless, *Sorrell* is not a case about push notifications. It is about a statute that prohibited the sale, disclosure, and use of pharmacy records. *Sorrell*, 564 U.S. at 557. It was, in other words, an outright ban on the sharing of content. No such ban is found within the Act at issue here.

NetChoice also cites to *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995) and *Miami Heral Pub. Co. v. Tornillo*, 418 U.S. 241 (1974) for the proposition that decisions about the presentation of an edited compilation of speech generated by other persons falls squarely within the core of First Amendment security. Pl.'s Mot. at 31. According to NetChoice, the infinite scroll and autoplay features of their websites constitute the exercise of editorial control and judgment upon which the State can never intrude because those features supposedly go to the "size and content" of private publications. *Id.*

*Hurley* is a case in which the Supreme Court held that a Massachusetts public accommodation law could not be interpreted to require a private organization to *alter* its message when hosting a parade. *Hurley*, 515 U.S. at 572-73 ("the state courts' application of the statute produced an order essentially requiring petitioners to alter the expressive content of their parade. . . This use of the State's power violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message"). The Act here does not alter the content or size of any message. Infinite scroll and autoplay are not features that create content. They are features that cause the content to run together into a sticky morass, making it difficult for children to escape.

*Tornillo* is a case in which the Supreme Court held that a Florida statute requiring newspapers which assail the character of political candidates afford free space to those candidates to reply violated the First

Amendment. *Tornillo*, 418 U.S. at 243. *Tornillo* is far afield from the case at hand. The Act here does no such thing – it does not dictate to social media companies what content must be allowed or not allowed or how much. It does not restrict minors from sharing or receiving content. All it does is require social media companies to turn off (for minors only) addictive design elements.

Whereas the cases cited by NetChoice are inapposite, *Grayned* and *Ward* are applicable. As previously discussed, *Grayned* upheld a statute preventing disturbing noises adjacent to a school building. While the "government has no power to restrict . . . activity because of its message . . . reasonable time, place, and manner regulations may be necessary to further significant governmental interests, and are permitted." *Grayned*, 408 U.S. at 115. And *Ward* upheld a municipal noise regulation designed to ensure that musical performances at a public band shell did not disturb surrounding residents. *Ward* is helpful in ascertaining how to apply intermediate scrutiny, discussed below.

## 2. ***The Act's prohibitions on addictive elements satisfy intermediate scrutiny.***

One thing becomes clear from the foregoing cases: strict scrutiny does not apply to content neutral regulations. Intermediate scrutiny is no rubber stamp; but it is no Olympic high bar either. Because the Act's definition of "social media company" is content neutral, and because the Act's prohibitions on addictive elements are reasonable manner restrictions that allow ample channels of communication, the Court should apply intermediate scrutiny and find that the Act satisfies the test.

Does the State have significant and important governmental interests at stake? Absolutely. The interests are far more than important; they are compelling for all the reasons set forth in Defendants' Statement of Facts. With respect to the tailoring prong, the *Ward* Court said, "the requirement of narrow tailoring is satisfied so long as the … regulation promotes a substantial interest that would be achieved less effectively absent the regulation." *Id.* at 798-99. Here, the Act is tailored to affect only the design elements that are contributing to addiction, not the content of the social media platforms.

The Act focuses on two major problems – adolescent addiction to social media and the privacy of children's personal information – and addresses them in a modest and targeted way. Those means are to remove addictive elements from the product's causing the problem (social media companies), but only as it pertains to susceptible youth, and to allow youth to share their personal information with the wider world (unconnected accounts) only under the guiding hand of a parent who has their interests at heart, rather than a behemoth social media data mining company, who doesn't. Further, the State's interests would be achieved less effectively, if at all, absent the regulation. Parental control of filters that children can work around, for example, is just not solving the problem.

The Act will satisfy intermediate scrutiny if it leaves "open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791. As with the regulation in *Ward*, the Act here does just that. Users, including minors, may still connect with each other and share any message they wish. They may access all the same content, even in the absence of autoplay or infinite scrolling features. And the Act does not preclude social media from communicating with minor users through means less intrusive and addictive than push notifications, such as notifications sent when the social media platform is already open on the user's device. *See* Utah Code § 13-71-101(11) ("'Push notification' means an automatic electronic message displayed on an account holder's device, when the user interface for the social media service *is not actively open or visible on the device*[.]") (emphasis added). And social media companies may still, of course, use push notifications, infinite scroll, and autoplay on adults' accounts.

The Act's methods of achieving the government's interests are just as narrow (and even more so) than the methods the Supreme Court has approved in the following speech related cases applying intermediate scrutiny: *United States v. O'Brien*, 391 U.S. 367 (1968) (upholding a federal law criminalizing destruction of a draft card); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984) (upholding federal camping regulation even where camping in public park was meant to illustrate the plight of the homeless); *Kovacs v. Cooper*, 336 U.S. 77 (1949) (upholding a ban on loudspeaker systems on city streets);

*Grayned*, 408 U.S. 104 (upholding a noise ordinance that prevented disturbing noises adjacent to a school

building when classes are in session; *Heffron*, 452 U.S. 640 (upholding a Minnesota State Fair regulation

requiring anyone wishing to promote anything to do so in a booth); and *Ward*, 491 U.S. 781 (upholding a

city's regulation requiring use of city-provided sound systems and technicians to control the volume of

performances in Central Park).

### 3.   *The Act's prohibitions on addictive elements satisfy any level of judicial review.*

The State's interests are so compelling, and its methods of tailoring so narrow, that the Act would

also satisfy strict scrutiny, if that were the standard of review. *See Sable Communications of California, Inc. v.

F.C.C.*, 492 U.S. 115, 126 (1989) (a regulation that is not a "total ban" and deals with a "uniquely pervasive"

problem that can "intrude on the privacy of the home" is more likely to withstand strict scrutiny). The

difference between tailoring under intermediate scrutiny and tailoring under strict scrutiny is that, under

strict scrutiny, the State carries the burden to show that its means of tailoring are the "least restrictive" way

of achieving a compelling government interest. *See, e.g., McCullen v. Coakley*, 573 U.S. 464, 478 (2014).

Unlike the laws at issue in *NetChoice, LLC v. Griffin*, -- F. Supp. --, 2023 WL 5660155 (W.D. Ark.,

August 31, 2024) and *NetChoice LLC v. Yost*,  -- F. Supp. --, 2024 WL 555904 (S.D. Ohio, Feb. 12. 2024),

the Act allows minors to create social media accounts without parental consent, as well as establish

connections, and share and receive content with those friends absent parental consent. Compare *Yost* at

*12 ("Foreclosing minors under sixteen from accessing all content on websites . . . absent affirmative

parental consent, is a breathtakingly blunt instrument for reducing social media's harm to children") and

*Griffin* at * 17 ("Act 689 bars minors from opening accounts on a variety of social media platforms").

And, unlike the law at issue in *NetChoice LLC v. Bonta*, -- F. Supp. --, 2023 WL 6135551 (N.D. Cal.,

Sept. 18, 2023), the Act does not require social media companies to create "Data Protection Impact

Assessments" and plans to mitigate or eliminate risks identified in such assessment. The Act also allows

default data restrictions to be altered by minor users with consent of parents, unlike the law at issue in

*Bonta*. This law thus places no burden on minors *access* to content, but protects them from constant bombardment of addictive design elements and mandates default security settings that protect minors that can be altered.

