DAVID N. WOLF (6688)
DOUGLAS CRAPO (13704)
LANCE F. SORENSON (10684)
Assistant Utah Attorneys General
Utah Attorney General
160 East 300 South, 6th Floor
PO Box 140856
Salt Lake City, UT 84114-0856
Telephone: (801) 366-0100
lancesorenson@agutah.gov

*Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NETCHOICE, LLC, <br><br> Plaintiff, <br><br> v. <br><br> SEAN D. REYES, in his official capacity as Attorney General of Utah, and <br><br> KATHERINE HASS, in her official capacity as Director of the Division of Consumer Protection of the Utah Department of Commerce, <br><br> Defendants. | **DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AND MEMORANDUM IN SUPPORT** <br><br> Case No.: 2:23-cv-00911 <br><br> Judge Robert J. Shelby <br><br> Magistrate Judge Cecilia M. Romero |

Defendants move the Court to dismiss count IV of NetChoice's First Amended Complaint under Fed. R. Civ. P. 12(b)(6) because under federal preemption doctrine, NetChoice has failed to adequately state a claim.

To survive a motion to dismiss under Rule 12(b)(6), "the complaint must allege enough facts to state a claim to relief that is plausible on its face, and any factual allegations must be enough to raise a right to relief above the speculative level." *TDC Lending LLC v. Private Capital Grp., Inc.*, 340 F. Supp. 3d 1218, 1224 (D. Utah 2018) (Shelby, J.) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)) (internal quotation marks and alterations omitted). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And "[b]ecause [Plaintiff's preemption] challenge rests purely on legal interpretation, [this court] may resolve [it] at the motion-to-dismiss stage." *John K. Maciver Inst. for Pub. Pol'y, Inc. v. Schmitz*, 885 F.3d 1004, 1014 (7th Cir. 2018). *See also S. Furniture Leasing, Inc. v. YRC, Inc.*, 989 F.3d 1141, 1144 (10th Cir. 2021) (affirming the granting of a motion to dismiss while interpreting a federal statute). NetChoice's allegations of preemption are legal conclusions which this Court need not accept as true, and because no fact development will affect the preemption analysis, this Court can and should resolve the matter now and dismiss Claim VI.

NetChoice has filed suit against the Defendants, alleging eleven counts spanning various constitutional and statutory claims against Utah's Minor Protection in Social Media Act (the Act). D51. This motion concerns only the sixth count: that the Act is preempted by 47 U.S.C. § 230. D51:39-41.

Count VI alleges that Section 230 forbids treating any provider or user of interactive computer services "as the publisher or speaker of any information provided by another information content provider." D51:40 (quoting 47 U.S.C. § 230(c)(1)). This, it says, "protects websites' decisions about offering or using any 'tools meant to facilitate the communication and content of others'—

1

including 'notifications,' seamless pagination, and autoplay." D51:40 (citations omitted). NetChoice also says that "Section 230 protects websites' decisions to 'filter, screen, allow, or disallow, . . . pick, choose, analyze, or digest, . . . transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content." *Id.* (quoting 47 U.S.C. § 230(f)(4)).

Because the Act imposes "liability on websites for such decisions or for making those 'tools' available to users to disseminate, receive or display content"—NetChoice asserts—it thus treats them as publishers, which is forbidden under Section 230. *Id.* Thus, it concludes, the Act and Section 230 are inconsistent, and the Act is preempted. *Id.* at 41. It is not preempted, and this Court should dismiss Count VI.

## ARGUMENT

### I. Section 230 protects liability for presenting or removing others' speech.

Section 230, in its essence, allows interactive computer services—such as NetChoice's members—to both host and remove content without fear of liability.

Section 230 forbids treating interactive computer services as "the publisher[s] or speaker[s] of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). By its plain terms, this forbids suits against service providers based on content made by someone else. They can allow the content to be on their service without fear of liability.

Section 230 also forbids imposing civil liability for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected," or "any action taken to enable or make available to information content providers or others the technical means to restrict access to [such] material[.]" *Id.* (c)(2). By its plain terms, this allows service providers to (1) remove content from their services

2

based on the enumerated categories and (2) provide tools to users to restrict their own access to such material without fear of liability.

