DAVID N. WOLF (6688)
DOUGLAS CRAPO (13704)
LANCE F. SORENSON (10684)
SCOTT R. RYTHER (5540)
Assistant Utah Attorneys General
Utah Attorney General
160 East 300 South, 6th Floor
PO Box 140856
Salt Lake City, UT 84114-0856
Telephone: (801) 366-0100
dnwolf@agutah.gov
crapo@agutah.gov
lancesorenson@agutah.gov
sryther@agutah.gov

*Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NETCHOICE, LLC,<br><br>                          Plaintiff,<br>v.<br><br>SEAN D. REYES, in his official capacity as Attorney General of Utah, and<br><br>KATHERINE HASS, in her official capacity as Director of the Division of Consumer Protection of the Utah Department of Commerce,<br><br>                          Defendants. | **DEFENDANTS' SUPPLEMENTAL BRIEF REGARDING THE SUPREME COURT'S DECISION IN *MOODY V. NETCHOICE***<br><br>Case No.: 2:23-cv-00911<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

**INTRODUCTION**

Instead of challenging the Utah Minor Protection in Social Media Act (the "Act") under the First Amendment on an as-applied basis, Plaintiff NetChoice LLC ("NetChoice") chose to bring its challenge as a facial one. As the Supreme Court cautioned in its recent decision in *Moody v. NetChoice*, "that decision comes at a cost."[1] The Court explained, "[e]ven in the First Amendment context, facial challenges are disfavored …," and the party bringing such a facial challenge must carry a heavy burden.[2] The Court's concern with facial challenges underscores its recent re-emphasis on the limits of a federal court's equitable power. "Consistent with historical practice, a federal court exercising its equitable authority may enjoin named defendants from taking specified unlawful actions. But under traditional equitable principles, no court may lawfully enjoin the world at large or purport to enjoin challenged laws themselves."[3]

Defendants Katherine Hass and Sean Reyes (collectively, the "State") provide this supplemental brief in response to the Court's order regarding the impact of *Moody* on this case.[4] *Moody* is a reminder that to succeed in a *facial* challenge to the Act, NetChoice cannot prevail simply by asserting that its members' websites are subject to an Act that it contends is unconstitutional, as if this were an as-applied challenge. Rather, NetChoice carries the burden to demonstrate that the Act's allegedly unconstitutional applications across *all* social media platforms and *all* their regulated activities are substantial as compared to the Act's plainly legitimate sweep. That burden is especially great where, as in *Moody* and in the present case, the issue arises in the context of a motion for preliminary injunction, where the plaintiff's right to relief must be clear and unequivocal. The burden is on NetChoice to do the work that *Moody* requires, and NetChoice has not done that work.

---

[1] *Moody v. NetChoice LLC*, -- U.S. --, 144 S. Ct. 2383, 2397 (2024).
[2] *Id.* at 2408-2409.
[3] *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021) (cleaned up).
[4] *See* Court's Order, ECF No. 71.

NetChoice also cannot simply claim that the law lacks *any* plainly legitimate sweep and assert that *all* of the regulated activity is expressive, protected speech.[5] Such an approach ignores the fact that there are multiple plainly legitimate sweeps, as set forth in Part II, herein. NetChoice has not provided the Court nearly any, let alone sufficient, evidence necessary to undertake the "daunting" balancing task required to determine whether a facial challenge is even appropriate.[6]

NetChoice is the master of its Complaint and has chosen to bring a facial challenge instead of an as-applied challenge. Given the failure of NetChoice to perform the balancing that *Moody* requires as part of its request for preliminary injunctive relief, the Court has three options, none of which entail granting the Motion for Preliminary Injunction. First, because the Act is constitutional, the Court can and should deny the Motion for Preliminary Injunction on the basis that NetChoice is not likely to succeed on the merits, and find that there is no balancing to be performed. There is no unconstitutional application to be weighed against the plainly legitimate sweep of the law. It is all constitutional.