For narrow tailoring under strict scrutiny, the Court is to compare *effective* alternatives with each other, and not compare an effective method with an ineffective alternative. *See, e.g., Ashcroft*, 542 U.S. 656, 666 (2004) ("[T]he court should ask whether the challenged regulation is the least restrictive means among available, *effective* alternatives") (emphasis added). There is a lot of technological water under the bridge since *Ashcroft* was decided 20 years ago. The smartphone has been invented, high speed streaming has proliferated, and social media became accessible to children on a constant basis. Given these technological realities that did not previously exist, even the most conscientious of parents is fighting a losing battle against social media companies for the attention of their own children. Device filters and parental supervision may be helpful, but they are not fully effective at preventing children from becoming addicted to social media. *See* Allen Dec., Exhibit C, ¶¶ 38-42. Parents need all the tools in the tool belt to combat the problem. The Act gives them another, more effective tool. On the upside, technology has also advanced such that age assurance is inexpensive, effective, and respectful of privacy. *Id.* at ¶¶ 7-8, 14-22.

NetChoice points to other measures the State might take to address the problem its members have created and that NetChoice claims would be less restrictive than what the Act entails, such as giving "parents the information needed to engage in active supervision" or "act[ing] to encourage the use of filters . . . by parents to protect minors." Pl.'s Mot. at 21.[64] These methods have been tried and have been found wanting. Allen Dec., Exhibit C, ¶¶ 38-42. Though plausibly less restrictive, device filters have proven

---

[64] NetChoice points to parents as the *solution* when it comes to protecting kids from the addictive nature of social media as well as protecting them from harmful content, but then NetChoice turns around and says parents are the *problem* when it comes to minors' rights to interact with strangers online. NetChoice says the State *cannot require* parents to be involved when it comes to deciding whether children can interact online with strangers but that the Constitution *requires* parents to be the only line of defense for the addictive nature of social media. Which is it?

ineffective at preventing minor addiction to social media. The Court should not judicially force the State to adopt ineffective means to help youth with social media addiction.

### 4. *The Act's requirement of Age Assurance does not violate the First Amendment.*

"It is well-settled that a State . . . can adopt more stringent controls on communicative materials available to youths than on those available to adults." *Erznoznik*, 422 U.S. at 212. The Supreme Court has recognized that there is a "compelling interest in protecting the physical and well-being of minors." *Sable Communications*, 492 at 126. There are a number of contexts, discussed below, in which governments require age assurance without running afoul of the Constitution, including settings in which fundamental constitutional rights may be in play, such as First Amendment free speech rights and Second Amendment rights. Courts typically apply rational basis review or intermediate scrutiny for age assurance laws involving constitutional rights.

Notably, the Fifth Circuit Court of Appeals recently applied rational basis review to a Texas law requiring pornographic websites to assure that their visitors were over the age of 18. *See Paxton*, 95 F. 4th 263. The Fifth Circuit reversed a district court's decision to preliminarily enjoin the law, finding that the pornography websites were not likely to prevail on the merits. *Id.* That decision is notable for two reasons.

First, the law at issue in *Paxton* is explicitly content based, unlike the Act at issue in this case. Even with a content-based law, rational basis review is appropriate for age-assurance requirements. A content-neutral law aimed at protecting children should be no different. Perhaps NetChoice may argue that *Paxton* involved speech that was unprotected as it pertains to children (pornography) and the Fifth Circuit used rational basis because children do not have a constitutional right to access unprotected speech. But *Paxton* considered the burdens the law would place on *adults* to access speech that *is* protected as to adults. *See Paxton*, 95 F.4th at 283 ("we address here only the application of [the law] to speech deemed . . . not obscene for adults[.]" Further, "the inclusion of some – or even much – content that is not obscene for minors does not end-run *Ginsberg*[.]" *Id.* at 277. Here, the aspect of social media services that is harmful to minors is

36

not content-based as it is in *Paxton*, but it is harmful to youth nonetheless. Rational basis review is appropriate in this context as well.

Second, the United States Supreme Court refused to reverse the Fifth Circuit when given the opportunity to do so in an emergency setting. *See Free Speech Coalition v. Paxton*, -- S. Ct. --, 2024 WL 1864355 (April 30, 2024). Although the Supreme Court did not issue an opinion explaining why it denied the petition for a stay of the Fifth Circuit, it chose *not* to upset a decision leaving an age assurance law in place, at least preliminarily, that the petitioners argued violated their fundamental First Amendment rights and caused them irreparable harm.

State legislatures and Congress recognize that children are different. From the founding, the people acting through their representatives have determined that some activities that may be appropriate for adults present dangers to children, based upon their immaturity, lack of self-control, and lack of experience. The following are contexts in which governments completely prohibit minor participation, or place regulations on their participation, and do so by placing a burden on vendors to assure the ages of their customers or users: purchasing pornography (upheld using rational basis review against First Amendment challenge in *Ginberg* and *Paxton*); possessing firearms (upheld against Second Amendment challenge in *U.S. v. Rene E*, 583 F. 3d 8 (1st Cir. 2009); *see also New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 73 (2022) ("Our decision . . . does not expand the categories of people who may lawfully possess a gun, and federal law generally forbids the possession of a handgun by a person who is under the age of 18") (J. Alito, concurring); tattoo parlors; tanning salons; and gambling.

      a.    **The Act's requirement of age assurance satisfies rational basis.**

To satisfy the rational basis test, the Act "need only be rationally related to a legitimate government purpose." *Powers v. Harris*, 379 F.3d 1208, 1215 (10th Cir. 2004). The Act easily satisfies that standard. The governmental interests, which are indeed compelling, are certainly legitimate. And restricting minor accounts in the way the Act proposes (turning off push notifications, autoplay, infinite scroll, and requiring

parental consent to allow children to interact with strangers) are rationally related to those worthy governmental goals. Minors would be better able to focus on homework, sleep, and real-life relationships without these addictive elements. And they could benefit from parental guidance in a virtual world that poses risk to youth.

> **b.    Though not required, the Act's requirement of age assurance satisfies any higher level of scrutiny.**

The governmental interests in youth mental health are compelling. The Act also satisfies the tailoring requirement of both strict and intermediate scrutiny. Age assurance regulations have passed heightened constitutional scrutiny in other contexts. *See, e.g., Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 569-70 (2001) ("Unattended displays of tobacco products present an opportunity for access without the proper age verification required by law . . . It is clear that the regulations leave open ample channels of communication [and] do not significantly impede adult access to tobacco products"). The *Lorillard* Court thus found that "the means chosen by the State are narrowly tailored to prevent access to tobacco products by minors, are unrelated to expression, and leave open alternative avenues for vendors to convey information." *Id.* at 570. Here, too, the State's methods are narrowly tailored to prevent harmful social media addiction in children, are unrelated to content, and leave open channels of communication among youth and adults alike.