> II. **NetChoice has not precisely stated which strain of preemption it believes applies, but is entitled to relief under none of them.**

NetChoice claims that the Act is preempted. D51:39-41. Federal preemption has two strains: express and implied. Implied preemption has three sub-strains: field, conflict (or impossibility), and obstacle (or frustration). The nature of NetChoice's preemption argument is unstated, but it appears to be one of express preemption. Yet however the argument is construed, it fails because there is nothing in the Act that is inconsistent with Section 230, Congress has not occupied the field of social media regulation, it is not impossible for NetChoice to comply with both laws, and the Act does not frustrate Congress's objectives in Section 230 (in fact, it compliments them). Thus, Defendants motion to dismiss should be granted.

> A. **Section 230 does not expressly preempt the Act because it has an anti-preemption provision and leaves space for state regulation consistent with it; the Act is consistent with Section 230 because it is possible to comply both.**

Express preemption is where preemption "is explicitly state[d] in the statute's language." *See Gade v. National Solid Wastes Management Association*, 505 U.S. 88, 98 (1992). NetChoice says that Section 230(c)(1) makes the Act's prohibitions on push notifications, infinite scroll, and autoplay "inconsistent" with federal law. D51:41. That section states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).

NetChoice's preemption count can be distilled to the following syllogism: (1) Section 230)(c)(1) forbids treating social media companies as publishers, which includes anything affecting website design, presentation, or user tools; (2) the Act's prohibitions on infinite scroll, autoplay, and push notifications affect website design, presentation, or user tools; (3) the Act's prohibitions treat

3

social media companies as publishers, and are thus preempted. D51:38-40. The first/major premise is true in part, but only in part; the second/minor premise is true but misleading; and the conclusion is wrong.

Nothing in the Act is inconsistent with Section 230 because Section 230 does not sweep as broadly as NetChoice asserts. To begin with, Section 230 has an *anti-preemption* provision: "[n]othing in [it] shall be construed to prevent any State from enforcing any State law that is consistent with [it]." 47 U.S.C. § 230(e)(3). And its plain terms merely prohibit covered sites from liability for presenting or censoring others' speech, and say under what circumstances publisher-like functions are protected. This is a far cry from expressly forbidding States from imposing any design regulations at issue in the Act. And as explained in Defendants' opposition to the preliminary injunction motion, the Act is "agnostic as to content." *City of Austin v. Reagan*, 596 U.S. 61, 69 (2022).

On the second portion of the syllogism, NetChoice says that "the Act's prohibition on autoplay, seamless pagination, and notifications on minors' accounts" treats its members as publishers or speakers because these design elements amount to "editorial . . . functions." D51:40. In support, it cites *Ben Ezra, Weinstein & Co. v. Am. Online Inc.*, 206 F.3d 980 (10th Cir. 2000). *Id.* But *Ben Ezra* was about liability for *removing* information from stock prices and said nothing about the practices at issue here, which affect only how information is presented. The Act does not impose liability for doing what Section 230 allows—restricting, or enabling others to restrict, objectionable content. Rather, the Act makes separate demands on these companies regarding how they present content and how minors can share or access content. There is thus nothing inconsistent here.

NetChoice also cites *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093 (9th Cir. 2019). D51:40. *Dyroff* involved a mother suing a social networking website for liability under state law due to a drug her son obtained from another website user. Again, that is liability based on the content of the communications from other users on the website.

4

Finally on this point, NetChoice cites *Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019). D51:40. There, Hamas carried out terrorist attacks using Facebook as a communications platform. *Force*, 934 F.3d at 57. Victims and their families sued Facebook for providing material support to Hamas, and Facebook argued that it was immune from suit under Section 230(c)(1)'s prohibition on publisher liability. *Id.* The Second Circuit agreed that Section 230 immunized Facebook's allowing Hamas members to have Facebook accounts and communicate through them. *Id.* at 63-71. The Act's requirements forbidding the use of certain tools for minors does not impose publisher liability on NetChoice's members.

Unlike the practices at issue in *Force*, *Ben Ezra,* or *Dryoff*, the Act does not provide a private right of action for third parties harmed by users publishing harmful content. Nor does it treat NetChoice's members as publishers.