However, if the Court harbors reservations about the Act's constitutionality (which it should not, as the State argues elsewhere), then the Court could deny NetChoice's Motion for Preliminary Injunctive relief without prejudice to seeking injunctive relief at a later stage, after full discovery and dispositive motions and/or trial during which NetChoice can complete the work *Moody* requires. The Court would then be in a much better position to undertake the daunting task of determining whether the facial challenge is appropriate. Alternatively, given the plainly legitimate sweep of the Act as set forth herein, the Court could dismiss NetChoice's Amended Complaint without prejudice to refiling it as an as-applied challenge. As Justice Barrett pointed out in *Moody*, "A facial challenge . . .

---

[5] *See* Pl.'s Supplemental Brief on the Supreme Court's Moody Decision, ECF No. 75, pp. 7-9.
[6] *See Moody*, 144 S. Ct. at 2409 (J. Barrett, concurring) ("In fact, dealing with a broad swath of varied platforms is a daunting, if not impossible, task. A function qualifies for First Amendment protection only if it is inherently expressive. Even for a prototypical social media feed, making this determination involves more than meets the eye").

. likely forces a court to bite off more than it can chew. An as-applied challenge, by contrast, would enable courts to . . . answer platform- and function- specific questions that might bear on the First Amendment analysis. While the governing constitutional principles are straightforward, applying them in one fell swoop to the entire social-media universe is not."[7]

## ARGUMENT

### I. Moody affects this case because it underscores that bringing a facial challenge is fact-intensive

*Moody* articulated a two-part test for determining whether a facial challenge is appropriate in the First Amendment context. First, the record must be sufficient for this Court to "assess the [Act's] scope," that is, to determine "[w]hat activities, by what actors, do[es] the [Act] prohibit or otherwise regulate?"[8] "Before a court can do anything else with [a] facial challenge[], it must … 'determine what [the law] covers.'"[9]

Second, the Court must "decide which of the [Act's] applications violate the First Amendment, and . . .measure them against the rest."[10] This necessitates an examination of the entirety of the Act's scope, to determine what activities of social media services are expressive in nature, which functions do not involve expressive activity, or which might contain expressive, but unprotected speech. "To decide the facial challenge[] here, the [Court] must explore the [Act's] full range of applications—the constitutionally impermissible and permissible both—and compare the two sets."[11] NetChoice's facial challenge can succeed "only if the [Act's] unconstitutional

---

[7] *Id.* at 2411.
[8] *Id.* at 2398.
[9] *Id.* (quoting *United States v. Hansen,* 599 U.S. 762, 770 (2023)).
[10] *Id.*
[11] *Id.*

3

applications substantially outweigh its constitutional ones."[12] "[T]he analysis is bound to be fact-intensive, and it will surely vary from function to function and from platform to platform."[13]

### A.     The record provided by NetChoice is insufficient under *Moody* for purposes of granting preliminary injunctive relief.

In support of its pending motion, in which NetChoice asks this Court to issue preliminary injunctive relief on its facial challenge, NetChoice submitted limited evidence. The record on which this Court has been asked to invalidate the Act in wholesale fashion contains six declarations. They include testimony from Carl Szabo, NetChoice's Vice President and General Counsel; Alexandra Veitch of Alphabet's YouTube service; Antigone Davis of Meta (discussing Meta's Facebook and Instagram services); Nona Yadegar of Snap, Inc., which operates Snapchat; Denise Poalucci, co-owner and operator of the website dreamwidth.org; and Stacie Rumenap of Stop Child Predators, a non-profit organization.[14] These submissions fall far short of what is required to enable this Court to assess the constitutionality of the Act under the guidance of *Moody*.

In his Declaration, NetChoice's Carl Szabo states that NetChoice has numerous members, which include many of the world's most used social media platforms, including X, TikTok, Pinterest, and Nextdoor.[15] Mr. Szabo concludes that the Act regulates services operated by Nextdoor, Pinterest, and X.[16] Glaringly absent from this record is any evidence describing the functions and

---

[12] *Id.* at 2397.
[13] *Id.* at 2411 (J. Barrett, concurring).
[14] *See* Dkts. 52-1 through 52-6.
[15] *See* Dkt. 52-1, Declaration of Carl Szabo ("Szabo Decl.") ¶ 4 at 2. The State understands that since the filing of the Amended Complaint, NetChoice and TikTok have parted ways. *See, e.g.,* https://www.politico.com/news/2024/05/09/facing-hill-pressure-tech-group-kicks-out-tiktok-00157229.
[16] Dkt. 52-1, Szabo Decl. ¶ 11 at 8.