NetChoice cites *Ashcroft* for the argument that governments can *never* require social media companies to assure their users are over a certain age, no matter how addictive or harmful their products are to children. *See* Pl.'s Mot. at 32 ("The Act violates the First Amendment by requiring covered websites to engage in 'age assurance' to disseminate protected and valuable speech"). However, *Ashcroft* said no such thing. Rather, *Ashcroft* determined that a district court, in 1999, did not abuse its discretion when it determined that, based on the evidence before it, an age verification scheme that required those accessing pornographic websites to upload personally identifying information to prove their age (such as a "credit card, debit account, adult access code, or adult personal identification number, [or] digital certificate) was not *at that time* the least restrictive alternative to protect children from pornography. *Ashcroft*, 542 U.S. at 666-

67.[65] And, although there is no First Amendment "freewheeling" right to anonymity, *see, e.g., John Doe No. 1 v. Reed*, 561 U.S. 186, 218 n.4 (2010) (J. Steven, concurring in part), and "the Constitution does not guarantee the right to acquire information . . . without any risk of embarrassment, *United Staes v. American Library Assn. Inc.*, 539 U.S. 194, 209 (2003) (plurality opinion), the Court in *Ashcroft* was concerned that requiring personally identifying information to access pornography websites would have a chilling effect. *Ashcroft*, 542 U.S. at 667 ("Under a filtering regime, adults without children may gain access to speech they have a right to see without having to identify themselves or provide their credit card information"). Utah's Act, however, does not require personally identifying information to be disclosed. It only requires a social media company to "implement an age assurance system to determine whether [an] account holder . . . is a minor. Utah Code § 13-71-201(1). And, in the year 2024, this can be done in a number of ways that: (1) do not reveal personally identifying information; (2) are quick; and (3) are inexpensive. Allen Dec., Exhibit C, ¶¶ 7-8, 14-22.

*Ashcroft* wisely noted that technology would change and specifically invited district courts to consider new evidence about what technologies are effective, and the degree to which they are restrictive. *Ashcroft*, 542 U.S. at 671 ("the factual record does not reflect current technological reality – a serious flaw in any case involving the internet . . . It is reasonable to assume that other technological developments important to the First Amendment analysis have also occurred . . .").

### 5. **The Act's requirements of parental consent do not violate the First Amendment.**

Minors are different. Their brains are not fully developed. Because of this, they often do not understand the long-term consequences of immediate decisions, especially when those consequences are

---

[65] The Fifth Circuit has determined that *Ashcroft* did <u>not</u> hold that strict scrutiny was the right level of judicial review. Instead, it merely held that <u>if</u> strict scrutiny applied, the Children's Online Protection Act would fall (based on then-existing technology). *Paxton*, 95 F.4th at 274 ("We see only one answer and therefore only one way to read *Ashcroft II* consistently with *Ginsberg*. *Ashcroft II* did not rule on the appropriate tier of scrutiny for COPA. It merely ruled on the issue the parties presented: whether COPA would survive strict scrutiny").

not readily apparent to them. Minors are thus uniquely susceptible to the enticements of profit-oriented companies who want to make money off them.

For this reason, governments may require parental consent in a variety of contexts, including many in which constitutional rights may be implicated. The State may require parental consent in tanning salons,[66] tattoo parlors (arguably implicating First Amendment rights),[67] and medical procedure decisions.[68] The State may require parental consent when it comes to a minor's exercise of her constitutional right to use a firearm.[69]

In the context of social media companies, which are data mining companies, minors risk exposing all sorts of information about themselves to the world at large, including financial information, their physical location at any given moment, their likes and dislikes, and just about every other aspect of their lives. The Act does not prevent minors from sharing this information with friends without parental consent, and the Act does not require minors to get parental consent when choosing their online friends (although parents may see who their friends are). But the Act does require minors to get parental consent if they wish to alter their default privacy settings to expose their personal lives to strangers. That is reasonable and it does not violate the First Amendment.

NetChoice relies primarily on *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011) for its argument that the Act's parental consent requirement is unconstitutional. In *Brown*, the Supreme Court applied strict scrutiny to strike down a California law that placed restrictions on the sale of violent video games to minors. The Court determined that the law was content based, meant to protect children from the harmful effects of viewing (and participating in) fantasy violence. *Id.* at 799 ("Because the Act imposes a

---

[66] *See, e.g.*, UTAH ADMIN. CODE R392-700-5 (2023).
[67] *See, e.g.*, UTAH CODE § 76-10-2201.
[68] *See, e.g.*, UTAH CODE § 78B-3-406(6).
[69] *See, e.g.*, UTAH CODE § 76-10-509.

restriction on the content of protected speech, it is invalid unless California can demonstrate that it passes strict scrutiny").

The Act at issue here is readily distinguishable from the law at issue in *Brown*. First, the Act is content-neutral. And, the minors who California sought to protect in *Brown* were not at risk of exposing every detail of their lives to strangers online, such as personal financial information and current physical location. In social media, however, they are. Simply put, the governmental interests are different. Whereas the government interest in *Brown* was to shield minors from harmful content (violence), the government interest here is to shield minors' personal information from strangers.

Social media globally broadcasts current information about all its users, including minors. Perhaps parents may find that desirable for their youth, such as the aspiring musician who wants to reach a global audience. *See* Pl.'s Mot. at 27. In such a case, the parent may permit it under the Act. Parents have long been entrusted in other contexts with guiding their children's decisions, such as whether children want to broadcast a message through tattoo art or visit an amusement park. Parents should be entrusted here to do the same and the Act assists them in that responsibility.

Parents have the constitutional right "to direct the upbringing and education of children under their control. . . [Children are] not the mere creature[s] of the state; those who nurture [them] and direct [their] destin[ies] have the right, coupled with the high duty, to recognize and prepare [them] for additional obligations." *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 535 (1925). In determining that Florida could constitutionally require parental consent for children to abstain from the pledge of allegiance, the Eleventh Circuit noted that the "rights of students and the rights of parents . . . are the subject of a legislative balance in the statute before us. The State, in restricting the student's freedom of speech, advances the protection of the constitutional right of parents; an interest which the State may lawfully protect." *Frazier ex rel. Frazier v. Winn*, 535 F.3d 1279, 1284 (11th Cir. 2008).

Social media is different than other forms of media due to its interactive nature. Social media is not just about sharing or viewing content; it is about interacting, in real time, with other human beings (or artificial intelligence). Those social interactions are fraught with concerns not present when a minor engages with television, radio, or streaming platforms. They entail revelations about the minor herself. Revelations that are often real-time and permanent. A minor, with an undeveloped brain, probably won't appreciate the potential consequences of sharing many details about herself with the wider world. The Act does not prohibit her from doing so, but the Act requires parental involvement in the decision. That parental involvement does not violate the First Amendment.

The alleged "difficulty in verifying a parent-child relationship" is not a new concern, nor is it insurmountable. Pl.'s Mot. at 29. Parental consent is required in other contexts already, such as when a minor seeks to procure a driver's license,[70] a hunting license,[71] or possess a weapon.[72] The Act directs the Division to promulgate rules that "establish processes and means by which a social media company may . . . obtain verifiable parental consent."[73] The Act also provides that a social media company is "considered to have obtained verifiable parental consent if [it] obtains parental consent through a mechanism that complies with the rules[.]"[74] Social media companies that comply with the forthcoming Proposed Rule will be compliant with the Act.