To the extent that the cases NetChoice cites take a broad view of Section 230 immunity, they contradict Section 230's plain terms. *See, e.g., Health and Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166, 175-77 (2023) (declining interpretive glosses in favor of statute's "plain language"). The plain text of Section 230 only prohibits two things: (1) treating a provider as the publisher of user-provided content, and (2) holding the provider liable for restricting or allowing others to restrict "objectionable" material. 47 U.S.C. § 230(c). The statute does not "declare[] a general immunity from liability" and a proper analysis of § 230 "rest[s] not on broad statements of immunity but rather on a careful exegesis of the statutory language." *Barnes*, 570 F.3d at 1100. *See also Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1171 (9th Cir.2008) (en banc) (observing that to "provid[e] immunity every time a website uses data initially obtained from third parties would eviscerate [the statute]"). Those plain terms include an anti-preemption provision. 47 U.S.C. § 230(e)(3) ("Nothing in [Section 230] shall be construed to prevent any State from enforcing any State law that is consistent with [it].").

5

In its preliminary injunction motion, NetChoice claims that the circuits agree that Section 230(c)(1) should be broadly construed to favor immunity. D52:35. But the circuits are far from united on that point. Multiple circuits and district courts have rightly urged caution about a broad reading of the statute. *See, e.g., Barnes v. Yahoo!*, 570 F.3d 1096 (9th Cir. 2009) ("Congress has not provided an all-purpose get-out-of-jail-free card for businesses that publish user content on the internet, though any claims might have a marginal chilling effect on internet publishing businesses."); *Bauer v. Armslist, LLC*, 572 F. Supp. 3d 641, 663 (E.D. Wis. 2021), *aff'd sub nom. Webber v. Armslist LLC*, 70 F.4th 945 (7th Cir. 2023) (observing that in the Seventh Circuit Section 230(c)'s "protection from liability . . . is not . . . a broad grant of immunity," but rather "[i]t is a fact-based inquiry"); *Cisneros v. Sanchez*, 403 F. Supp. 2d 588, 593 (S.D. Tex. 2005) ("[T]he CDA is clearly not intended to completely preempt state law in any given area because [Section] 230(e)(3) is narrowly tailored to allow state and local laws within the same field, so long as they are consistent" with Section 230). This Court should take this more restrained approach, given Section 230's own stated tolerance for consistent State regulation.

NetChoice also points to subsection (f)(4) of Section 230 to support its preemption argument. D51:40. This does not aid NetChoice. That subsection defines "Access software provider" as "a provider of software . . . or enabling tools that do any one or more of the following: (A) filter, screen, allow, or disallow content; (B) pick, choose, analyze, or digest content; or (C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content." 47 U.S.C. § 230(f)(4). "Access software provider" in turn is defined as a subset of an "interactive computer service." 47 U.S.C. § 230(f)(2). From this, NetChoice reasons that Section 230 "protects websites' decisions to" do anything that an Access software provider does. D51:40. But saying who Section 230 applies to does not expand the reach of its prohibitions, which are spelled out above.

6

And it certainly does not say that doing any of those things is tantamount to acting as a publisher or speaker.

What NetChoice characterizes as preemption is merely the State imposing liability for entirely different obligations. Under the Act, Social media companies remain free from liability for the speech of their users. They are still free under Section 230, to restrict—or enable users to restrict—objectionable content. There is no liability for doing such under the Act. Nor is there anything inconsistent between the Act and Section 230's obligation to let parents know about commercial parental controls. If anything, the two laws complement each other on this point. Thus, there is no express preemption here.

### B.  Section 230 does not impliedly preempt the Act.

Nor is the Act preempted under the implied preemption doctrines of field, conflict (or impossibility), or obstacle (or frustration) preemption.

#### 1.  Field preemption does not apply for three reasons: (1) Section 230's anti-preemption provision; (2) scant federal regulation in this area; and (3) the lack of historical federal control over these matters.