4

activities of any of these four massive social media services.[17] There is no discussion or evidence showing how these services function, but more importantly, whether any of these missing social media platforms claim to be engaged in expressive activities, or whether the Act's provisions will curtail or burden such expression. This Court has requested that the parties provide briefing addressing the effect of the *Moody* decision on NetChoice's facial challenges. One effect is clear: NetChoice must present sufficient evidence for this Court to determine what services and functions of not only its members, but all social media companies, and whether the affected activities involve protected expression.[18]

For example, X is a very large social media platform. Users of X upload messages, photos, memes, video clips, and links to various publications and other media millions of times each day. To enable this Court to engage in the analysis required to decide NetChoice's facial challenge, NetChoice must provide evidence sufficient for the Court to determine whether X believes the Act will burden X's expression. As Justice Alito stated in his concurring opinion in *Moody,* in some cases, the Court has held that a party that curates the speech of others in way that expresses the ideas of the curator itself enjoys First Amendment protection.[19] But, as Justice Alito also observes, some compilers of third-party content do not engage in content curation, but instead consider themselves "'passive receptacle[s]'" of third-party speech or as "'dumb pipes' that merely emit what they are fed," and therefore, "communicate no message of their own" leaving such pass-through outside the scope of First Amendment protection.[20] As Justice Alito goes on to explain, a publisher or platform

---

[17] Mr. Szabo and NetChoice list TikTok as a member of NetChoice's organization, but do not list TikTok among NetChoice's members that are regulated under the Act. Defendants believe the TikTok platform and mobile application are covered under the Act's definition of "social media service." Moreover, if NetChoice succeeds on its facial challenge of the Act, TikTok would be among those services freed from the Act's regulations.
[18] *See Moody,* 144 S.Ct. at 2398-2399.
[19] *See Moody,* 144 S.Ct. 2430-2431 (Alito, J. concurring).
[20] *Id.* at 2431 (quoting *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241 (1974)).

5

may consider some of its activities expressive in nature while others are not, requiring close examination of what is and is not expressive activity.

> Determining whether an entity should be viewed as a "curator" or a "dumb pipe" may not always be easy because different aspects of an entity's operations may take different approaches with respect to hosting third-party speech. The typical newspaper regulates the content and presentation of articles authored by its employees or others, . . . but that same paper might also run nearly all the classified advertisements it receives, regardless of their content and without adding any expression of its own. . . . These differences may be significant for First Amendment purposes.[21]

Another example is the distinction between X's account feeds and its direct messaging function. X may claim that it is exercising "content moderation" much like Meta with its Facebook newsfeed and Google with its YouTube home page discussed by the majority in *Moody*.[22] However, where X's direct messaging function is concerned, X might be acting simply as a "dumb pipe" such that regulation of X's direct messaging service does not implicate First Amendment Protection.

> Even on a preliminary record, it is not hard to see how the answers might differ as between regulation of Facebook's News Feed (considered in the courts below) and, say, its direct messaging service (not so considered). Curating a feed and transmitting direct messages, one might think, involve different levels of editorial choice, so that the one creates an expressive product and the other does not. If so, regulation of those diverse activities could well fall on different sides of the constitutional line.[23]

NetChoice's failure to address the impact of the Act on X is but one of many deficiencies in NetChoice's claims. The same deficiency exists with respect to at least TikTok, Pinterest, and Nextdoor, and many other social media platforms outside the membership of NetChoice that must be considered before this Court can apply the required analysis for facial challenges discussed in *Moody*.

Rather than provide the thorough showing required to establish their chosen facial challenge, NetChoice repeatedly relies on the First Amendment rights of current and prospective social media

---

[21] *Id.* at 2431.
[22] *See Moody,* 144 S.Ct. at 2399-2406.
[23] *Id.* at 2399.

*users*, such as minors and others who wish to post or access expressive content on various social media platforms. Even if this Court were persuaded that users' First Amendment rights may be implicated under the Act, this would still not satisfy the rigorous showing outlined in *Moody*. Moreover, the facial challenges here have been brought by NetChoice, not by the users of its members' services.