**B.   The Act is not vague for any of the reasons that NetChoice argues.**

NetChoice asserts that it has shown a likelihood of success on three vagueness claims: (1) the definition of "social media service" to include (a) "primarily" user-generated content and (b) allowing "social interaction"; (2) the prohibitions on infinite scroll and push notifications; and (3) the "assurance of confidentiality" and prohibitions on data collection in privacy provisions. Pl.'s Mot. at 24-26, 31-32, 37-38.

---

[70] *See* UTAH CODE § 52-3-211(2)(a).
[71] *See* UTAH CODE § 23A-4-701(3)(b)(v).
[72] *See* UTAH CODE § 76-10-509.4.
[73] UTAH CODE § 13-71-302(1)(a).
[74] UTAH CODE § 13-71-302(3).

Even if these provisions had points of imprecision (as virtually all laws do), none of them bears the sort of unintelligible vagueness that would render them unconstitutional.

Some uncertainty is inherent in language. "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110. The "imagination" may "conjure up hypothetical cases in which the meaning of [given] terms will be a nice question." *American Communications Assn. v. Douds*, 339 U.S. 382, 412 (1950). But close calls on matters of interpretation are grounds for litigation and development of the law through precedent—not grounds for striking a statute down in its infancy. *See Grayned*, 408 U.S. at 114 (noting that enforcement always "requires the exercise of some degree of [executive] judgment").

The Constitution "does not require impossible standards" or the elimination of any possible point of vagueness. *United States v. Petrillo*, 332 U.S. 1, 7 (1947). A statute is unconstitutionally vague only if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see also City of Chicago v. Morales*, 527 U.S. 41, 52 (1999).[75] "[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Humanitarian Law Project*, 561 U.S. at 20 (quoting *Village of Hoffman Estates*, 455 U.S. at 495.

This is the due process standard. Additional considerations are added "where a vague statute" "operates to inhibit the exercise of" First Amendment freedoms by chilling lawful expression. *Grayned*, 408 U.S. at 109 (1972). Chilling effects are addressed in the First Amendment section. "But perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Holder v.*

---

[75] Though couched separately, the standards are related; indeed, it's hard to conceive of a case where one is met that the other is not. *See City of Chicago*, 527 U.S. at 95 (noting that "the vagueness that causes notice to be inadequate is the very same vagueness that causes 'too much discretion' to be lodged in the enforcing officer") (Thomas, J., dissenting).

*Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (cleaned up). And in a pre-enforcement challenge like this one, potential problems are by nature "somewhat speculative." *Gonzales v. Carhart*, 550 U.S. 124, 150 (2007); *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 503 (1982). That uncertainty further counsels against an injunction where the Division may, through its general rulemaking powers, Utah Code § 13-2-5(1), narrow the application of the challenged terms. *See Village of Hoffman Estates*, 455 U.S. at 504 ("Nor do we assume that the village will take no further steps to minimize the dangers of arbitrary enforcement. The village may adopt administrative regulations that will sufficiently narrow potentially vague or arbitrary interpretations of the ordinance[.]")

Vagueness is not determined in a vacuum; reviewing courts—as all people communicating do—consider both content and context. *See ACORN v. City of Tulsa, Oklahoma*, 835 F.2d 735, 741 (10th Cir. 1987) Relevant context can include terms that have technical or specialized meaning within the relevant speech community, *see, e.g., Jones v. District of Colombia*, 323 F.2d 306, 309-10 (D.C. Cir. 1963) – here, tech companies.

NetChoice's vagueness claims are facial attacks. Pl.'s Mot. at 22 ("For all claims, NetChoice raises a traditional facial challenge"). Such challenges are "the most difficult to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). It is difficult to respond to claims the nature of which NetChoice has not been clear on. The difference matters because the plaintiff's burden on a facial attack differs from that on an as-applied challenge. Where the vagueness of a statute is challenged as applied, the plaintiff must show merely that the statute is vague as applied to his own conduct. *See, e.g., Humanitarian Law Project*, 561 U.S. at 21 (acknowledging that "the scope of" the challenged "material-support statute may not be clear in every application," but concluding that it was "not vague as applied to plaintiffs"). Facial challenges, by contrast, require the plaintiff to "establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Village of Hoffman Estates*, 455 U.S. at 495

44

(plaintiff claiming facial vagueness must show that term is "impermissibly vague in *all of* its applications") (emphasis added). NetChoice has not acknowledged these different burdens in its briefing; and it certainly has not carried them.

Some of NetChoice's arguments take the form of a bare assertion that terms of the Act are "not defined" or fall short of "explain[ing]" or "clarify[ing]" certain points, Pl.'s Mot. at 24 (raising concerns about the lack of explanation or clarification of terms like "primarily" and "display"). Others are framed as concerns that certain provisions "could" be understood to sweep (in NetChoice's view) too broadly, *id.* at 25 (asserting that much "interaction could be defined as 'social'"), such that some "websites will not have guidance" about whether they are running afoul of the Act, *id.* (contending that "many websites will not have guidance about whether they allow sufficiently 'social' interaction"). Still others are just a string of conclusory assertions, *see id.* at 30-31 (stating three alleged points of vagueness in a single paragraph with little analysis).

On these and other points, NetChoice is not speaking to the operative constitutional standard. It is not analyzing whether the statutory provisions that it challenges leave a point of vagueness that is so problematic that there is no "reasonable opportunity" for a person of "ordinary intelligence" to understand it in context. And NetChoice's rapid-fire, conclusory assertions fall far short of meeting the high bar on a facial challenge—on whether the law is vague in all its applications. *See* Pl.'s Mot., pp. 24-26 (two claims, one page), 31-32 (three claims in three sentences), 37-38 (two claims). In various places, NetChoice's brief expressly undermines its required showing—in focusing on vagueness as applied to only *some* (or even *many*) websites or users. *Id.* at pp. 25, 30, 33, 34, 40.

NetChoice's vagueness claims fail at the threshold. This Court can and should find that NetChoice has not established a likelihood of success on these claims because it has not connected its arguments to the operative standard of proof. And NetChoice's arguments fall short on their merits in any event.