Field preemption does not fit here. That sort applies "when the federal scheme of regulation is so pervasive that Congress must have intended to leave no room for a State to supplement it." *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1324 (10th Cir. 2010). *See also Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963) (observing field preemption occurs when "either . . . the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained."). But there is no field preemption here for at least three reasons. First, as already noted, Section 230 itself leaves the door wide open for state regulation that is consistent with Section 230. See 47 USC § 230(e)(3). That means Congress didn't think it had preempted this field. There is no stronger evidence of congressional intent than the plain language of a statute. *See Woods v. Standard Ins. Co.*, 771 F.3d 1257, 1263 (10th Cir. 2014) ("It is our primary task in interpreting

7

statutes to determine congressional intent, using traditional tools of statutory construction. In ascertaining such congressional intent, we begin by examining the statute's plain language, and if the statutory language is clear, our analysis ordinarily ends."). And congressional intent is king in analyzing field preemption, *O'Donnell*, 627 F.3d at 1325 (observing that for field preemption, a court "must . . . evaluate whether Congress intended to occupy the field to the exclusion of the states").

Second, Section 230 regulates just a very minor part of social media issues, and there is not much other federal regulation in this area—hardly the type of "pervasive" regulation necessary for field preemption. Finally, social media is not "of the nature" that traditionally is deemed to be appropriate for field preemption, such as foreign policy, *see, e.g., American Insurance Assn. v. Garamendi*, 539 U.S. 396 (2003), and immigration, *see Arizona v. United States*, 567 U.S. 387 (2012), where the federal government has been constitutionally entrusted with the subject matter. There is thus no field preemption here. *See also O'Donnell*, 627 F.3d at 1325 (noting that, for field preemption, "the purpose of Congress must be clear as we presume that 'Congress does not cavalierly pre-empt state-law'") (*quoting Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

### 2. Conflict preemption does not apply because there is no direct conflict between Section 230 and the Act.

Conflict preemption is inapplicable. This strain applies where "compliance with both federal and state regulations is a physical impossibility." *Gade*, 505 U.S. at 98. That is not the case here. The only obligation that Section 230 imposes on companies is to notify customers that commercial parental control protections are available and to provide information as to such commercial protections. The Act's obligations are different, and a company can easily comply with both. It is therefore not a "physical impossibility" for Plaintiff's members to follow both federal and state law here.

8

### 3. Obstacle preemption does not apply because Section 230 and the Act have compatible purposes.

Finally, obstacle preemption fails. This is where a state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes or objectives of Congress." *In re MDL 2700 Genentech Herceptin (Trastuzumab) Mktg. & Sales Prac. Litig.*, 960 F.3d 1210, 1230 (10th Cir. 2020) (citation omitted). The opposite is true here. Section 230 is worried about minors accessing harmful content, and so it protects providers from censoring such content and requires providers to give notice of commercial parental control options. The Act has the same purpose—to protect minors from harm—and so it is not an obstacle to Section 230's purpose but a complement to it. Therefore, there is no obstacle preemption here.

### CONCLUSION

NetChoice has not shown that Section 230 preempts the Act under any variant of that doctrine. The two laws can comfortably co-exist. Because Plaintiff has failed to adequately state a preemption claim, this Court should grant Defendants' motion to dismiss Count VI from Plaintiff's First Amended Complaint.

DATED: May 31, 2024

OFFICE OF THE UTAH ATTORNEY GENERAL

/s/ Lance Sorenson
DAVID WOLF
LANCE SORENSON
Assistant Utah Attorneys General
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

  I hereby certify that on May 31, 2024, I electronically filed the foregoing, **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** by using the Court's electronic filing system which will send a notice of electronic filing to the following:

Alexis Swartz
Jeremy Evan Maltz
Joshua P. Morrow
Scot A. Keller
Steven P. Lehotsky
Todd L. Disher
LEHOTSKY KELLER COHN LLP
alexis@lkcfirm.com
jeremy@lkcfirm.com
josh@lkcfirm.com
scott@lkcfirm.com
steve@lkcfirm.com
todd@lkcfirm.com

Kade N. Olsen
David C. Reymann
PARR BROWN GEE & LOVELESS
kolsen@parrbrown.com
dreymann@parrbrown.com

  *Counsel for Plaintiff*

UTAH ATTORNEY GENERAL'S OFFICE

/s/ Seth A. Huxford
SETH A. HUXFORD
Legal Secretary