Because NetChoice has submitted nothing in this record allowing a full examination of which activities, expressive or otherwise, engaged in by X, TikTok, Pinterest, and Nextdoor, its facial challenge fails on this ground alone.

### B. The declarations of a few of NetChoice's members is also insufficient.

NetChoice submitted Declaration testimony of representatives from four of its members that operate services NetChoice claims are covered by the Act's regulations. However, the Declarations lack the necessary information for this Court to undergo the analysis required by *Moody*.

NetChoice presents the Declaration from Google's Alexandra Veitch, containing 55 paragraphs over 27 pages, the majority of which describes many of YouTube's features, including safeguards for minors and YouTube's general operations.[24] The portions of the Veitch Declaration dealing with the Act and its regulation of YouTube's activities is almost entirely focused on YouTube's *users* and the impact the Act may have on minors wishing to access YouTube's content.[25] Among the declarations submitted by NetChoice, the Veitch Declaration comes closest to addressing the scope of the Act's regulation on various functions employed by YouTube on its

---

[24] *See* Dkt. 52-2, Declaration of Alexandra Veitch ("Veitch Decl.") ¶¶ 6-33 at 2-17.
[25] *See* Dkt. 52-2, Veitch Decl. ¶¶ 34-51 at 17-27.

service, but it fails to explain how each of the Act's requirements actually burdens expressive activity of YouTube itself.[26]

Similarly, the Declaration of Meta's Antigone Davis contains 59 paragraphs over 27 pages, the vast majority of which is spent outlining Meta's Facebook and Instagram services, their functions, various benefits users of Facebook and Instagram enjoy, Meta's efforts to promote safety on the two platforms, including what Meta refers to as "content moderation" policies and practices, and Meta's policies around user data.[27] In its final few pages, the Davis Declaration discusses impacts of the Act on Meta's services, but is focused on user access to the platforms, and does not explain how the Act may burden expressive activity of Meta or those running its two social media platforms.[28]

The Declaration submitted by NetChoice from Snap, Inc.'s Nona Yadegar is almost entirely dedicated to explaining Snapchat's functions, Snapchat's policies around users under the age of 18, and user data policies.[29] The Yadegar Declaration contains a single paragraph addressing the impact of the Act on Snapchat's operation, but is entirely focused on the impact to Snapchat's users.[30] Nothing presented by Snap, Inc. addresses any burden on any expressive activity of Snap, Inc. or those running its Snapchat service.

Finally, the Declaration of Denise Paolucci of Dreamwidth Studios, LLC ("Dreamwidth") is entirely focused on the technical difficulties Dreamwidth anticipates it will face if the Act is allowed to take effect, and its primary objection to the Act involves user privacy and protecting the data of

---

[26] *See id.*
[27] *See* Dkt. 52-3, Declaration of Antigone Davis ("Davis Decl.") ¶¶ 5-50 at 2-24.
[28] *See .* 52-3, Davis Decl ¶¶ 51-59 at 24-27.
[29] *See* Dkt. 52-4, Declaration of Nona Yadegar ¶¶ 3-8 at 1-4.
[30] *See id.* ¶ 9 at 4.

Dreamwidth's users.[31] The Paolucci Declaration does not address any possible impacts of the Act on any expression of Dreamwidth.

## II.     The Act has a "plainly legitimate sweep"

While far beyond its burden when confronted with a facial challenge, especially in the preliminary injunction context, the State asserts that NetChoice is not likely to prevail on the merits because the Act satisfies constitutional scrutiny. For that reason, there is no need to balance any alleged unconstitutional applications against its plainly legitimate sweep. However, if the Court were inclined to do so as it reviews an Act that addresses the relatively new and certainly unique problem of social media addiction and data protection for children, it should know that there are potentially many plainly legitimate sweeps of the Act. For example:

- Any platform that acts as a "dumb pipe," merely emitting what it is fed with no expressive activity of its own would be outside the scope of the First Amendment regarding its own claims.[32]

- Further, social media platforms might contain both expressive and non-expressive features. How much of any particular regulated social media platform is expressive versus non-expressive? The regulation of non-expressive activity (e.g., push notifications, autoplay, and infinite scroll) falls outside the ambit of First Amendment protection.