1. ***The definition of "social media service" is not vague.***

The Act defines "social media service" as "a public website or application that" meets five requirements: "(i) displays content that is primarily generated by account holders and not by the social media company; (ii) permits an individual to register as an account holder and create a profile that is made visible to the general public or set of other users defined by the account holder; (iii) connects account holders to allow users to interact socially with each other within the website or application; (iv) makes available to each account holder a list or lists of other account holders with whom the account holder shares a connection within the system; and (v) allows account holders to post content viewable by other users." UTAH CODE § 13-71-101(14)(a).[76]

NetChoice challenges two parts of this definition as unconstitutionally vague: (1) "primarily generated" and (2) "interact socially." Pl.'s Mot. at 32. Neither is. They are not facially vague because they clearly cover at least some of NetChoice's members. And NetChoice has not shown that they are vague as applied because it has not specified particular websites that will be confused. And context makes the challenged terms reasonably clear to a person of ordinary intelligence. NetChoice has thus failed to establish a likelihood of success on its vagueness challenges.

a.     ***"Primarily generated" is reasonably understood to mean "mostly produced by."***

The first challenged provision states that a social media service is one that "displays content that is *primarily generated* by account holders and not by the social media company." UTAH CODE § 13-71-

---

[76] NetChoice cites several cases for the proposition that failure to define the "central coverage definition" is "fatally vague." Pl.'s Mot. at 24. It can be the case that a vague term can invalidate a whole statute—that is, be "fatal." But that is a question of severability—whether the law can continue to exist without the term or provision. That is strong medicine, rarely administered. *See Barr v. American Association of Political Consultants, Inc.*, 140 S. Ct. 2335, 2350-51 (2020) ("From *Marbury v. Madison* to the present, apart from some isolated detours . . . , the Court's remedial preference after finding a provision of federal law unconstitutional has been to salvage rather than destroy the rest of the law. . . . The Court's precedents reflect a decisive preference for surgical severance rather than wholesale destruction[.]"). The Act has a severability provision, Utah Code § 13-71-401, but because the terms in this statute are reasonably clear, there is no need to address what portions can be severed without undermining the entire statute.

101(14)(a)(i) (emphasis added). NetChoice claims that "primarily" is vague because the Act does not make "clear whether primarily means 'the majority, supermajority, or some other measure has to be from account holders." Pl.'s Mot. at 25. Because "[m]any covered websites display their own content" as well as "content 'generated by account holders," NetChoice complains that the law is vague as applied to such websites. *Id.*

A straightforward understanding of "primarily" is "mostly"—that is, a majority. Merriam-Webster.com, *primarily*, available at https://www.merriam-webster.com/dictionary/primarily ("for the most part: CHIEFLY"). This is not a vague standard, as many courts have held in many different contexts. *See, e.g., Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 521-22, 525-26 (1994) ("We conclude that the term 'primarily intended . . . for use' . . . is to be understood objectively and refers generally to an item's likely use" and holding that objective criteria "minimize the possibility of arbitrary enforcement"); *United States v. Gibson*, 998 F.3d 415, 419–20 (9th Cir. 2021) (holding that phrase "primarily used by children" not vague; "[i]t means a place chiefly and for the most part used by children"); *United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 468–71 (S.D.N.Y. 1997) (holding statutory phrase "primarily useful" in wiretap device statute not vague); *Pizza di Joey, LLC v. Mayor of Baltimore*, 235 A.3d 873, 907 (Md. Ct. App. 2020) (holding "primarily engaged in" not vague in statute differentiating between food trucks and brick-and-mortar stores and explaining that plaintiffs were "able to compare their trucks' menus to the menus of various brick-and-mortar establishments and thereby determine"); *Rockdale County v. U.S. Enters., Inc.*, 865 S.E.2d 135, 147 (Ga. 2021) ("As many courts have held, the use of that qualitative word ["primarily"] does not render a law impermissibly vague.") (citing cases). A person of "ordinary intelligence" could understand the term *primarily* in line with this meaning under the Act. And such reasonable meaning would resolve the principal ambiguity conjured by NetChoice (majority, supermajority, etc.).

Even with such a yardstick, NetChoice complains that it's not clear what is being measured—"the pieces of content, the length of the content (e.g., how many minutes of account-holder-submitted videos), or some other metric." Pl.'s Mot. at 25. In essence, NetChoice seems to be complaining that "displayed"

*could* be interpreted in various ways. That's often true of almost any term. But again, the Court should find that a person of ordinary intelligence could identify a reasonable basis for resolving any ambiguity.

"Display" as a verb can be reasonably understood to mean to "place or spread (something) for people to see." Merriam-Webster.com, *display*, available at https://www.merriam-webster.com/dictionary/display. In the social media context, to display can reasonably be understood to mean "to place in users' feeds." A person of ordinary intelligence would understand this as measuring the pieces of content—the number of posts, tweets, etc. And at least as to Meta (Facebook and Instagram), the content that the user sees is primarily produced by persons other than Meta. It is thus not facially vague. *Village of Hoffman Estates*, 455 U.S. at 495. And as to other websites with different mixes of self- and user-produced content, it is likewise reasonably clear what the statute refers to.

An analogy may help highlight the point. In *American Booksellers Ass'n v. Rendell*, 481 A.2d 919 (Penn. 1984), a statute regulated the "display" of materials harmful to minors. Booksellers challenged the law as vague, asserting that the statute was "unclear" as to whether the mere shelving of problematic material could be deemed to constitute "display" of such material to minors. The court held that any ambiguity could be resolved on the basis of "common" definitions of display—to "put or spread before the view publicly," to "make evident"—definitions "suggest[ing] that the mere shelving or stocking of questionable material, without in some manner directing attention to them, is not the type of conduct prohibited by virtue of the legislature's use of the term 'display.'" *Id.* at 938. Likewise here, to display digital content can reasonably be understood as putting a given piece of media out for perusal. On this reading, what counts is the number of displays—like the number of magazines or books under the statute in *Rendell*—not the content of each. This is at least a reasonable reading. And it forecloses NetChoice's facial vagueness challenge.

NetChoice also claims that even if the yardstick and the thing measured were clear, the time frame is not, and because "the ratio of account-holder content to other content changes over time on covered

websites," the measure is vague. Pl.'s Mot. at 25. Again, NetChoice has fallen far short of carrying its burden. For all websites, it is reasonably clear that this refers to what the website is doing at any given time. The verb is in the present tense: displays. That suggests that a company must keep a running tally of its displayed content at any given moment. But the fact that compliance may require constant monitoring does not render the display provision vague. Just as in the bookstore example, to avoid displaying unlawful material, the store would have to monitor its ever-changing displays for prohibited content.

        **b.**    ***"Interact socially" in the website and application context is reasonably understood to mean to "interact with other users in a social manner."***

The second challenged provision states that a social media service "connects account holders to allow users to *interact socially* with each other within the website or application. UTAH CODE § 13-71-101(14)(a)(iv) (emphasis added). NetChoice argues that "social" is vague because "[m]ost interaction could be defined as 'social,' so most websites that 'allow' user interaction could plausibly be covered." Pl.'s Mot. at 25. But even taking the broadest meaning of "social" as meaning any interaction, the challenged provision further requires that the service "connect[] accounts"—that is, directly link them in a way (like friending or following) that allows social interaction. *See* UTAH CODE § 13-71-101(3) (defining "Connected account" as "an account on the social media service that is directly connected to: (a) the minor account holder's account; or (b) an account that is directly connected to an account directly connected to the minor account holder's account."). So mere interaction is not enough; it must allow interaction through connected accounts.