- The age-assurance and parental consent requirements have a plainly legitimate sweep as they apply to children under the age of 13.

Why? Because the Act is consistent in this regard with the federal Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501-06 ("COPPA") – a law that requires any website or online service

---

[31] *See* Dkt. 52-5, Declaration of Denise Paolucci ¶¶ 1-21 at 1-12.
[32] *Moody,* at 2431 (J. Alito, concurring) (quoting *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241 (1974)).

directed to children (defined as under 13) to "obtain verifiable parental consent for the collection, use, or disclosure of personal information from a child."[33] NetChoice has invoked COPPA in unsuccessful supremacy clause arguments to challenge state regulations.[34]

- The Act also has a plainly legitimate sweep with respect to unprotected speech.

To be certain, the Act is not aimed at any content; it is content neutral. But to the extent there is a significant amount of unprotected speech on any social media platforms (not just NetChoice's members' platforms), such as obscenity, fighting words, true threats, and incitement to violence, then there is a plainly legitimate sweep. It is not enough for NetChoice merely to assert, without factual support, that "there may be some websites with a small amount of unprotected speech."[35] NetChoice must do and show its math. For example, how does NetChoice account for the fact that NetChoice member X recently announced (subsequent to the filing of this lawsuit and request for preliminary injunction) that it would formally allow pornography on its platform, which may be unprotected if it is obscene or as it pertains to children?[36] With the addition of pornographic content, what percentage of X now contains unprotected speech?

The Court asked for briefing on the question of what comprises the "plainly legitimate sweep" of the Act.[37] The State respectfully suggests that the full scope of the Act's "plainly legitimate sweep" can only be determined based on a far-more developed record than the one available here. As explained above, NetChoice has not presented evidence sufficient to determine the scope of the Act's coverage. NetChoice has also failed to present sufficient evidence in this record to allow this Court to determine how much regulated activity falls outside the scope of First

---

[33] 15 U.S. § 6502(b)(1)(A)(ii).
[34] *See, e.g., NetChoice v. Bonta*, 692 F. Supp. 924, 962-63 (N.D. Cal. 2023).
[35] *See* Pl.'s Supplemental Brief on the Supreme Court's Moody Decision, ECF No. 75, p. 9.
[36] *See, e.g.*, https://thehill.com/policy/technology/4700638-x-twitter-porn-policy-update/.
[37] Dkt. 71, Order For Supplemental Briefing ("Briefing Order") at 2.

Amendment protection in order to do the balancing that Moody requires. These evidentiary burdens belong to NetChoice, and they remain unsatisfied.

## **CONCLUSION**

Facial challenges are disfavored. Given the deficiencies in NetChoice's facial challenge outlined above, and in light of the guidance provided by the Court's decision in *Moody,* the Court should deny NetChoice's request to facially enjoin the Act on such a thin record.

DATED: August 9, 2024

OFFICE OF THE UTAH ATTORNEY GENERAL

*/s/ Lance Sorenson*
DAVID WOLF
LANCE SORENSON
Assistant Utah Attorneys General
   *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2024, I electronically filed the foregoing, **DEFENDANTS' SUPPLEMENTAL BRIEF REGARDING THE SUPREME COURT'S DECISION IN *MOODY V. NETCHOICE*** by using the Court's electronic filing system which will send a notice of electronic filing to the following:

Alexis Swartz
Jeremy Evan Maltz
Joshua P. Morrow
Scot A. Keller
Steven P. Lehotsky
Todd L. Disher
LEHOTSKY KELLER COHN LLP
alexis@lkcfirm.com
jeremy@lkcfirm.com
josh@lkcfirm.com
scott@lkcfirm.com
steve@lkcfirm.com
todd@lkcfirm.com

Kade N. Olsen
David C. Reymann
PARR BROWN GEE & LOVELESS
kolsen@parrbrown.com
dreymann@parrbrown.com

*Counsel for Plaintiff*

UTAH ATTORNEY GENERAL'S OFFICE

/s/ Seth A. Huxford
SETH A. HUXFORD
Legal Secretary