NetChoice next argues that it is not clear what distinguishes "social" interaction from other kinds of interaction, like professional interaction. Pl.'s Mot. at 25. In the context of a website or application, to "interact socially" is reasonably understood to mean communicating with by posting, messaging, reacting, and the like with other members of society—connected users. *See* Interact, Merriam-Webster ("to act upon one another") (last accessed May 17, 2024), https://www.merriam-webster.com/dictionary/; Socially, Merriam-Webster ("in a social manner"; "with respect to society"; "by or through society"); Social,

Merriam-Webster ("marked by or passed in pleasant companionship with friends or associates"; "of or relating to human society, the interaction of the individual and the group, or the welfare of human beings as members of society"). But whatever the sweep of the term "social," it is not facially vague because the interaction on websites like Facebook and Instagram—commenting, posting, tagging friends, etc.—fall comfortably within any definition of "social." *Village of Hoffman Estates*, 455 U.S. at 495.

And it is not vague as applied to other websites. A website meets this element if it connects accounts for the purpose of *allowing* users to interact socially. Utah Code § 13-71-101(14)(a)(iv). Even reading "social" as distinguished from "professional" or some other sense, if connecting accounts *allows* users to interact socially, then it is covered regardless of what interaction actually takes place. At least, that is a reasonable understanding that gives adequate guidance.

Courts have routinely held that "social" and "social media" are not vague terms to describe targeted interactions between people. *See, e.g., United States v. Comer*, 5 F.4th 535, 542–43 (4th Cir. 2021) (holding that term "social networking account" in probation condition not vague); *United States v. Brandenburg*, 157 F. App'x 875, 878–79 (6th Cir. 2005) (holding phrase "social contact" in release condition not vague); *People v. Lopez*, No. H041713, 2016 WL 297942, at *4 (Cal. Ct. App., Jan. 25, 2016) (same); *see also Keister v. Bell*, 29 F.4th 1239, 1259 (11th Cir. 2022) (holding phrase "casual recreational and social activities" not vague); *Taverns for Tots, Inc. v. City of Toledo*, 341 F.Supp.2d 844, 856 (N.D. Ohio 2004) (ruling phrase "private social function" not vague in anti-smoking ordinance).

*Comer* is instructive. There, a federal inmate on supervised release was subject to a condition that he not maintain a "social networking account" without approval from his probation officer. 5 F.4th at 539. He challenged this provision as vague, but the Fourth Circuit disagreed, holding that the condition was "truly about *social* networks—websites and apps designed primarily to allow individuals to meet and communicate." *Id.* at 543. Thus, "Comer could clearly not maintain a profile on a dating app (like Bumble or Tinder), but could just as clearly maintain an online account with a news website (like the New York

Times) or shopping website (like Amazon). Thus, the term 'social networking account' as used in Comer's supervised release conditions carries with it a commonsense meaning, which tempers any concern that the . . . condition is unconstitutionally vague." *Id.* The same is true here.

> ### 2.   The push-notification provisions are not vague.

> #### a.   The term "prompt" is not vague in this context; "prompt" is reasonably understood to mean "to send notice that encourages usage."

The Act defines "push notification" as "an automatic electronic message displayed on an account holder's device, when the user interface for the social media service is not actively open or visible on the device, that prompts the account holder to repeatedly check and engage with the social media service." UTAH CODE § 13-71-101(11). It then requires that "[a] social media company shall, for Utah minor account holders on the social media service … disable the following features that prolong *user engagement*: … push notifications *prompting* repeated user engagement." Utah Code § 13-71-202(5)(c) (emphasis added).

NetChoice claims that "prompt" is vague because it does not specify whether it is message- or topic-based. Pl.'s Mot. at 30-31. It also argues that "repeated user engagement" is vague because there is no limiting timeframe and unclear whether engagement can be passive viewing or must be more active, like posting content. Pl.'s Mot. at 31. These terms are reasonably understood in context, particularly in the world of websites.

The term "prompt" relates to a "push notification." That term is reasonably understood. A "notification" is simply something that gives notice of something. Merriam-Webster.com, *notification*, available at https://www.merriam-webster.com/dictionary/notification ("the act or instance of notifying; a written or printed matter that gives notice"). A "push" in the online context, is something that is sent from the website or application to the user's device to give notice of some activity in the website or application. *See, e.g., Dyroff v. Ultimate Software Grp., Inc.,* 934 F.3d 1093, 1098 (9th Cir. 2019) (listing "emails and push notifications" as two distinct methods of communication); *Games, Inc. v. Apple, Inc.,* 67 F.4th 946, 1001 (9th Cir. 2023), cert. denied, 144 S. Ct. 682 (2024) ("Apple's own internal communications for the proposition

that the anti-steering provision prevents developers from using two of the three 'most effective marketing activities,' push notifications and email outreach."); *Yershov v. Gannett Satellite Info. Network, Inc.,* 820 F.3d 482, 484 (1st Cir. 2016) ("When opened for the first time, the App presents a screen that seeks the user's permission for it to "push" or display notifications on the device.").

In this context, "prompt" is reasonably understood to mean that which induces the user to engage with the application, i.e., opening and using it. *See* Dictionary.com, *prompt*, https://www.dictionary.com/browse/prompt ("to move or induce to action") (last visited, XX); *id.*, repeat ("to do, make, or perform again"), https://www.dictionary.com/browse/repeat; *id.*, engagement ("the act of engaging or the state of being engaged; involvement"), https://www.dictionary.com/browse/engagement. The Act is not rendered vague by the fact that it places no numerical or subject-matter limitations on prompting. It is reasonable to conclude that a prompt is a prompt, whatever it is about.

      **b.**      **The term "user engagement" is not vague in this context; it is reasonably understood to mean "to use and give attention to."**

NetChoice also says that "user engagement" is unclear, as it could mean "time spent on the website, . . . submitting content, . . . liking content, or something else." Pl.'s Mot. at 31. But "user engagement" is likewise reasonably clear in this context. For a user to be "engaged with" a device or application reasonably means to use it. Merriam-Webster.com, *engage with*, available at https://www.merriam-webster.com/dictionary/engage%20with ("to become involved with (someone or something.") Using a social media application or website means to interact with it in some way—looking, posting, typing, etc. That is not facially vague because it clearly applies to NetChoice members like Meta and X. And it is not vague as applied to other websites because it is reasonably clear that engaging with the site or app means, at very least, to be looking at it.

Relatedly, NetChoice says that the timeframe of "repeated" is not clear and will chill lawful speech. Pl.'s Mot. at 31. But the lack of a timeframe does not render the statute fatally vague. A musical note can be

repeated whether played in rapid succession or pages apart. And it is reasonable to conclude that a person "repeatedly" engages with a social media site based on a prompt from the app or website any time he opens it after getting a prompt. This is not facially vague because obvious social media sites like Facebook, Instagram, and X, often send notifications ("see what's new!"; "[X] commented on your post") or display on the app icon by some means (like a red dot) that something is new since the user's last visit that ought to be seen immediately. *See generally,* Airship.com, Bill Schneider, *Push Notification Strategies Top Social Media Brands are Using: What Digital Marketers Can Learn*, available at https://www.airship.com/blog/push-notification-strategies-top-social-media-brands/. And it is not vague as applied to other websites for similar reasons.

### 3. The infinite scroll prohibition is not vague because it is reasonably understood to require that whatever loading action is required, it must be something beyond the mere act of scrolling.

NetChoice next takes issue with the Act's prohibition on infinite scrolling: "scroll or pagination that loads additional content as long as the user continues scrolling." UTAH CODE § 13-71-202(5)(b). This is colloquially referred to as "infinite scroll" or "lazy loading," by which a site or app displays additional content with the mere act of scrolling rather than clicking a button. *See Schroeder v. Pinterest Inc.*, 133 A.D. 3d 12, 17 n.1 (N.Y. App. Div. 2015) ("Infinite scrolling allows users to peruse a website's content on a

seemingly single long page, instead of having to open separate pages to retrieve additional content.").[77] It is not clear, NetChoice claims, "how much content is allowed on each virtual 'page,' so its members "cannot know how much 'content' can be loaded" onto it, "how far a website page may go with content, and other important liability-defining requirements." Pl.'s Mot. at 31-32.

The Act's plain terms are reasonably understood to target the practice of scrolling-triggered page loading. UTAH CODE § 13-71-202(5)(b) (prohibiting "scroll or pagination that loads additional content as long as the user keeps scrolling."). It does not define how big a page is or how much content is in one. But it does not need to; it is not concerned with the size of the source material, but with how a user loads it. It is common experience that sites like Facebook and YouTube present material that the user can see more of simply by scrolling, which alone defeats NetChoice's facial vagueness challenge. Whatever a page's capacity—even if it were to vary somewhat from site to site and from device to device—a social media company must simply give the minor user some mechanism other than scrolling (like a "see more" or "load more" button) to load more content. It thus provides "a reasonable opportunity" for "the person of ordinary intelligence" "to know what is prohibited." *Village of Hoffman Estates*, 455 U.S. at 498 (citation omitted).

---

[77] NetChoice uses the term "seamless pagination." Pl.'s Mot., pp. 3, 6–7, 31. This, it asserts, is "where more content loads frictionlessly and does not require users to click onto more pages to see more content." *Id.* at 7. But that is not exactly what "seamless pagination" means. Seamless pagination is a technical term for features enabling a website user to navigate through a webpage without having to reload each new page and start at the top each time. *See* U.S. Patent No. US11237700B2, "Seamless Pagination" (filed May 7, 2019, available at https://www.patentguru.com/US11237700B2; seamless-pagination, https://seamless-pagination.webflow.io/. For example, say a website offers coats for sale. Without seamless pagination, if a user reached the end of the displayed coats but had not yet reached the end of all offered coats, having the page load more would require starting from the top each time, displaying the website's header or banner information and forcing the user to scroll past information it has already seen. But with seamless pagination, each additional coat display is added to the end of the previous display when additional content is loaded. The statute does not target that practice, but instead targets *the act* by which additional content is loaded.

### 4. *The data collection and use regulations are not vague.*

#### a. *A presumption of "assurance of confidentiality" is reasonably understood to mean that the minor user's information is presumed to be confidential.*

The Act states that a covered site or service's terms of service are "presumed to include an assurance of confidentiality" for minor user's personal information (their name, address, and other individually identifying information. UTAH CODE §§ 13-71-101(10) (defining "personal information"); 13-71-204(2). NetChoice argues the presumption of including an "assurance of confidentiality" for this personal information is vague because "assurance" is not defined. Pl.'s Mot. at 37-38. But it need not be defined separately, because its meaning is reasonably understood as is. To give "assurance" is to affirm a certain state of affairs—here, it is presumed that the service will keep the minor user's information confidential. Merriam-Webster.com, *assurance,* available at https://www.merriam-webster.com/dictionary/assurance ("the state of being assured: such as a being certain in the mind; confidence in mind or manner: easy freedom from self-doubt or certainty"). "Confidential," as NetChoice itself explains, means to keep from unauthorized disclosure to third parties. Pl.'s Mot. at 38; *see also* Merriam-Webster.com, *confidential,* https://www.merriam-webster.com/dictionary/confidential ("intended for or restricted to the use of a particular person, group or class"). That is, a minor user's personal information is presumed confidential, absent an exception or parental consent. *See generally* Eugene Volokh, *Freedom of Speech and Information Privacy: The Troubling Implications of a Right to Stop People From Speaking About You,* 52 Stan. L. Rev. 1049, 1059 & n.34 (1999-2000) (explaining that statutory default contractual privacy likely passes First Amendment scrutiny). That is why the statute uses the term "presumption of confidentiality" to describe the "assurance" language. UTAH CODE § 13-71-204(3), (4).

But, says NetChoice, exceptions are precisely the problem. Pl.'s Mot. at 38. For example, the statute exempts use of a minor's personal information for a "company's internal use or external sharing . . . necessary" for various purposes, including to maintain the website and customize user experience. UTAH CODE § 13-71-204(4). Because the statute says "internal use," NetChoice asserts that "confidentiality" as

protection from third-party exposure cannot be what "confidentiality" means. Pl.'s Mot. at 38. But there is a simpler explanation: the statute wants as few people to have access to a minor user's personal information as possible. By covering both "internal use" and "external sharing," it limits exposure to as few parties as possible—that is, every person inside or outside the company is a third party unentitled to the information unless they meet an exception. UTAH CODE § 13-71-204(4).

NetChoice also argues that its members may not be able to present as much helpful content to minor users if the privacy exceptions do not allow the use of personal information to tailor the user experience based on anything other than age and location. Pl.'s Mot. at 38; *see also* Utah Code § 13-71-204(4)(c). But that is not a vagueness problem because it does not give unclear notice to companies. And the State addresses that concern in its response to NetChoice's First Amendment claims.

### b. *"Core functioning" is reasonably understood to mean "essential to the functioning of" a social media service.*

NetChoice finally challenges the phrase "core functioning." The Act requires social media services to "set default privacy settings to prioritize maximum privacy, including settings that . . . restrict any data collection and sale of data from a Utah minor account holder's account that is not required *for core functioning* of the social media service." UTAH CODE § 13-71-202(1)(c) (emphasis added). NetChoice says that "core functioning" is vague because it is not defined. Pl.'s Mot. at 39. But "core functioning" in the context of a technology is reasonably understood as something that is a "basic, essential, or enduring part" of it— something without which it could not function. Merriam-Webster.com, *core* meaning 2a, available at https://www.merriam-webster.com/dictionary/core. While close cases may exist, that does not show that it does not give reasonable notice in the main. *See, e.g., United States v. Perea*, 818 F.Supp.2d 1293, 1305 (D. N.M. 2010) ("The issue of intent is a fact question, however, for the jury to resolve, and is not justification for why the Court should find that the enumerated facts in [the statute] are unconstitutionally vague.").

\*\*\*

Overall, NetChoice attempts "to inject doubt as to the meaning of words where no doubt would be felt by the normal reader." *United States v. Powell*, 423 U.S. 87, 93 (1975). That level of straining "is not required by the 'void for vagueness' doctrine, and" this court should "not indulge in it" here. *Id.* The terms are plain enough on a reasonable understanding.

### C.   47 U.S.C. § 230 does not preempt the Act, expressly or otherwise.

The State has filed a motion to dismiss NetChoice's claims deriving from § 230, filed simultaneously herewith. The State incorporates by reference the arguments made in that motion and further responds to NetChoice's arguments in its Motion for Preliminary Injunction as follows.

NetChoice cites *In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, -- F. Supp. --, 2023 WL 7524912 (N.D. Cal., Nov. 14, 2023) for the proposition that "case after case has found that claims that target 'tools' that facilitate user speech are preempted by § 230." Pl.'s Mot. at 35. But that case held that some tools—including notification limits similar to those in the Act—*were not* preempted by Section 230. *Id.* at *12. And those that were preempted (like hours-of-use restrictions, caps on use, etc.), *id.* at *13, are not part of the Act.

NetChoice says that *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116 (N.D. Cal. 2016) supports that any law affecting "what form" user-generated content takes is a classic editorial function and thus preempted under Section 230.[78] Pl.'s Mot. at 36. But this is an overstatement. *Fields* was about whether Twitter could be held liable for not removing accounts from members of ISIS and permitting them to directly message each other. But there were no statutory privacy protections at issue there, and such failure-to-remove claims based on the speech of others falls comfortably within Section 230's ambit. *Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019) had facts similar to *Fields* (for Hamas rather than ISIS). And *Dyroff v. Ultimate Software Grp.*,

---

[78] The case on which *Fields* relied for the "what form" notion —*Jane Doe No. 1 v. Backpage.com*, LLC, 817 F.3d 12 (1st Cir. 2016)—dealt with vetting procedures for accounts and posting regarding "harmful content provided by others," *id.* at 21, not with relegating that information to a particular form.

*Inc.*, 934 F.3d 1093 (9th Cir. 2019), involved a mother suing a social networking website for liability under state law due to a drug her son obtained from another website user. Unlike *Force, Fields,* or *Dryoff*, the Act does not provide a private right of action for third parties harmed by users publishing harmful content.

For reasons set forth herein and in the State's Motion to Dismiss, NetChoice has not shown that Section 230 preempts the Act under any variant of that doctrine. The two laws can comfortably co-exist.

## II.     The public interest strongly favors allowing the law to go into effect

The public interest in protecting children and adolescents from the harmful effects of social media has been recognized as important and even compelling. *See, e.g., Griffin* at *16 (an Arkansas social media regulation "clearly serves an important governmental interest") and *Bonta* at *16 (the goal of protecting children from the harms of social media is "compelling and laudable"). Even NetChoice concedes that the State "undoubtedly has a compelling public interest in protecting children." Pl.'s Mot. at 29. Children who become addicted to social media face difficult obstacles that harm not only themselves, but the relationships they have with family, friends, and others. Utah has enacted reasonable regulations to govern how social media is peddled to children, just like Utah and other states regulate the sale of other dangerous products to children. In this case, there is no reason for the Court to tie the State's hands during the pendency of the lawsuit as it attempts to address a major public health issue affecting the very lives of its children.

Perhaps recognizing the strong public interest in favor of social media regulation, Plaintiff does not discuss the public interest prong of Rule 65A other than to assert that a preliminary injunction would not "harm the State."[79] However, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. at 1303 (internal citation omitted). The State has set forth ample evidence to show that excessive social media use causes significant harm to children. And the State has set forth evidence that placing all responsibility on

---

[79] Pl.'s Mot. at 40.

parents (to solve a problem that NetChoice's members created) in the modern internet age is ineffective. Even the most conscientious of parents have trouble shielding their children from the cascade of alluring enticements pouring onto their children's devices, which children often access away from home on devices not issued or controlled by parents.

**III.    The balance of the harms weighs in favor of allowing the law to go into effect.**

"To be entitled to a preliminary injunction, the movant has the burden of showing that the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction." *Heideman*, 348 F.3d at 1190. "The ability of a [government] to enact and enforce measures it deems to be in the public interest is . . . an equity to be considered in balancing hardships." *Id.* at 1191.

There is immense harm to many children and their families if they use social media for more than just two hours per day, or at night. They lose sleep. They become subject to cyber-bullying. They develop anxiety. They develop depression. Some even engage in self-harm, including suicide.

NetChoice complains of the cost of complying with the law.[80] (Tobacco companies also complained about the cost of compliance when states began regulating them.)[81] NetChoice asks this Court to conclude that the costs its members would incur in complying with the reasonable regulations found within the Act outweighs the harm to children from using their products.

This is not a close balancing. The harm to children from social media far outweighs any harm to NetChoice and its members. The Court should easily find that the balance of harms favors denying the request for the injunction and allowing the law to remain in effect pending this litigation.

---

[80] Pl.'s Mot. at 49.
[81] *See* https://truthinitiative.org/research-resources/tobacco-prevention-efforts/5-things-tobacco-industry-didnt-do-until-it-was.

## CONCLUSION

The present historical legal moment is eerily similar to when tobacco regulation was introduced and tobacco company executives testified that they didn't believe their product was addictive.[82] Large, trillion-dollar companies, left unregulated, pushed harmful products on children for generations. Governments finally stepped in to protect children from those harmful products, including by enacting regulations that implicate speech, such as compelled "Surgeon General" warning labels. Large companies pushed back, complaining of the cost of compliance.

As in the tobacco context, the U.S. Surgeon General has now also issued an advisory regarding social media, attached hereto as Exhibit D, stating there are "serious concerns about the risk of harm from social media exposure for children and adolescents who are at a more vulnerable state of brain development."[83] Further, "excessive and problematic use of social media can harm children and adolescents by disrupting important healthy behaviors . . . Push notifications, autoplay, [and] infinite scroll . . . are some examples of [] features that maximize engagement" which "encourage[s] excessive use and behavioral dysregulation."[84]

Utah has enacted a very modest, yet precise, law that targets the problem. And Utah has done so in a careful, content-neutral way. A preliminary injunction is extraordinary, drastic relief to be issued only when a movant's right to it is clear and unequivocal. Because NetChoice has not clearly and unequivocally demonstrated that it has a right to relief, the State requests that the Court deny Plaintiff's Motion for Preliminary Injunction.

---

[82] *See* Tobacco CEO's Statement to Congress, accessed at https://senate.ucsf.edu/tobacco-ceo-statement-to-congress.

[83] *See* "Social Media and Youth Mental Health," The U.S. Surgeon General's Advisory, p. 7 (2023), available at https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf.

[84] *Id.* at p. 9.

DATED: May 31, 2024

OFFICE OF THE UTAH ATTORNEY GENERAL


 /s/ *Lance Sorenson*
DAVID WOLF
LANCE SORENSON
Assistant Utah Attorneys General
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2024, I electronically filed the foregoing, **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** by using the Court's electronic filing system which will send a notice of electronic filing to the following:

Alexis Swartz
Jeremy Evan Maltz
Joshua P. Morrow
Scot A. Keller
Steven P. Lehotsky
Todd L. Disher
LEHOTSKY KELLER COHN LLP
alexis@lkcfirm.com
jeremy@lkcfirm.com
josh@lkcfirm.com
scott@lkcfirm.com
steve@lkcfirm.com
todd@lkcfirm.com

Kade N. Olsen
David C. Reymann
PARR BROWN GEE & LOVELESS
kolsen@parrbrown.com
dreymann@parrbrown.com

*Counsel for Plaintiff*

OFFICE OF THE UTAH ATTORNEY GENERAL

/s/ Seth A. Huxford
SETH A. HUXFORD
Legal Secretary

62